**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:18-cv-0046** |
| | ) | |
| **SCHOLASTIC, INC., HOUGHTON MIFFLIN** | ) | **JURY DEMAND** |
| **HARCOURT PUBLISHING COMPANY, and** | ) | |
| **TED S. HASSELBRING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

The Plaintiff, Vanderbilt University ("Vanderbilt," the "University" or "Plaintiff") states

its causes of action against Defendants Scholastic, Inc. ("Scholastic"), Houghton Mifflin

Harcourt Publishing Company ("HMH"), and Ted S. Hasselbring (collectively, "Defendants") as

set out in more detail below.

## INTRODUCTION

Vanderbilt University developed and owns the intellectual property behind one of the

most successful products ever brought to market in the educational technology industry, "Read

180," which helps children and teenagers reading below grade level to obtain reading literacy

and competency. Over twenty years ago, Vanderbilt licensed its intellectual property (the "Read

180 Materials") to Defendant Scholastic (the "License") to permit the commercial development

and availability of Read 180.[1]  According to press reports, Defendant Scholastic and HMH have

sold more than one billion dollars of Read 180 and related products, yet Vanderbilt has only been

paid a fraction of the royalties to which it is entitled under the License. In return for the transfer

---

[1] Also referred to herein as the "Read 180 Literacy Program."

of intellectual property, Scholastic promised Vanderbilt royalties on all products using, derived from, or based on the original materials.

Vanderbilt asserts that Scholastic and/or HMH have failed to pay royalties on numerous products that were derived from or are based on the Read 180 products (the "Derivative Products"). Moreover, upon information and belief, Defendants Scholastic and HMH and Defendant Hasselbring, surreptitiously and in violation of the License and Hasselbring's duties and obligations to Vanderbilt as a Vanderbilt faculty member, conspired to enter into additional agreements that were not disclosed to Vanderbilt to develop and exploit additional learning products (the "Ancillary Products") – products that are derived from or based on the Read 180 Intellectual Property, or belong to Vanderbilt as intellectual property developed by its employees, or both. Defendants have not provided any royalties from the sale of the Ancillary Products to Vanderbilt nor acknowledged Vanderbilt's rightful ownership of these products in any way.

This action is a suit to remedy Defendants' Scholastic and HMH's numerous and repeated breaches of the License, to assert Vanderbilt's ownership in the Derivative and/or Ancillary Products under the theories set out below, and to obtain Vanderbilt's rightful share of the monies earned by Read 180 and the Derivative and/or Ancillary Products and the benefits wrongfully and fraudulently obtained by Hasselbring through his relationship with Vanderbilt. Further, Defendants have unlawfully used Vanderbilt's goodwill and trademarks to market the Derivative and/or Ancillary Products without the permission or approval of Vanderbilt and without accounting to Vanderbilt for their use. In support of these claims, Vanderbilt states as follows:

2

## PARTIES

1. Vanderbilt University is a private, not-for-profit corporation organized and existing under the laws of the State of Tennessee with its principal place of business at 305 Kirkland Hall, Nashville, Tennessee, 37203.

2. Ted S. Hasselbring ("Hasselbring") is a resident of the State of Tennessee and Professor of Special Education, Emeritus, in the Department of Special Education at Vanderbilt.

3. Scholastic is a corporation incorporated and existing under the laws of the State of New York, with a principal place of business located at 557 Broadway, New York, New York, 10012. Scholastic describes itself as the world's largest publisher and distributor of children's books, a leading provider of print and digital instruction materials for grades pre-kindergarten to grade 12, and a producer of education and entertaining children's media, which are sold and distributed via employees and agents in the Middle District of Tennessee and throughout the United States.

4. HMH is a Massachusetts corporation with its principal place of business at 222 Berkeley Street, Boston, Massachusetts 02116 and is engaged in the business of publishing, marketing and selling pre-kindergarten through grade 12 educational content and related services, which include, but are not limited to, Read 180, System 44, FASTT Math, MATH 180, iRead, and Expert 21, which are sold and distributed via HMH's employees and agents in the Middle District of Tennessee and throughout the United States. In 2015, HMH purchased Scholastic's Educational Technology business, including the Read 180 License.

3

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of Vanderbilt's claims for relief arising under the United States Trademark Act and the copyright laws of the United States pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.  Further, this is an action for Declaratory Judgment in a case of actual controversy pursuant to 28 U.S.C. § 2201. This Court has original or supplemental jurisdiction over the subject matter of Vanderbilt's common law claims for relief under 28 U.S.C. §§ 1338(b) and 1367.

6.     Venue is appropriate in this District pursuant to 28 U.S.C. §§ 1391(a) and (b) and 28 U.S.C. § 1400(a), in that a substantial part of the events or omissions and alleged misconduct giving rise to Vanderbilt's claims occurred in this District.   This Court has personal jurisdiction over Defendants because they have been a party to an on-going License agreement with Vanderbilt in this district over the last twenty years, have remitted payments to Vanderbilt in Tennessee pursuant to the License, have entered into numerous on-going agreements with Defendant Hasselbring in this district for the payment of many millions of dollars, and have regularly conducted and continue to conduct substantial business within the Middle District of Tennessee. Moreover, Scholastic and/or HMH have communicated and corresponded frequently and consistently over the years with Hasselbring in Tennessee and in this district on matters relating to the subject matter of Vanderbilt's claims. Defendant Hasselbring is a resident of the State of Tennessee and this Court has jurisdiction over him on that basis, among others.

### A.     Overview and Background

4

7.     Vanderbilt University is one of the foremost research institutions in the country. In fact, in 2017, it was named to Thompson Reuters' top ten list of the most innovative universities in the world.[2] This ranking is based, in part, on the amount of intellectual property that Vanderbilt's faculty and staff create and develop, primarily to advance knowledge and scholarship and to promote the free flow of ideas, but also to bring needed innovations to the world marketplace.

8.     Vanderbilt invests enormous time and money to create the advancements and intellectual property developed by its ten different schools and nearly 120 interdisciplinary centers and institutes. In fiscal year 2016, the university spent $234.5 million on research, with sponsored research and project awards to University projects totaling $214 million.[3] Vanderbilt's tenured-track faculty generally are expected and encouraged to research, write, and create, and these activities are squarely within the scope and purpose of their employment. Accordingly, the technology and other creative works that the faculty create in their areas of study and research are "works for hire" under Tennessee law and federal copyright law.

9.     Because Vanderbilt sponsors these innovations and advancements by hiring faculty and providing facilities, staff, equipment, and other support, Vanderbilt faculty are subject to a written employment policy, the "Policy on Technology and Literary Works" or the "Technology Policy",[4] that provides, among other things, that almost all innovations in

---

[2] https://www.reuters.com/innovative-universities-2017/profile?uid=10.
[3] *Id.*

[4] A copy of Vanderbilt's current Technology Policy is attached as **Exhibit 1.** Earlier versions of the Technology Policy that have existed during Hasselbring's employment are attached at **Collective Exhibit 2.**

technology as defined by the University[5] created by faculty members ("Vanderbilt Technology") are assigned to and owned by the University. This policy and a faculty member's conformance with it are material terms of the member's employment. Staff members, students, and other persons receiving financial support from or through Vanderbilt are also subject to the Technology Policy.

10.     Vanderbilt relies upon its Center for Technology, Transfer and Commercialization (the "CTTC") to protect and commercialize as appropriate, the intellectual property developed at the University. To that end, the CTTC is responsible for negotiating, on behalf of the university, license agreements with commercial entities that are positioned to develop and commercialize the intellectual property advancements that Vanderbilt's faculty and staff create in the course and scope of their intellectual pursuits at the University.

11.     Under the Technology Policy, faculty members receive a significant share of any royalties received by the University. The Technology Policy provides that between forty and

---

[5] Under the Technology Policy, set forth in Chapter 4 of the publically available Vanderbilt Faculty Manual, "Technology" is broader than patentable intellectual property, and "includes tangible or intangible inventions, in the patent sense, whether or not reduced to practice, and research results whether or not patentable or copyrightable. These research results include, for example, computer programs, integrated circuit designs, industrial designs, databases, technical drawings, biogenic materials, and other technical creations." *See* **Exhibit 1.**

The Technology Policy further provides that: "All rights in works of authorship, other than Literary and Artistic Works, that are created with the use of University funds or facilities, or that capitalize on an affiliation with the University, or are created within the Covered Person's scope of employment, are hereby assigned to the University, and shall be handled in the same manner as Technology. Commercial use of the University's name and marks requires prior University approval." *Id.*

The Technology Policy in effect until 2016 used slightly different language to describe copyrightable intellectual property: "All rights in nonscholarly Literary and Artistic Works created with the use of University funds or facilities, or that capitalize on an affiliation with the University, are granted to the University, and income distribution shall be handled in the same manner as technology. Commercial use of the University's name and marks requires prior University approval." *See* **Collective Exhibit 2.**

6

fifty percent[6] of the royalties received by the University are paid to the faculty member (or members) involved in the creation of the intellectual property. The balance is distributed to the department and school to which the faculty member belongs and to the University to fund the advancement of research and scholarship to benefit the general public.

