# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:18-cv-00046** |
| | ) | |
| **SCHOLASTIC, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

"Money tends to make people suspicious, if there's any money floating around."[1] This case arises from just such a suspicion. By means of a License Agreement executed in 1997 ("License"), Vanderbilt University ("Vanderbilt") and Defendant Scholastic, Inc. ("Scholastic") joined forces to develop, market, and distribute an educational literacy program called Read 180 based on the cutting-edge work of Vanderbilt Professor Ted S. Hasselbring. Pursuant to the License, Scholastic used certain copyrightable software and related instructional materials, along with other materials it both obtained and created, to develop the "Read 180" program. It was wildly successful. Scholastic distributed Read 180 and paid Vanderbilt royalties under the License until 2015, when Scholastic sold that part of its business and assigned the License to Defendant Houghton Mifflin Harcourt Publishing Company ("HMH"). However, Defendants' public exuberance about their success with Read 180 in connection with this sale led Vanderbilt to became suspicious that it was being exploited by Defendants. Vanderbilt conducted an investigation and now claims that it was

---

[1] Mitchell Baker, former manager of the technology legal group of Netscape, CEO of the Mozilla Foundation and member of the Internet Hall of Fame. <u>See</u> https://www.internethalloffame.org//blog/2012/05/10/mozillas-mitchell-baker-being-alternative-microsoft-google-and-apple (last accessed May 16, 2019).

deceived by the Defendants and has not been properly compensated for (1) components of Read 180 that are royalty-bearing under the License; (2) programs other than Read 180 that may be royalty-bearing because they are based on Vanderbilt-owned materials ("Derivative Products"); and (3) additional learning products that may have been surreptitiously developed by Hasselbring and Scholastic in violation of the License and Hasselbring's duties to Vanderbilt ("Ancillary Products").

Vanderbilt brings claims for trademark infringement in violation of § 32(1) of the United States Trademark Act, 15 U.S.C. § 1114(1); unfair competition, in violation of § 43(a) of the United States Trademark Act, 15 U.S.C. § 1125(a); declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201; as well as numerous Tennessee state law claims. Before the Court are (1) Scholastic and HMH's Motion to Dismiss the Second Through Fourth and Seventh Through Eleventh Counts of the Complaint (Doc. No. 87); and (2) Hasselbring's Motion to Dismiss Counts Nine and Ten of the Complaint (Doc. No. 89).[2] Vanderbilt has filed responses in opposition (Doc. Nos. 96; 97), and Defendants have filed replies (Doc. Nos. 100; 101.) For the following reasons, both motions will be granted in part and denied in part.

---

[2] Counts One (Breach of Contract by Scholastic and HMH), Five (Breach of Contract by Hasselbring), and Six (Breach of Duty of Loyalty by Hasselbring) are not addressed by these motions and remain pending.

I.      Factual Allegations[3]

        A.      Vanderbilt, Faculty Research, and Professor Hasselbring

        Vanderbilt is a private, non-profit Tennessee university known in part for bringing research

innovations into the world marketplace. (Doc. No. 85 at ¶¶ 1, 7.) Tenure-track faculty are expected

and encouraged to research, write, and create, and these activities fall within the scope and purpose

of their employment. (Id. at ¶ 8.) Vanderbilt contends that the technology and other creative works

that its faculty create in their areas of study and research are "works for hire" under Tennessee law

and federal copyright law. (Id.) Accordingly, as part of their employment, Vanderbilt faculty are

subject to a written policy ("Technology Policy"), that provides, among other things, that almost

all innovations in technology as defined by Vanderbilt ("Vanderbilt Technology") created by

faculty members are assigned to and owned by Vanderbilt. (Id. at ¶ 9.) Under the Technology

Policy in effect until 2016, "[a]ll rights in non-scholarly Literary and Artistic Works created with

_____

[3] "[A]s a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss," Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997), however, "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); see also Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are "integral to the claims" in deciding motion to dismiss); Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005) (in deciding a motion to dismiss "the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice"). In short, "if both parties reference and quote extensively from particular documents, and neither party contests the appropriateness of considering the documents on review of a motion to dismiss, the Court may consider the documents." Doe v. Ohio St. Univ., 219 F. Supp. 3d 645, 653 (S.D. Ohio 2016) (citing In re Fair Fin. Co., 834 F.3d 651, 656 n.1 (6th Cir. 2016)). Here, the Court draws the factual allegations from the Amended Complaint ("Complaint"). In addition, the Court has considered the exhibits to the Complaint (Doc. Nos. 85-1 and 85-2 (Vanderbilt's Technology Policy); 85-3 (Hasselbring's Employment Agreement); 85-4 (Vanderbilt's Conflict of Interest Policy).) as well as (1) the License (Doc. No. 11) and (2) the Tolling Agreement (Doc. No. 56-1), both of which are referenced in the Complaint and important to Vanderbilt's claims.

the use of University funds or facilities, or that capitalize on an affiliation with the University, are granted to the University, and income distribution shall be handled in the same manner as technology. Commercial use of the University's name and marks requires prior University approval." (Doc. No. 85-2 at 10.) A superseding Technology Policy further explains that "Vanderbilt Technology" is broader than patentable intellectual property, and "includes tangible or intangible inventions, in the patent sense, whether or not reduced to practice, and research results whether or not patentable or copyrightable. These research results include, for example, computer programs, integrated circuit designs, industrial designs, databases, technical drawings, biogenic materials, and other technical creations." (Doc. No. 85-1 at 4.)

Vanderbilt relies upon its Center for Technology, Transfer and Commercialization ("CTTC") to protect and commercialize, as appropriate, the intellectual property developed at the University. (Doc. No. 85 at ¶ 10.) The CTTC is responsible for negotiating, on behalf of Vanderbilt, license agreements with commercial entities that are positioned to develop and commercialize the intellectual property advancements that Vanderbilt's faculty and staff create in the course and scope of their intellectual pursuits at the University. (Id.) Faculty members receive a significant share – between 40 and 50 percent – of royalties received by Vanderbilt. (Id. at ¶ 11.) The remainder is invested in the university. (Id.)

To facilitate this process and safeguard Vanderbilt's rights, faculty are subject to Vanderbilt's Conflict of Interest Policy ("COI Policy"). (Doc. No. 85-4.) Under the COI Policy, Vanderbilt faculty are required, prior to undertaking consulting or any other activity or commitment that may create a potential conflict of interest, to disclose the activity or commitment in writing to the appropriate dean (and department chair), in sufficient detail and with appropriate documentation such that the dean and the department chair can determine whether a potential

4

conflict exists. (Doc. No. 85 at ¶¶ 20, 51.) In addition, faculty members are required to file annual reports disclosing consulting and other outside business relationships that they engage in during the year, including the number of days devoted to the activities. (Id. at ¶¶ 21, 52.)

Hasselbring, a Tennessee resident, is currently an Emeritus Professor of Special Education in the Department of Special Education at Vanderbilt.[4] (Id. at ¶ 2.) The Letter Agreement ("Hasselbring Employment Agreement") between Hasselbring and Vanderbilt dated December 27, 2005 concerning his employment specifies that the above "[p]olicies set forth in the Faculty Manual constitute part of the contractual relationship between [Hasselbring] and the University." (Id. at ¶ 19; Doc. No. 85-3.) Accordingly, Vanderbilt alleges that at all times during his employment, Hasselbring was subject to Vanderbilt's Faculty Manual, COI Policy, and Technology Policy. (Id. at ¶¶ 19-22.)

B.      Hasselbring's Development of Read 180 and Vanderbilt's License to Scholastic

Hasselbring's area of research and study at Vanderbilt was, among other things, the use of technology to enhance learning for students with disabilities. (Id. at ¶ 23.) Beginning in 1985, Hasselbring and members of the Learning and Technology Center at Vanderbilt developed software that used student performance data to individualize and differentiate the path of computerized reading instruction in order to identify and help elementary and middle school students reading below grade level. (Id. at ¶ 24.) According to the Complaint, this software, which became the prototype for Read 180, was owned by Vanderbilt pursuant to the Technology Policy. (Id.)

---

[4] Vanderbilt first hired Hasselbring as an Assistant Professor in its Peabody College in 1982. (Id. at ¶ 17.) He was promoted to Associate Professor in 1984 (id. at ¶ 18), and, after a five-year stint at the University of Kentucky from, 2000-2005, he returned to Vanderbilt as a Research Professor (id. at ¶ 19).

Between 1994 and 1998, Hasselbring and his Vanderbilt team tested their work in Orange County, Florida. (Id. at ¶ 25.) The Orange County Literacy Project successfully used the Read 180 prototype with more than 10,000 struggling students. (Id.) Vanderbilt alleges that, at that time, the Read 180 intellectual property consisted of (1) a software-based multimedia instructional program designed to provide daily computer-based compensatory instruction for middle school aged students (the "Software"); (2) an interactive multimedia CD-ROM containing instruction materials in middle school literacy consisting of software, a library of terms and sentences, video, text, and graphics, all of which were designed to be used in conjunction with the software (the "Literacy Unit"); and (3) certain confidential key academic concepts and techniques that formed the pedagogical basis for the Literacy Unit (all collectively, the "Read 180 Materials"). (Id. at ¶ 26.) Because the Read 180 Materials were created within the course and scope of Hasselbring and his Vanderbilt team's employment, Vanderbilt considered all of the components to be works for hire assigned to Vanderbilt pursuant to the Technology Policy. (Id. at ¶ 27.)

Scholastic is a for-profit New York corporation that describes itself as the world's largest publisher and distributor of children's books and a leading provider of children's print and digital instruction materials sold throughout the United States. (Id. at ¶ 3.) The positive results with Read 180 in Orange County, Florida, led Scholastic to partner with Vanderbilt to license the software and launch Read 180 as a commercial product. (Id. at ¶ 25.) Accordingly, Vanderbilt and Scholastic entered into the License effective January 1, 1997. (Id. at ¶ 28.) Vanderbilt granted Scholastic an exclusive, royalty-bearing license to the Read 180 Materials for the purpose of producing and marketing a literacy program (the "Read 180 Literacy Program") throughout the world that would embody the Read 180 Materials. (Id. at ¶ 29.) In exchange, Scholastic was to pay Vanderbilt escalating royalties on net sales as defined in the License. (Id. at ¶ 30.) According to

the Complaint, Vanderbilt and Scholastic recognized that Scholastic's development of the Read 180 Materials to a marketable state would likely result in the future creation of Derivative Products that were unknown and unforeseen at the time of contracting. (Id. at ¶ 31.) So that Vanderbilt could receive royalties on the Derivative Products, the parties agreed to the following language in Paragraph 6.2 of the License:

> The parties recognize and agree that future improvements may result in products different in form, content, or medium from the [Read 180] Materials delivered to Scholastic under this Agreement. It is the express intent of the parties that regardless of the form of future improvements or derivative works, Vanderbilt shall receive royalties pursuant to Section 9 [of the License] on all software products based on or derived from the [Read 180] Materials, pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products.

