# **EXHIBIT Q**

# MATTHEW G. EZELL'S RESPONSE TO REBUTTAL REPORT OF HAL PORET

## INTRODUCTION

1. Counsel for Plaintiff, Vanderbilt University ("Vanderbilt"), has requested that I respond to the report by Hal Poret, including his criticisms of my survey. I have reviewed Mr. Poret's report and the exhibits cited in that report.

## MR. PORET'S SURVEY PROCEDURE LIKELY UNDERESTIMATES CONFUSION

2. Mr. Poret explains in his report that he finds a likelihood of confusion rate of 1.5% based upon 3 respondents who specifically mentioned Vanderbilt University by name. However, given the nature of Mr. Poret's survey's reliance on respondents' memories (which is discussed in greater detail below), I submit that respondents who mention "universities" or "colleges" may have also been confused with respect to Vanderbilt University, especially since Vanderbilt is the only university that appears twice in the promotional materials used as a survey stimulus. If one counts respondents who may not have been able to recall details from a slide shown more than 12 screens prior, Mr. Poret's survey shows many instances of confusion, far more than the 1.5% (3 respondents) set forth in his report. In fact, the confusion rate is at least 11% confusion, and arguably even higher still. See **Appendix A** (pages 10-13 of this document) for example verbatim responses from Mr. Poret's survey.

## OVERVIEW OF MR. PORET'S SURVEY AND HIS CRITICISMS

3. Before I address the criticisms Mr. Poret has levelled against my survey, it is important to acknowledge that he, at least by implication, approves of the majority of my survey design. Although Mr. Poret has "personally designed…well over 1,000 surveys," (Poret Expert Report, p. 5) he did not design his survey from the ground up. Instead, he conducted a survey that adopts the following elements of my survey design verbatim unless otherwise noted: 1) the overall format (i.e., the Eveready survey design); 2) the survey universe (i.e., individuals

1

responsible for decisions or recommendations regarding their school or school district's purchase of a new academic program or course materials); 3) the geographic quotas used; 4) the key survey questions about source, endorsement or approval, and business affiliation or business connection (with only minor wording changes to reflect his preference for not showing respondents an alleged infringing use of Vanderbilt's name and logo while asking these key questions); and 5) the stimulus images based on promotional materials from Scholastic and HMH (although Mr. Poret uses 11 additional images, he agrees that images showing a Vanderbilt trademark were appropriate for use as part of the survey stimuli, both for my survey and his survey). The following sections will address the elements of his survey that differ from mine and his related criticisms.

## PURPORTED FAILURE TO REPLICATE MARKETPLACE CONDITIONS

4. Mr. Poret asserts that my survey "failed to realistically replicate the marketplace conditions under which prospective consumers of Defendants' programs were exposed to the allegedly infringing promotional materials." (Poret Expert Report, p. 6.) However, it is my understanding from testimony from Ms. Dunkin[1] that 1) Scholastic and HMH salespeople were able to leave a copy of promotional materials with potential customers and that, in fact, certain promotional materials showing a Vanderbilt trademark were provided by Scholastic and HMH to customers and/or potential customers and 2) individual salespeople could select and show as many or as few images from a presentation as they wished. Given such potential variations, my survey properly showed a representative portion of promotional material content to potential purchasers of Scholastic's and HMH's commercial products. It is also noted that while Mr. Poret

---

[1] Deposition of Amy Dunkin, 116:9-15. "A program guide is a fancier name for a brochure…It's a -- it's a -- an introduction or a step through the solution that you would leave behind for a customer."
Deposition of Amy Dunkin, 105:5-8. "Q: …[S]o, I guess, the salesperson, whether they decided to use six or 60 slides, it's up to the – A: It is. It's up to the – the individual."

2

criticizes the length or number of images in my survey, he also concedes that "...Mr. Ezell could not reasonably have been expected to completely recreate this full sales process or a full in-person presentation." (Poret, p. 7.) I believe that my survey did appropriately "replicate the marketplace conditions."

5. Mr. Poret also claims that "these images were not used at all by some Scholastic representatives and were not used at all by Houghton Mifflin." (Poret, p. 7, footnote 5.) While Mr. Poret does not provide any citation to evidence in support of this claim, to the extent the exact materials or images shown to respondents in my survey were not seen by potential purchasers, my stimulus nevertheless contains an alleged infringing or misleading use of Vanderbilt's name and logo that is similar to and representative of those uses found in other promotional materials produced by the Defendants in this litigation. See **Appendix B** (pages 14-24 of this document) to compare Images 2 and 6, which appeared in my survey, with similar images from other promotional materials produced by Defendants.

