IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VANDERBILT UNIVERSITY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 3:18-CV-00046 |
| v. | ) | |
| | ) | Chief Judge Waverly D. Crenshaw, Jr. |
| SCHOLASTIC, INC.; HOUGHTON | ) | Magistrate Judge Jeffery S. Frensley |
| MIFFLIN HARCOURT PUBLISHING | ) | |
| COMPANY; and TED S. HASSELBRING, | ) | JURY DEMAND |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR *DAUBERT*
MOTION TO EXCLUDE IN PART PLAINTIFF'S EXPERT REPORTS AND
TESTIMONY**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II. LEGAL STANDARD ...........................................................................................4

III. ARGUMENT .........................................................................................................4

    A.    Mr. Ezell's consumer perception survey, purportedly designed to measure trademark confusion, should be excluded in its entirety.................................4

          1.    Mr. Ezell's stimulus unrealistically emphasizes Vanderbilt.....................5

          2.    The Ezell Survey was impermissibly suggestive and leading ...................9

          3.    The Ezell Survey is so methodologically flawed that it should be excluded in its entirety ...........................................................................11

          4.    Mr. Poret's properly designed survey showed virtually no potential confusion......................................................................................................12

    B.    Mr. Lovin's opinions concerning the applicable royalty rate for the Other Scholastic Products and his trademark infringement damages calculations should be excluded.......................................................................................13

          1.    There is no reliable basis for the 7% royalty rate that Mr. Lovin applied to the Other Scholastic Products for his assessment of alleged contract damages .........................................................................13

          2.    Mr. Lovin's untimely attempt to offer a pro rata analysis via a "Response Report" is unreliable .............................................................14

          3.    Mr. Lovin's trademark infringement damages calculations rely on inapposite licenses and therefore are unreliable .......................................17

    C.    Mr. Webster's "analysis of documentation" opinions are neither relevant nor reliable ..............................................................................................20

IV. CONCLUSION.....................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biscotti Inc. v. Microsoft Corp.*,
No. 2:13 Civ. 01015 (JRG) (RSP), 2017 WL 2607882 (E.D. Tex. May 25,
2017) ..............................................................................................................18

*CareFirst of Md., Inc. v. First Care, P.C.*,
434 F.3d 263 (4th Cir. 2006) .......................................................................12

*Champion v. Outlook Nashville, Inc.*,
380 F.3d 893 (6th Cir. 2004) .........................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).............................................................................. *passim*

*Franklin Res. Inc. v. Franklin Credit Mgmt. Corp.*,
988 F. Supp. 322 (S.D.N.Y. 1997) .............................................................9,10

*Frisch's Rest., Inc. v. Shoney's Inc.*,
759 F.2d 1261 (6th Cir. 1985) ......................................................................12

*Gen. Motors Corp. v. Cadillac Marine & Boat Co.*,
226 F. Supp. 716 (W.D. Mich. 1964) .............................................................6

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and affirmed*, 446 F.2d 295 (2d
Cir. 1971) ..................................................................................................17,18

*Haddad v. Rav Bahamas, Ltd.*,
589 F. Supp. 2d 1302 (S.D. Fla. 2008) ........................................................14

*Hoffman v. Caterpillar, Inc.*,
368 F.3d 709 (7th Cir. 2004) ........................................................................21

*Juicy Couture, Inc. v. L'Oreal USA, Inc*.,
No. 04 Civ. 7203 (DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) .............5,6

*Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*,
No. 06 Civ. 550 (JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007).............10, 11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)........................................................................................4

*Lanard Toys Ltd. v. Anker Play Prods., LLC*,
No. 19 Civ. 4350, 2020 WL 6873647 (C.D. Cal. Nov. 12, 2020)...........................21

ii

*LaserDynamics, Inc. v. Quanta Comput. Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)..........................................................................17

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)......................................................................17

*Luna v. Bell*,
   No. 3:11 Civ. 00093, 2013 WL 12316066 (M.D. Tenn. Aug. 1, 2013) ...........................22, 23

*M2M Sols. LLC v. Enfora, Inc.*,
   167 F. Supp. 3d 665 (D. Del. 2016)................................................................20

*Madej v. Maiden*,
   951 F.3d 364 (6th Cir. 2020), *cert. denied*, No. 20-227, 2020 WL 6037415
   (U.S. Oct. 13, 2020) ..............................................................................15

*Moore v. Weinstein Co.*,
   No. 3:09 Civ. 00166, 2012 WL 1884758 (M.D. Tenn. May 23, 2012), *aff'd*,
   545 F. App'x 405 (6th Cir. 2013) ..................................................................21

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
   No. 04 Civ. 73923, 2006 WL 20523 (E.D. Mich. Jan. 4, 2006)...........................................10

*Pride v. BIC Corp.*,
   218 F.3d 566 (6th Cir. 2000) ......................................................................4

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010)..................................................................17, 18

*Rocky Brands, Inc. v. Red Wing Shoe Co.*,
   No. 2:06–cv–00275, 2009 WL 5125475 (S.D. Ohio Dec. 28, 2009) .....................................10

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ......................................................................4

*Simon Prop. Grp, L.P. v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (S.D. Ind. 2000) ..............................................................11

*SMD Software, Inc. v. EMove, Inc.*,
   945 F. Supp. 2d 628 (E.D.N.C. 2013)................................................................22

*Spears v. Cooper*,
   No. 1:07 Civ. 58, 2008 WL 5552336 (E.D. Tenn. Nov. 17, 2008) .......................................22

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999)......................................................................11, 12

iii

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010)..................................................................5, 11

*Truckstops Corp. of Am. v. C-Poultry Co.*,
    596 F. Supp. 1094 (M.D. Tenn. 1983)..................................................................12

*United States v. Jones*,
    107 F.3d 1147 (6th Cir. 1997) ...............................................................................4

*Univ. of Pittsburgh v. Townsend*,
    No. 3:04 Civ. 291, 2007 WL 1002317 (E.D. Tenn. Mar. 30, 2007)........................21

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984)....................................................................................9

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
    No. 12 Civ. 00329 (AG), 2014 WL 12586737 (C.D. Cal. Apr. 21, 2014) ...............18

*Vista Food Exch., Inc. v. Vistar Corp.*,
    No. 03 Civ. 5203 (DRH), 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005)..................6

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003)...............................................................9, 12