12.     This dispute centers on certain technology, intellectual property, know how, and educational concepts owned by Vanderbilt and developed by Vanderbilt professor Hasselbring and his colleagues in Vanderbilt's Peabody College of Education and Human Development that were licensed to Scholastic (and later assigned to HMH) for further development and commercialization.

13.     Vanderbilt contends that while Hasselbring properly tendered some of the technology and intellectual property at issue in this case to Vanderbilt to license to Scholastic and HMH for the development and monetization of Read 180, the University has been severely underpaid royalties on sales of the Read 180 Literacy Program in violation of the Read 180 License.

14.     Vanderbilt further contends that there are number of Derivative Products for which it has received no royalties at all in violation of the License.

15.     Vanderbilt further contends that Derivative Products and/or Ancillary Products contain Vanderbilt Technology authored by Hasselbring (and possibly other Vanderbilt faculty, staff, or students) that was not disclosed to Vanderbilt but rightfully belongs to the University as works for hire assigned to it under the Technology Policy. Upon information and belief,

---

[6] The Technology Policy provides that 50% of royalties are distributed to inventor(s) or creator(s) and that the percentage will decline to 40% when the royalties received in any University fiscal year exceed $100,000. The royalties paid to inventor(s) or creator(s) during the next fiscal year rise to 50% until the $100,000 threshold is exceeded again for that next fiscal year.

7

Hasselbring and the other Defendants intentionally and surreptitiously misappropriated this technology to enrich themselves at Vanderbilt's expense. Moreover, through his conduct (including his violations of Vanderbilt policies, entering into consulting agreements without notice or consent, and other secretive behavior), Hasselbring improperly and unfairly benefited from his relationship with Vanderbilt, including his use of Vanderbilt's resources for his personal financial gain. Vanderbilt asserts that it owns some percentage of the intellectual property comprising these Derivative and Ancillary Products and that Defendants must account to it for the monies these products have earned using Vanderbilt's IP.

16.    And finally, Vanderbilt asserts that Scholastic/HMH have misappropriated Vanderbilt's goodwill and trademarks in order to enrich themselves and Hasselbring at Vanderbilt's expense.

### 1.    Hasselbring's Employment at Vanderbilt

17.    In 1982, Vanderbilt hired Hasselbring as an Associate Professor of Special Education at the Peabody College of Vanderbilt University.

18.    In 1984, Vanderbilt promoted him to the position of Associate Director of its Learning Technology Center ("LTC").

19.    Hasselbring left his employment at Vanderbilt and went to the University of Kentucky in January 2000, but was re-hired by Vanderbilt in a letter agreement dated December 1, 2005, as a Research Professor in Vanderbilt's Department of Special Education (the "Rehire Letter").[7] The Rehire Letter, signed by Hasselbring on December 27, 2005, states that the

---

[7] The Rehire Letter is attached as **Exhibit 3**.

8

"[p]olicies set forth in the *Faculty Manual* constitute part of the contractual relationship between you and the University."

20. At all times during his employment with Vanderbilt, Hasselbring was subject to Vanderbilt's Conflict of Interest Policy ("COI Policy"), relevant copies of which are attached hereto as **Collective Exhibit 4**. From at least Professor Hasselbring's arrival during the 1982-83 academic year, Vanderbilt's COI Policy has required that faculty must, prior to undertaking consulting or any other activity or commitment that may create a potential conflict of interest, disclose the activity or commitment in writing to the appropriate dean (and department chair), in sufficient detail and with appropriate documentation such that the dean and the department chair can determine whether a potential conflict exists.

21. In addition to Hasselbring's disclosure requirements under the COI Policy, as a faculty member he was required under Vanderbilt's COI Policy to file annual reports with the dean disclosing consulting and other commitments he had engaged in during the past year, including number of days devoted to the activities.

22. Other than the period of time he was employed by the University of Kentucky, Hasselbring was subject to Vanderbilt's Technology Policy, which provided that any technology he created was automatically assigned to the University. Accordingly, all technology he developed as a Vanderbilt faculty member belonged to Vanderbilt, and Hasselbring agreed, as a material term of his employment, to this arrangement.

23. Hasselbring's area of research and study at Vanderbilt was, among other things, the use of technology to enhance learning in students with disabilities and those who are at risk of school failure.

9

24. Read 180 is the result of research that began in 1985 with the work of Hasselbring and members of the Learning and Technology Center at Vanderbilt University. With a grant from the United States Department of Education's Office of Special Education, Hasselbring developed software that used student performance data to individualize and differentiate the path of computerized reading instruction in order to better identify and help elementary and middle school students reading below grade level. This software was called the Peabody Middle School Literacy Program and became the prototype for Read 180. It was owned by Vanderbilt as a work for hire and pursuant to Vanderbilt's Technology Policy.

**B.     Vanderbilt's License Agreement with Scholastic**

25. Between 1994 and 1998, Hasselbring and his team tested their work in Orange County, Florida. The Orange County Literacy Project used the Read 180 prototype with more than 10,000 struggling students. The positive results led Scholastic to partner with Vanderbilt to license the software and to commercially launch Read 180.

26. At that time, the Read 180 Intellectual Property consisted of (1) the Peabody Middle School Literacy Program ("Software"), a software-based multimedia instructional program designed to provide daily computer-based compensatory instruction for middle school aged students;    (2) an interactive multimedia CD-ROM containing instruction materials in middle school literacy, and consisting of software, a library of terms and sentences, video, text, and graphics, all of which were designed to be used in conjunction with the Software ("Literacy Unit"); and (3) certain key academic concepts and techniques that formed the pedagogical basis for the Literacy Unit that were set out in an exhibit to the License. The items set forth in this

10

paragraph shall be referred to collectively herein as the "Read 180 Materials" and were deemed to be confidential information under § 15 of the License.[8]

27.     Because the Read 180 Materials were created by Hasselbring and his Vanderbilt colleagues and staff while being paid by and using the resources of Vanderbilt and because the intellectual property was created within the course and scope of their employment, the Materials were works for hire and were also assigned to Vanderbilt pursuant to the Technology Policy.

28.     Vanderbilt and Scholastic entered into the License on January 1, 1997, whereby Vanderbilt licensed the Read 180 Materials to Scholastic so that Scholastic could develop them to a marketable state and create "a series of lessons that can be used with the Software and which can be effectively produced, promoted, marketed, and distributed in a way that (1) establishes the professional and educational integrity of the software and promotes its goals of upper elementary and middle-school literacy; and (2) preserves the identity of the software as a creation of Vanderbilt and LTC to the extent of its contribution to the final product."[9]

29.     Pursuant to Section 2 of the License, Vanderbilt granted Scholastic an exclusive, royalty-bearing license to the Read 180 Materials for the purpose of producing and marketing the a literacy program (the "Read 180 Literacy Program") that would embody the Materials (whether in the form of film, video, or written word) throughout the world.

30.     In exchange, Scholastic was to pay escalating royalties on net sales (as defined in the License).

---

[8] Because the License provides that its terms are confidential, Vanderbilt will file a Motion to File the License Agreement Under Seal once this case is assigned a docket number.

[9] License Recitals at B.

31.     Vanderbilt and Scholastic recognized that Scholastic's development of the Read 180 Materials to a marketable state would likely result in future creation of Derivative Products that were unknown and could not be foreseen at the time of contracting.  For that purpose, and so that Vanderbilt could receive royalties on the Derivative Products, Vanderbilt and Scholastic expressly negotiated the following language included in Paragraph 6.2 of the License (emphasis added):

> The parties recognize and agree that future improvements may result in products different in form, content, or medium from the Materials delivered to Scholastic under this Agreement. ***It is the express intent of the parties that regardless of the form of future improvements or derivative works, Vanderbilt shall receive royalties pursuant to Section 9 [of the License] on all software products based on or derived from the Materials, pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products.***

32.     Vanderbilt and Scholastic expressly agreed in Paragraph 4.2 of the License that "Scholastic may, subject to Vanderbilt policies on outside employment and conflicts of interest, negotiate a consulting arrangement with Dr. Ted Hasselbring for consulting on Scholastic's development or marketing of the Literacy Program." Upon information and belief, Scholastic was provided with a copy of the relevant Vanderbilt policies at or around the time the Parties entered into the License and these policies have been publicly available on Vanderbilt's website for nearly twenty years.

33.     By and through this License, Scholastic derived the Read 180 Literacy Program, which it launched in 1999 and which it used to form the foundation of its highly successful Educational Technology business.  There have been several versions, updates, and new iterations of Read 180 produced since 1999, and today Read 180 remains the largest selling digital

12

curriculum in the marketplace. Moreover, according to Scholastic and HMH's own marketing materials, a number of other products have been based on or derived from Read 180, including but not limited to System 44, FASTT Math, MATH 180, iRead, Expert 21, and Scholastic U. To the extent these products are not derived from or related to the Read 180 Materials, Vanderbilt asserts that they are Ancillary Products as that term is defined herein.