(Id.)[5] Through the License, Scholastic launched the Read 180 Literacy Program in 1999, and it became the foundation of Scholastic's highly-successful Education Technology and Services business. (Id. at ¶ 33.) There have been several versions, updates, and new iterations of Read 180 produced since 1999, and, according to the Complaint, Read 180 continues to be the largest selling digital curriculum in the marketplace. (Id.)

The Complaint alleges that, according to internal marketing materials, a number of other products have been based on or derived from Read 180, including, but not limited to, System 44, FASTT Math, MATH 180, iRead, Expert 21, and Scholastic U. (Id.) Vanderbilt claims that these are Derivative Products or, if not, then Ancillary Products. (Id.) According to the Complaint,

---

[5] Vanderbilt and Scholastic also expressly agreed in Paragraph 4.2 of the License that "Scholastic may, subject to Vanderbilt policies on outside employment and conflicts of interest, negotiate a consulting arrangement with Hasselbring for consulting on Scholastic's development or marketing of the literacy program." (Doc. No. 85 at ¶ 32.) Vanderbilt avers that it provided Scholastic with a copy of the relevant Vanderbilt policies at or around the time the parties entered into the License. (Doc. No. 85 at ¶ 32.) The policies have also been publicly available on Vanderbilt's website for nearly twenty years. (Id.)

Scholastic and HMH have repeatedly marketed these Derivative and Ancillary Products in a way that leaves "little doubt" that they "are derived from and related to Read 180 [or that] Hasselbring authored them while in Vanderbilt's employ. Vanderbilt alleges that Scholastic and HMH's marketing extensively promotes Hasselbring and emphasizes his Vanderbilt connection in an effort to falsely imply to consumers that Vanderbilt is either a source of, affiliated with, or sponsors these products. (Id. at ¶¶ 60-61.) In addition, Vanderbilt alleges that Hasselbring has consistently held himself out as the author of the Derivative or Ancillary Products. (Id. at ¶ 62.) In any event, Vanderbilt alleges that Hasselbring, Scholastic, and HMH knowingly failed to disclose Hasselbring's authorship of the Derivative or Ancillary Products to Vanderbilt and did not pay appropriate royalties to Vanderbilt based on the use of Vanderbilt Technology and intellectual property therein. (Id. at ¶ 63.)

C.    Sale to HMH and Vanderbilt's Audit

HMH is a for-profit Massachusetts corporation engaged in the business of publishing, marketing and selling pre-kindergarten through grade 12 educational content and related services. (Id. at ¶ 4.) On May 15, 2015, Vanderbilt received a letter from Scholastic announcing the sale of Scholastic's Education Technology and Services business to HMH and requesting Vanderbilt's consent to the assignment of the License to HMH. (Doc. No. 85-5.) Vanderbilt consented to the assignment on May 27, 2015, under which HMH would assume all rights and obligations under the License. (Doc. No. 85 at ¶ 34.) According to the Complaint, in connection with the sale, Scholastic and HMH made certain public representations about total sales and value of Read 180 products that were extremely surprising to Vanderbilt. (Id. at ¶ 35.) Specifically, press reports indicated that sales of the Read 180 Literacy Program exceeded one billion dollars, far greater than the sales figures for which Vanderbilt had been paid royalties under the License. (Id.) In 2016,

after reviewing publicly-available financial information concerning the sale of Scholastic to HMH and the value of Read 180, Vanderbilt exercised its right under Paragraph 9.4 of the License to have the books and records of Scholastic/HMH audited with respect to performance under the License, and it retained the accounting firm RSM US LLP ("RSM") for this task. (Id. at ¶ 36.)

In June 2016, RSM produced an initial audit report that covered the period of June 1, 2010 through May 31, 2015. (Id. at ¶ 37.) RSM first estimated that Vanderbilt had been underpaid by at least $5.5 million for this five-year period for products that Scholastic and HMH had already agreed were royalty-bearing. (Id. at ¶¶ 37-38.) Second, RSM estimated that as much as $25 million in royalties could be owed on the Derivative and Ancillary Products – specifically, on sales of products derived from the Vanderbilt's licensed materials, including, but not limited to, System 44, FASTT Math, MATH 180, iRead, Expert 21, and Scholastic U. (Id. at ¶¶ 37, 39.) RSM also reached several additional conclusions: (1) Scholastic and HMH failed to pay Vanderbilt for any royalties generated by Canadian sales of Read 180; (2) Scholastic and HMH failed to pay royalties for the complete Read 180 Literacy Program as required by the License because they impermissibly carved out sales of certain Read 180 components that they dubbed to the "non-software" components[6] while advertising the full Read 180 family of products, including the non-software components, as a single literacy program; and (3) Scholastic and HMH made improper deductions from Vanderbilt's royalty payments for supposed shipping and handling costs associated with Read 180 products. Vanderbilt therefore concluded that Scholastic/HMH owed it in excess of $30,000,000 under the License for all of these categories. (Id. at ¶ 43.)

---

[6] This would include, for example, rBooks (student work texts), teaching guides, and data and assessment systems. (Doc. No. 85 at ¶ 41.)

D.      Vanderbilt's Review of Hasselbring's Conduct

Given RSM's audit findings, Vanderbilt (1) reviewed Hasselbring's conduct regarding his relationship with Scholastic and HMH, the License, the Read 180 Literacy Program, and the Derivative/Ancillary Products, and (2) evaluated Hasselbring's compliance with Vanderbilt's Technology Policy, COI Policy, and fiduciary obligations to the University. (Id. at ¶ 45.) According to the Complaint, Vanderbilt discovered that Hasselbring had negotiated and entered into a number of undisclosed agreements with Scholastic or HMH for the sharing or creation of intellectual property and Vanderbilt Technology, most of which, if not all, Vanderbilt claims that it owns pursuant to the Technology Policy (collectively the "Undisclosed Hasselbring/Scholastic/HMH Agreements"). (Id. at ¶¶ 46-50.) In addition, Vanderbilt alleges that it discovered that, in 2012, 2013, and 2014, Hasselbring incorrectly answered "no" when asked on his Vanderbilt COI Disclosure if he had a relationship with a business that had a contractual relationship with Vanderbilt or that paid royalties to him directly. (Id. at ¶ 51.) Vanderbilt claims Hasselbring knew those representations were false and that Vanderbilt would rely upon them. (Id.) According to Vanderbilt, Hasselbring also answered "no" when asked if he was involved in an activity or relationship directly or indirectly involving Vanderbilt that created a conflict of interest/commitment or the appearance of a conflict of interest/commitment under Vanderbilt's COI Policy. (Id. at ¶ 52.) Once again, Vanderbilt claims Hasselbring knew that representation was false and that Vanderbilt would rely upon it. (Id.) Vanderbilt alleges that these attempts by Defendants to circumvent Vanderbilt's policies, obtain title to Vanderbilt Technology, and avoid paying a royalty to Vanderbilt, were on-going and continued even after HMH purchased Scholastic. (Id. at ¶ 54.)

In addition, the Complaint alleges that the Undisclosed Hasselbring/Scholastic/HMH Agreements (1) contained warranties representing that Hasselbring had the right to convey the Vanderbilt Technology he was supplying; (2) contained non-compete language preventing Hasselbring from otherwise monetizing the Vanderbilt Technology by creating similar products; (3) were styled as "consulting agreements" in order to hide the fact that Hasselbring was authoring technology that belonged to Vanderbilt under its Technology Policy or because the Technology was related to or derived from Read 180 Materials, and despite that Scholastic, HMH, and Hasselbring all knew that Hasselbring was not permitted under Vanderbilt's employment policies to directly convey intellectual property in exchange for a royalty; and (4) directed millions of dollars in on-going royalty payments to Hasselbring without providing any payment to Vanderbilt for the use of the Vanderbilt Technology or other intellectual property. (Id. at ¶¶ 55, 56.) Vanderbilt claims Hasselbring continues to improperly earn millions of dollars in royalties directly from the other Defendants. (Id. at ¶ 58.)

E.     Trademarks

The Complaint also alleges that Scholastic and HMH improperly used Vanderbilt's intellectual property, registered name, logo, and associated goodwill in the design, development, marketing, and promotion of the products discussed above, for the purpose of falsely implying to consumers that Vanderbilt was a source of or sponsor of the products or was in some way affiliated with the products. (Id. at ¶ 65; see also id. at ¶ 66 (listing family of registered trademarks).)

II.     Legal Standard

To survive a Rule 12(b)(6) motion, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 557). "If the plaintiffs do not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed." Lutz v. Chesapeake Appalachia, L.L.C., 717 F.3d 459, 464 (6th Cir. 2013) (citation and brackets omitted). Dismissal is likewise appropriate where the complaint, however factually detailed, fails to state a claim as a matter of law. Mitchell v. McNeil, 487 F.3d 374, 379 (6th Cir. 2007). In deciding a motion to dismiss, the court is not required to accept summary allegations, legal conclusions, or unwarranted factual inferences. Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999); Lillard v. Shelby Cty. Bd. of Educ., 76 F.3d 716, 726 (6th Cir. 1996).

III.     Analysis

   A.     Trademark Infringement Claim under the Lanham Act (Count Three)

   The Lanham Act makes any person who uses "any word, term, name, symbol, or device" in a way that is "likely to cause confusion, or to cause mistake, or to deceive as to . . . affiliation, connection, or association" liable to a senior trademark owner. Sazerac Brands, LLC v. Peristyle, LLC, 892 F.3d 853, 856-57 (6th Cir. 2018) (quoting 15 U.S.C. § 1125(a)(1)(A)); see also 15 U.S.C. § 1114. The "touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997). "To frame it another way, the ultimate question is whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1116 (6th Cir. 1996) (internal quotation marks omitted). "Trademark law's likelihood-of-confusion requirement . . . is designed to promote informational integrity in the marketplace. By

ensuring that consumers are not confused about what they are buying, trademark law allows them to allocate their capital efficiently to the brands that they find most deserving." Oaklawn Jockey Club, Inc. v. Kentucky Downs, LLC, 687 F. App'x 429, 431-32 (6th Cir. 2017) (quoting Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc., 730 F.3d 494, 512 (6th Cir. 2013)).