## PURPORTED BIAS IN MY SURVEY STIMULUS

6. Mr. Poret asserts that my survey showed "a biased selection of slides from a far longer presentation, which severely overemphasized the prominence of any references to Vanderbilt." (Poret, p. 2.)

7. With respect to the selection of the survey stimulus, the stimulus was not biased. My survey contained the alleged infringing or misleading use of Vanderbilt's name and logo, and provided some context for those images without over-burdening the respondents with irrelevant content (e.g., System 44's selection of eBooks). That is, my survey showed respondents images from Scholastic's and HMH's promotional materials that contained the alleged infringing use of Vanderbilt's name and logo, along with several other images for context. Furthermore, my selection of a subset of images available to Scholastic and HMH

3

salespeople is consistent with the testimony from Ms. Dunkin. (Dunkin Deposition, 103:7-14, 104:4-7.)

8. Mr. Poret purports to correct the alleged bias in my survey by showing his survey respondents 11 additional images (shown below). However, those 11 images provide no additional information as to the likelihood of confusion being alleged in this matter.[2] By including such materials, Mr. Poret obfuscates a salient issue in this litigation by including additional irrelevant content and, most importantly, forcing respondents to rely on their memory of images shown more than a dozen screens prior in order to address that issue. (Poret, Appendix C, in particular pages 12 through 24.)



---

[2] Although "System 44," a plausible response to one of the main survey questions, appears prominently on the last image shown in Mr. Poret's survey, it also appears in the upper right corner of all 6 images in my survey. If Mr. Poret is suggesting that his survey's final image was important "missing context," any potential argument that respondents were discouraged from answering "System 44" is dispelled by the fact that over 20% of my survey respondents mentioned that name to the first survey question alone. (Ezell Expert Report, Exhibit A, pages 18 through 25.)

4



## PURPORTED BIAS IN MY SURVEY'S LIKELIHOOD OF CONFUSION RATE

9. Mr. Poret also asserts my survey data "demonstrate that the supposed confusion rate with respect to Vanderbilt is merely the arbitrary result of the biased procedure." (Poret, p. 13.) That is, he contends that the likelihood of confusion evidenced by my survey is unreliable because the data only support a finding of a likelihood of confusion with respect to Vanderbilt and not to the same degree with respect to other universities also found on an earlier image of the stimulus (Image 2, shown below). I disagree. My survey was designed based upon the allegations in Vanderbilt's first amended complaint and was not intended to measure a likelihood of confusion caused by the use of other university trademarks (e.g., Brown, the University of Iowa, etc.). As such, my survey provided respondents with the alleged infringement (for example, Image 6, shown below) which was a representative example[3] of the alleged infringing use of the Vanderbilt name and logo. By showing Image 6 to respondents, my survey addresses the issue of what potential purchasers understand or believe when they see the Vanderbilt name and logo being used on promotional/sales material for Scholastic or HMH commercial products – one of the issues in this case as set forth in the first amended complaint (e.g., Dkt. 85, Paragraphs 67, 87-93). If a different complaint submitted in this matter had hypothetically listed one or more universities as co-plaintiffs, perhaps Mr. Poret's criticism would have merit.

---

[3] See Appendix B (pages 14-24) of this report for a collection of some of the other alleged infringing uses of Vanderbilt's name and logo produced by Defendants.

5

However, given the allegations and facts of this case, it is appropriate to conduct an analysis focusing the inquiry on the alleged infringement as shown on, for example, Image 6 below.

Image 2



Image 6

PURPORTED "READING TEST"

10. Mr. Poret asserts that showing an alleged infringing use of Vanderbilt's name and logo in my survey is an "artificial 'reading test'" (Poret, p. 11) and therefore unreliable. Mr. Poret takes issue with my survey providing respondents visible access to an example of the very

use that is alleged to be infringing or misleading in this litigation, namely, Vanderbilt's name and logo, while asking the survey questions. In contrast, Mr. Poret removed the images from view while asking common likelihood of confusion questions, which forced his survey respondents to try to recall content shown on their computers at least 12 screens prior to the questions, thus creating a memory test. The method used in my survey of allowing respondents to view the alleged infringing use is consistent with literature from an author that Mr. Poret cites, and is preferred in the present circumstances over Mr. Poret's method of relying on consumers' memory.[4] I further submit that my survey's methodology of allowing respondents to view an example of an alleged infringing or misleading use of Vanderbilt's name and logo is consistent with the allegations and facts in this case and the high degree of purchaser care and sophistication,[5] one of the Frisch Factors considered by courts in the Sixth Circuit. I therefore disagree with Mr. Poret's conclusion that the results of my survey are unreliable.