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
    No. 4:09 Civ. 1827, 2012 WL 2911968 (S.D. Tex. July 16, 2012)........................20

**Other Authorities**

6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed. Dec. 2020) ....................5

6 McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed. Dec. 2020) ..................11

Fed. R. Evid. 702 .......................................................................................................4

Henry D. Ostberg, Ph.D, *Response to the Article Entitled "A 'Reading' Test or a
    'Memory' Test: Which Survey Methodology Is Correct?"*, 95 Trademark Rep.
    1446 (2005) ........................................................................................................9

Itamar Simonson & Ran Kivetz, "Demand Effects in Likelihood of Confusion
    Surveys: The Importance of Marketplace Conditions," *Trademark and
    Deceptive Advertising Surveys: Law, Science and Design* 243-59 (Shari
    Seidman Diamond & Jerre B. Swann eds., 2012)...............................................10

Jerre B. Swann, "Survey Critiques," *Trademark and Deceptive Advertising
    Surveys: Law, Science, and Design* 374-75 (Shari Seidman Diamond & Jerre
    B. Swann eds., 2012) ...........................................................................................6

Defendants Scholastic Inc. ("Scholastic"), Houghton Mifflin Harcourt Publishing Company ("HMH"), and Ted S. Hasselbring ("Hasselbring" and, collectively, "Defendants") respectfully submit this memorandum of law in support of their *Daubert* motion to exclude expert reports and related testimony proffered by plaintiff Vanderbilt University ("Plaintiff" or "Vanderbilt"). Specifically, Defendants move to exclude in its entirety the expert report and related testimony of Vanderbilt's proffered expert Matthew G. Ezell and to exclude in part the expert reports and related testimony of Vanderbilt's proffered experts Christopher M. Lovin and Bruce F. Webster.[1]

## I.      INTRODUCTION

As the U.S. Supreme Court has made plain, the Federal Rules of Evidence are "designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596-97 (1993). The expert testimony that Defendants seek to exclude by this motion falls well outside the realm of relevant, reliable testimony admissible under *Daubert* to aid the "quest for truth in the courtroom." *Id.*

First, the expert testimony proffered by Mr. Ezell, Vanderbilt's proffered trademark survey expert, should be excluded in its entirety. The flaws in Mr. Ezell's consumer perception survey (the "Ezell Survey") are so profound that it would be highly prejudicial to permit Vanderbilt to present his findings and opinions to the jury. The Ezell Survey failed to replicate the marketplace conditions under which prospective purchasers of Scholastic's and HMH's

---

[1] Defendant Hasselbring has filed a separate motion seeking to exclude the portion of Mr. Lovin's report and related testimony that addresses the damages Vanderbilt seeks from Hasselbring individually.

programs were exposed to the allegedly infringing promotional materials, instead showing a cherry-picked and highly biased selection of six PowerPoint slides from a far longer Scholastic presentation, which severely overemphasized the prominence of any references to Vanderbilt and severely diminished the prominence of references to Scholastic. The Ezell Survey also arbitrarily and inaccurately ended the survey presentation on a slide that featured a reference to Vanderbilt as Hasselbring's employer that was not the final slide in any actual presentation—a deliberate attempt to bias responses toward suggesting an association between the Scholastic educational product featured in the presentation and Vanderbilt. Mr. Ezell then exacerbated this bias by having respondents repeatedly view this one cherry-picked slide while answering every single one of the critical test questions.

Second, the expert testimony proffered by Mr. Lovin, Vanderbilt's damages expert, should be excluded to the extent it relates to programs other than *READ 180* (*i.e.,* the "Other Scholastic Products"[2]) that Vanderbilt alleges are royalty-bearing because Vanderbilt incorrectly contends they are based on or derived from the materials licensed by Vanderbilt to Scholastic pursuant to a 1997 agreement (the "License"). Mr. Lovin's opinions concerning a royalty rate for the Other Scholastic Products are untethered to any relevant or reliable evidence. In his report, Mr. Lovin simply applied the same contractual rate that the parties agreed to for the student software portion of *READ 180* (7%) to the Other Scholastic Products, notwithstanding express contractual language providing that, in the event that Scholastic developed any other software products "based on or derived from" the licensed materials, Vanderbilt would only receive royalties on such products "pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products." *See* Declaration of

---

[2] The Other Scholastic Products are *System 44*, *iRead*, *MATH 180*, and *FASTT Math*.

Benjamin E. Marks ("Marks Decl.") Ex. A (License) § 6.2. In his report, Mr. Lovin undisputedly did not perform the required pro rata analysis, nor would he have been qualified to do so.[3] And although he tried to fix this failing by attempting to conduct a pro rata analysis in an untimely "Response Report," here too he failed because the Plaintiff's expert he relied upon for his new analysis (Dr. Timothy Shanahan) testified that he did not conduct a pro rata analysis either.[4] The Court also should exclude Mr. Lovin's trademark infringement damages opinion because it is based on licenses for uses that are far too dissimilar to the use of Vanderbilt marks at issue here to provide a basis for reliable testimony. His opinion also fails to account for the context of the hypothetical negotiations that are the subject of his testimony.

Third, the expert testimony proffered by Mr. Webster, Vanderbilt's software source code expert, should be excluded to the extent it relates to his analysis of user manuals designed for teachers, rather than to his analysis of the software source code of *READ 180*, *System 44*, and *iRead*. Mr. Webster simply reviewed these user manuals to identify certain exercises that appear in the student software portions of various programs. But Mr. Webster's claimed expertise is in information technology, computer science, and software engineering, not reading non-technical documents, and no such expertise is required for the analysis Mr. Webster conducted of user manuals designed for classroom teachers. Furthermore, he has no expertise in pedagogy or

---

[3] The contractual provision on which Vanderbilt relies for its purported entitlement to royalties on the Other Scholastic Products is also an unenforceable agreement to agree, which is a separate ground for denying Vanderbilt's claim for damages as discussed in the concurrently-filed motion. *See* Defendants Scholastic and HMH's Memorandum of Law in Support of Motion for Summary Judgment, dated January 22, 2021 (the "SJ Brief"), Section II(C).