      C.    **Vanderbilt's External Audit of the License**

     34.    On May 15, 2015, Scholastic informed Vanderbilt, via letter, that Scholastic had sold its Educational Technology and Services business to HMH and requested Vanderbilt's consent to the assignment of the License to HMH. A copy of this letter assignment is attached hereto as **Exhibit 5.** Vanderbilt consented to the assignment on May 27, 2015, under which HMH would assume all rights and obligations under the License.

     35.    In connection with the sale of its Educational Technology and Services business to HMH, Scholastic and HMH made certain public representations about the total sales and value of the Read 180 Products that were extremely surprising to Vanderbilt. Specifically, public press reports indicated that sales of the Read 180 Literacy Program exceeded one billion dollars, far greater than the sales figures for which Vanderbilt had been paid royalties under the License.

     36.    After reviewing publically available financial information concerning the sale of Scholastic to HMH and the value of Read 180, in 2016, Vanderbilt exercised its right under Paragraph 9.4 of the License to have the books and records of Scholastic/HMH audited with respect to its performance under the License and retained the accounting firm RSM US LLP ("RSM") for this purpose.

13

37. RSM produced an initial audit report to Vanderbilt dated June 9, 2016, that detailed its findings for the audit period of June 1, 2010 through May 31, 2015, and identified additional information needed to fully analyze and calculate the amounts due. In this June report, RSM estimated that Vanderbilt had been underpaid by at least $5.5 million for this five year period only and estimated that as much as $25 million in royalties could be due on the Derivative and Ancillary Products.

38. First, RSM determined that Scholastic and HMH failed to pay Vanderbilt royalties for products that Scholastic and HMH had already agreed were royalty-bearing. For example, RSM reviewed the ISBN codes that Scholastic and HMH had previously reported as royalty-bearing in reports to Vanderbilt. With respect to fifty-nine of these ISBN codes, RSM discovered discrepancies between the sales amounts that Scholastic and HMH reported to Vanderbilt in royalty reports and the sales that were separately accounted for by Scholastic/HMH's Educational Technology Business Unit. Additionally, RSM asked HMH to identify by ISBN code all products that HMH itself conceded are royalty-bearing, and HMH did so. RSM determined that Vanderbilt had never received royalty payments for fifty-two ISBN codes that HMH identified as royalty-bearing.

39. Second, the RSM audit revealed that Scholastic and HMH failed to remit royalty payments to Vanderbilt for sales of products based on or derived from the licensed Materials, including, but not limited to, System 44, FASTT Math, MATH 180, iRead, Expert 21, and Scholastic U. RSM estimated the underpaid royalties on these Derivative Products could be as much as $25 million dollars, although HMH refused to provide documentation on sales of these products.

14

40.    Third, RSM discovered that Scholastic and HMH failed to pay Vanderbilt for any royalties generated by Canadian sales of Read 180.

41.    Fourth, the audit revealed that Scholastic and HMH failed to pay royalties for the complete Read 180 Literacy Program as required by the License. Even when Scholastic and HMH paid Vanderbilt royalties for sales of Read 180 products, they impermissibly carved out sales of certain Read 180 components, specifically what they dubbed to be the "non-software" components. These non-software components include, but are not limited to, rBooks (student work texts), teaching guides, and data and assessment systems. HMH's advertising and promotional materials confirm that the full Read 180 family of products, including its non-software components, together comprises a single Literacy Program.

42.    Fifth, the audit additionally revealed that Scholastic and HMH made improper deductions from Vanderbilt's royalty payments for supposed shipping and handling costs associated with Read 180 products. While the License allowed Scholastic and HMH to deduct the *actual* costs incurred for shipping and handling of products upon which royalties are paid, Scholastic and HMH deducted a flat rate of $1,300 from each Read 180 unit sold, without regard to shipping method, location or other factors. Additionally, this flat shipping rate was applied (and deducted from Vanderbilt royalties) to ship Read 180 program components that Scholastic and HMH were treating as non-royalty-bearing and for which Vanderbilt was not receiving royalty payments. Furthermore, the Read 180 software (which Scholastic and HMH treated as royalty-bearing) represented a small percentage of the Read 180 shipping and handling costs because the non-software components included heavier and bulkier items such as books and printed materials.

15

43.     Based on RSM's audit findings and publically available sales information, Vanderbilt concluded that Scholastic/HMH owed it in excess of $30,000,000 under the License for underpaid royalties, unpaid royalties, and improper deductions/carve-outs.

44.     Vanderbilt attempted to negotiate a resolution to these claims for unpaid and underpaid royalties with Scholastic and HMH but was unsuccessful.

**D.      Vanderbilt's Investigation**

**1.      Hasselbring's Consulting Agreements with Scholastic and HMH**

45.     Given RSM's audit findings and the issues they raised for the first time, Vanderbilt reviewed Hasselbring's conduct with respect to his relationship with Scholastic and HMH, the License, the Read 180 Literacy Program, and the Derivative Products, and his compliance with Vanderbilt's COI and Technology Policies, as well as his fiduciary obligations to the University.

46.     Vanderbilt recently discovered that Hasselbring negotiated and entered into a number of agreements with Scholastic and/or HMH that were not disclosed to the University for the production/creation of intellectual property and Vanderbilt Technology, most of which, if not all, belongs to Vanderbilt pursuant to its Technology Policy (collectively the "Undisclosed Hasselbring Scholastic/HMH Agreements").

47.     For example, on or about August 31, 2011 Hasselbring and Scholastic were negotiating an agreement which controlled Hasselbring's participation in the Math180 product. On that date, Scholastic employee Karen Nachbar proposed an agreement on behalf of Scholastic employees Rosamund Else-Mitchell ("Else-Mitchell") and David Dockterman that provided that Hasselbring's contribution was to be a work made for hire, with title to the work that he was

16

providing under the agreement going to Scholastic. The proposed agreement did not provide for an on-going royalty, but instead for a payment based on hours actually worked, which is typical of most academic consulting agreements.

48.     On or about September 12, 2011, Hasselbring rejected this agreement, stating, "[w]e do not want to be difficult but we want to participate fully and freely share our expertise and intellectual property in the development of these programs. Consequently, we feel that a work-for-hire agreement will not allow us to do that." Of course, the intellectual property that he wanted to "freely share" belonged to Vanderbilt, which Scholastic knew.

49.     In March or April of the following year, the parties finalized and entered into an agreement on this product which was back-dated to August of 2010 that included a significant on-going royalty, a warranty representing that Hasselbring had the right to convey the Technology that he was contributing to the project, and a contractual provision that prevented him from creating competitive Technology. None of this was disclosed to Vanderbilt by either party, despite the fact that both parties had actual knowledge that such an agreement violated the Technology and COI Policies. As such, Hasselbring's warranty that he had the right to convey the technology was false and both parties had actual knowledge that it was false.

50.     Likewise, the System44 Jr. Contract, negotiated at or around this same time period between Else-Mitchell and Hasselbring, also back-dated to 2010, contained an on-going royalty and similar warranties and non-compete language. Neither Scholastic nor Hasselbring disclosed this agreement or Hasselbring's participation in the project to Vanderbilt.

51.     Not only were these agreements not disclosed to Vanderbilt by either party, on or about April 2, 2012, Hasselbring   answered "no" when expressly asked on his Vanderbilt

17

Conflict of Interest Disclosure if he had a relationship with a business that had a contractual relationship with Vanderbilt or that paid royalties to him directly. This representation was false and Hasselbring knew it was false and that Vanderbilt would rely upon it.

52.     Further, on this same date, Hasselbring expressly answered "no" when asked if he was involved in an activity or relationship directly or indirectly involving Vanderbilt that created a conflict of interest/commitment or the appearance of a conflict of interest/commitment under the Vanderbilt COI Policy. This representation was false and Hasselbring knew it was false and that Vanderbilt would rely upon it.

53.     Hasselbring again made these same untrue statements to Vanderbilt on April 12, 2013. He also failed to truthfully disclose these relationships in 2014.

54.     These conspiratorial attempts by Defendants to circumvent Vanderbilt's policies, obtain title to the Technology, and avoid paying a royalty to Vanderbilt were on-going and continued even after HMH purchased Scholastic. For example, Else-Mitchell, now an HMH employee, negotiated the contract involving READ 180 Universal and READ 180 California Edition (working title) in September of 2015. Upon information and belief, that agreement also provided for the payment of significant on-going royalties to Hasselbring. He again warrantied that he had the right to convey the intellectual property that he was providing under the agreement and that he would not create new competitive works. Again, neither Hasselbring nor HMH disclosed this agreement and the intellectual property that was being conveyed under it to Vanderbilt, despite the fact that both parties had a duty to do so.

55.     Upon information and belief, most if not all of the Hasselbring/Scholastic/HMH agreements contained warranties representing that Hasselbring had the right to convey the

Vanderbilt Technology he was supplying and non-compete language preventing Hasselbring from otherwise monetizing the Vanderbilt Technology by creating similar products. Upon information and belief, the Undisclosed Hasselbring Scholastic/HMH Agreements directed millions of dollars in on-going royalty payments to Hasselbring, without providing any payment to Vanderbilt for the use of the Vanderbilt Technology or other Intellectual Property.