Generally, the courts evaluate whether a plaintiff has demonstrated a likelihood of consumer confusion by means of "an eight-factor, nothing-is-off-the-table, totality-of-the-circumstances test." Sazerac Brands, 892 F.3d at 857 (citing Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 648 (6th Cir. 1982)); Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d. Cir. 1961) (Friendly, J.)). Before employing this test in this Circuit, however, courts must first ask whether the defendant is actually using the plaintiff's trademark to identify the source of the defendant's product. Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 610 (6th Cir. 2009). "If defendants are only using [the] trademark in a 'non-trademark' way – that is, in a way that does not identify the source of a product – then trademark infringement and false designation of origin laws do not apply."[7] Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.,

---

[7] This "threshold" test has drawn criticism. See Kelly-Brown v. Winfrey, 717 F.3d 295, 305-08 (2d Cir. 2013); Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 168-70 (4th Cir. 2012). The Second Circuit has suggested that the Sixth Circuit's test "would lead to the dismissal of [ ] claims without addressing what is beyond doubt the central question in considering consumer confusion: whether consumers were actually confused by the allegedly infringing product." Kelly-Brown, 717 F.3d at 307. And a leading trademark treatise notes the Sixth Circuit's "eccentric and peculiar view is erroneous because it finds no support either in the Lanham Act or in precedent." 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:11.50 (5th ed. 2018). Last year, the Sixth Circuit noted that "the critics may have a point, but they exaggerate the consequences of our approach. The trademark use test resembles in nearly every particular the fair use defense[.] . . ." Sazerac Brands, 992 F.3d at 859. The court continued: "There is little daylight between the "non-trademark use" the Circuit test requires and the "descriptive use" that the statute requires. So it will often be the case that a claim that fails our threshold trademark use test will also be vulnerable to a fair use defense. Exhibit A: [Defendant] used the [trademark] in a 'non-trademark way' under our circuit's test and 'fairly and in good faith only to describe goods or services' under the [Lanham] Act." Id. However, the court acknowledged that "patterns might arise where our test might make a difference" and where [it] "might wish to reconsider whether our test respects the

326 F.3d 687, 695 (6th Cir. 2003); <u>see also</u> <u>Oaklawn Jockey Club</u>, 687 F. App'x at 432; <u>Grubbs v.</u> <u>Sheakley Grp., Inc.</u>, 807 F.3d 785, 793-94 (6th Cir. 2015). "Only if the plaintiff clears this threshold test," does a court eventually reach the full likelihood-of-confusion analysis and any defenses. <u>Sazerac Brands</u>, 892 F.3d at 859; <u>Grubbs v. Sheakley Grp., Inc.</u>, 807 F.3d 785, 793 (6th Cir. 2015).

The threshold "trademark use" inquiry is the sole basis for Scholastic and HMH's argument to dismiss Count III. They contend that any references to "Vanderbilt" in the context of the Derivative or Ancillary Products are made in a "non-trademark" way, primarily for the innocent purpose of identifying Hasselbring. Vanderbilt responds that, by using Vanderbilt's trademarks, Scholastic and HMH create the type of consumer confusion that is actionable under the Lanham Act. Factual statements about the past experience of an employee are not *per se* barred by the Lanham Act. <u>See, e.g.</u>, <u>Review Directories Inc. v. McLeodUSA Publ'g Co.</u>, 236 F. Supp. 2d 810, 813 (W.D. Mich. 2001) ("Thus, the use of a trademark in a non-trademark sense, where the trademark is used fairly and accurately as a way to identify an individual working for a company or the nature of the goods or services being offered are not prohibited by the Lanham Act."); <u>Bus.</u> <u>Trends Analysts, Inc. v. Freedonia Grp., Inc.</u>, 700 F. Supp. 1213, 1233 (S.D.N.Y. 1988) ("It has long been settled that the trademark laws do not prohibit the use of a company name or trademark in a non-trademark sense where the trademark is used fairly and accurately as a means of identifying either an individual working for a company or of describing the nature of goods or services being offered by that company."). Rather, the Lanham Act comes into play when a plaintiff's trademark is used in such a manner that "a consumer is likely to notice [the plaintiff's

language of the statute." This is clearly the purview of the Court of Appeals. In the meantime, the Court applies the threshold test in accordance with controlling precedent.

trademark] . . . and then think that the [defendant's product] may be produced by the same company[.]" Interactive Prods. Corp., 326 F.3d at 696. A professor like Hasselbring is, of course, identified with his or her university employer in some ways, and the research that a professor conducts over the course of his or her career will always inform things that he or she may do outside that forum. The Court must therefore consider whether Vanderbilt has sufficiently alleged that Scholastic and HMH have used Vanderbilt's trademarks in connection with the Derivative or Ancillary Products in such a manner that goes beyond mere identification – that is, so that consumers might think that the Derivative or Ancillary Products are affiliated with or were made by Vanderbilt.

The Complaint lists a family of trademarks that Vanderbilt has registered "for numerous classes of goods and services." (Doc. No. 85 at ¶ 66.) The list is comprised of twelve marks – nine of which are stylized Vanderbilt logos and three of which are "Vanderbilt" or "Vanderbilt University." (Id.) Vanderbilt sets forth several alleged improper uses of those trademarks in marketing and promotional materials for Derivative or Ancillary Products, as follows:

a. The website for the System 44 program states that "at the heart of this adaptive technology" is the FASTT algorithm developed by Hasselbring "in partnership with his team at Vanderbilt University." (Doc. No. 85 at ¶ 61(A)(a).)

b. That System 44 "grew out of seminal research on cognition and technology . . . conducted by Dr. Hasselbring at Vanderbilt University." (id. at ¶ 61(A)(a)(ii).)

c. That "System 44 has relied on the research-based design of Dr. Hasselbring and his work through Vanderbilt University" and "leverages the power of research-based instructional practices and adaptive, personalized technology driven by the FASTT algorithm Dr. Hasselbring helped to pioneer with READ 180." (Id. at ¶ 61(A)(a)(iii).)

d. Advertising for the FASTT Math program states that "FASTT Math is the result of over two decades of research conducted by Dr. Ted Hasselbring, Co-Director of the Learning Technology Center at Vanderbilt University. This research on using

technology to provide instruction and intervention is the basis of the FASTT algorithm." (Id. at ¶ 61(B)(b).) Until December 2017, this statement was also accompanied by a version of the Vanderbilt "V" logo as illustrated below:



(Id. at ¶ 61(B)(c).)

e. The website for the Math 180 program lists Hasselbring as Lead Author and states that he is a professor at Vanderbilt who used "his expertise" earned from twenty-five (25) years of research. (Id. at ¶ 61(C)(b).)

Vanderbilt alleges that, for a significant period of time, Scholastic and HMH marketed Derivative or Ancillary Products by means of these and other advertisements and promotional materials. That is an alleged business use in an effort to sell products that Scholastic and HMH, not Vanderbilt, created. The Complaint further alleges that Scholastic and HMH not only used Vanderbilt trademarks, but did so in a manner that suggested the substantial involvement of Vanderbilt. This is most evident in the marketing of the FASTT Math program. (Doc. No. 85 at ¶ 61(B)(b).) Scholastic and HMH promoted that "FASTT Math *is the result of over two decades of*

*research conducted by Dr. Ted Hasselbring, Co-Director of the Learning Technology Center at Vanderbilt University. This research* on using technology to provide instruction and intervention *is the basis of* the FASTT algorithm." <u>Id</u>. (emphasis added). Until December 2017, this language was accompanied by an oversized Vanderbilt "V" logo as seen above, which served no informational purpose because the text already identified Hasselbring's association with Vanderbilt. (<u>Id</u>. at ¶ 61(B)(c).) Vanderbilt is entitled to the favorable inference that the purpose of the logo was to reinforce the idea that Vanderbilt was affiliated with, directly contributed to, or created the FASTT Math program.

The Court finds that, on a robust reading of the Complaint and drawing all inferences in favor of the plaintiff, Vanderbilt has stated a Lanham Act trademark infringement claim. Direct references to twenty years of Vanderbilt research as the basis for specific Derivative or Ancillary Products, taken together with Hasselbring's well-known position at Vanderbilt and his Vanderbilt team, constitute plausible allegations that Defendants created a likelihood of confusion in the mind of consumers regarding whether Vanderbilt approved or produced the Derivative or Ancillary products.[8] The Court's conclusion is bolstered because Vanderbilt further alleges that Scholastic and HMH have "traded on Vanderbilt's extensive goodwill and reputation in an attempt to misrepresent to consumers that Vanderbilt sponsors or endorses Defendants' products, which is not true and is likely to cause confusion in the marketplace." (Doc. No. 85 at ¶ 67.) Confusion giving rise to a claim of trademark infringement includes confusion as to "source, sponsorship, affiliation, connection, or identification." <u>Star Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373,

---

[8] On a motion to dismiss, the Court simply cannot accept Defendant's numerous bald assertions to the contrary (e.g., "nothing in the [Complaint] suggests that Defendants represented to consumers that Vanderbilt created or endorsed Hasselbring's work, much less Defendant's products" (Doc. No. 101 at 2)), which would require inference upon inference against Vanderbilt to place Defendants, in their own words, "on the right side of that distinction." (<u>Id</u>.).

383 (2d Cir. 2005) (citation omitted). In other words, "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." Id. at 384 (citation omitted); see also id. ("'Affiliation confusion' exists where use of a 'unique and recognizable identifier' could lead consumers to 'infer a relationship' between the trademark owner and the new product."). Vanderbilt has sufficiently pled that Scholastic and HMH used Vanderbilt's trademarks to create confusion regarding their affiliation with Vanderbilt and, thus, permit the inference that Vanderbilt may have been "behind" part or all of the Derivative or Ancillary Products.

For these reasons, the motion to dismiss Count Three will be denied.

B.      Unfair Competition Claim Under the Lanham Act (Count Four)

While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a) is one of the few provisions that goes beyond just trademark protection. See 15 U.S.C. § 1125(a). Section 43(a) of the Lanham Act provides civil liability for:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

Id. "As originally enacted, § 43(a) created a federal remedy against a person who used in commerce either 'a false designation of origin, or any false description or representation' in connection with 'any goods or services.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003) (quoting 60 Stat. 441). However, it has come to be understood that § 43(a) "does not have boundless application as a remedy for unfair trade practices." Id. (citing Alfred Dunhill, Ltd. v.

18

Interstate Cigar Co., 499 F.2d 232, 237 (2d Cir. 1974)). "[B]ecause of its inherently limited wording, § 43(a) can never be a federal 'codification' of the overall law of 'unfair competition,' but can apply only to certain unfair trade practices prohibited by its text." Id. (citing 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:7 (4th ed. 2002)).