11. Additionally, if my survey were truly a reading test (i.e., if it had hypothetically asked respondents to "Please read the name of the university shown"), one would expect close to 100% of respondents mentioning Vanderbilt to each survey question. Instead, the data from my test cell show that approximately 38% of respondents gave a Vanderbilt response from the combination of *all* survey questions (Ezell Report, Table 15, p. 23). Additionally, all mentions in the control cell of "a leading research university" (the language used in the control cell in place of the alleged infringing use of the Vanderbilt name and logo) were counted as confused and

---

[4] "A reading test should…be used…under circumstances where consumers make involved, deliberate, thoughtful decisions…. A "memory" test…is inappropriate to prove or disprove confusion under circumstances where consumers exercise care in purchasing decisions." Jerre B. Swann, "A 'Reading' Test or a 'Memory' Test: Which Methodology Is Correct?", 95 TMR 876 (2005). I likewise submit that a memory test is inappropriate here.
[5] See, e.g., Deposition of Amy Dunkin, pp. 56-58 (56:25-57:1 "The sales process, depending on the district took anywhere from 6 to 18 months."; 57:15-20 "So there were many, many layers of approval in a district."; 58:2-4 "[T]hese were very thoughtful decisions to implement solutions and professional services like this."); Deposition of Joe Welty, pp. 50-55 (50:7-9 "…[When] you're selling a solution like Read 180, it's a high-ticket price."; 52:25-53:1 [Before making a decision, a potential customer would have] "spent time researching that the model is successful…"; 54:25-55:1 "[T]he process would be through multiple engagements.")

accordingly subtracted from the 38% figure in the test cell. That is, the survey data do not support Mr. Poret's assertion that respondents were simply reading the stimulus for the "correct" answer. Instead, the data from my survey show that respondents had measurably different reactions to 1) images showing an alleged infringing or misleading use of Vanderbilt's name and logo (test cell) or 2) images identical to the test cell with the key exception of the content that is alleged to infringe or mislead (control cell).

## PURPORTED IMPROPER CONTROL

12. As discussed in my expert report, my survey's test cell included examples of allegedly infringing uses of Vanderbilt's name and logo, and my control cell showed the same images as the test cell except that Vanderbilt's logo was removed and references to Vanderbilt and Peabody College were replaced by the words, "leading research university." (Ezell, Exhibit A, pp. 2-4, 108-110.) This approach is consistent with standard practices in trademark surveys as outlined in the Federal Judicial Center's *Reference Manual on Scientific Evidence*.[6]

13. Mr. Poret criticizes the control I used in my survey, concluding without citation that it would be "indisputably fair [and] non-confusing" to "remove[] the Vanderbilt logo but retain[]…reference to…Vanderbilt." (Poret, p. 16.) First, the language used in my control cell corresponds with the First Amended Complaint: "Commercial use of the University's name and marks requires prior University approval." (Dkt. 85, p. 6, n. 5.) Similarly, I am aware that the License Agreement between Vanderbilt University and Scholastic (HMH) likewise requires prior approval before use may be made of a Vanderbilt trademark. (VU074763, Sections 6.4 and 16.2.) Further, I am aware that Vanderbilt's witness Ms. Maggie McHugh testified that if a staff

---

[6] Diamond, Shari Seidman. (2011). "Reference Guide on Survey Research" in Reference Manual on Scientific Evidence, 399. "In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the [test or] experimental stimulus as possible, *with the key exception of the characteristic whose influence is being assessed*." (emphasis added)

8

or faculty member has entered into a partnership with an outside company and wanted to say they work at Vanderbilt for marketing purposes, then they must use a generic reference such as "…Mr. Davis, professor at a large private university in Tennessee. VU logos cannot be displayed." (McHugh Deposition, pp. 92-94.) She also testified that her office and the university routinely denied Vanderbilt faculty requests to use a Vanderbilt name or logo for commercial activity. (McHugh Deposition, pp. 198-199.) My control stimulus is consistent with this testimony. Moreover, I submit that the control selected for my survey was precisely what Mr. Poret advocates for: "an indisputably fair, non-confusing" reference to Dr. Hasselbring's university of employment (without use of the allegedly confusing name and/or logo), which does not suggest that Vanderbilt sponsors, promotes, or is otherwise associated with the academic programs offered by Scholastic.

14. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of October, 2020, in Huntington Beach, California.

*M. Ezell*
Matthew G. Ezell