[4] Defendants separately have moved *in limine* to preclude Vanderbilt's experts from offering testimony concerning opinions not disclosed in their initial expert reports and only belatedly raised in so-called "response reports" served by Vanderbilt on October 26, 2020, as Vanderbilt neither sought nor obtained leave for an additional round of expert reports not contemplated by the Case Management Order. *See* Dkt. No. 273.

classroom instruction that might be relevant to an analysis of those materials, which renders his opinions unreliable.

Therefore, for these reasons and as explained in greater detail below, the Court should exclude Mr. Ezell's testimony and report in its entirety and Mr. Lovin's and Mr. Webster's testimony and reports in part.

## II.    LEGAL STANDARD

In ruling on admissibility, the trial judge serves as the gatekeeper who "has the duty to decide not only whether evidence is relevant but also whether it is reliable."  *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997).  Under *Daubert*, expert testimony is admissible only if: (1) the witness is qualified by knowledge, skill, experience, training or education, (2) the testimony of that witness is relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue, and (3) the testimony of that witness is reliable.  509 U.S. at 589; *see also* Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).  The party proffering expert testimony must show "by a 'preponderance of proof'" that these three requirements are satisfied.  *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592 n.10).  These requirements apply with equal force to non-scientific testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004).

## III.   ARGUMENT

### A.    Mr. Ezell's consumer perception survey, purportedly designed to measure trademark confusion, should be excluded in its entirety

Vanderbilt submitted the report of Mr. Ezell, which describes a consumer perception survey he designed to measure the extent to which references to Vanderbilt University in Scholastic's marketing materials would lead potential purchasers to think (mistakenly) that the

4

Other Scholastic Products were endorsed or approved by Vanderbilt.  Marks Decl. Ex. B (Ezell Report).  As the stimulus for his survey, Mr. Ezell used parts of one marketing PowerPoint presentation prepared by Scholastic for *System 44*.  Mr. Ezell did not display this presentation to survey respondents in the same manner as Scholastic used that document in practice.  Instead, he showed survey respondents a truncated, biased version of that presentation, where he unrealistically emphasized the two lone slides that mention Vanderbilt and improperly deemphasized references to Scholastic, and as a result, "concludes" that a net total of 29% of respondents to his test were confused.  *Id.* at 2.  Because Mr. Ezell's survey design completely failed to replicate the market conditions under which real consumers would have encountered Vanderbilt's name or logo, it is fundamentally flawed and useless for measuring confusion.  His report and testimony should be excluded in their entirety.

### 1.    Mr. Ezell's stimulus unrealistically emphasizes Vanderbilt

A properly designed consumer perception survey must replicate the marketplace conditions under which the relevant marks are encountered by prospective consumers.  6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed. Dec. 2020) (a survey's methodology must mirror the situations in which consumers encounter the service or mark and should reflect marketplace conditions with respect to the presentation of survey stimuli).  Courts routinely exclude surveys that do not adequately replicate marketplace presentation of the marks.  *See THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 235-239 (S.D.N.Y. 2010) (survey did not replicate market conditions where it failed to account for whether the parties' products would have been viewed together in the marketplace, omitted references to defendant's trademark that may have dispelled confusion**,** and did not use proper control); *Juicy Couture, Inc. v. L'Oreal USA, Inc*., No. 04 Civ. 7203 (DLC), 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (excluding survey where it failed to replicate the marketplace conditions in which consumers

5

encounter defendant's products); *Vista Food Exch., Inc. v. Vistar Corp.,* No. 03 Civ. 5203 (DRH), 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (excluding survey as not adequately replicating market conditions in part because stimulus omitted several references to defendant's trademark); *Gen. Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F. Supp. 716, 736 (W.D. Mich. 1964) (excluding survey as not replicating market conditions in part because respondents were shown only a brochure and the decision to purchase a boat involves more than review of a brochure); *see also* Marks Decl. Ex. U (Jerre B. Swann, "Survey Critiques," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 374-75 (Shari Seidman Diamond & Jerre B. Swann eds., 2012)).

Here, the Ezell Survey did not replicate or even approximate market conditions because respondents were shown a stimulus that artificially highlighted references to Vanderbilt and omitted or downplayed references to Scholastic. For his survey, Mr. Ezell cherry-picked six slides out of a much longer PowerPoint presentation used by Scholastic to market *System 44* during live presentations (the "Ezell Stimulus"). Marks Decl. Ex. B (Ezell Report) at 4-6. Two of the slides selected by Mr. Ezell—a full 1/3 of the slides shown to respondents—mentioned Vanderbilt University as Hasselbring's employer and contained a Vanderbilt University logo. *See id*. None of the many slides that Mr. Ezell chose to exclude from his stimulus contained a reference to Vanderbilt. *See id.* at 8; Marks Decl. Ex. N (Dunkin Ex. 13).

Not only did Mr. Ezell use a biased stimulus that contained the only two references to Vanderbilt that appeared in a much longer presentation, but he: (a) ended the stimulus on the following slide ("Slide Six"), making it the last slide viewed by respondents; (b) showed Slide Six a second time before asking any questions; and then (c) showed Slide Six over and over again by placing it on the screen above each survey question:



*Id.* at 9-13.  Although actual potential purchasers of *System 44* would see Slide Six just once in the course of the presentation he used, Mr. Ezell ensured that all respondents saw Slide Six three times in succession, and a minimum of five times total—and more typically between seven and fourteen times total—before concluding the survey.  Marks Decl. Ex. B (Ezell Report) at 10.  In short, Mr. Ezell went to great lengths to ensure that survey respondents would focus on the contents of Slide Six, including by making sure they would see Slide Six—and only Slide Six—when answering survey questions.