56. Upon information and belief, the Undisclosed Hasselbring Scholastic/HMH Agreements were styled as "consulting agreements" in order to hide the fact that Hasselbring was authoring technology that belonged to Vanderbilt under its Technology Policy and/or because the Technology was related to or derived from Read 180 Materials. Scholastic, HMH, and Hasselbring all knew that Hasselbring was not permitted under Vanderbilt's employment policies to directly convey intellectual property in exchange for a royalty. A transaction conveying intellectual property is typically accomplished with a license. In an effort to disguise the nature of the transaction and to give Hasselbring "cover" for circumventing Vanderbilt, the parties purposely styled these agreements as "consulting agreements" in order to hide the true nature of their transactions. Upon information and belief, most if not all of these agreements provide for significant on-going royalty streams that are not consistent with a mere consulting arrangement and far exceed what is typically paid to "consultants" from academia.

57. Vanderbilt recently learned that Hasselbring frequently and consistently communicated with Scholastic and/or HMH using Vanderbilt resources and during regular work hours. Rather than acting as a mere consultant, Hasselbring communicated to Scholastic via his Vanderbilt email account that he wanted to "participate fully and freely share our expertise and intellectual property in the development of these programs." The intellectual property that he

19

sought to "freely share" belonged to Vanderbilt and he acted so as to misappropriate this valuable intellectual property, to frustrate Vanderbilt's ability to enforce its contractual rights and negotiate additional contractual rights, and to abuse his contractual and fiduciary relationship with Vanderbilt for the benefit of himself and Scholastic, without compensation of any kind to Vanderbilt.

58.     Upon information and belief, Hasselbring earned, and continues to earn, significant revenues in the form of royalty payments and consulting fees well in excess of seven figures under these agreements.  Yet, neither Hasselbring, Scholastic, nor HMH disclosed any of these agreements to Vanderbilt pursuant to the License as involving products based on or derived from Read 180 or pursuant to Vanderbilt's COI Policy or the Technology Policy. Upon information and belief, such "consulting" agreements were negotiated with Scholastic in violation of Paragraph 4.2 of the License for the purpose of increasing payments to Hasselbring and depriving Vanderbilt of the royalties for the Intellectual Property it owned.

59.     Vanderbilt did not discover Defendants' misrepresentations,  non-disclosures and many of the other misdeeds described herein until the full extent of the Hasselbring/Scholastic/HMH relationship was revealed to it during the parties' negotiations pursuant to the tolling agreement entered into by Scholastic, HMH and Vanderbilt on or about July 28, 2017 ("Tolling Agreement"). The Tolling Agreement provided that any limitations period that might apply to any claim in the parties' dispute would be tolled during the period of the Tolling Agreement.

20

## 2.    The Derivative Products

60.    Vanderbilt's review of the derivative products identified in RSM's audit revealed that Scholastic and/or HMH and Hasselbring had long been creating new Derivative Products from the Read 180 Materials and/or creating Ancillary Products that rightfully belong to Vanderbilt as works for hire and pursuant to its Technology Policy, without paying Vanderbilt its rightful share of the proceeds.

61.    Defendants' representations to the marketplace and the industry leave little doubt that the Derivative Products are derived from and related to Read 180 and/or Hasselbring authored them while in Vanderbilt's employ. In fact, both Scholastic and HMH's marketing extensively promotes Hasselbring and heavily emphasizes his Vanderbilt connection in an effort to falsely imply to consumers that Vanderbilt is either a source of, affiliated with, or a sponsors these products. For example, Vanderbilt's recent investigation yielded the following:

### A.    *System 44*

a.  Scholastic published System 44 in 2008 and System 44 Next Generation in 2013. HMH's website lists Hasselbring as a "Program Author" and "Principal Scientist" for System 44 and states that "System 44's adaptive technology was created by Dr. Ted Hasselbring. … At the heart of this adaptive technology is the research-validated FASTT algorithm (Fluency and Automaticity through Systematic Teaching with Technology), developed in partnership with his team at Vanderbilt University."[10]    HMH's website, as well as a research paper published by

---

[10] Houghton Mifflin Harcourt, Authors & Advisors, (Dec. 28, 2017) http://www.hmhco.com/products/system-44/research-results/authors-advisors/index.htm.

Scholastic, states that System 44 is based on the same model and pedagogical concepts and techniques as Read 180 and advertises that System 44 is a companion product to Read 180:



HMH further publically represents that Hasselbring is the "principal scientist" behind System 44's adaptive technology:



By way of a few illustrative examples only, Scholastic and/or HMH have made numerous other marketplace representations that indicate that System 44 is technology based on or derived from Read 180, which is Vanderbilt Technology:

    i. Under the System 44's webpage titled "Companion Program READ 180," HMH states, "Based on the proven effective FASTT model, like System 44, READ 180 provides a personalized learning experience for students in Grades 4–12+ reading two or more years below grade level."[11]

    ii. "System 44 and READ 180 grew out of seminal research on cognition and technology, as related to the development of literacy skills, conducted

---

[11] Houghton Mifflin Harcourt, System 44, Companion Program READ 180, (Dec. 28, 2017) http://www.hmhco.com/products/system-44/read180/about-read-180.htm

by Dr. Hasselbring at Vanderbilt University. The programs were further enhanced through collaboration between Dr. Hasselbring and other leading researchers ….”[12]

   iii.  “Since its inception, System 44 has relied on the research-based design of Dr. Ted Hasselbring and his work through Vanderbilt University. System 44 leverages the power of research-based instructional practices and adaptive, personalized technology driven by the FASTT (Fluency and Automaticity through Systematic Teaching with Technology) algorithm that Dr. Hasselbring helped to pioneer with READ 180, in order to deliver the precise foundational literacy instruction each student needs to achieve mastery.” [13]

  b.  Hasselbring also repeatedly and consistently holds himself out as being the lead author of System 44 and System 44 Next Generation.

**B.**    ***Fast Math***

  a.  Scholastic published FASTT Math in 2005, which is a “mathematics intervention program that uses the FASTT (Fluency and Automaticity through Systematic Teaching with Technology) system to help students develop fluency with basic math facts.” The program uses adaptive software to adjust instruction to the

---

[12] *Id.*

[13] Houghton Mifflin Harcourt, *System 44 Next Generation Research Foundation Paper* at 3, *available at* http://www.hmhco.com/products/system-44/pdfs/System44 ResearchFoundationsPaper downsample.pdf.

24

student's individual skill level.[14] FASTT Math Next Generation is the current, updated version of FASTT Math and was launched in April 2012.

b. HMH's website lists Hasselbring as the only author of this product and states that FASTT Math was developed by Hasselbring and that "*FASTT Math* is the result of over two decades of research conducted by Dr. Ted Hasselbring, Co-Director of the Learning Technology Center at Vanderbilt University. This research on using technology to provide instruction and intervention is the basis of the *FASTT* algorithm."[15]

---

[14] Houghton Mifflin Harcourt, *FASTT Math Software Manual*, *available at* https://www.hmhco.com/product-support/content/techsupport/fasttmath/manuals/FM_SM_2_2.pdf.

[15] Houghton Mifflin Harcourt, Research & Results, (Dec. 27, 2017), *available at* http://www.hmhco.com/products/fastt-math/research-results.htm.. *See also "FASTT Math Next Generation: Evidence & Efficacy." Houghton Mifflin Harcourt, FASTT Math Next Generation: Evidence & Efficacy at 4, available at http://www.hmhco.com/products/fasttmath/files/FASTT%20Math_NG%20Research%20 Foundation%20Paper_1015_8355.pdf*

25



c. Until approximately December 18, 2017, HMH used Vanderbilt's trademark and logo to advertise FASTT Math as follows:



d.  Neither Scholastic nor HMH requested nor received permission from Vanderbilt for use of Vanderbilt's trademark, much less to market products on which it is not receiving royalties.

### C. *Math 180*

a.  Scholastic published MATH 180 in 2013, which is a math intervention program that is "designed to address the needs of struggling students in Grades 5 and up … building students' confidence with mathematics and accelerating their progress to algebra."[16]

b.  HMH's website for MATH 180 lists Hasselbring as "Lead Author" of MATH 180, as distinguished from others who are listed as "Advisors" or "Contributors." The website further states that Hasselbring is a professor at Vanderbilt who used

---

[16] Houghton Mifflin Harcourt, MATH 180, About MATH 180, (Dec. 28, 2017), *available at* http://www.hmhco.com/products/math-180/program-overview/theory-of-action.htm; Houghton Mifflin Harcourt, MATH 180 Research Foundation Paper, *available at* http://www.hmhco.com/products/math-180/pdfs/6487-M180_ResFound_FINAL.pdf.