Every court of appeals to consider the issue has found that § 43(a) encompasses "reverse passing off," which occurs when a producer misrepresents someone else's goods or services as his own.[9] Id. at 27 (citation omitted). In a classic §43(a) reverse passing off claim, a plaintiff accuses a defendant of buying some of its products and "merely repackag[ing] them as its own." Id. at 31. In Dastar, the Supreme Court held that § 43(a) of the Lanham Act protected only "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." Id. at 37. The court reasoned that, "in construing the Lanham Act, we have been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright." Id. at 34 (quoting TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29 (2001)). That is because "[t]he Lanham Act . . . does not exist to reward manufacturers for their innovation in creating a particular device," id. (quoting TrafFix, 532 U.S. at 34), and "has no necessary relation to invention or discovery," id. (quoting In re Trade-Mark Cases, 100 U.S. 82, 94 (1879)), but instead, "by preventing competitors from copying 'a source-identifying mark . . . [the Lanham Act] reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a producer

---

[9] This is in contrast to "passing off," which occurs when a producer misrepresents his own goods or services as someone else's. Dastar, 539 U.S. at 27 (citing O. & W. Thum Co. v. Dickinson, 245 F. 609, 621 (6th Cir. 1917)). That circumstance is not present here.

that it . . . will reap the financial, reputation-related rewards associated with a desirable product,'" id. (quoting Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 163-64 (1995)).

At issue in Dastar was the repackaging of videos available in the public domain that had once been produced by another company. Id. at 31. As the court explained it: "If 'origin' refer[red] only to the manufacturer or producer of the physical 'goods' that are made available to the public (in this case the videotapes), Dastar was the origin. If, however, 'origin' includes the creator of the underlying work that Dastar copied, then someone else (perhaps [the plaintiff]) was the origin of Dastar's product." Id. The court rejected the idea that §43(a) should be understood to encompass communicative or intellectual product as opposed to physical product. Id. at 33-37. It did so in significant part because this would conflict with the law of copyright, and the rights of copyright holders are a "carefully crafted bargain." Id. at 34-35. The court concluded that, assuming for the sake of argument that Dastar's representation of itself as the "Producer" of its videos amounted to a representation that it originated the creative work conveyed by the videos, "allowing a cause of action under § 43(a) for that representation would impermissibly "create a species of mutant copyright law." Id. at 34-35. The court also noted the practical problems that would arise from adopting a special definition of "origin" for communicative products: "On the one hand, they would face Lanham Act liability for *failing* to credit the creator of a work on which their lawful copies are based; and, on the other hand, they could face Lanham Act liability for *crediting* the creator if that should be regarded as implying the creator's 'sponsorship or approval' of the copy." Id. at 36 (citations omitted). Accordingly, the Dastar Court held that "origin of goods" in § 1125(a)(1) referred only to the origin of a physically-produced item, and not the origin of the creative content in an item. See Brainard v. Vassar, 561 F. Supp. 2d. 922, 934 (M.D. Tenn. 2008) (discussing Dastar). Dastar therefore stands for the straightforward proposition that Lanham Act

unfair competition claims must "refer[ ] to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." Dastar, 539 U.S. at 37.

In 2015, the Court of Appeals highlighted the principles of Dastar in Kehoe Component Sales Inc. v Best Light Products, Inc., 796 F.3d 576 (6th Cir. 2015). In Kehoe, a lighting products company brought to a manufacturer the idea to make certain specialized products for the company to sell. Id. at 580. The manufacturer agreed, but after it made enough units to fill the company's orders, the manufacturer used the same methods to manufacture thousands of additional units and began selling them under its own name to several of the company's customers. Id. The products company brought an unfair competition claim under the Lanham Act. Citing Dastar, the Court of Appeals observed that "the Lanham Act protects the ability to control one's brand; it does not protect the ability to control one's inventions or innovations. The Act's use of the term "origin" does not refer to "the person or entity that originated the ideas or communications that 'goods' embody or contain." Id. at 587. "As Dastar makes plain," the court explained, "an entity makes a false designation of origin sufficient to support a reverse passing off claim only where it falsely represents the product's geographic origin or represents that it has manufactured the tangible product that is sold in the marketplace when it did not in fact do so." Id. The Court of Appeals therefore confirmed that the Lanham Act does not guard against theft of "product ideas to manufacture a rival, facsimile product." Id. at 589.

In this district, Judge Aleta Trauger has described the holding of Dastar as "quite simple." Brainard, 561 F. Supp. 2d. at 936. In Brainard, a number of songwriters and publishing entities brought claims against a country musician based upon performance of an allegedly unauthorized derivative work. Id. at 926. Among these claims was one for unfair competition under the Lanham

Act. Id. Judge Trauger explained that "[t]he federal courts have consistently applied Dastar to hold that "'origin of goods' in the Lanham Act § 43(a)(1)(A) [does] not refer to the author of any idea, concept, or communication embodied in a good, but to the producer of the tangible good itself." Id. at 935. Based upon Dastar, the plaintiffs' § 43(a) claim in Brainard was dismissed because they alleged that defendants had stolen their ideas, not that the plaintiffs actually physically produced the items that were sold by the Defendants. Id.

Vanderbilt alleges that Defendants have misappropriated copyrightable Vanderbilt Technology and intellectual property, including computer programs, without disclosure to Vanderbilt; incorporated some combination of that Vanderbilt Technology and intellectual property into the Derivative and Ancillary Products; and sold those products. (Doc. No. 85.) However, no matter what degree of intellectual property and creative content Vanderbilt alleges Defendants misappropriated and used to create the Derivative or Ancillary Products, Vanderbilt has *not* alleged, as required, either that Defendants were (1) selling actual repackaged Vanderbilt products or (2) passing their products off as actually physically produced by Vanderbilt. Under the consistent line of precedent from Dastar to Kehoe to Brainard, Vanderbilt has therefore not alleged that it is the "origin" of the Derivative or Ancillary Products because it did not produce or manufacture them. Rather, Scholastic and HMH produced and sold the Derivative or Ancillary Products and are thus the alleged "origin" of the Derivative or Ancillary Products, regardless of whether they incorporated Vanderbilt's copyrightable intellectual property. Accordingly, Vanderbilt's § 43(a) claim is untenable. Dastar, 539 U.S. at 37.

Vanderbilt's arguments to the contrary are unconvincing. First, Vanderbilt's contention that Dastar is simply "unpersuasive" is wholly without merit in light of Kehoe in this Circuit and Brainard in this District (which go undiscussed in Vanderbilt's brief). Second, Vanderbilt's

attempt to distinguish <u>Dastar</u> because that case involved information in the public domain, instead of confidential or proprietary information, also fails. Judge Trauger aptly rejected this argument in <u>Brainard</u>, concluding that "[i]t does not follow" that <u>Dastar</u> intended that "origin of goods" should mean one thing when addressing protected intellectual property and mean something quite different when addressing works in the public domain. <u>Brainard</u>, 561 F. Supp. 2d at 934. "Quite to the contrary," Judge Trauger concluded, "the Court in <u>Dastar</u> set out to answer whether 'origin of goods' could be applied to the origin of creative content in all settings, and [it] found that it could not." <u>Id</u>. (citing <u>Dastar</u>, 539 U.S. at 32 ("[A]s used in the Lanham Act, the phrase 'origin of goods' is in our view incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain.")).

Finally, Vanderbilt essentially contends that this claim should be allowed to proceed as a false association claim and not just a false origins claim. (<u>See</u> Doc. No. 96 at 13.) This argument also fails. As an initial matter, false association under 15 U.S.C. § 1125(a) involves the very same statutory subsection as was involved in <u>Dastar</u>: § 1125(a)(1)(A). Thus, from a statutory perspective, false association "is the same claim as that of false designation of origin, just under a different name." <u>Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.</u>, 170 F. Supp. 3d 1249, 1266 (C.D. Cal. 2016). Second, an unfair competition claim based upon false association cannot succeed where one based upon false origin fails because <u>Dastar</u>, at its core, dictates that "communicative products" suited to copyright protection simply cannot be "goods" for the purposes of a Lanham Act unfair competition claim. <u>See</u> <u>Rudovsky v. W. Pbl'g Corp.</u>, No. 09-cv-00727-JF, 2010 WL 2804844, at *1 (E.D. Pa. July 15, 2010). While § 1125 "is one of the few provisions that goes beyond trademark protection," <u>Dastar</u>, 539 U.S. at 29, it simply "does not," as previously noted, have "boundless application," <u>id</u>. (quoting <u>Alfred Dunhill, Ltd.</u>, 499 F.2d at

237); see also, e.g., Lions Gate Entm't Inc., 170 F. Supp. 3d at 1266 (stating that § 43(a) false association claims are barred by Dastar); Rudovsky, 2010 WL 2804844, at *1 (holding that § 43(a) false endorsement claim is precluded by Dastar). Vanderbilt's claim, however worded, is premised on the core allegations that Hasselbring created distinctive conceptual copyrightable work that belonged to Vanderbilt; Hasselbring, Scholastic and HMH misappropriated the Vanderbilt Technology and intellectual property and used it to create the Derivative or Ancillary Products; and Defendants then unfairly associated Vanderbilt with those products without compensation. Accordingly, the Court finds that Dastar still controls even if Vanderbilt characterizes its claim as one of unfair false association.

For these reasons, Vanderbilt's unfair competition Lanham Act § 43(a) claim is precluded by Dastar and its progeny. Count Four will therefore be dismissed.

## C.    Declaratory Judgment Act Claim (Count Two)

Vanderbilt also brings a federal claim for "a declaratory judgment that it owns an interest in the intellectual property comprising the Derivative [or] Ancillary Products."[10] (Doc. No. 85 at ¶ 83.)  The Declaratory Judgment Act ("DJA") provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has explained that the DJA "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). In passing the act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Id. at 288. District courts are afforded substantial discretion to exercise

---

[10] Vanderbilt brings a claim for declaratory judgment because, as purported co-owner, it cannot bring a copyright infringement claim. Severe Records, LLC v. Rich, 658 F.3d 571, 582 (6th Cir. 2011).

jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." Id. at 289. In considering whether a district court has properly exercised its discretion in this regard, the Court of Appeals has traditionally focused on five factors:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984).

The Copyright Act requires authors to intend to create a joint work. Hemby v. Winans, No. 3:06-0979, 2010 WL 793681, at *3 (M.D. Tenn. Mar. 5, 2010) (citing 17 U.S.C. § 101); Childress v. Taylor, 945 F.2d 500, 505-09 (2d Cir. 1991). Accordingly, for Vanderbilt to have an ownership interest in the Derivative or Ancillary Products, it must establish that Defendants intended for those to have been joint works. Scholastic and HMH argue that Vanderbilt's declaratory judgment claim should be dismissed because Vanderbilt fails to allege this intent.[11]

---

[11] Scholastic and HMH also argue, as an initial matter, that a claim to co-ownership claim is foreclosed to some degree by the License itself. However, the "Improvements" section of the License is far from clear. It grants Scholastic and HMH ownership in "all proprietary rights, including copyright, in the future improvements" they make to the Vanderbilt's materials, but not to "the underlying Software." (Doc. No. 11 at ¶ 6.2.) The Court cannot say at this stage of the case (i.e., before being presented with evidence regarding whether the underlying software was used in any particular Derivative or Ancillary Products) that this provision allows for, or precludes, any specific claim to ownership.