By contrast, real consumers encountering the slides that were included in the Ezell Stimulus would have done so under significantly different market conditions.  *First*, consumers who actually saw the slides in the Ezell Stimulus in the marketplace encountered them as part of a much longer presentation that contained only two references to Vanderbilt among many references to or depictions of the Scholastic and *System 44* trademarks, as well as detailed information about *System 44* itself.  *See* Marks Decl. Ex. N (Dunkin Ex. 13).[5]  Specifically,

---

[5] At his deposition, Mr. Ezell admitted that the Ezell Stimulus contained only six slides out of what originally was a 117-slide presentation, that there is no evidence that these particular six slides ever comprised the full presentation given by a sales rep, and that there is no evidence that

consumers who saw the full presentation from which the Ezell Stimulus was drawn actually saw eleven slides after Slide Six, while consumers who saw other versions of this same presentation may have seen many more than eleven slides after Slide Six, all of which would have contained numerous references to Scholastic and *System 44*. *Second*, consumers who saw the Ezell Stimulus in the marketplace encountered it only on the screen during a live presentation by a Scholastic sales representative, who introduced herself as such, and closed the presentation by inviting attendees to ask questions about *System 44* and to contact her at Scholastic with later questions. Marks Decl. Ex. J (Dunkin Tr.) at 105:9-106:4. *Third*, to the extent a sales representative left any materials behind with the consumer after a meeting, it would not have been a copy of the PowerPoint presentation used as the Ezell Stimulus. *Id.* Accordingly, real consumers would not have had any part of this presentation in front of them—let alone Slide Six—as they made their purchasing decision. *Finally*, prospective customers would not have encountered the Scholastic presentation in isolation. Rather, it would have been preceded by and followed by other mentions of Scholastic, including (for example) in phone calls and emails describing *System 44*, scheduling the in-person presentation, and Scholastic representative follow up after the presentation. Indeed, the sales process for *System 44* typically took six to eighteen months, spanning a time period when prospective consumers would have engaged with their Scholastic sales representative (who would have been identified as a SCHOLASTIC sales rep) multiple times.[6] Marks Decl. Ex. J (Dunkin Tr.) at 56:19-58:6.

_____

any sales representative would have ended his or her presentation on Slide Six or repeatedly shown Slide Six to prospective customers. Marks Decl. Ex. I (Ezell Tr.) at 64:11-66:2.

[6] As Hal Poret, Scholastic's and HMH's consumer perception expert explained, while Mr. Ezell could not be expected to replicate the multi-month sales process exactly, the missing context is important to understand just how drastically the Ezell Survey overemphasized the Vanderbilt

8

In sum, the Ezell Survey was highly manipulated and failed to replicate the marketplace conditions under which real consumers would have encountered the Vanderbilt trademark by overemphasizing Vanderbilt, de-emphasizing Scholastic, and ignoring the actual context in which real consumers would have seen the Ezell Stimulus.

## 2. The Ezell Survey was impermissibly suggestive and leading

"A survey is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767-68 (E.D. Mich. 2003). For example, in *Universal City Studios, Inc. v. Nintendo Co*., 746 F.2d 112 (2d Cir. 1984), the Second Circuit upheld the district court's exclusion of a consumer survey where, *inter alia*, respondents were led to find a connection between the products in question rather than being permitted to make their own associations. *Id.* at 118.

As explained above, Mr. Ezell artificially focused respondents on the presence of the Vanderbilt marks by showing Slide Six multiple times to respondents, including above every single survey question. Accordingly, Mr. Ezell did not test survey participants on what they would have believed about Vanderbilt's involvement after viewing an actual presentation for *System 44*. Rather, he gave participants what was, for all intents and purposes, a reading test where they were prodded to name Vanderbilt while viewing a slide that focused on Vanderbilt. *See* Marks Decl. Ex. V (Henry D. Ostberg, Ph.D, *Response to the Article Entitled "A 'Reading' Test or a 'Memory' Test: Which Survey Methodology Is Correct?"*, 95 Trademark Rep. 1446 (2005)); *see also Franklin Res. Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 335

---

marks, as compared to how consumers would have encountered them. Marks Decl. Ex. C (Poret Report) at 7-8.

(S.D.N.Y. 1997) ("Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion.").

Moreover, the fact that survey respondents were continually shown Slide Six during the additional questioning that asked "who else, if anyone, do you believe develops or puts out this program" (Marks Decl. Ex. B (Ezell Report) at 10) created what is known as a "demand effect," a phenomenon under which survey respondents use cues provided by the survey stimuli and questions to discern what they believe to be the answer that the questioner is seeking.  *See* Marks Decl. Ex. W (Itamar Simonson & Ran Kivetz, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," *Trademark and Deceptive Advertising Surveys: Law, Science and Design* 243-59 (Shari Seidman Diamond & Jerre B. Swann eds., 2012)).  By repeatedly showing survey respondents Slide Six before asking them "who else, if anyone, do you believe develops or puts out this program", Mr. Ezell prompted them to look at Slide Six for clues as to the right answer.  This cue made it more likely that respondents who were not confused as to who developed *System* 44 answered "Vanderbilt" solely because they discerned that to be the answer Mr. Ezell was seeking.  *See Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.,* No. 06 Civ. 550 (JFK), 2007 WL 2258688, at *9 (S.D.N.Y. Aug. 6, 2007) (precluding survey because survey design "suggested to respondents that they should believe that a connection existed between the companies' marks") (emphasis in original); *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04 Civ. 73923, 2006 WL 20523, at *6-7 (E.D. Mich. Jan. 4, 2006) (survey design suggesting business relationship between parties was flawed); *Rocky Brands, Inc. v. Red Wing Shoe Co.*, No. 2:06–cv–00275, 2009 WL 5125475, at *6 (S.D. Ohio Dec. 28, 2009) (finding question about where a product was made suggestive where stimulus was marked with "made in USA with imported materials" or "made in USA").

10

### 3. The Ezell Survey is so methodologically flawed that it should be excluded in its entirety

Under the *Daubert* standard, "[t]here is no doubt that a trial court, in the exercise of its 'gatekeeping function' may, in an appropriate case, exclude seriously flawed survey data from being received into evidence."  6 McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed. Dec. 2020).  This gatekeeping function is especially applicable to jury cases.  *See id.*; *THOIP*, 690 F. Supp. 2d at 231 ("Where, as here, a trademark action contemplates a jury trial rather than a bench trial, the court should scrutinize survey evidence with particular care."); *Kargo Glob.,* 2007 WL 2258688, at *11-12 (precluding consumer survey report in a jury case where failure to replicate actual market condition meant that any probative value was outweighed by potential for unfair prejudice and confusion of the jury).