"his expertise" earned from his twenty-five (25) years of research to create MATH 180.[17]



**D. iRead**

[17] Houghton Mifflin Harcourt, MATH 180, Authors & Advisors, (Dec. 28, 2017), *available at* http://www.hmhco.com/products/math-180/research-results/authors-advisors.htm.

a. Scholastic published iRead in 2013, which is a software program for kindergarten through second grade students of all reading levels that provides a mastery of foundational reading skills based on Common Core standards.[18]

b. HMH's website for iRead identifies Hasselbring as an author of the product, even listing Hasselbring first in the list of authors and advisors, and states that he was responsible for "Adaptive Technology & Cognition:"

---

[18] Houghton Mifflin Harcourt, *iRead Software Manual*, *available at* https://www.hmhco.com/product-support/content/techsupport/iread/manuals/HMHiRead_SM_1_2.pdf.



c. In a Scholastic press release, Scholastic described iRead as based upon and "leveraging" the adaptive technology from Read 180 and System 44.[19]

---

[19] Press Release, Scholastic, News Room, iRead, (Sept. 7, 2015), *available at* https://web.archive.org/web/20150907144307/http://mediaroom.scholastic.com/iread ("After more than a decade of research working in READ 180® and System 44® classrooms, we know the impact our adaptive technology has had on older, struggling readers. iRead leverages the power of these proven-effective programs to deliver cutting-edge, research-based instruction and practice for ALL K–2 students."). HMH's research paper notes that iRead was created by working with Hasselbring to adapt Hasselbring's FASTT model. Houghton Mifflin Harcourt, *iRead*

### E. Expert 21

    a. In approximately 2009, Scholastic published Expert 21; it is designed for students in sixth through ninth grades and is a "comprehensive English Language Arts curriculum that prepares students for the literacy demands of the 21st Century through a powerful combination of explicit instruction, inquiry-based learning, contemporary and relevant literature and informational texts, real-world writing and projects, and supportive technology."[20]

    b. HMH's website for Expert 21 states that Hasselbring developed Expert 21 as "Expert Faculty" for "Adaptive Technology"[21] and describes Expert 21 as a continuation of Read 180 that builds upon its best practices:[22]

---

*Research Foundation Paper* at 28, *available at* https://www.hmhco.com/products/iread/pdfs/iRead_ResearchFoundation_2013.pdf.

[20] Houghton Mifflin Harcourt, Expert 21, Program Overview, (Dec. 28, 2017), *available at* http://www.hmhco.com/products/expert-21/overview.htm.

[21] Houghton Mifflin Harcourt, Expert 21, Expert Faculty + Research, (Dec. 28, 2017), *available at* http://www.hmhco.com/products/expert-21/faculty-research.htm.

[22] Houghton Mifflin Harcourt, Expert 21, *READ 180* Students, (Dec. 28, 2017), *available at* http://www.hmhco.com/products/expert-21/read-180-students.htm.



### F. Score It

    a.  In 2016, Lizzy B. Good Behavior Consulting, LLC published SCORE IT i, which is marketed as a "research-based self-monitoring app" that facilitates "students and teachers to work together to improve students' classroom behavior."

    b.  The SCORE IT webpage within the iTunes Store indicates that the app is to be used with and in READ 180, SYSTEM 44, and iREAD classrooms …"[23]

---

[23] https://itunes.apple.com/us/app/score-it-behavior-monitor/id1153767419?mt=8

c.  Hasselbring holds himself out as being an author of SCORE IT, and the product is marketed naming him as one of its authors:



d.  Based upon information and belief, Hasselbring worked on SCORE IT within the course of his employment at Vanderbilt and used Vanderbilt resources to create SCORE IT.

62.     In addition to the representations made above, Hasselbring has also consistently and repeatedly held himself out as the author of the Derivative and/or Ancillary Products set out above.

63.     Hasselbring, Scholastic, and HMH knowingly failed to disclose Hasselbring's authorship of the above-referenced products to Vanderbilt and failed to disclose the products' close relationship to and derivation from Read 180. Defendants further used the confidential Read 180 Materials licensed to Scholastic under the License to develop, design, and market these products, and Scholastic and/or HMH failed to pay royalty payments to Vanderbilt for such products as required by the License.

64.     Scholastic and HMH knowingly failed to provide to Vanderbilt an accurate statement, pursuant to Paragraph 9.2 of the License, identifying the above-referenced royalty-bearing products or to provide an accounting of the annual revenues pertaining to each such product.

### 3.     Trademarks

65.     Despite its failure to disclose the existence of the above referenced products, Scholastic and HMH repeatedly used Vanderbilt's intellectual property, registered name, logo, and associated goodwill in the design, development, marketing, and promotion of Scholastic's and HMH's products. Such use of Vanderbilt's name and Marks was done to falsely imply to consumers that Vanderbilt was a source of or sponsor of the products or was in some way affiliated with the products.

66.     Vanderbilt has registered the following family of Vanderbilt trademarks (the "Trademarks" or "Marks") for numerous classes of goods and services, including but not limited to the following marks:

| Mark | Reg. No. | Goods/Services |
|---|---|---|
|  | 3955015 | Healthcare; Hospitals; Medical services; Providing medical information, in International Class 44. |
|  | 4057428 | Healthcare; Hospitals; Medical services; Providing medical information, in International Class 44. |

34

| Mark | Reg. No. | Goods/Services |
|---|---|---|
|  | 4324813 | Educational services, namely, providing classes, conferences, meetings, seminars, symposiums and workshops in the fields of diseases, disease prevention, healthcare, medicine, medical research and medical services, in International Class 41. |
|  | 4900954 | Medical research; Scientific research, in International Class 42. |
|  | 4900955 | Healthcare; Internet-based health care information services; Medical clinics; Medical services; Providing healthcare information; Providing medical information, in International Class 44. |
|  | 5073171 | Medical research; Scientific research, in International Class 42. |
|  | 5085759 | Educational services, namely, providing instruction and training at the undergraduate, graduate and post-graduate levels; Educational services, namely, providing instruction at the university level; Educational services in the nature of courses at the university level; Educating at university or colleges; Organizing, arranging, operating, and conducting collegiate athletic and sporting events; Organizing, arranging, operating, and conducting collegiate sports competitions; Entertainment in the nature of competitions in the field of athletics, in International Class 41. |
|  | 5085789 | Educational services, namely, providing instruction and training at the undergraduate, graduate and post-graduate levels; Educational services, namely, providing instruction at the university level; Educational services in the nature of courses at the university level; Educating at university or colleges; Organizing, arranging, operating, and conducting collegiate athletic and sporting events; Organizing, arranging, operating, and conducting collegiate sports competitions; Entertainment in the nature of competitions in the field of athletics, in International Class 41. |

35

| Mark | Reg. No. | Goods/Services |
|---|---|---|
| VANDERBILT V UNIVERSITY | 5085790 | Educational services, namely, providing instruction and training at the undergraduate, graduate and post-graduate levels; Educational services, namely, providing instruction at the university level; Educational services in the nature of courses at the university level; Educating at university or colleges; Organizing, arranging, operating, and conducting collegiate athletic and sporting events; Organizing, arranging, operating, and conducting collegiate sports competitions; Entertainment in the nature of competitions in the field of athletics, in International Class 41. |

36

| VANDERBILT UNIVERSITY | 1639680 | Educational and entertainment services, namely, conducting courses at the university level, and organizing and conducting sports competitions and events in International Class 41. |
|---|---|---|
| VANDERBILT | 2778959 | Education services in the nature of courses at the university level; entertainment in the nature of competitions in the fields of athletics; and entertainment in the nature of theater productions in International Class 41. |
| VANDERBILT | 5073167 | Medical Research; Scientific Research in International Class 42. |

67.     Although Vanderbilt has not given its permission to Scholastic/HMH for the use of its Trademarks pursuant to Paragraph 6.4 of the License or otherwise, upon information and belief, Scholastic and/or HMH have used one or more of Vanderbilt's Trademarks in commerce and traded on Vanderbilt's extensive goodwill and reputation in an attempt to misrepresent to consumers that Vanderbilt sponsors or endorses Defendants' products, which is not true and is likely to cause confusion in the marketplace.

## COUNT I
## BREACH OF CONTRACT IN VIOLATION OF NEW YORK LAW BY SCHOLASTIC AND HMH

68.     Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

69.     The License is a valid and binding contract regarding the rights and obligations of Vanderbilt and Scholastic/HMH for the period of time commencing January 1, 1997, to the present and continuing into the future.

70.     HMH and Scholastic failed to properly remit to Vanderbilt a proper accounting of products sold or licensed pursuant to the License, failed to remit and/or underpaid contracted-for

37

royalties for Read 180 and its Derivative Products pursuant to the License, and improperly deducted and carved-out from such royalty amounts due to Vanderbilt.

71.     HMH and Scholastic further failed to disclose certain consulting agreements with Hasselbring to Vanderbilt in breach of Paragraph 4.2 of the License.

72.     HMH's and Scholastic's actions caused damages to Vanderbilt in the form of under-calculated and underpaid royalties to the present which damages, upon information and belief, will continue through the future.

73.     Scholastic and HMH took Vanderbilt's confidential Read 180 Materials and used it for other purposes for which it failed to compensate Vanderbilt.

74.     Vanderbilt is further entitled to reimbursement of the cost of the audit it was forced to undertake due to Scholastic and HMH's failure to pay royalties due under the License.

75.     In addition to damages and unpaid royalties, Vanderbilt seeks a full and complete accounting of gross and net sales of all products related to or derived from Read 180 pursuant to this claim.