The Complaint contains allegations that Scholastic and HMH knew of the obligations imposed by Hasselbring's employment relationship with Vanderbilt, and therefore knew that Vanderbilt would have an ownership interest in any Derivative or Ancillary Products that used Vanderbilt Technology or intellectual property created or conveyed by Hasselbring. To the extent Scholastic and HMH knowingly used Vanderbilt Technology and intellectual property in the Derivative or Ancillary Products, they intended a result in which Vanderbilt would be a co-owner, nevertheless they took steps to avoid compensating Vanderbilt by means of subterfuge. As just one specific example, Vanderbilt alleges that "the Undisclosed Hasselbring Scholastic/HMH Agreements were styled as 'consulting agreements' in order to hide the fact that Hasselbring was authoring technology *that belonged to Vanderbilt under its Technology Policy and/or because the Technology was related to or derived from Read 180 Materials.*" (Doc. No. 85 at ¶ 56 (emphasis added).) Scholastic, HMH, and Hasselbring *all knew*, according to Vanderbilt, that Hasselbring was not permitted under Vanderbilt's employment policies to directly convey intellectual property in exchange for a royalty. However, Scholastic and HMH disguised their agreements to give Hasselbring "cover" for circumventing Vanderbilt and to hide "the true nature of the transactions." Id. These allegations can be reasonably understood to mean that Defendants knew Vanderbilt would own a part of the Derivative or Ancillary Products, and they continued nonetheless. Vanderbilt is entitled to the favorable inference that Scholastic and HMH were intentionally creating a jointly-owned product and seeking to conceal it from Vanderbilt. At the very least, at this stage, Scholastic and HMH are not entitled to any greater competing inference.

Given that the claim is legally viable, the Court considers the Grand Trunk factors. Here, the third and fourth factors have no particular relevance, but the first, second, and fifth factors favor continuing to exercise jurisdiction over Vanderbilt's declaratory judgment claim. There is

an ongoing controversy between Vanderbilt and Defendants concerning alleged violations of Vanderbilt's rights, a significant part of which involves the use of Vanderbilt Technology and intellectual property in the Derivative or Ancillary Products. This cause of action will therefore help settle the controversy. It is almost always the case that if a declaratory judgment will help settle the controversy, then it will help clarify the legal relations in issue. Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 557 (6th Cir. 2008). Here, Vanderbilt's claim is fundamentally as much about its relationship with Defendants as it is about its attempt to recover from them. Accordingly, the second factor weighs in favor of retaining this claim. Finally, the court sees no alternative remedy that presents a notably more attractive option. In fact, resolving the issue of co-ownership separately from the remaining claims in this case makes little sense. The fifth factor therefore speaks against dismissal.

The Sixth Circuit has "never indicated how the Grand Trunk factors should be balanced." Scottsdale, 513 F.3d at 563. Nonetheless, having found the relevant factors favor exercising declaratory jurisdiction in varying degrees, the Court's balancing of the factors in this case leans in favor of allowing this claim to proceed.

### D. Tortious Interference with Contract Claim (Count Seven)

The elements of the tort of tortious interference with contract "are quite clear under Tennessee law." Keith v. Aerus, LLC, No. 2:09-cv-297, 2010 WL 3883434, at *5 (E.D. Tenn. Sept. 29, 2010). Vanderbilt must sufficiently plead: "(1) that there was a legal contract; (2) that the defendant knew of the existence of the contract; (3) that the defendant intended to induce a breach of the contract; (4) that the defendant acted maliciously; (5) that the contract was actually breached; (6) that the defendant's acts were the proximate cause of the breach; and (7) that the plaintiff suffered damages resulting from the breach." Id. (quoting Lee v. State Volunteer Mut.

Ins. Co., No. E2002-03127-COA-R3-CV, 2005 WL 123492, at *10 (Tenn. Ct. App. 2005)); see also Buddy Lee Attractions, Inc. v. William Morris Agency, Inc., 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999). "A complaint for tortious interference with contract must do more than simply parrot the legal elements of the cause of action. . . . [I]t must also allege specific facts that, if true, would support each of the seven elements of the tort." Lee, 2005 WL 123492, at *10.

Scholastic and HMH contend that Vanderbilt has not adequately alleged the intent or malice elements. "[K]nowledge alone by [a] defendant is [not] sufficient to show intent and malice. It may be a factor relevant to the question of intent, but simple knowledge of [a] contract cannot be automatically equated with intent to induce a breach. What [a] plaintiff must allege is plausible facts to show an intent to induce a breach." Keith, 2010 WL 3883434, at *5. Malice is more specifically defined as the "willful violation of a known right." Prime Co. v. Wilkinson & Snowden, Inc., No. W2003-00696-COA-R3CV, 2004 WL 2218574, at *4 (Tenn. Ct. App. Sept. 30, 2004). Although Federal Rule of Civil Procedure 9(b) permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally[,]" factual allegations corroborating Defendant's malicious intent are still necessary. Rule 9(b) does not give plaintiffs "a license to evade the less rigid – though still operative – strictures of Rule 8" and its plausibility requirement. Iqbal, 556 U.S. at 686-87. Accordingly, "to make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred[.]" Mourad v. Marathon Petroleum Co. LP, 129 F. Supp. 3d 517, 526 (E.D. Mich. 2105). The Court therefore considers whether Vanderbilt has alleged facts sufficient to support the reasonable inference of malice and an orchestrated effort to interfere with Vanderbilt's contracts. Id.

Vanderbilt alleges: (1) it had a legal contract with Hasselbring; (2) Scholastic and HMH were aware of that contractual relationship and of the policies it entailed; (3) Scholastic and HMH

acted intentionally to circumvent that contractual relationship by means of disguised "consulting agreements" with Hasselbring for the purpose of gaining access to his work product; (4) as a result, Hasselbring did not comply with the Vanderbilt Technology Policy and COI Policy as required by his Employment Agreement with Vanderbilt; (5) Hasselbring, Scholastic, and HMH improperly developed the Derivative or Ancillary Products outside the scope of the License using Vanderbilt Technology and intellectual property provided by Hasselbring; and (6) Vanderbilt was grossly underpaid royalties on the Derivative and Ancillary Products that the Defendants earned outside the scope of the License. (See Doc. No. 85 at ¶¶ 18-22; 27-64; 110-115.) The Complaint does not contain factually insignificant allegations or "formulaic recitations," as Scholastic and HMH contend. Indeed, Vanderbilt's allegations contain substantial factual detail relevant to this claim. For example, there are no less than 15 paragraphs of allegations concerning the Defendants' alleged attempts to circumvent Hasselbring's contractual obligations to Vanderbilt by means of undisclosed consulting agreements. (Id. at ¶¶ 45-59.) Indeed, when the Complaint alleges the "conspiratorial attempts by Defendants to circumvent Vanderbilt's policies, obtain title to the Technology, and avoid paying a royalty" (id. at ¶ 54), the very policies referenced are in force by means of the contract between Hasselbring and Vanderbilt, (id. at ¶¶ 21-22.)

Vanderbilt has alleged enough plausible facts, taken as a whole, to allow sufficient reasonable inferences that Scholastic and HMH[12] intended to induce a breach of Hasselbring's

_____

[12] Because HMH succeeded to Scholastic's rights and obligations, it is not appropriate (as Defendants argue in the reply) to dismiss HMH from liability on this claim simply because Scholastic was the corporate entity allegedly involved in the initial efforts to lure Hasselbring away from fidelity to his alleged contractual obligations to Vanderbilt. Moreover, the Complaint specifically alleges that the "conspiratorial attempts" to circumvent the Hasselbring-Vanderbilt relationship "were on-going and continued even after HMH purchased Scholastic." (Doc. No. 85 at ¶ 54.)

contractual relationship with Vanderbilt and willfully sought to violate Vanderbilt's rights.[13] Count Seven shall proceed.

E.     Tennessee Consumer Protection Act Claim (Count Eight)

Vanderbilt alleges that Scholastic and HMH violated the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-104 et. seq., which prohibits "falsely passing off goods or services as those of another." Tenn. Code Ann. § 47-18-104(b)(1). Scholastic and HMH contend that Vanderbilt's TCPA claim should be dismissed for numerous reasons, but the Court need only reach the argument that this claim is barred by the statute of limitations.

When considering a motion to dismiss on the ground of a statute of limitations, the Court must decide whether "it is apparent from the face of the complaint that the limit for bringing the claim[s] has passed." Bishop v. Lucent Techs., Inc., 520 F.3d 516, 520 (6th Cir. 2008) (alteration in original) (quoting Hoover v. Langston Equip. Assocs., Inc., 958 F.2d 742, 744 (6th Cir. 1992)). The statute of limitations under the TCPA is "one (1) year from a person's discovery of the unlawful act or practice, but in no event . . . more than five (5) years after the date of the consumer transaction giving rise to the claim for relief." Tenn. Code Ann. § 47-18-110; Phillips v. Nationstar Mortg., LLC, No. 3:13-cv-01414, 2016 WL 2866164, at *5 (M.D. Tenn. May 17, 2016). In determining when a plaintiff "discovers" a harm, courts look to "what event should have alerted the typical lay person to protect his or her right." Howell v. Farris, 655 F. App'x 349, 351 (6th Cir. 2016).

---

[13] Scholastic and HMH suggest that warranties provided to them by Hasselbring in third-party agreement(s) absolve liability because they bely the knowledge element. (Doc. No. 88 at 12.) Any such exculpatory evidence, however, is not properly before the Court at this juncture. Hasselbring's third-party agreements are not attached to the Complaint or motion to dismiss, and they are not so integral to the Complaint that the Court may consider them without converting this to a motion for summary judgment. Jackson, 194 F.3d at 745.

The Complaint alleges that, after public statements made in connection with the sale of Scholastic's Education Technology and Services business to HMH, Vanderbilt engaged RSM to audit the books and records of Scholastic and HMH under the terms of the License. (Doc. No. 85 at ¶¶ 34-36.) On June 9, 2016, RSM produced an initial report that "detailed findings for the audit period of June 1, 2010 through May 31, 2015." (Id. at ¶ 37.) In this report, "RSM estimated that Vanderbilt had been underpaid by at least $5.5 million for this five-year period only and estimated that as much as $25 million in royalties could be due on the Derivative and Ancillary Products." (Id.) More specifically, the RSM report detailed conclusions that Scholastic and HMH had (1) failed to pay full royalties under the License for products that had been previously agreed to be royalty-bearing; (2) failed to pay royalties for Derivative or Ancillary Products; (3) failed to pay royalties on any Canadian sales of Read 180; (4) improperly "carved-out" sales of certain Read 180 components to reduce royalty payments; and (5) made improper deductions from royalties for supposed shipping and handling costs. (Id. at ¶¶ 38-42.) RSM identified "additional information" that it would need to "fully analyze and calculate the total amounts due" to Vanderbilt to remedy these "underpaid royalties, unpaid royalties, and improper deductions/carve-outs." (Id. at ¶¶ 37, 43.)