While flaws in survey methodology frequently go to the weight accorded to the survey evidence, it is widely recognized that there are situations where the flaws are so great that the survey should be excluded in its entirety or given little or no weight in deciding a summary judgment motion.  In *Simon Prop. Grp, L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043 (S.D. Ind. 2000), for example, the court rejected a proposed survey that asked respondents about just two pages from an internet search request where real consumers would have seen many other pages, calling it "nothing more than a meaningless memory game or word association exercise that bears no relationship to the marketplace."  *Id.*  In so holding, the court stated that it "need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility.  If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial."  *Id.* at 1038; *see also Starter Corp. v. Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999) (affirming exclusion of expert survey that was

11

little more than a memory test, measuring ability to remember the names of shows they had just been shown); *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1267-69 (6th Cir. 1985) (recognizing that it was not error for district court to discount probity of survey where design was defective); *Wells Fargo,* 293 F. Supp. 2d at 766 ("A survey that fails to adequately replicate market conditions is entitled to little weight, if any.").

### 4. Mr. Poret's properly designed survey showed virtually no potential confusion

If there were any doubt about the infirmities in Mr. Ezell's methodology, they were confirmed by the survey conducted by Scholastic's and HMH's survey expert, Hal Poret.  Marks Decl. Ex. C (Poret Report).  Despite having concerns about other aspects of Mr. Ezell's survey design, Mr. Poret replicated Mr. Ezell's design in its entirety, except that he showed respondents Scholastic's full seventeen-slide presentation in its proper order and did not leave any slides in front of the test subject during questioning.  *See* Marks Decl. Ex. C (Poret Report) at 3-4.  Mr. Poret's survey yielded only a 1.5% gross confusion rate, *id.*, which is *de minimis* under the law. *See CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (2% confusion rate insufficient to show infringing likelihood of confusion); *Truckstops Corp. of Am. v. C-Poultry Co*., 596 F. Supp. 1094, 1099 (M.D. Tenn. 1983) (4% maximum rate of confusion not sufficient to demonstrate a likelihood of confusion).  Indeed, only one out of 200 (0.5%) of the test subjects mentioned Vanderbilt in response to the first test question, which asked who developed or put out the *System 44* program that was the subject of the presentation.  Marks Decl. Ex. C (Poret Report) at 23.  Only two additional subjects mentioned Vanderbilt in response to follow-up questions.  *Id.* at 24-25.

Here, the flaws in the Ezell Survey, including Mr. Ezell's failure to replicate market conditions, the overemphasis of Vanderbilt in the stimulus, and the impermissibly suggestive

12

reading test, render the survey incapable of reliably evaluating the likelihood that consumers encountering the Vanderbilt marks in the marketplace would be confused as to Vanderbilt's sponsorship or affiliation with Scholastic's and HMH's products. Accordingly, testimony concerning the Ezell Survey would be highly prejudicial to Scholastic and HMH, and therefore his testimony and report should be excluded in their entirety.

> **B.** **Mr. Lovin's opinions concerning the applicable royalty rate for the Other Scholastic Products and his trademark infringement damages calculations should be excluded**

The Court should exclude Mr. Lovin's opinions concerning the applicable royalty rate for the Other Scholastic Products because they are untethered to any relevant or reliable evidence. The Court also should exclude Mr. Lovin's trademark infringement damages opinion because it is based on licenses for uses that are too dissimilar to the use of the Vanderbilt marks at issue to provide a basis for reliable testimony and fails to take into account hypothetical negotiations between the parties.

> **1.** **There is no reliable basis for the 7% royalty rate that Mr. Lovin applied to the Other Scholastic Products for his assessment of alleged contract damages**

Vanderbilt asserts (but Defendants dispute) that the Other Scholastic Products are "based on or derived from" the materials licensed to Scholastic for the development of *READ 180* and therefore are royalty-bearing under Section 6.2 of the License. *See* FAC ¶ 31 (Dkt. No. 85); Marks Decl. Ex. A (License) § 6.2. That provision provides that if Scholastic subsequently developed other software products based on or derived from the licensed materials, Vanderbilt would only receive royalties on such software products "pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products." Marks Decl. Ex. A (License) § 6.2. Although Vanderbilt's damages expert, Mr. Lovin, cited this provision in his report when it came time to calculating the royalty rate for the Other Scholastic

13

Products (after assuming they were royalty-bearing), he did not conduct any pro rata analysis at all.  Instead, he simply applied the 7% royalty rate that the parties agreed would apply to the student software portion of *READ 180* without adjustment.  *See* Marks Decl. Ex. D (Lovin Report) at 27; *see also* Marks Decl. Ex. K (Lovin Tr.) at 110:13-111:12, 112:23-113:5 (conceding he did not attempt to assess the amount of the licensed materials incorporated into any of the Other Scholastic Products or otherwise include any pro rata analysis).

Mr. Lovin admitted that he does not have the requisite expertise to assess the extent to which, if any, Scholastic incorporated the licensed materials into the Other Scholastic Products.  Marks Decl. Ex. K (Lovin Tr.) at 112:13-22, 115:6-14.  And he further admitted that he did not review the opinions of other experts, any technical documentation, source code, or the software components of the at-issue products themselves in preparing his expert report and forming the opinions disclosed therein.  *See id.* at 115:6-116:18.  Because Mr. Lovin failed to conduct or cite any analysis of the amount of licensed materials allegedly incorporated into any of the Other Scholastic Products, let alone analyze how the parties would have reached agreement on that subject, Mr. Lovin's opinion that the royalty rate for these Other Scholastic Products should be 7% should be excluded, as should his contractual damages calculations that are based on that royalty rate.  *See, e.g.*, *Daubert*, 509 U.S. at 589-95; *Haddad v. Rav Bahamas, Ltd.*, 589 F. Supp. 2d 1302, 1306-07 (S.D. Fla. 2008) (excluding damages expert's testimony for breach of contract claim as not relevant where expert ignored remedy provisions in parties' memorandum of understanding).

       **2.**     **Mr. Lovin's untimely attempt to offer a pro rata analysis via a "Response Report" is unreliable**

Following the disclosure of Defendants' rebuttal expert reports, Vanderbilt served an untimely and improper "Response Report" from Mr. Lovin, that attempted to fix the glaring flaw

in his analysis by offering an opinion that purports to reflect a pro rata analysis. *See* Marks Decl. Ex. E (Lovin "Response Report") at 11-13. He conceded that his belated analysis was "an entirely new opinion," and it should be excluded for the reasons set forth in Defendants' *in limine* motion (Dkt No. 273); Marks Decl. Ex. K (Lovin Tr.) at 217:3-13. It also should be excluded under *Daubert* because Mr. Lovin's new opinion is completely unreliable: it rests solely on a misunderstanding of another expert's opinions. *See Madej v. Maiden*, 951 F.3d 364, 376-77 (6th Cir. 2020), *cert. denied*, No. 20-227, 2020 WL 6037415 (U.S. Oct. 13, 2020) (finding causation opinion unreliable where rested on "an apparent misunderstanding" of another doctor's diagnosis and views).