## COUNT II
## CLAIM FOR DECLARATORY JUDGMENT OF OWNERSHIP INTEREST IN THE ANCILLARY PRODUCTS

76.     Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

77.     As set forth above, Vanderbilt contends that the products defined as the Derivative Products are related to or are derived from the Read 180 Materials. As such, Vanderbilt is entitled to royalties from the sale of those products pursuant to the License.

38

78.     Upon information and belief, the Undisclosed Hasselbring Scholastic Agreements provided that Hasselbring would receive millions of dollars in royalty payments in exchange for creating technology and other copyrightable intellectual property that would be incorporated into the Derivative and/or Ancillary Products with all rights in the technology and intellectual property conveyed to Scholastic (the "Misappropriated Vanderbilt Technology and Intellectual Property"). The Misappropriated Vanderbilt Technology and Intellectual Property includes, but is not limited to, copyrightable computer programs, integrated circuit designs, industrial designs, databases, technical drawings, software, and/or algorithms created or designed by Defendant Hasselbring (and possibly other Vanderbilt employees, staff and/or students) during his employment at Vanderbilt, using Vanderbilt equipment, staff, computer systems, and other resources.

79.     Because Hasselbring and any other Vanderbilt employee are subject to Vanderbilt's Technology Policy, as set forth above, Vanderbilt owns the technology they create, which are works for hire.

80.     The Vanderbilt Technology and Intellectual Property constitute original works of creativity and authorship that have been reduced to a tangible form and are copyrightable and protectable under the US Copyright Act.

81.     Hasselbring failed to disclose to Vanderbilt the creation of the Misappropriated Vanderbilt Technology and Intellectual Property that supplies the basis for some or all of the Derivative and/or Ancillary Products. Upon information and belief, he wrongfully took the Misappropriated Vanderbilt Technology and Intellectual Property and attempted (but failed) to convey it to Scholastic and/or HMH through the series of Hasselbring/Scholastic Agreements.

39

The Misappropriated Vanderbilt Technology and Intellectual Property that Hasselbring wrongfully conveyed to Scholastic were incorporated into the Derivative and/or Ancillary Products.

82. Because the Misappropriated Vanderbilt Technology and Intellectual Property have been wrongfully incorporated into the Derivative and/or Ancillary Products without the knowledge and permission of Vanderbilt, the University has been deprived of the exclusive rights of the copyright owner to control and exploit its technology and intellectual property as it sees fit.

83. Vanderbilt seeks a declaratory judgment that it owns an interest in the intellectual property comprising the Derivative and/or Ancillary Products because the Vanderbilt Technology and Intellectual Property were copyrightable subject matter, were owned by Vanderbilt, were wrongfully conveyed to Scholastic and/or HMH, were misappropriated into Scholastic/HMH's highly successful and valuable products with no notice or compensation whatsoever to Vanderbilt.

84. There is a substantial controversy between these parties in that Vanderbilt asserts that the Vanderbilt Technology and Intellectual Property, which consists of copyrightable subject matter and of which Vanderbilt is the lawful owner, has been wrongfully taken from it and misappropriated into Defendants' Derivative and/or Ancillary Products such that Vanderbilt is entitled to an ownership interest therein, as a co-owner of some degree with Scholastic and/or HMH.

85. The parties have adverse legal positions of sufficient immediacy and reality such that this Court should determine that ownership of some portion of the intellectual property

40

comprising the Ancillary Products should be awarded to Vanderbilt because they wrongfully contain Vanderbilt Technology and Intellectual Property.

86.    Vanderbilt also seeks a judgment for any damages to which it is entitled arising from Defendants' wrongful taking of Vanderbilt Technology and Intellectual Property without compensation or royalties to Vanderbilt. In addition, Vanderbilt seeks a full accounting of all gross and net sales of the Derivative and/or Ancillary Products pursuant to this claim.

## COUNT III
## INFRINGEMENT OF FEDERALLY-REGISTERED TRADEMARKS BY SCHOLASTIC AND HMH

87.    Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

88.    Vanderbilt is the owner of an existing family of Vanderbilt Trademarks as set forth above.

89.    Scholastic's and HMH's unauthorized advertisement, promotion, display, offering for sale, sale, and distribution of Scholastic's and HMH's goods and services bearing Vanderbilt's Marks is likely to cause confusion, to cause mistake, or to deceive, in violation of § 32(1) of the United States Trademark Act, 15 U.S.C. § 1114(1).

90.    Scholastic's and HMH's use of Vanderbilt's Marks is likely to confuse and mislead consumers and cause damage to Vanderbilt's trademark and goodwill.

91.    Scholastic's and HMH's willful and deliberate infringement of Vanderbilt's federally-registered Marks as described above has caused and continues to cause irreparable harm to Vanderbilt as well as money damages.

41

92.    Unless restrained and enjoined by this Court, Scholastic and HMH will persist in infringement of Vanderbilt's federally-registered Marks, thereby causing Vanderbilt further irreparable harm and money damages.

93.    Vanderbilt has no adequate remedy at law.

## COUNT IV
## UNFAIR COMPETITION IN VIOLATION OF FEDERAL LAW
## BY SCHOLASTIC AND HMH

94.     Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

95.     Scholastic's and HMH's unauthorized advertisement, promotion, display, offering for sale, sale, and distribution of Scholastic's and HMH's goods and services bearing Vanderbilt's Marks constitute the use in commerce, on or in connection with Scholastic's and HMH's goods, of words, terms, names, symbols or devices, or combinations thereof, and false designations of origin, and false or misleading descriptions or representations of fact, that are likely to cause confusion, cause mistake or deceive as to the affiliation, connection, or association of Scholastic and HMH with Vanderbilt and/or as to the origin of Scholastic's and HMH's goods and commercial activities with or their sponsorship or approval by Vanderbilt, in violation of § 43(a)(1)(A) of the United States Trademark Act, 15 U.S.C. § 1125(a)(1)(A).

96.     Scholastic's and HMH's use of Vanderbilt's trademark is likely to confuse consumers and potential consumers of products including, but not limited to, Read 180, System 44, FASTT Math, MATH 180, iRead, Expert 21, and Scholastic U and give Scholastic and HMH the advantage of Vanderbilt's long-established excellent reputation for scholarship and innovation, when Scholastic and HMH are not entitled to trade on Vanderbilt's good will.

97.     Further, Vanderbilt asserts that Scholastic, HMH, and Hasselbring have committed acts of unfair competition by wrongfully misappropriating Vanderbilt Technology and Intellectual Property, without disclosure to Vanderbilt, and by incorporating Vanderbilt's Technology and Intellectual Property into Defendants' products and passing those products off

43

as Defendants' works, without compensation or royalties to Vanderbilt. These acts are likely to confuse consumers into purchasing Defendants' products because Defendants are able to sell them at a lower price than if Defendants had to fairly compensate Vanderbilt for its Technology and Intellectual Property. Moreover, consumers are likely to be confused and incorrectly believe that Vanderbilt endorses or sponsors these products when it does not.

98.     Scholastic's and HMH's willful and deliberate unfair competition as described above has caused and continues to cause irreparable harm to Vanderbilt and extensive money damages, in an amount to be determined at trial.

99.     Unless restrained and enjoined by this Court, Scholastic and HMH will persist in unfair competition, thereby causing Vanderbilt further irreparable harm.

100.    Vanderbilt has no adequate remedy at law.

## COUNT V
## BREACH OF CONTRACT IN VIOLATION OF TENNESSEE LAW
## BY HASSELBRING

101.    Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

102.    Hasselbring had a contractual commitment not to engage in the operation of business which was in direct competition with the services provided by him as an employee of Vanderbilt, or to misappropriate Vanderbilt intellectual property for other entities, under the terms of Vanderbilt's COI Policy and under the common law of Tennessee.

103.    Hasselbring's acceptance of millions of dollars in royalties arising for commercial exploitation of Vanderbilt Technology without authorization by or disclosure to Vanderbilt

44

constituted a breach of the terms of his obligations to Vanderbilt under the COI and Technology Policies and has caused damages to Vanderbilt's profits and other legitimate business interests.

## COUNT VI
## BREACH OF DUTY OF LOYALTY IN VIOLATION OF TENNESSEE LAW BY HASSELBRING

104.    Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

105.    As an employee of Vanderbilt, Hasselbring owed a duty of loyalty, which required him to act for the exclusive benefit of Vanderbilt with the utmost good faith in furthering and advancing Vanderbilt's interests with respect to all matters falling within the scope of his employment.

106.    Hasselbring breached his duty of loyalty to Vanderbilt when he contracted with Scholastic and HMH to author and consult for the Derivative Products and/or Ancillary Products in direct competition with Vanderbilt and for his sole benefit.

107.    Further, upon information and belief, Hasselbring committed to far-reaching non-compete provisions in the Undisclosed Hasselbring Scholastic Agreements without the agreement of or knowledge of Vanderbilt that deprived the University of the ability to monetize the Technology.

108.    As a direct consequence of Hasselbring's breach of duty of loyalty, Vanderbilt is entitled to recover damages against Hasselbring in an amount to be determined at the trial of this matter.