Based on these clear allegations, the Court finds that Vanderbilt "discovered" the unlawful acts or practices it alleges under the TCPA no later than the delivery of RSM's audit report on June 9, 2016. The RSM audit report reasonably put Vanderbilt on notice that it needed to protect its rights under the TCPA in a timely fashion. Vanderbilt argues that the statute of limitations was not triggered on June 9, 2016 because "its investigation was ongoing" and "was not complete" because it had "no definitive information" and RSM needed additional information to calculate the amounts due. (Doc. No. 96 at 18-19.) It is bold indeed to feature the RSM report so prominently in the

Complaint and then dismiss it here as apparently having so little import. More importantly, Vanderbilt misunderstands the law. It is *not* the "date of the ascertainable loss" that begins that running of the statute of limitations under the TCPA. Town of Smyrna, Tenn. v. Mun. Gas Auth. Of Ga., 129 F. Supp. 3d 589, 598 (M.D. Tenn. 2015). Rather, "a claim under the [TCPA] accrues when a plaintiff discovers the unlawful act or practice." Id. (citing Overton v. Westgate Resorts, Ltd., L.P., 2015 WL 399218, at *11 (Tenn. Ct. App. Jan. 30, 2015)); Phillips, 2016 WL 2866164, at *5. So for the purposes of this inquiry, it is largely irrelevant how much more time or information Vanderbilt needed to determine the *extent* of its alleged injury at the hands of Scholastic and HMH. It is clear that Vanderbilt had "discovered" the *existence* of the potential TCPA injury by June 9, 2016. Vanderbilt therefore had until June 9, 2017 to timely file a claim under the TCPA. Tenn. Code Ann. § 47-18-110.

Vanderbilt also contends that it is excused from any time bar by the Tolling Agreement between the parties. (Doc. Nos. 96 at 19; 56-1.) Although not clearly worded, this is essentially an argument for application of the doctrine of equitable estoppel, which tolls the running of the statute of limitations where the defendant has "misled the plaintiff into failing to file [his] action within the statutory period of limitations." Norton v. Everhart, 895 S.W.2d 317, 321 (Tenn. 1995). A classic example of this is when a defendant breaks a promise not to plead the statute of limitations once the plaintiff has waited for the statute to expire before filing his complaint. Fahrner v. SW Mfg., Inc., 48 S.W.3d 141, 145 (Tenn. 2001). Vanderbilt contends that the parties entered into the Tolling Agreement, dated July 28, 2017, that provides "any" limitations period that might apply to any claim is tolled. (Doc. No. 96 at 19 (citing Doc. No. 85 at ¶ 59).) However, by its unambiguous language, the Tolling Agreement tolled only the "time remaining" on statute of limitations periods for claims that "could be asserted," and "[n]othing in th[e] Tolling Agreement

*revive[d] a claim that was time barred . . . "* (Doc. No. 56-1 at ¶ 2 (emphasis added).) Tennessee courts recognize that a party is presumed to understand the contents of a contract. <u>Philpot v. Tenn. Health Mgmt., Inc.</u>, 279 S.W.3d 573, 579 (Tenn. Ct. App.2007) (citations omitted). In other words, "[t]he law imparts on parties to a contract to learn the contents and stipulations . . . before signing it, and signing it without learning such information is at the party's own peril." <u>Id</u>. Vanderbilt "has not alleged any exceptional circumstances explaining why [it] did not understand the [Tolling Agreement]." <u>Gebhardt v. GMAC Mortg., LLC</u>, No. 3:09-CV-425, 2010 WL 2901823, at *3 (E.D. Tenn. July 21, 2010). Accordingly, because the statute of limitations for Vanderbilt's TCPA claim had already expired on June 9, 2017, that claim could not be revived when the Tolling Agreement was later executed on July 28, 2017.

This action was not filed until January 16, 2018, over six months past the statute of limitations for Vanderbilt's TCPA claim. Count Eight is therefore time-barred and will be dismissed.

F.    <u>Fraud Claim (Count Nine)</u>

Tennessee recognizes two theories of fraud: fraud and fraudulent concealment. To plead fraud, a plaintiff must show the following elements: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation. <u>Dixon v. Producers Agric. Ins. Co.</u>, 198 F. Supp. 3d 832, 837 (M.D. Tenn. 2016) (citing <u>Walker v. Sunrise Pontiac-GMC Truck, Inc.</u>, 249 S.W.3d 301, 311 (Tenn. 2008)); <u>Metropolitan Gov't v. McKinney</u>, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992). Fraudulent concealment, also known as constructive fraud, "is essentially fraud

without the element of intent. Neither actual dishonesty of purpose nor intent to deceive is an essential element[.]" Kincaid v. S. Tr. Bank, 221 S.W.3d 32, 39 (Tenn. Ct. App. 2006) (citing Cornwell v. Hodge, C.A. No. 44, 1986 WL 5890, at *3 (Tenn. Ct. App. May 23, 1986)). Rather, constructive fraud is a breach of a legal or equitable duty that is deemed fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Id. at 39. Accordingly, "[c]onstructive frauds are acts, statements or omissions which operate as virtual frauds on individuals." Cornwell, 1986 WL 5890, at *3 (citing Maxwell v. Land Developers, Inc., 485 S.W.2d 869 (Tenn. Ct. App. 1972)). They are acts, statements, or omissions that "entail as an attribute of fraud, conduct which reasonably can be expected to influence the conduct of others." Kincaid, 221 S.W.3d at 39 (citing Cornwell, 1986 WL 5890, at *3).

Scholastic/HMH and Hasselbring have separately moved for the dismissal of Vanderbilt's fraud claims. Scholastic and HMH argue that this claim is deficient because it (1) is improperly based on intentional breach of contract and (2) fails to satisfy the pleading standards imposed by Federal Rule of Civil Procedure 9(b). Hasselbring contends that the reliance alleged by Vanderbilt's did not cause the required damages.

      i.    Scholastic and HMH

Vanderbilt brings two fraud claims against Scholastic and HMH. First, it alleges that "Scholastic and HMH ha[d] a contractual duty to Vanderbilt under Section 9.2 of the License (as well as the contractual duty of good faith and fair dealing) to provide Vanderbilt with a complete and accurate list of Derivative Products that were derived from or based on the Read 180 Literacy Program and to provide an accurate and truthful accounting of the revenue generated from such products." And it alleges that they "knowingly made false representations and concealed material facts to Vanderbilt regarding the sales of Derivative Products that were derived from or based on

the Read 180 Literacy Program, and the amount of revenue generated by such royalty bearing products for the purpose of deceiving and misleading Vanderbilt and preventing Vanderbilt from receiving what it was owed for its contribution to Read 180." (Doc. No. 85 at ¶¶ 127-128.) In other words, Vanderbilt alleges that Scholastic and HMH provided false information concerning products and sales *in breach of Section 9.2 of the License*. This is a breach of contract claim, not a tort claim. See, e.g., Becker v. Celebration, Inc., 541 F.2d 156, 158 (holding no claim for tortious breach of contract exists in Tennessee); Mid-South Milling Co., Inc. v. Loret Farm, Inc., 521 S.W.2d 586, 588 (Tenn. 1975) ("A contract may be negligently or fraudulently breached and the cause of action remains in contract rather than in tort.").

Vanderbilt next alleges that Scholastic, HMH, and Hasselbring together engaged in fraudulent conduct to "circumvent" the License to obtain Vanderbilt Technology and intellectual property and to deprive Vanderbilt of its right to control the use thereof. (Doc. No. 85 at ¶ 129.) This claim is supported by allegations detailing how the three Defendants executed deceptive "consulting agreements" designed to hide the true nature of their actions. (Id. at ¶¶ 130-141.) As an initial matter, these allegations are still plagued by reference to breach of the License (See id. at ¶ 130 (citing License Section 4.2). But there are two other fatal problems. First, Vanderbilt fails to meet the requirements of Federal Rule of Civil Procedure 9(b), which requires that averments of fraud must be stated with particularity. See also Tenn. R. Civ. P. 9.02 (same). This means that a plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 643 (6th Cir. 2003) (citing Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)); see also Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 878 (6th Cir. 2006) ("At a minimum, Rule

9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud.") (citation omitted). Despite the paragraphs of allegations concerning the consulting agreements with Hasselbring, Vanderbilt does not identify, as required, the details of any specific false or misleading statement allegedly made to it by Scholastic or HMH.

Equally as problematic is that Vanderbilt fails to allege reliance concerning the Scholastic/HMH-Hasselbring consulting agreements. See Shah v. Racetrac Petroleum Co., 338 F.3d 557, 571 (6th Cir. 2003) (must show reasonable reliance upon misrepresentation and resulting injury) (citing Chrisman v. Hill Home Dev., Inc., 978 S.W.2d 535, 538-39 (Tenn. 1998)). Under the rule in this Circuit, "[c]onclusory statements of reliance are not sufficient to explain with particularity how [the plaintiff] detrimentally relied on the alleged fraud[.]" Evans v. Pearson Enters., 434 F.3d 839, 852-853 (6th Cir. 2006). The Complaint – filed in August 2018 – states that Vanderbilt only "recently discovered" the consulting agreements between Scholastic/HMH and Hasselbring. (Doc. No. 85 at ¶ 45.) Vanderbilt does not explain (and it does not logically follow) how it could have "relied upon" those agreements to its detriment during the much-earlier time period encompassed by the Complaint. (See, e.g., Vanderbilt Opp. Br. at 33 (mentioning that Vanderbilt relies upon "Defendants' *failure to disclose* the true nature of their relationship with Hasselbring," as opposed to those parties' representations). The law of fraud is not rooted in the silence of the accused.