Specifically, Mr. Lovin's purported pro rata analysis set forth in his "Response Report" relied exclusively on the expert report submitted by Vanderbilt's pedagogy expert, Dr. Timothy Shanahan. *See* Marks Decl. Ex. E (Lovin "Response Report") at 11-13. Mr. Lovin never spoke to Dr. Shanahan to ensure that he understood Dr. Shanahan's opinions. Marks Decl. Ex. K (Lovin Tr.) at 58:21-22, 215:22-24. Rather, apparently based solely on his own reading of Dr. Shanahan's report,[7] Mr. Lovin came to believe—incorrectly—that Dr. Shanahan had analyzed the amount of the licensed materials incorporated into each of the Other Scholastic Products. Marks Decl. Ex. K (Lovin Tr.) at 214:21-216:24, 219:3-12, 219:24-220:3. Mr. Lovin's "Response Report" contains no citations to any pages from Dr. Shanahan's report from which he attained this purported understanding. Marks Decl. Ex. E (Lovin "Response Report") at 12-13; *see also* Marks Decl. Ex. K (Lovin Tr.) at 216:15-24.

---

[7] Mr. Lovin initially testified that his understanding of Dr. Shanahan's report also came from discussions from Vanderbilt's counsel. Marks Decl. Ex. K (Lovin Tr.) at 214:21-216:24. However, he subsequently disclaimed reliance on any such discussions. *Id.* at 219:16-220:8.

This absence is not surprising because Dr. Shanahan testified that he did not quantify the amount of the licensed materials that were incorporated into the Other Scholastic Products. *See* Marks Decl. Ex. L (Shanahan Tr.) at 57:6-61:2. Instead, Dr. Shanahan's task was to identify the "key academic concepts and techniques that form the pedagogical basis" of the Peabody Middle School Literacy Program (also referred to as the "Peabody Learning Lab or the "PLL") and to analyze which of the 13 academic concepts he identified were also used in the Other Scholastic Programs. Marks Decl. Ex. F (Shanahan Report) at 1, 8-9. Dr. Shanahan made clear in his report that this does not amount to a pro rata analysis:

> In my analysis I did not attempt to weigh the proportion that anchor videos, FASTT, or the predominance of design features of the PLL may have played in a particular product or whether these proportions may have changed across different versions, editions, or copyrights. Nor did I attempt to evaluate the financial value that these three design components [*i.e.,* the 13 academic concepts, anchor videos, and FASTT], separately or in any combination, may have represented to each program. When examining the design of *READ 180,* I did not attempt to evaluate what proportion of the program that Scholastic eventually brought to market had been developed or drawn directly from the components in the License Agreement. That these components were identified in the License Agreement and then later were employed by the publisher was considered by me to be sufficient grounds for concluding that they were based on or derived from the licensed Materials.

Marks Decl. Ex. F (Shanahan Report) at 7-8.

Mr. Lovin conceded that his opinions would be invalid if he misunderstood Dr. Shanahan's analysis. *See* Marks Decl. Ex. K (Lovin Tr.) at 221:10-223:2. When asked if he would have any basis to support his pro rata royalty rate calculations if Dr. Shanahan's report did not actually analyze the amount of the licensed materials incorporated into each of the Other Scholastic Products, Mr. Lovin responded "[i]t would seem to me I would need to use some additional data or different data to come up with that pro rata royalty . . . for these products." *Id.* at 221:10-21. But Mr. Lovin has no other "additional data or different data" to rely upon in this

16

case.  He cites none and he expressly rejected any reliance on, or any ability to rely upon, the opinions of Vanderbilt's software source code expert, Mr. Webster.  Marks Decl. Ex. E (Lovin "Response Report") at 11-13; Marks Decl. Ex. K (Lovin Tr.) 210:14-212:7, 214:3-18.  By Mr. Lovin's own admissions, the pro rata calculations in his "Response Report" should be excluded.

### 3. Mr. Lovin's trademark infringement damages calculations rely on inapposite licenses and therefore are unreliable

Mr. Lovin's assessment of damages for alleged trademark infringement is also unreliable.[8]  In conducting his reasonable royalty analysis, Mr. Lovin applied the *Georgia-Pacific* factors often used to assess damages in patent infringement cases.  One of those factors is "[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."  *Georgia-Pac. Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and affirmed*, 446 F.2d 295 (2d Cir. 1971).[9]  As the Federal Circuit has held, "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit" (*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)), and cannot be "radically different from the hypothetical agreement under consideration."  *Id*. at 1327.  That court also has held that "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."  *LaserDynamics, Inc. v. Quanta Comput. Inc.,* 694 F.3d 51, 79 (Fed. Cir. 2012); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871-72 (Fed. Cir. 2010) ("The first *Georgia-Pacific* factor . . . must consider licenses that are

---

[8] Vanderbilt's trademark infringement claims are also legally flawed for the reasons set forth in Scholastic and HMH's concurrently-filed Motion for Summary Judgment.  *See* SJ Brief, Section V.

[9] Another factor is "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit."  *Id*. at 1120.  Mr. Lovin assumed he could apply a similar *Georgia-Pacific* analysis for trademark infringement.  Marks Decl. Ex. D (Lovin Report) at 43.

17

commensurate with what the defendant has appropriated.  If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question").  Courts routinely exclude expert testimony and opinions that fail to account for differences between the prior licenses and the hypothetical license at issue.[10]  *See, e.g.*, *Biscotti Inc. v. Microsoft Corp.*, No. 2:13 Civ. 01015 (JRG) (RSP), 2017 WL 2607882, at *3-4 (E.D. Tex. May 25, 2017) (excluding damages opinions regarding certain licenses where failed to account for technological and economic differences between those prior licenses and hypothetical license); *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, No. 12 Civ. 00329 (AG), 2014 WL 12586737, at *9 (C.D. Cal. Apr. 21, 2014) (excluding reasonable royalty damages opinions including for failure to account for technological and economic differences between licenses).