## COUNT VII

45

## TORTIOUS INTERFERENCE WITH CONTRACT
## IN VIOLATION OF TENNESSEE LAW
## BY SCHOLASTIC AND HMH

109.    Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

110.    Vanderbilt entered into an employment contract with Hasselbring in December 2005.

111.    Scholastic and HMH were aware of Hasselbring's continuing obligations to Vanderbilt pursuant to the Technology and COI Policies, by and through Paragraph 4.2 of the License.

112.    Despite this knowledge of Hasselbring's contractual obligations, Scholastic and/or HMH intentionally, knowingly, and without legal justification interfered with Vanderbilt's contract of employment with Hasselbring by continuing to engage Hasselbring, without disclosure to Vanderbilt, for the consulting and authorship of certain of Scholastic's products in breach of those contractual obligations, with the intent of depriving Vanderbilt of compensation for the Technology and Intellectual Property created by Hasselbring and others that is owned by Vanderbilt as works for hire and incorporated into some or all of the Scholastic/HMH Derivative and/or Ancillary Products. Defendants committed these acts for the purpose of enriching themselves at Vanderbilt's expense.

113.    Scholastic and HMH were aware of the potential harm Scholastic's actions could cause Vanderbilt but nonetheless continued to engage Hasselbring in disregard of Vanderbilt's rights and with malice.

46

114. As a direct and proximate cause of Scholastic's and HMH's actions, Vanderbilt has suffered a loss of revenue and other legitimate business interests and has been irreparably injured in an amount to be proven at trial.

115. Because of Scholastic and HMH's malicious actions, Vanderbilt is entitled to punitive damages and/or treble damages.

## COUNT VIII
## DECEPTIVE TRADE PRACTICES IN VIOLATION OF TENNESSEE LAW
## BY SCHOLASTIC AND HMH

116. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

117. Scholastic and HMH engaged and continue to engage in acts and practices that violate the prohibition against deceptive trade practices found in the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104 *et. seq* (the "TCPA").

118. As described herein, Scholastic/HMH misappropriated the confidential Read 180 Materials conveyed to them through the License, and used it to create Ancillary Products outside the License that they falsely marketed and sold as their own. Moreover, in collaboration with Hasselbring, they took additional confidential Vanderbilt Technology and Intellectual Property conveyed outside the License and incorporated it into the Ancillary Products, which they falsely marketed and sold as their own, all of which constitutes unfair and deceptive acts under Tenn. Code Ann. § 47-18-104(b)(1). In so doing, the Defendants conspired to violate the duty of trust and loyalty that Hasselbring owed Vanderbilt.

47

119.    Moreover, through their marketing and sales processes, Scholastic and HMH used Vanderbilt's Trademarks and Tradename in an effort to mislead consumers, capitalize on an affiliation with the University, and increase their sales and prestige without Vanderbilt's permission or without providing any remuneration to the University. HMH and Scholastic willfully and knowingly sought to cause a likelihood of confusion as to the affiliation with, sponsorship of, or certification by Vanderbilt, which constitutes an unfair and deceptive act under Tenn. Code Ann. § 47-18-104(b)(3).

120.    The natural and probable effect of Scholastic's and HMH's use of Vanderbilt's confidential information, Technology, Trademarks and Tradenames in the manner alleged is to enable Scholastic and HMH to deceive and confuse the public.

121.    Scholastic's and HMH's use of Vanderbilt's confidential information, Technology, Trademarks and Tradenames in the manner alleged constitutes deceptive trade practices of the type prohibited by the TCPA.

122.    Scholastic and HMH had actual and constructive knowledge of Vanderbilt's rights when they misused Vanderbilt's confidential information, Technology, Trademarks and Tradenames.

123.    Upon information and belief, Scholastic's and HMH's unfair business practices are recurring and are harmful to consumers, the public at large, and Vanderbilt. These practices have caused great damage to Vanderbilt in an amount to be proved at trial. Unless enjoined by this Court, Scholastic and HMH will continue these acts, thereby causing Vanderbilt further immediate and irreparable damage.

48

124.     Vanderbilt is without an adequate remedy at law because Scholastic's and HMH's acts set forth herein are causing great and irreparable damage to Vanderbilt and will continue to damage Vanderbilt unless enjoined by this Court.

125.     Moreover, because of the willful and deliberate nature of Scholastic and HMH's acts as alleged herein, Vanderbilt is entitled to treble damages and an award of its attorney's fees.

## COUNT IX
## FRAUD BY SCHOLASTIC, HMH, AND HASSELBRING

126.     Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

127.     Scholastic and HMH have a contractual duty to Vanderbilt under Section 9.2 of the License (as well as the contractual duty of good faith and fair dealing) to provide Vanderbilt with a complete and accurate list of Derivative Products that were derived from or based on the Read 180 Literacy Program and to provide an accurate and truthful accounting of the revenue generated from such products. This information was and is solely in the possession, custody, and control of Scholastic and/or HMH.

128.     Scholastic and HMH knowingly made false representations and concealed material facts to Vanderbilt regarding the sales of Derivative Products that were derived from or based on the Read 180 Literacy Program, and the amount of revenue generated by such royalty-bearing products for the purpose of deceiving and misleading Vanderbilt and preventing Vanderbilt from receiving what it was owed for its contribution to Read 180.

129.     In addition, upon information and belief, Defendants Scholastic, HMH, and Hasselbring conspired with one another to obtain Vanderbilt's Technology and Intellectual

49

Property by fraud and to deprive Vanderbilt of its right to control the use of its Technology and Intellectual Property.

130. The License expressly provided at Section 4.2 that Scholastic could contract with Hasselbring for "consulting," so long as their consulting agreement was in compliance with Vanderbilt's policies on outside employment and conflicts of interests. Accordingly, this section creates a contractual duty for Scholastic to contract with Hasselbring only so long as those contracts are in conformance with Vanderbilt's COI and Technology Policies.

131. Upon information and belief, Vanderbilt's then-Technology Policy and its COI Policy were forwarded to Scholastic prior to the execution of the License. Moreover, these policies are and were publicly available on Vanderbilt's website. Accordingly, Scholastic was on actual notice that technology that Hasselbring created belonged to Vanderbilt.

132. Hasselbring was also provided with the Vanderbilt Faculty Manual upon his employment with Vanderbilt and had to sign yearly COI disclosures as a condition of his employment. In these yearly disclosures, Hasselbring made material misrepresentations, such as affirmatively representing that there were no relationships of which he was aware that presented a conflict or paid him a royalty, which was false. Moreover, during his employment with Vanderbilt, Hasselbring served on Vanderbilt's Technology Review Committee, which reviews and monitors the activities of the CTTC for matters relating to the administration of the Technology Policy. As such, Hasselbring was familiar with the Policy, how it worked, and what the Policy required of Vanderbilt employees.

133. Scholastic, HMH and Hasselbring all knew that Hasselbring did not have the right to create Technology and convey the rights to that Technology to a third party. Instead, under

50

Vanderbilt's COI and Technology Policies, which were material conditions of Hasselbring's employment, any Technology he created is a work made for hire that belongs to Vanderbilt and was to be licensed and monetized through the CTTC, the very body that Hasselbring monitored for compliance with the Technology Policy.

134. Upon information and belief, when Hasselbring entered into the Undisclosed Hasselbring Scholastic Agreements, Hasselbring, HMH and Scholastic all knew that Hasselbring did not have the right to convey ownership to the Technology that he brought to the agreements with Scholastic.

135. Upon information and belief, these myriad side "consulting" agreements were done for the purpose of falsely documenting the nature of Hasselbring's contribution to the various products at issue in this lawsuit so that he could receive millions in royalties and Scholastic/HMH could own the Technology and Intellectual Property outright, while misappropriating Vanderbilt's ownership interest in them. Scholastic and/or HMH and Hasselbring attempted to hide the fact from Vanderbilt that Hasselbring was an author of the Technology underlying these products and was receiving millions of dollars in on-going royalties for his authorship contributions, in violation of both Scholastic and Hasselbring's contractual duties to Vanderbilt.

136. In continuance and furtherance of this scheme, Hasselbring made material misrepresentations to and/or concealed material information from Vanderbilt pursuant to the COI Policy, such as understating the amount and nature of the work he was performing for Scholastic and/or HMH and failing to disclose his work on the Derivative and/or Ancillary Products, the

51

true value of what he was receiving for that work, and the nature and extent of the work he was performing on the Derivative and/or Ancillary Products.

137. Upon information and belief, Scholastic/HMH and Hasselbring hid this information from Vanderbilt so that they could increase the share of royalties going to Hasselbring without having to compensate Vanderbilt, the rightful owner of the Technology and Intellectual property that Hasselbring sought to contribute and sell to Scholastic and/or HMH. Because these agreements were entered into in an effort to defraud Vanderbilt of its Technology and Intellectual Property with a knowing and deliberate scheme to misappropriate Vanderbilt's Intellectual Property, they are void and/or voidable.

138. Vanderbilt relied upon Hasselbring's, Scholastic's and/or HMH's false representations and material omissions to its detriment and has suffered damages as a direct and proximate result.