Accordingly, the fraud claim against Scholastic and HMH must be dismissed. To the extent the Complaint can be read to include a fraudulent concealment claim against these Defendants, it too will be dismissed.

ii.     Hasselbring

To the extent the fraud claim against Hasselbring is based on the allegations discussed above, it is not viable. However, Vanderbilt has additional allegations against Hasselbring. Vanderbilt alleges that, as part of his employment at Vanderbilt, Hasselbring was subject to the Technology Policy and the COI Policy. (Doc. No. 85 at ¶ 20.) These required Hasselbring, prior to undertaking consulting or any other activity or commitment that may create a potential conflict of interest, to disclose the activity or commitment in writing. (Id.) Hasselbring allegedly did not disclose his consulting agreements with defendants Scholastic and HMH. (Id. at ¶ 51.) For the reasons discussed above, this alone does not push these claims over the line to plausibility. However, the COI Policy also required Hasselbring to file annual reports disclosing consulting and other commitments he had engaged in during the past year. (Id. at ¶ 21.) The Complaint alleges that Hasselbring made "affirmative misstatements" regarding his relationship with Scholastic and HMH. Specifically, Hasselbring allegedly marked "no" on his 2012, 2013, and 2014 conflict of interest disclosure forms in response to questions concerning (1) whether he had a relationship with a business that had a contractual relationship with Vanderbilt or that paid royalties to him directly and (2) whether he was involved in an activity or relationship directly or indirectly involving Vanderbilt that created a conflict of interest or the appearance of such under the COI Policy. (Id. at ¶ 51-53.) These alleged specific false representations, for which Vanderbilt has provided a sufficient "who, what, where, when and how," form the basis of well-pled fraud claims against Hasselbring.

Hasselbring contends that Vanderbilt has not alleged any damages resulting from reliance on these alleged misstatements. Hasselbring's argument – premised on two cases from New York and Illinois – is that the allegations "amount to a mere complaint that Vanderbilt couldn't sue

earlier," which does not give rise to a fraud action. As a fallback position, Hasselbring argues that Vanderbilt's damages are too speculative in any event. The Court does not agree. Vanderbilt has alleged that it relied upon Hasselbring's representations that he was not engaged in royalty-earning activity with Vanderbilt-contracted entities. Vanderbilt has further alleged that it was damaged by Hasselbring's misrepresentations because it was unable to, upon learning of Hasselbring's actions, act to protect its rights. (Id. at ¶ 141.) In other words, Vanderbilt alleges that it would have been able to exploit the Vanderbilt Technology and intellectual property in a different manner if Hasselbring had not been deceptive. With all inferences drawn in favor of Vanderbilt, this damage could include lost royalties, negotiating leverage, market intelligence, and market share. At this stage, this is sufficient to allege reliance and resulting damages.

Accordingly, the fraud and fraudulent concealment claims against Hasselbring shall proceed.

G.    Unjust Enrichment Claim (Count Ten)

In Tennessee, unjust enrichment is a quasi-contractual claim by which a court may impose a contractual obligation where one does not exist. Cole v. Caruso, No. W2017-00487-COA-R3-CV, 2018 WL 1391625, at *3 (Tenn. Ct. App. Mar. 20, 2018) (citing Whitehaven Cmty. Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998)). The theory of unjust enrichment is based on the principle that "a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit." Id. (quoting Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005)). To establish an unjust enrichment claim, "one must prove: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for [the

defendant] to retain the benefit without payment of the value thereof." Id. (quoting Freeman Indus., 172 S.W.3d at 525)); see also Paschall's Inc. v. Dozier, 407 S.W.2d 150, 154-55 (Tenn. 1966).

Scholastic/HMH and Hasselbring separately move for dismissal of Vanderbilt's unjust enrichment claim on the ground that it is preempted by the Copyright Act. Section 301 of the Copyright Act broadly preempts certain state law claims. It states: "[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106 in works of authorship that . . . come within the subject matter of copyright . . . are governed exclusively by this title. . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State. 17 U.S.C. § 301(a). "Congress explained what the statute made obvious: '[t]he intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works, within the scope of the Federal copyright law." Patel v. Hughes, No. 3:13-0701, 2014 WL 4655285, at *6 (M.D. Tenn. Sept. 16, 2014) (quoting H.R. Rep. No. 94-1476 at 130 (1976)). "State laws may also be impliedly preempted by the Copyright Act if they create rights that could be violated by the exercise of one of the five 'exclusive [federal] rights' granted to copyright owners – reproduction, derivation, distribution, public performance, and public display, see 17 U.S.C. § 106, or if they otherwise undermine the Copyright Act's fundamental purpose of providing a uniform system for protecting original expression for the benefit of society at large." Landham v. Lewis Galoob Toys, Inc., 227 F.3d 619, 623 (6th Cir. 2000) (citing Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 165-66 (1989)).

The Court of Appeals has held that, under § 301, a state common law or statutory claim is preempted if: (1) the work is within the scope of the subject matter of copyright, as specified in 17 U.S.C. §§ 102, 103; and, (2) the rights granted under state law are equivalent to any exclusive

rights within the scope of federal copyright, as set out in 17 U.S.C. § 106. Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453 (6th Cir. 2001); see also ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc., 402 F.3d 700, 713 (6th Cir. 2005). "These requirements are often referred to as the 'subject matter requirement' and the 'general scope' or 'equivalency' requirement." Stromback v. New Line Cinema, 384 F.3d 283, 300 (6th Cir. 2004) (citing Wrench, 256 F.3d at 453). As Judge Trauger of this court has explained:

> The "subject matter" requirement is satisfied if a work fits within the general subject matter of Sections 102 and 103 of the Copyright Act, regardless of whether it qualifies for copyright protection. . . .
>
> The second step of analysis – the "general scope" or "equivalency" requirement – asks whether "the state common law or statutory action at issue asserts rights that are the same as those protected under § 106 of the Copyright Act. Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights set forth in § 106. To determine whether an act abridging the state right would necessarily infringe upon a right protected by the Copyright Act, the Sixth Circuit has adopted the "extra element" test. Under this test, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim. The existence of an extra element precludes preemption only where the element changes the nature, rather than the scope, of the action.

Brainard, 561 F. Supp. 2d at 928-29 (internal citations and quotation marks omitted).

"The Court of Appeals for the Sixth Circuit has joined other circuits in holding that claims for unjust enrichment are preempted by the Copyright Act." Diamond v. Gillis, 357 F. Supp. 2d 1003, 1009 (E.D. Mich. 2005) (citing Ritchie v. Williams, 395 F.3d 283, 289 (6th Cir. 2005); Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc., 264 F.3d 622, 638 (6th Cir. 2001), abrogated on other grounds by Reed Elsevier, Inc. v. Mushnick, 559 U.S. 154 (2010)). However, this broad statement must be qualified. Within the species of unjust enrichment claims, a distinction exists

between "an action based on a contract implied in law [which] requires no extra element in addition to an act of reproduction, performance, distribution or display, [and] an action based on a contract implied in fact [which] requires the extra element of a promise to pay for the use of the work."[14] Wrench, 256 F.3d at 459. It is only when an action for unjust enrichment is based on a contract implied in law, i.e., it does not allege a promise to pay, that it includes "no meaningful 'extra element' . . . that removes the reformulated claims from the policy of national uniformity established by the preemption provisions of § 301(a)." Ritchie, 395 F.3d at 287-88 (footnote omitted).

Accordingly, in Murray Hill Publications, when faced with unjust enrichment claims that involved no more than that the defendant allegedly misappropriated the plaintiff's motion picture and related proprietary ideas, concepts, strategies, and marketing tie-ins, and there was no promise to pay, the Court of Appeals held the claims to be preempted by the Copyright Act because they depended on "nothing more than . . . unauthorized use of plaintiffs' work." Id. at 638. In another example, in Ritchie, a group alleged that musician Kid Rock performed certain songs that they co-owned, and breached various contracts by transferring to other parties the right to publish, record and distribute those songs. Ritchie, 395 F.3d at 287. The Court of Appeals concluded that "alternative theories" for "relief against misappropriation of income derived from the songs," including a claim for unjust enrichment, were preempted by the Copyright Act despite being "described as sounding in tort or restitution rather than contract." Id. at 288-89; see also Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C., 134 F. App'x 1, No. 03-2533, 2005 WL 820606, at

---

[14] Contracts implied in law "unlike true contracts, are not based upon the apparent intention of the parties to undertake the performance in question, nor are they promises." Brainard, 561 F. Supp. 2d at 931. Instead they are "obligations created by law for reasons of justice." Wrench, 256 F.3d at 458 (quoting NIMMER ON COPYRIGHT § 16.03).

*6 n.3 (6th Cir. 2005) (holding Copyright Act preempted claim that the defendants were unjustly enriched as a result of their copying of printed consultant manual materials because claim "depend[ed] on nothing more than the unauthorized use of the forms"); Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting, Inc., 2009 WL 186367, at *4 (E.D. Mich. Jan. 18, 2018) ("Plaintiff in this case makes no assertion of a promise to pay. Accordingly, the Court finds that the Copyright Act completely preempts Plaintiff's claim for common law unjust enrichment.").

The Court applies this analytical rubric to Vanderbilt's allegations. First, the Complaint alleges that the Vanderbilt Technology and intellectual property at issue here, including computer programs, constitute original works of creativity and authorship that have been reduced to a tangible form and are copyrightable and protectable under the Copyright Act. (Doc. No. 85 at ¶ 80.) Indeed, computer programs do "fall under the [Copyright] Act's protection of 'literary works'" under §102(a). Digital Filing Sys., LLC v. Aditya Int'l, 323 F. App'x 407, 418 (6th Cir. 2009). Accordingly, because Hasselbring's work fits within the general subject matter of Sections 102 and 103 of the Copyright Act, regardless of whether all of it qualifies for copyright protection, the "subject matter" requirement is satisfied. Brainard, 561 F. Supp. 2d at 928.

The Court then looks to determine if the alleged infringement would violate Tennessee law of unjust infringement and if there is an "extra element required that "changes the nature of the action so that it is qualitatively different from a copyright infringement claim." Wrench, 256 F.3d at 456. Under the Court of Appeals precedent discussed above, the Court focuses on whether Vanderbilt's unjust enrichment claim alleges an implied in law or implied in fact contract. Vanderbilt alleges that:

> To the extent that Scholastic and/or HMH incorporated the [m]isappropriated Vanderbilt [t]echnology and [i]ntellectual [p]roperty or the confidential Read 180 Materials into the Ancillary Products that are otherwise outside the License Agreement, Scholastic and HMH have been unjustly enriched by their use of the Vanderbilt Technology and [i]ntellectual [p]roperty due to Hasselbring's unlawful conveyance of it to them. Moreover, upon information and belief, they have received millions of dollars from sales of the products containing Vanderbilt's misappropriated intellectual property.
>
> As a result of the Undisclosed Hasselbring Scholastic Agreements, Hasselbring has realized millions of dollars in royalty payments for the Ancillary Products, which contain [m]isappropriated Vanderbilt [t]echnology and [i]ntellectual [p]roperty and/or the confidential Read 180 Materials. Th[ose] . . . [m]aterials were not owned by Hasselbring and, therefore, he had no right to convey them to Scholastic and/or HMH. Moreover, through that conduct, Hasselbring abused his position and relationship with Vanderbilt and frustrated Vanderbilt's ability to enforce its contractual rights and to negotiate additional contractual rights.
>
> All three Defendants have been unjustly enriched at Vanderbilt's expense, and it would be inequitable for them to retain these benefits. Vanderbilt is entitled to a judgment for the benefit that Defendants unjustly received by virtue of their concerted efforts to deprive Vanderbilt of its intellectual property and that Hasselbring improperly received through his contractual and fiduciary relationship with Vanderbilt.