The Court should do the same here and exclude Mr. Lovin's proffered opinion as to trademark infringement damages because it is based on licenses for uses that are far too dissimilar to the use of Vanderbilt marks at issue here to provide a basis for reliable testimony. It is undisputed that Vanderbilt's marks did not appear on the products at issue themselves. Rather, the alleged use of Vanderbilt's name and marks was in certain marketing for the products.  A typical example as shown in Mr. Lovin's report was the use of the Vanderbilt mark on a single page within an otherwise lengthy PowerPoint presentation.  *See* Marks Decl. Ex. D

---

[10] Mr. Lovin acknowledges that Vanderbilt has allowed "hotels to use its name for marketing purposes" and not in the name of the hotel or on its exterior in exchange for a flat fee (*see* Marks Decl. Ex. D (Lovin Report) at 43)—the comparable licenses cited by Scholastic and HMH's expert, Laura Stamm.  *See* Marks Decl., Ex. G (Stamm Report) at 26-30.  However, his report makes only a passing reference to these agreements, and he conducted no analysis of how the flat fees in those licenses compare to the royalty percentages he applied where the display of the Vanderbilt mark is the central feature of the product in question (*e.g.*, a t-shirt or baseball cap).

18

(Lovin Report) at 30-32. The use of the mark served to identify Hasselbring, who had consulted on the product, as a professor at Vanderbilt. *See id.*

Rather than identify licenses that use Vanderbilt's marks in a similar way to the way they were used by Scholastic and later by HMH, *i.e.*, to identify Vanderbilt as Hasselbring's employer and the locus of his research, Mr. Lovin relied on inapposite apparel and merchandise licenses (*e.g.*, licenses to sell t-shirts with the Vanderbilt name and mark)—where the mark is prominently displayed on the face of the apparel or merchandise, meaning that the entire value of the license is the ability to use a Vanderbilt trademark. Marks Decl. Ex. K (Lovin Tr.) at 167:23-168:23. Mr. Lovin then adopted and applied a royalty rate of 7-10% based on those licenses. Marks Decl. Ex. D (Lovin Report) at 57-58. But, those prominent uses of marks on the face of the product are strikingly different than the way the marks were used here, buried in certain marketing materials for the products. Indeed, Mr. Lovin admits in his expert report that apparel and merchandise licensees are willing to pay certain royalty rates because consumers of that "merchandise bearing Vanderbilt's trademarks desire to reflect a visible allegiance to Vanderbilt generally making the trademark a primary reason for consumer's purchase of a particular item (e.g., a shirt bearing a Vanderbilt logo vis-à-vis a non-logo bearing shirt)." *See* Marks Decl. Ex. D (Lovin Report) at 44. However, Mr. Lovin fails to account for the fact that there was no similar benefit in this case. Here, there was no use of the trademark on *READ 180* or on the Other Scholastic Products themselves, and there is no evidence (and Mr. Lovin cites none) that the use of any Vanderbilt trademarks played any role in any actual consumer's decision to purchase *READ 180* or any of the Other Scholastic Products. *See* Marks Decl. Ex. K (Lovin Tr.) at 168:19-23, 169:15-171:5.

19

Not only did Mr. Lovin rely on inapposite licenses for comparison, but he also failed to take into account the context of the hypothetical negotiations between the parties. As a result, Mr. Lovin's "methodology inherently arrives at an unreasonable result, and one to which no reasonable negotiator for [Scholastic or HMH] could possibly have agreed." *See WesternGeco L.L.C. v. ION Geophysical Corp.*, No. 4:09 Civ. 1827, 2012 WL 2911968, at *2 (S.D. Tex. July 16, 2012). This is apparent from Mr. Lovin's conclusion that Scholastic or HMH would have been willing to pay a *higher* royalty rate for the use of Vanderbilt's tradename and marks in connection with marketing the Other Scholastic Products (7-10%) than Scholastic actually negotiated for the rights to use *both* the licensed Peabody Middle School Literacy Program software to develop its own *READ 180* software product *and* Vanderbilt marks in connection with the marketing of *READ 180* (totaling 7%). Marks Decl. Ex. K (Lovin Tr.) at 164:5-165:16. His opinion should be excluded for this reason as well. *See M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675-78 (D. Del. 2016) (excluding expert's references to relied upon licenses and finding "for a license to be used in a damages analysis, the license must be proven comparable to the hypothetical negotiation").

### C.     Mr. Webster's "analysis of documentation" opinions are neither relevant nor reliable

The majority of the expert testimony proffered by Mr. Webster, Vanderbilt's software source code expert, does not relate to source code at all but rather is devoted to an analysis of user manuals that are designed for teachers and require no special expertise (and certainly no expertise that Mr. Webster possesses) for their interpretation. Accordingly, the portion of Mr. Webster's report that contains his purported analysis of user manuals of the student software components of the literacy products at issue and/or alleged similarities in their instructional activities should be excluded.

Courts commonly exclude proffered expert opinions like Mr. Webster's where specialized knowledge or expertise is not required to understand the facts or data presented. *See, e.g.*, *Univ. of Pittsburgh v. Townsend*, No. 3:04 Civ. 291, 2007 WL 1002317, at *14-18 (E.D. Tenn. Mar. 30, 2007) (excluding opinions of radiology professor who provided synopsis of documentary evidence to opine development of PET/CT scanner derived from work of university employees and NIH grants); *Moore v. Weinstein Co.*, No. 3:09 Civ. 00166, 2012 WL 1884758, at *9 (M.D. Tenn. May 23, 2012), *aff'd*, 545 F. App'x 405 (6th Cir. 2013) (finding opinions containing observations about similarities between certain aspects of a movie and soul duo would not assist trier of fact because within ken of jury to compare); *see also Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (finding expert testimony based on review of videotape would not assist trier of fact because jury could watch videotape and draw its own inferences regarding plaintiff's ability to meet production levels); *Lanard Toys Ltd. v. Anker Play Prods., LLC* , No. 19 Civ. 4350 (RSWL), 2020 WL 6873647, at *4-5 (C.D. Cal. Nov. 12, 2020) (excluding industrial design expert's opinions involving comparisons of accused product and patented products because "the jury is able to realize those observations themselves").

Here, Mr. Webster's marshaling of certain facts verbatim from user manuals and extensive copying and pasting from those documents into his report are not relevant to help the trier of fact to understand the manuals or to determine whether *System 44* or *iRead* were "based on or derived from" the materials licensed by Vanderbilt to Scholastic pursuant to the License. Specifically, throughout Section 4 of his report entitled "Analysis of Documentation," Mr. Webster copied directly from user manuals for *READ 180*, *System 44* and *iRead* that are not technical in nature and do not require any information technology or computer science expertise

to understand.[11]  Marks Decl. Exs. O-T (manuals).  While Mr. Webster purported to use the manuals as he compared certain allegedly similar activities between the software portions of these programs, Mr. Webster's reading of these user manuals is not any more persuasive than that of a layperson's reading.  Marks Decl. Ex. H (Webster Report) at 7-158; *Id.* Ex. M (Webster Tr.) at 76:13-15, 106:5-8, 136:11-138:21, 180:5-11.  As Mr. Webster himself described, the user manuals simply document for the end-users (teachers and students) "how the software is intended to operate, what the activities are, what the purposes of the activities are [and] what the user interface looks like and so on."  Marks Decl. Ex. M (Webster Tr.) at 104:13-16; *see also id.* at 105:2-8 ("My understanding is, yes, these are created for the teachers to understand how the software operates and what the different activities are.").  But no expertise is required to read non-technical documents and identify software functions.  *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 640 (E.D.N.C. 2013) (finding no expertise needed to understand whether software products have certain functions).

To the extent Mr. Webster purports to opine on alleged similarities between the instructional literacy activities in *READ 180, System 44*, and *iRead*, Mr. Webster has no expertise that qualifies him to do so.  Mr. Webster admitted that he is not an expert in pedagogy (Marks Decl. Ex. M (Webster Tr.) at 40:19-21), literacy or math instruction (*id.* at 41:2-6), or special education.  *Id.* at 41:7-10.  Mr. Webster should not be permitted to testify on topics that he has admitted are outside of his areas of expertise.  *See Spears v. Cooper*, No. 1:07 Civ 58, 2008 WL 5552336, at *3 (E.D. Tenn. Nov. 17, 2008) (refusing to admit testimony outside of expert's expertise); *Luna v. Bell*, No. 3:11 Civ. 00093, 2013 WL 12316066, at *3 (M.D. Tenn. Aug. 1,

---

[11] Other witnesses were able to easily review and glean information from these same types of user manuals.  *See, e.g.,* Marks Decl. Ex. L (Shanahan Tr.) at 45:22-46:6 ("I don't remember there being any particularly technical information in there about the coding or anything like that.")

2013) (excluding expert testimony and remarking that the Sixth Circuit "has warned courts not to frame an area of expertise too broadly to allow an expert to testify on an issue outside of his qualifications").

Accordingly, the testimony and related sections of the report proffered by Mr. Webster, Vanderbilt's software source code expert, should be excluded to the extent they relate to his analysis of user manuals of the student software portions of the literacy products at issue and/or alleged similarities in their instructional activities, rather than an analysis of the software source code of these products.

## IV.    <u>CONCLUSION</u>

For all of the reasons set forth herein, Defendants respectfully request that the Court grant their Motion and exclude in its entirely the report and testimony of Matthew G. Ezell and exclude in part the reports and testimony of Christopher M. Lovin and Bruce F. Webster.

Dated: New York, New York
         January 22, 2021

/s/ David J. Lender
David J. Lender (*pro hac vice*) (NY Bar No. 2583722)
Benjamin E. Marks (*pro hac vice*) (NY Bar No. 2912921)
Sara Lonks (*pro hac vice*) (NY Bar No. 5445630)
Taylor Dougherty (*pro hac vice*) (NY Bar No. 5526561)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
david.lender@weil.com
benjamin.marks@weil.com
sara.lonks@weil.com
taylor.dougherty@weil.com

Michael G. Abelow (No. 26710)
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, TN  37201
(615) 742-4200
mabelow@srvhlaw.com

23

*Attorneys for Defendant Houghton Mifflin Harcourt Publishing Company*

Dated: New York, New York
      January 22, 2021

*/s/ Edward H. Rosenthal*
Edward H. Rosenthal (*pro hac vice*) (NY Bar No. 1731835)
Caren Decter (*pro hac vice*) (NY Bar No. 4456992)
Kimberly M. Maynard (*pro hac vice*) (NY Bar. No. 4767844)
Nicole Bergstrom (*pro hac vice*) (NY Bar No. 5236344)
Viviane K. Scott (*pro hac vice*) (NY Bar No. 5468996)
FRANKFURT KURNIT KLEIN & SELZ, PC
28 Liberty Street
New York, New York 10005
Phone: (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
cdecter@fkks.com
kmaynard@fkks.com
nbergstrom@fkks.com
vscott@fkks.com

Thor Y. Urness (BPR No. 13641)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, TN 37203
(615) 252-2384
turness@bradley.com

*Attorneys for Defendant/Counterclaim-Plaintiff Scholastic Inc.*

Dated: Nashville, Tennessee
      January 22, 2021

*/s/ Thomas H. Dundon*
Thomas H. Dundon #4539
Aubrey B. Harwell, Jr. #2559
Erik C. Lybeck #35233
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1100
Nashville, TN 37203
(615) 244-1713
aharwell@nealharwell.com
tdundon@nealharwell.com
elybeck@nealharwell.com

*Attorneys for Defendant Ted S. Hasselbring*

24

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 22rd day of January, 2021, the foregoing was served via the Court's CM/ECF system on the following:

| | |
|---|---|
| Paige W. Mills<br>Robert E. Cooper, Jr.<br>Mary Leigh Pirtle<br>Ashleigh Karnell<br>BASS BERRY & SIMS PLC<br>150 Third Avenue South, Suite 2800<br>Nashville, TN 37201<br>pmills@bassberry.com<br>rcooper@bassberry.com<br>mpirtle@bassberry.com<br>ashleigh.karnell@bassberry.com | John W. Harbin<br>Mary Katherine Bates<br>MEUNIER CARLIN & CURFMAN LLC<br>999 Peachtree Street NE, Suite 1300<br>Atlanta, GA 30309<br>jharbin@mcciplaw.com<br>kbates@mcciplaw.com |
| *Attorneys for Plaintiff/Counterclaim-Defendant Vanderbilt University* | |

/s/ Michael G. Abelow
Michael G. Abelow