139. In order to monetize the intellectual property and Technology developed by its faculty and staff, Vanderbilt relies upon the honesty and integrity of its faculty and staff and the representations they make (or do not make) under the Technology and COI policies. Compliance with the Technology and COI Policies are material terms of Vanderbilt's employment agreements with its faculty and staff. When the existence of Technology that would be subject to the Technology Policy is not revealed to Vanderbilt, Vanderbilt is unable to exploit and monetize the Technology for the benefit of the University. Likewise, when faculty and staff do not comply with the COI Policy by disclosing consulting agreements and the terms of those agreements, Vanderbilt is unaware of relationships and projects that might involve the creation and transmittal of Technology or other intellectual property that belongs to Vanderbilt under the

52

Technology Policy. Accordingly, Vanderbilt reasonably relied on Hasselbring's non-disclosure of his involvement in numerous agreements with Scholastic and/or HMH to create and convey intellectual property and to receive substantial royalties in several ways. First, Vanderbilt was unable to take corrective action via Hasselbring's breach of his fiduciary duties because it was unaware that he was materially breaching his employment agreement and subverting royalties to himself that rightfully belong to the university. Second, Vanderbilt was unable to pursue its ownership rights in the Ancillary or Derivative Products that were the subject of the non-disclosed agreements or negotiate new terms for their exploitation because it was unaware that its employee had created the Technology that was at the heart of those products. And third, Vanderbilt did not receive royalties that it was due as the rightful owner or part owner of the Technology upon which the Products were based.

140.    Similarly, Vanderbilt reasonably relied on Scholastic/HMH's failure to disclose its relationships with Hasselbring and the extent of the work he was providing to them. In the License, Vanderbilt allowed Scholastic to further contract with Hasselbring, but only on the condition that it did so in compliance with Vanderbilt's Technology and COI Policies. This requirement was in place because disclosure under these policies and compliance with the letter and spirit of them is what allows Vanderbilt to capture and monetize its intellectual property. Scholastic and HMH were aware of the Technology and COI policies and Hasselbring's duties under them. Vanderbilt reasonably relied on Hasselbring, Scholastic and/or HMH's contractual duty to disclose their relationships and the nature of their work together. Vanderbilt reasonably relied on Scholastic, HMH, and Hasselbring's failure to disclose under these policies or comply with the requirements of the License because, when these relationships were not revealed or the

requirement of the License was not met in this regard, it caused Vanderbilt to be unaware that its intellectual property existed and was being monetized without compensation to Vanderbilt.

141.    Vanderbilt was further damaged by this conduct because it was unable to negotiate the terms of the exploitation of this undisclosed Technology, participate in the royalties earned by the Technology, or to develop competing Technology because Hasselbring had signed those rights away without compensation to Vanderbilt.

142.    As a result of their egregious, willful, and malicious conduct, Scholastic and HMH are liable to Vanderbilt for punitive damages.

## COUNT X
## CLAIM FOR UNJUST ENRICHMENT
## AS TO SCHOLASTIC, HMH, AND HASSELBRING

143.    Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

144.    To the extent that Scholastic and/or HMH incorporated the Misappropriated Vanderbilt Technology and Intellectual Property or the confidential Read 180 Materials into the Ancillary Products that are otherwise outside the License Agreement, Scholastic and HMH have been unjustly enriched by their use of the Misappropriated Vanderbilt Technology and Intellectual Property due to Hasselbring's unlawful conveyance of it to them. Moreover, upon information and belief, they have received millions of dollars from sales of the products containing Vanderbilt's misappropriated intellectual property.

145.    As a result of the Undisclosed Hasselbring Scholastic Agreements, Hasselbring has realized millions of dollars in royalty payments for the Ancillary Products, which contain Misappropriated Vanderbilt Technology and Intellectual Property and/or the confidential Read

180 Materials. The Misappropriated Technology and Intellectual Property and the confidential Read 180 Materials were not owned by Hasselbring and, therefore, he had no right to convey them to Scholastic and/or HMH. Moreover, through that conduct, Hasselbring abused his position and relationship with Vanderbilt and frustrated Vanderbilt's ability to enforce its contractual rights and to negotiate additional contractual rights.

146.    All three Defendants have been unjustly enriched at Vanderbilt's expense, and it would be inequitable for them to retain these benefits. Vanderbilt is entitled to a judgment for the benefit that Defendants unjustly received by virtue of their concerted efforts to deprive Vanderbilt of its intellectual property and that Hasselbring improperly received through his contractual and fiduciary relationship with Vanderbilt.

## COUNT XI
## CLAIM FOR AN ACCOUNTING AS TO SCHOLASTIC AND HMH

147.    Vanderbilt repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

148.    Vanderbilt seeks a full and complete accounting of all monies earned under the License for all products derived from or related to Read 180.

149.    Vanderbilt asserts that the Derivative Products and/or the Ancillary Products are derived from or based on the Read 180 Literacy Program and thus are all royalty-bearing under the License. In the alternative, Defendants conspired together to misappropriate Vanderbilt's confidential information and copyrights and to violate Hasselbring's duty of trust and loyalty to Vanderbilt in order to create the Derivative and/or Ancillary Products and enrich themselves at Vanderbilt's expense. Because these products contain Vanderbilt's Technology and Intellectual

55

Property, Vanderbilt is entitled to a full and complete accounting of their gross and net sales under the principles of equity and fairness and to serve the interests of justice.

## JURY DEMAND

150.     Pursuant to Federal Rule of Civil Procedure 38, Vanderbilt hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Vanderbilt prays for a judgment as follows:

1.     That Vanderbilt be awarded a judgment for all damages owed and any other requested or proven relief due pursuant to the claims asserted herein in an amount to be proven at trial;

2.     That Vanderbilt be awarded a judgment for all damages, remedies, or other requested or proven relief flowing from the equitable causes of action asserted herein or proven at trial;

3.     That this Court enter an order declaring that Vanderbilt owns some portion of the intellectual property comprising the Derivative and/or Ancillary Products as a co-owner with Scholastic and/or HMH as the Court or jury deems to be just and proper after a trial on the merits;

4.     That this Court order a full and complete accounting of gross and net sales of the Derivative and Ancillary Products and that Vanderbilt be awarded its portion of those monies in accordance with the proof at trial;

5.     That Vanderbilt be awarded injunctive relief as appropriate and as requested herein after a hearing on the merits;

56

6.      That Vanderbilt be awarded treble damages under the Tennessee Consumer Protection Act and as a remedy for Scholastic's tortious interference with Hasselbring's contract;

7.      That Vanderbilt be awarded attorney fees under the Lanham Act, the Copyright Act, and/or the Tennessee Consumer Protection Act for the willful and deliberate wrongs set forth above and as proven at trial;

8.      That Vanderbilt be awarded pre-judgment and post-judgment interest; and

9.      That Vanderbilt be granted such other and further relief as the Court may deem just and proper.

Dated this 31st day of August, 2018

Respectfully Submitted,

/s/ *Paige W. Mills*
Paige W. Mills (TN BPR16218)
Robert E. Cooper, Jr.  (TN BPR 10934)
Mary Leigh Pirtle (TN BPR 26659)
Ashleigh Karnell (TN BPR 36074)
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
pmills@bassberry.com
rcooper@bassberry.com
mpirtle@bassberry.com

*Attorneys for Vanderbilt*

57

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served upon the following individuals, via the Court's CM/ECF e-mail notification system, on this the 31st day of August, 2018.

Caren Decter (*pro hac vice*)
Edward H. Rosenthal (*pro hac vice*)
Matt Woleske (*pro hac vice*)
Frankfurt, Kurnit, Klein & Selz, P.C
488 Madison Avenue
New York, NY 10022
(212) 826-5524
cdecter@fkks.com
erosenthal@fkks.com
mwoleske@fkks.com

     *Attorneys for Defendant, Scholastic Inc.*

Maia T. Woodhouse, #030438
Philip Michael Kirkpatrick, #06161
Adams and Reese LLP
424 Church Street
Suite 2700
Nashville, TN 37219-0058
(615) 259-1085
maia.woodhouse@arlaw.com
phil.kirkpatrick@arlaw.com

     *Attorneys for Defendant, Scholastic Inc.*

Michael G. Abelow, #26710
Sherrard Roe Voight & Harbison, PLC
150 Third Avenue South
Suite 1100
Nashville, TN 37201
(615) 742-4532
mabelow@srvhlaw.com

     *Attorney for Defendant, Houghton Mifflin Harcourt Publishing Company*

58

Aubrey B. Harwell, Jr., #2559
Thomas H. Dundon, #4539
Erik C. Lybeck, #35233
Neal & Harwell, PLC
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
(615) 244-1713
aharwell@nealharwell.com
tdundon@nealharwell.com
elybeck@nealharwell.com

*Attorneys for Defendant, Ted S. Hasselbring*

Benjamin E. Marks (*pro hac vice*)
David J. Lender (*pro hac vice*)
Jessica Falk (*pro hac vice*)
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
benjamin.marks@weil.com
david.lender@weil.com
jessica.falk@weil.com

*Attorneys for Defendant, Houghton Mifflin*
*Harcourt Publishing Company*

*/s/ Paige W. Mills*