(Doc. No. 85 at ¶¶ 144-146.) This claim alleges the unauthorized use of Vanderbilt Technology and intellectual property in the Derivative or Ancillary Products. There is no allegation of any promise by Scholastic or HMH, in word or deed, to pay Vanderbilt for its alleged use of the misappropriated materials in the Derivative or Ancillary Products. Indeed, to the contrary, the Complaint is a tale of Scholastic and HMH's alleged scheme to use those materials and *not* pay Vanderbilt. This is the classic case of an implied-in-law unjust enrichment claim. Accordingly, the equivalency requirement is satisfied. Ritchie, 395 F.3d at 287; Murray Hill Publ'ns, Inc., 264 F.3d at 638.

Vanderbilt argues that it can escape this conclusion because it alleges that (1) Hasselbring abused his position and relationship with Vanderbilt and (2) Scholastic and HMH were aware of Hasselbring's duties to Vanderbilt and conspired with him to violate them. Accordingly, Vanderbilt contends that allegations of breach of fiduciary duty add an extra element that makes the unjust enrichment claim "distinguishable from a garden-variety copyright claim." (Doc. No. 97 at 12.) The Court does not agree. In making such an allegation, Vanderbilt relies on both (1) the Employment Agreement and resulting relationship between it and Hasselbring and (2) the License, which are two *actual* contracts. But recovery on a theory of unjust enrichment is premised upon whether there is "*no* existing, enforceable contract between the parties covering the same subject matter." Crye-Leike, Inc. v. Carver, 415 S.W.3d 808, 824-25 (Tenn. Ct. App. 2011) (emphasis added); see also Commc'ns Unlimited Contracting Servs, Inc. v. Comdata, Inc., Case No. 3:17-cv-01158, 2018 WL 418566, at *6 (M.D. Tenn. Jan. 16, 2018) (dismissing unjust enrichment claim because alternative theory of recovery and, therefore, is available only when there is no existing, enforceable contract between the parties covering the same subject matter"). Vanderbilt's argument is therefore self-defeating. Further, even if Vanderbilt were somehow not relying on its contractual relationships, it makes no plausible fiduciary duty allegations concerning Scholastic or HMH aside from that they conspired with Hasselbring when he allegedly breached his duties. Vanderbilt has not advanced any law suggesting that Hasselbring's duties can be imputed to Scholastic and HMH. Regardless, in the end, there are still "no allegations [against any Defendant] indicating that any duty existed between the parties except those duties created by copyright protection itself." Brainard, 561 F. Supp. 2d at 932.[15] Vanderbilt's "fiduciary"

---

[15] Vanderbilt's argument is at odds with Brainard. In a separate section of Brainard discussing common law misappropriation, Judge Trauger did note that claims for misappropriation of trade secrets are sometimes not preempted because they involve "a breach of an implied duty of trust."

allegations that Hasselbring developed works-for-hire and then allowed Scholastic and HMH, rather than the proper owner Vanderbilt, to monetize them remain co-extensive with Vanderbilt's copyright claims. Indeed, the former allegations could not and would not exist independent of the alleged misappropriation of the copyrightable materials. See, e.g., Nat'l Bus. Dev. Servs., 2009 WL 186367, at *4 (dismissing as preempted unjust enrichment claim despite presence of allegations of breach of fiduciary duty).

For these reasons, the Court finds Vanderbilt has brought an implied-in-law unjust enrichment claim concerning copyrightable subject matter. It is therefore preempted by the Copyright Act. See, e.g., Patel, 2014 WL 4655285, at *7 (dismissing as preempted unjust enrichment claim based on unauthorized use of proprietary tax source code and software); RSR Sales, Inc. v. Lowe's Cos., Inc., 2013 WL 1858592, at *3 (E.D. Mich. May 2, 2013) (finding pre-emption because "[t]he work upon which Plaintiff's state law claims are based is clearly within the subject matter of copyright" and "the confusion and misrepresentation arises from the copying . . . , which is the essence of Plaintiff's copyright claim.") Count Ten will therefore be dismissed.

### H.    Claim for Accounting (Count Eleven)

Finally, Vanderbilt brings a cause of action for the equitable relief of an accounting of (1) all monies earned under the License for all products derived from or related to Read 180 and (2) the gross and net sales of Derivative or Ancillary Products that contain Vanderbilt Technology and intellectual property. (Doc. No. 85 at ¶¶ 148-149.) Scholastic and HMH move to dismiss this claim

---

Brainard, 561 F. Supp. 2d at 932. However, this was because that was an element unique to such claims. Id. Judge Trauger noted that "[t]he plaintiffs ha[d] identified no source in law for this implied duty, *nor ha[d] they shown this duty to be an element in misappropriation claims that do not involve trade secrets.*" Id. (emphasis added). In subsequently considering the plaintiff's unjust enrichment claim, Judge Trauger rejected the argument that the "breach of duty of trust" was an extra element under the equivalency analysis and concluded that the *unjust enrichment claim* was preempted by the Copyright Act. Id.

on two grounds. First, they argue that Vanderbilt has adequate remedies at law as part of its breach of contract claim. Second, they contend that, to the extent Vanderbilt seeks an accounting concerning Ancillary Products outside the scope of the License, this alternative ground for an accounting is pre-empted by the Copyright Act because Vanderbilt has alleged that the Vanderbilt Technology and intellectual property contain copyrightable works.

"An accounting is a species of disclosure, predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another." Bradshaw v. Thompson, 454 F.2d 75, 79 (6th Cir. 1972). However, "[a]ccounting is an extraordinary remedy, and like other equitable remedies, is available only when legal remedies are inadequate." Bradshaw, 454 F.2d at 79. Furthermore, "[i]n light of the broad discovery available to litigants, accounting actions are of dubious utility," Digital 2000, Inc. v. Bear Commc'ns, Inc., 130 F. App'x 12, 23 (6th Cir. 2005), and they must be viewed with a critical eye.

Vanderbilt's justifications for a separate accounting cause of action do not pass muster. As an initial matter, to the extent Vanderbilt seeks an accounting to determine how much money was earned "under the License for all products derived from or related to Read 180," this is redressed through Vanderbilt's breach of contract claim on the same subject matter. (See Doc. No. 85 at ¶ 70, Count One – Breach of Contract ("HMH and Scholastic failed to properly remit to Vanderbilt a proper accounting of products sold or licensed pursuant to the License.").) Under the Federal Rules of Civil Procedure, Vanderbilt has a liberal discovery right under its breach of contract claim to determine the extent to which Scholastic and HMH allegedly misreported the sales of Read 180. Vanderbilt does not argue that the Read 180 accounts are so "greatly complicated" that the discovery process is insufficient. Digital 2000, Inc., 130 F. App'x at 23.

Vanderbilt also seeks an accounting regarding the sales of any Derivative or Ancillary Products that fall outside the License and, thus, the breach of contract claim. This part of Vanderbilt's accounting claim fails as well because it is premised on the allegations that Defendants infringed on protected Vanderbilt Technology and intellectual property. See Martinez v. McGraw, No. 3:08-0738, 2009 WL 2447611, at *8 (M.D. Tenn. Aug. 10, 2009) ("[B]ecause Plaintiff's cause of action for accounting is based on the allegation that Defendants infringed on Plaintiff's copyrighted work, Plaintiff's accounting claim is preempted."); Brainard, 561 F. Supp. 2d at 933 (dismissing accounting claim where "[t]he allegations do not go beyond the acts of reproduction, performance, distribution, or display that are subject to the Copyright Act"); Wells v. Chattanooga Bakery, Inc., 448 S.W.3d 381, 391-92 (Tenn. Ct. App. 2014) (citing Brainard and concluding that state law claim for accounting based on extra-contractual use was preempted by Copyright Act).

Neither Martinez v. McGraw, No. 3:08-0738, 2009 WL 2447611, at *8 (M.D. Tenn. Aug. 10, 2009), nor Lynn v. Sure-Fire Music Company, Inc., 237 F. App'x 49 (6th Cir. 2007), save Vanderbilt's accounting cause of action. It is true that, in Martinez, Judge John T. Nixon noted that for a court to award a share of profits based on an accounting, a plaintiff had to plead that it was a co-owner (which Vanderbilt has done here in the Declaratory Judge Act claim). Id. However, Judge Nixon also ruled that where the cause of action for accounting is premised upon *infringement*, as it is here, it is nonetheless pre-empted by the Copyright Act. Id. Lynn also does not apply. Vanderbilt has cited Lynn for the proposition that "a state law claim for accounting is not preempted by the Copyright Act when coupled with a claim of copyright ownership." Not quite so. In Lynn, the plaintiff deliberately pleaded ownership claims based *only* on interpretation of a written agreement and did *not* assert "an infringement claim or any other theory equivalent to a

right exclusive to the Copyright Act." Id. at 53-54. Accordingly, the Court of Appeals held the accounting claim was not preempted because "[a] request for an accounting of amounts at issue in a common law breach of contract case is uniquely a state law claim and it is neither a right nor a remedy conferred by the Copyright Act." Id. at 54. Here, Vanderbilt's allegations concerning the Ancillary Products are extracontractual and directly implicate Vanderbilt Technology and intellectual property allegedly subject to the Copyright Act.

Vanderbilt "may be entitled to an accounting for profits as a remedy" for one of its remaining claims. Baglama v. MWV Consumer and Office Prods., No. 3:13-cv-276, 2014 WL 5768577, at *8 (S.D. Ohio Nov. 5, 2014). Indeed, Vanderbilt has included a request for an accounting in its Prayer for Relief. (Doc. No. 85 at p. 56, Prayer for Relief ¶ 4 ("That this Court order a full and complete accounting of gross and net sales of the Derivative and Ancillary Products and that Vanderbilt be awarded its portion of those monies in accordance with the proof at trial.").)

For these reasons, Vanderbilt's independent cause of action for an accounting will be dismissed.

IV.    Conclusion

For the foregoing reasons, (1) Scholastic and HMH's Motion to Dismiss (Doc. No. 87) will be granted in part and denied in part, and (2) Hasselbring's Motion to Dismiss (Doc. No. 89) will be granted in part and denied in part. Specifically, the motions are granted concerning Counts 3, 8, 9 (as to Scholastic and HMH), 10, and 11, and denied regarding Counts 2, 4, 7, and 9 (as to Hasselbring).

Counts 1, 5, and 6 were not addressed by these motions and remain pending.

In sum, therefore, Counts 1, 2, 4, 5, 6, 7, and 9 (as to Hasselbring) remain pending against the Defendants in this action.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE