IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VANDERBILT UNIVERSITY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 3:18-CV-00046 |
| v. | ) | |
| | ) | Chief Judge Waverly D. Crenshaw, Jr. |
| SCHOLASTIC, INC.; HOUGHTON | ) | Magistrate Judge Jeffery S. Frensley |
| MIFFLIN HARCOURT PUBLISHING | ) | |
| COMPANY; and TED S. HASSELBRING, | ) | JURY DEMAND |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS SCHOLASTIC INC. AND HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

SUMMARY OF MATERIAL FACTS ................................................................ 4

    A.    Hasselbring and The Peabody Middle School Literacy Program ........................... 4

    B.    The 1997 License Agreement Between Vanderbilt and Scholastic ...................... 5

    C.    Scholastic's Development of READ 180 ............................................................ 7

    D.    Scholastic's Development of the Other Scholastic Products ................................ 8

    E.    Vanderbilt's Longstanding Knowledge and Delayed Pursuit of Its Claims .......... 9

    F.    Scholastic's Sale of Its Educational Technology and Services
        Business to HMH ........................................................................................... 13

    G.    Vanderbilt's Audit, the Tolling Agreement, and the Present Suit ..................... 13

ARGUMENT ...................................................................................................... 14

    I.    MOST OF VANDERBILT'S CLAIMS ARE TIME-BARRED ......................... 14

        A.    Most of Vanderbilt's Breach of Contract Claims Are Time-Barred ......... 14

            1.    Vanderbilt's Contract Claims for System 44 and FASTT
                Math Are Barred in Their Entirety ................................................. 15

            2.    Vanderbilt's Claims Based Upon Alleged Underpayments
                of Royalties on READ 180 Are Time-Barred ............................... 17

        B.    Vanderbilt's Claim for a Declaratory Judgment Is Time-Barred ............. 19

        C.    Vanderbilt's Claims for Tortious Interference With Contract Are
            Time-Barred ............................................................................................ 21

        D.    Vanderbilt's Trademark Infringement Claims Are Time-Barred ............. 22

            1.    Vanderbilt Unreasonably Delayed Pursuing Its Trademark
                Claims ......................................................................................... 22

            2.    Vanderbilt's Unreasonable Delay Has Prejudiced
                Scholastic and HMH ................................................................... 24

Case 3:18-cv-00046   Document 304   Filed 01/22/21   Page 2 of 60 PageID #: 7739

II.  VANDERBILT'S UNTIMELY CONTRACT CLAIMS ALSO FAIL AS
     A MATTER OF LAW ...................................................................... 24

     A.   The Undisputed Evidence Establishes that Vanderbilt Is Not
          Entitled to Royalties on Sales of Non-Software Products and
          Services ............................................................................. 25

          1.   The Plain Language of the License Forecloses Vanderbilt's
               Claims for Royalties on Sales of Non-Software Products
               and Services ................................................................. 25

          2.   If the Court Were to Consider Extrinsic Evidence, Such
               Evidence Confirms that Vanderbilt Is Not Entitled to
               Royalties on Sales of Non-Software Products and Services ......... 31

     B.   Vanderbilt Is Not Entitled to Royalties on Software Products That
          Were Independently Developed by Scholastic Prior to the License ......... 33

     C.   Vanderbilt's Has No Contractual Claim for Royalties on Products
          Other Than READ 180 Because Section 6.2 of the License Is an
          Unenforceable Agreement to Agree ........................................ 34

     D.   In Any Event, Vanderbilt Has No Competent Evidence of
          Damages Concerning the Other Scholastic Products ................................ 36

     E.   Vanderbilt's Additional Contract Claims Against Scholastic Also
          Fail ....................................................................................... 37

III. VANDERBILT'S UNTIMELY CLAIM FOR A DECLARATORY
     JUDGMENT THAT IT HAS AN OWNERSHIP INTEREST IN THE
     OTHER SCHOLASTIC PRODUCTS ALSO FAILS AS A MATTER OF
     LAW ........................................................................................... 37

IV.  VANDERBILT'S UNTIMELY CLAIMS FOR TORTIOUS
     INTERFERENCE ALSO FAIL AS A MATTER OF LAW ................................ 39

     A.   Vanderbilt Cannot Show that Scholastic or HMH Intended to
          Induce Hasselbring to Breach a Contract With Vanderbilt or Acted
          With Malice ............................................................................. 40

     B.   Vanderbilt Has No Competent Evidence of Damages Arising From
          the Alleged Interference ............................................................. 42

V.   VANDERBILT'S UNTIMELY CLAIMS FOR TRADEMARK
     INFRINGEMENT ALSO FAIL AS A MATTER OF LAW ............................ 42

     A.   There Is No Evidence of Actual Confusion ................................ 43

B.    All But One of the Remaining Factors Also Favor Scholastic and HMH ................................................................................................ 44

C.    The Proffered Testimony of Vanderbilt's Trademark Survey Expert Does Not Create a Genuine Issue of Material Fact ...................... 46

D.    Vanderbilt Has No Competent Evidence of Damages for the Alleged Infringement .............................................................................. 47

CONCLUSION ..................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3com Corp. v. Banco Do Brasil, S.A.*,
    171 F.3d 739 (2d Cir. 1999)........................................................................31, 32

*Americare Sys., Inc. v. Pinckney*,
    635 F. App'x 305 (6th Cir. 2016) .............................................................14

*Audi AG v. D'Amato*,
    469 F.3d 534 (6th Cir. 2006) ....................................................................22

*AutoZone, Inc. v. Tandy Corp.*,
    373 F.3d 786 (6th Cir. 2004) .............................................................44, 46

*Beal Sav. Bank v. Sommer*,
    8 N.Y.3d 318 (2007) ..................................................................................29

*Beckwith v. LBMC, P.C.*,
    No. 2017 Civ. 00972, 2019 WL 1306201 (Tenn. Ct. App. Mar. 21, 2019) ............................14

*Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*,
    446 F. Supp. 3d 258 (M.D. Tenn. 2020)..................................................14

*CareFirst of Maryland, Inc. v. First Care, P.C.*,
    434 F.3d 263 (4th Cir. 2006) .............................................................44, 47, 48

*Caruso v. Allnet Commc'n Servs., Inc.*,
    242 A.D.2d 484 (1st Dep't 1997) .............................................................35

*Childress v. Taylor*,
    945 F.2d 500 (2d Cir. 1991)......................................................................39

*Cole v. Mileti*,
    133 F.3d 433 (6th Cir.) *cert. denied* 525 U.S. 810 (1998)......................14

*Cramer v. Spada*,
    203 A.D.2d 739 (3d Dep't 1994) ..............................................................36

*Everly v. Everly*,
    958 F.3d 442 (6th Cir. 2020) ....................................................................20

*Fed. Deposit Ins. Corp. v. Homestead Mortg. Co.*,
    No. 04 Civ. 74842, 2011 WL 717456 (E.D. Mich. Feb. 22, 2011) ........48

Case 3:18-cv-00046   Document 304   Filed 01/22/21   Page 5 of 60 PageID #: 7742

*Franconero v. Universal Music Corp.*,
  No. 02 Civ. 1963, 2011 WL 566794 (S.D.N.Y. Feb. 11, 2011), *aff'd sub nom.*
  *Franconero v. UMG Recordings, Inc.*, 542 F. Appx. 14 (2d Cir. 2013) ..........................36, 37

*Frisch's Restaurant, Inc. v. Shoney's Inc.*,
  759 F.2d 1261 (6th Cir. 1985) ................................................................................46

*Frisch's Restaurants, Inc. v. Elby's Big Boy*,
  670 F.2d 642 (6th Cir. 1982) ................................................................................43

*Givens v. Mullikin ex rel. Estate of McElwaney*,
  75 S.W.3d 383 (Tenn. 2002).................................................................................39

*Goot v. Metro. Gov't of Nashville & Davidson Cty.*,
  No. 2:03 Civ. 02013, 2005 WL 3031638 (Tenn. Ct. App. Nov. 9, 2005) *app.*
  *denied* 2008 WL 5330502 (Ct. App. Tenn. Sept. 28, 2009)...................................18

*Harvey v. Knox Cty.*,
  No. CA 1179, 1988 WL 80973 (Tenn. Ct. App. Aug. 3, 1988) ..............................14

*Hauck Mfg. Co. v. Astec Indus., Inc.*,
  376 F. Supp. 2d 808 (E.D. Tenn. 2004).................................................................42

*HCA-Info. Tech. & Servs., Inc. v. Informatica Corp.*,
  No. 3:10 Civ. 01155, 2012 WL 13042609 (M.D. Tenn. Apr. 2, 2012) ...................17

*Hemby v. Winans*,
  No. 3:06 Civ. 0979, 2010 WL 793681 (M.D. Tenn. Mar. 5, 2010)........................39

*Hensley Mfg. v. ProPride, Inc.*,
  579 F.3d 603 (6th Cir. 2009) ................................................................................43

*Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*,
  931 F.2d 1100 (6th Cir. 1991) ..............................................................................45

*Indiv. Healthcare Specialists*, *Inc. v. BlueCross Blue Shield of Tenn., Inc.*,
  566 S.W.3d 671 (Tenn. 2019)..........................................................16, 17, 18, 19

*Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*,
  326 F.3d 687 (6th Cir. 2003) ................................................................................42

*Johnny's Fine Foods, Inc. v. Johnny's Inc.*,
  286 F. Supp. 2d 876 (M.D. Tenn. 2003)................................................................22

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
  52 N.Y. 2d 105 (1981) ....................................................................................34, 35

v

*Keith v. Aerus, LLC*,
  No. 2:09 Civ. 297, 2010 WL 3883434 (E.D. Tenn. Sept. 29, 2010) ......................................41

*Kellogg Co. v. Exxon Corp.*,
  209 F.3d 562 (6th Cir. 2000) ......................................................................................................22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)......................................................................................................47

*Laukus v. Rio Brands, Inc.*,
  391 F. App'x 416 (6th Cir. 2010) ...............................................................................................48

*Leelanau Wine Cellars, Ltd v. Black & Red, Inc.*,
  452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd* 502 F 3d 504 (6th Cir. 2007).........................46

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
  502 F.3d 504 (6th Cir. 2007) ......................................................................................................44

*McDonald's Corp. v. Shop at Home*,
  82 F. Supp. 2d 801 (M.D. Tenn. 2000)................................................................................44, 46

*Nartron Corp. v. STMicroelectronics, Inc.*,
  305 F.3d 397 (6th Cir. 2002) *cert. denied* 538 U.S. 907 (2003)...............................22, 23, 24

*Nave v. Life Bank*,
  334 B.R. 586 (M.D. Tenn. 2005) ................................................................................................41

*Nutley v. SkyDive the Ranch*,
  65 A.D.3d 443 (1st Dep't 2009) .................................................................................................35

*Precision Tracking Sols., Inc. v. Spireon, Inc.*,
  No. 3:12 Civ. 00626, 2014 WL 3058396 (E.D. Tenn. July 7, 2014)....................................21, 22

*Riggs v. Royal Beauty Supply, Inc.*,
  879 S.W.2d 848 (Tenn. Ct. App. 1994) ......................................................................................40

*Ritchie v. Williams*,
  395 F.3d 283 (6th Cir. 2005) ......................................................................................................19

*Roger Miller Music v. Sony/ATV Publ'g*,
  477 F.3d 383 (6th Cir. 2007) ......................................................................................................19

*Santa-Rosa v. Combo Records*,
  471 F.3d 224 (1st Cir. 2006).................................................................................................20, 21

*Sarinsky's Garage Inc. v. Erie Ins. Co.*,
  691 F. Supp. 2d 483 (S.D.N.Y. 2010).....................................................................................25, 26

vi

*Sazerac Brands, LLC v. Peristyle, LLC,*
    892 F.3d 853 (6th Cir. 2018) ................................................................43

*SeeScentsational Techs., LLC v. Pepsico, Inc.,*
    No. 13 Civ. 8645, 2018 WL 2465370 (S.D.N.Y. May 23, 2018), *aff'd*, 773 F.
    App'x 607 (Fed. Cir. 2019)...................................................................37

*Sikora v. Vanderploeg,*
    212 S.W.3d 277 (Tenn. Ct. App. 2006) ................................................40

*Smith v. Music City Homes, LLC,*
    No. 3:12 Civ. 0681, 2015 WL 752011 (M.D. Tenn. Feb. 23, 2015) ......................21

*Stratienko v. Chattanooga-Hamilton Cty. Hosp. Auth.,*
    435 S.W.3d 189 (Tenn. Ct. App. 2013) ................................................42

*Stroll v. Epstein,*
    818 F. Supp. 640 (S.D.N.Y.) *aff'd* 9 F.3d 1537 (2d Cir. 1993) ................31

*Tenn. Walking Horse Breeders' & Exhibitors' Ass'n v. Nat'l Walking Horse
    Ass'n,*
    528 F. Supp. 2d 772 (M.D. Tenn. 2007)........................................42, 45

*Teutul v. Teutul,*
    79 A.D.3d 851 (2d Dep't 2010) ............................................................35

*Therma-Scan, Inc. v. Thermoscan, Inc.,*
    295 F.3d 623 (6th Cir. 2002) ..........................................................45, 46

*Total Telcom Group Corp. v. Kendal on Hudson,*
    157 A.D.3d 746 (2d Dep't 2018) ..........................................................34

*Truckstops Corp. of Am. v. C-Poultry Co.,*
    596 F. Supp. 1094 (M.D. Tenn. 1983)............................................45, 47

*Univ. of Pittsburgh v. Townsend,*
    542 F.3d 513 (6th Cir. 2008) ................................................................18

*W.W.W. Assocs., Inc. v. Giacontieri,*
    77 N.Y.2d 157 (1990) ..........................................................................25

*Wagner & Brown v. Horwood,*
    58 S.W.3d 732 (Tex. 2001) ..................................................................19

*Waste Servs. of Decatur, LLC v. Decatur Cty, Tenn.,*
    367 F. Supp. 3d 792 (W.D. Tenn. 2019)..............................................16

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings*,
  LLC, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) ..................................................25, 26

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*,
  237 F. Supp. 3d 1230 (M.D. Fla. 2017) ...............................................................46

**Statutes**

17 U.S.C. §102(b) ...........................................................................................................38

17 U.S.C. § 507(b) ..........................................................................................................19

Lanham Act ......................................................................................................................22

Tennessee Code Annotated § 28-3-109 ...........................................................14, 16, 17, 21

**Other Authorities**

N.Y. C.P.L.R. § 213(2) ..................................................................................................14

Rule 30(b)(6) ...................................................................................................................44

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 30.85
  (5th ed.) ..........................................................................................................................47

Defendants Scholastic Inc. ("Scholastic") and Houghton Mifflin Harcourt Publishing Company ("HMH") respectfully submit this memorandum of law in support of their motion for summary judgment.

## INTRODUCTION

Although Vanderbilt has asserted a variety of contract and tort claims, the core of this dispute is Vanderbilt's contention that it has been underpaid royalties for more than twenty years under a license agreement dated January 1, 1997 with Scholastic (the "License") that was assigned to HMH in 2015. The undisputed discovery record shows that most of Vanderbilt's claims are barred by the applicable statutes of limitation and that none of its claims are supported by the evidence. Scholastic and HMH are entitled to summary judgment on all counts.

The License conveyed to Scholastic rights to: (i) certain copyrightable software known as the Peabody Middle School Literacy Program that was developed in the mid-1990s by co-defendant Dr. Ted S. Hasselbring while he was employed as a professor of special education by Vanderbilt, and by Laura Goin, a former Vanderbilt graduate student and consultant; (ii) three interactive, multimedia CD-ROMs containing instructional materials; and (iii) a written description of certain related academic concepts and techniques (collectively, the "Licensed Materials" or the "Materials"). Scholastic used the licensed software, along with a vast number of other elements independently created by Scholastic's employees and consultants or licensed from third parties, to develop a successful educational program named *READ 180*, which was designed to help children who were having difficulty learning to read. Scholastic distributed *READ 180* to school districts across the United States, and it paid Vanderbilt the royalties owed under the License. In 2015, Scholastic sold its Educational Technology and Services business to HMH and, with Vanderbilt's consent, assigned the License to HMH. Since then, HMH has distributed *READ 180* and paid Vanderbilt royalties owed under the License.

In 2016—the year after the Scholastic/HMH sale, 19 years after the License was signed, and 17 years after Vanderbilt began to receive royalties—Vanderbilt first exercised its contractual right to conduct an audit. At the conclusion of that audit, Vanderbilt incorrectly asserted that it was owed additional royalties.

A significant part of the amount in dispute relates to Vanderbilt's contention that it should have been paid royalties on the non-software components of *READ 180*, such as trade books, teacher guides, teacher training and cloud storage services that have been sold together with the *READ 180* software. But Vanderbilt's contention is refuted by the plain terms of the License, the negotiation history, the parties' 17-year course of dealing prior to the audit, and common sense. None of the non-software components, which include novels such as *The Adventures of Tom Sawyer*, incorporate or are derived from the Licensed Materials. Non-software components such as these have been an integral part of *READ 180* from the outset, but they fall outside of the royalty provisions of the License and, accordingly, have been excluded from royalty calculations since sales began. It makes no sense to expect Scholastic and HMH—decades later—to pay Vanderbilt royalties on materials that Scholastic either licensed from third parties or created itself without any use of the Licensed Materials.

The other significant part of this dispute relates to other educational programs created by Scholastic that Vanderbilt now contends are royalty-bearing. These products—referred to herein as the "Other Scholastic Products"—are *FASTT Math*, *System 44*, *iRead*, and *MATH 180*.[1] *System 44* and *iRead* address literacy skills but they are directed at different student populations

---

[1] In its First Amended Complaint, Vanderbilt alleged that two other programs, *Expert 21* and *Score It*, were also at issue, but it is no longer pursuing claims in relation to either.

and different learning challenges than *READ 180*.  *FASTT Math* and *MATH 180* are not literacy

programs at all.  As their names indicate, they are used for math instruction.

Vanderbilt pleaded alternate (and inconsistent) theories with respect to the Other

Scholastic Products.  Vanderbilt first alleged that they were "based on" or "derived from" the

Licensed Materials, and are therefore royalty-bearing under the License.[2]  While the undisputed

facts show that Scholastic did not use the Licensed Materials in connection with any of these

products, the Court need not decide this issue because the contractual provision on which

Vanderbilt relies is an unenforceable agreement to agree, and Vanderbilt has no competent

evidence of damages from this alleged breach.  Thus, Vanderbilt's breach of contract claim with

respect to the Other Scholastic Products fails as a matter of law.

In the alternative, Vanderbilt alleged that, if the Other Scholastic Products are not based

on or derived from the Licensed Materials (and therefore are not covered by the License), then

Vanderbilt owns some unspecified interest in, and is entitled to compensation for, those products

to the extent that they incorporate any copyrightable contribution made by Hasselbring while he

was employed by Vanderbilt.  With respect to this alternative theory, there is no dispute—and

Vanderbilt has long known—that Hasselbring served as a consultant to Scholastic in connection

with the development and marketing of the Other Scholastic Products.  The undisputed record

shows that Hasselbring did not contribute any copyrightable material to Scholastic or HMH in

connection with these other products at all, let alone any intellectual property belonging to

Vanderbilt.  Rather, his consulting services consisted of reviewing materials created by

Scholastic's employees and other consultants, attending product development meetings, and

---

[2] Here too, Vanderbilt seeks a royalty not just on the software, but on the books and other
materials developed entirely by Scholastic or by other third parties and sold with the software.

speaking at conferences organized by Scholastic to help market the products. Thus, Vanderbilt's declaratory judgment claim fails as well.

Vanderbilt's remaining claims for tortious interference and trademark infringement cannot survive summary judgment either. The record is devoid of any evidence that Scholastic or HMH acted with malice or intended to induce Hasselbring to breach any Vanderbilt policies when they engaged him as a consultant, and thus Vanderbilt cannot prove essential elements of its tortious interference claims. To the contrary, Scholastic and HMH obtained specific representations and warranties from Hasselbring that he was free to consult with them without violating any contractual obligations, and they are entitled to rely on those representations and warranties. Vanderbilt's trademark claims—which arise out of non-trademark uses of Vanderbilt's name and logo to identify it as the university that employs Hasselbring and the locus of his research—also fail because Vanderbilt cannot show any likelihood of confusion as to the source of the products or any sponsorship by Vanderbilt.

In any event, irrespective of the merits of any of Vanderbilt's claims, most of these claims are barred by the applicable statutes of limitations. Accordingly, and for the reasons explained in detail below, the Court should grant summary judgment to Scholastic and HMH.

## SUMMARY OF MATERIAL FACTS

### A. Hasselbring and The Peabody Middle School Literacy Program

Hasselbring is one of the nation's leading experts in the field of special education, with a particular focus on the use of technology for enhancing learning by students with mild disabilities and those who are at risk of school failure. *See* Defendants Scholastic and HMH's Statement of Undisputed Material Facts in Support of Their Joint Motion for Summary Judgment, dated January 22, 2021 ("Defs.' 56.1") ¶ 1. In 1982, he left the faculty of North Carolina State University to join the faculty of Peabody College at Vanderbilt University. Defs.'

56.1 ¶¶ 2-3. In 1984, he became the Associate Director of Vanderbilt's Learning Technology Center and eventually became its Co-Director. Defs.' 56.1 ¶ 4. Hasselbring left Vanderbilt for the University of Kentucky as of January 2000, but he returned to Vanderbilt in September 2006. Defs.' 56.1 ¶¶ 5-6.

Hasselbring created the Peabody Middle School Literacy Program with Laura Goin (Defs.' 56.1 ¶ 7), then a consultant to Vanderbilt. Defs.' 56.1 ¶ 10. They designed the program to assist middle school students who were struggling to learn to read. Defs.' 56.1 ¶ 8. The program was successfully tested in middle school classrooms in Florida in the mid-1990s, and showed considerable promise for its impact on learning outcomes. Defs.' 56.1 ¶ 11. Scholastic was intrigued by the potential for a commercial product using the Peabody Middle School Literacy Program, and it expressed interest in developing one. Defs.' 56.1 ¶ 12.

In 1996, to facilitate a transaction with Scholastic, Hasselbring and Goin assigned their copyright ownership interests in the Peabody Middle School Literacy Program to Vanderbilt in exchange for half of any royalties Vanderbilt might earn from licensing the program (with Hasselbring and Goin splitting their half equally). Defs.' 56.1 ¶ 13. Those assignments defined the "Peabody Middle School Literacy Program" as "middle school literacy materials consisting of text, graphics, video, software and computer code." Defs.' 56.1 ¶ 14.

### B. The 1997 License Agreement Between Vanderbilt and Scholastic

Following negotiations, Scholastic and Vanderbilt entered into the License in 1997. Defs.' 56.1 ¶ 30. Scholastic agreed to use its "expertise, ability, and wherewithal to effectively develop the Software and Literacy Units" that Hasselbring and Goin had created, together with other video materials that Scholastic owned or would license, to develop a marketable product. Declaration of Edward H. Rosenthal, dated January 22, 2021 ("Rosenthal Decl.") Ex. A (License) at 1. The License defined the specific elements (the "Materials") that Vanderbilt was

5

licensing to Scholastic as: (i) the "Software," *i.e.*, the Peabody Middle School Literacy Program; (ii) the "LTC Literacy Units," *i.e.*, three specific CD-ROMs designed to be used in conjunction with the Software; and (iii) "a written description of the key academic concepts and techniques that form the pedagogical basis for the Literacy Units as described in Exhibit A."  Rosenthal Decl. Ex. A at § 1.6.  The written description of the underlying pedagogy attached as Exhibit A is a 25-page summary describing and quoting extensively from the published, publicly available work of numerous scholars in the field of education around the country over the preceding decades.  Rosenthal Decl. Ex. A at Ex. A.

In exchange for the grant by Vanderbilt of an exclusive license to the "Materials" (Rosenthal Decl. Ex. A at § 2.1), Scholastic agreed to pay Vanderbilt royalties set as a percentage of the "Net Sales"[3] from "sales or licenses of the Materials or the Literacy Program." Rosenthal Decl. Ex. A at § 9.1.  The Literacy Program was defined to include only the software developed under the License and "Literacy Units," which were interactive, multimedia CD-ROMs consisting of specific instructional materials and the modified software.  *Id.* at § 1.5; *see also id.* at § 1.3.  During the contract negotiations, Scholastic made clear that it would develop and sell other non-software products together with the Literacy Program, but that it would not pay royalties to Vanderbilt on these non-software components.  Defs.' 56.1 ¶ 16.  Vanderbilt further agreed that Scholastic would own any and all proprietary rights in the future improvements made to the Materials.  Rosenthal Decl. Ex. A § 6.2.  The parties also contemplated the possibility that Scholastic might develop additional software products "based

---

[3] "Net Sales" is defined as "all income received by Scholastic from the sale, licensing, or other use of the Materials or Literacy Program, computed annually, less (a) cash, trade, or quantity discounts; (b) shipping and handling costs, taxes, including sales taxes and duties; (c) credits, returns and replacements, and (d) a reasonable reserve for returns."  Rosenthal Decl. Ex. A § 1.7.

on or derived from" the Licensed Materials in the future, with any royalty rate to be established "pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products." *Id.*.

The License provided an audit provision to allow Vanderbilt to ensure that it was receiving all of the royalties due thereunder. Specifically, Section 9.4 of the License granted Vanderbilt an audit right "to once per year during the term of the Agreement examine the books and records of Scholastic pertaining to the Development and Production Costs, royalty accounts, and sales records of products that are subject to [the] Agreement." Rosenthal Decl. Ex. A § 9.4.

### C.    Scholastic's Development of *READ 180*

Using the Peabody Middle School Literacy Program as a prototype for its student software component, Scholastic began work on creating a commercially viable educational program, which it eventually branded as *READ 180*. Defs.' 56.1 ¶ 32. This creation of a commercial product that could be sold to school districts across the country and used by hundreds of thousands of students was an enormous undertaking. It involved dozens of Scholastic's employees, consultants from a number of leading academic institutions, and an investment of millions of dollars. Defs.' 56.1 ¶ 33.

The *READ 180* program that Scholastic marketed and sold to schools was based on the following structure. Teachers would begin by facilitating literacy instruction for the whole class, using texts and guides provided by Scholastic. Defs.' 56.1 ¶ 35. Next, the students would break into small groups and rotate through the following stations: (i) small-group direct instruction by teachers using a workbook developed by third-party consultants unaffiliated with Vanderbilt; (ii) instructional technology using the *READ 180* software; and (iii) independent reading using books that Scholastic had licensed from third parties. *Id.* Only the software component was in any way based on the Peabody Middle School Literacy Program. Defs.' 56.1 ¶¶ 34, 37, 38, 39. The other

classroom "rotations" were not in any sense part of or derived from the Peabody Middle School Literacy Program. Defs.' 56.1 ¶ 39. Instead, they used a variety of non-software components having nothing to do with the Materials licensed from Vanderbilt, such as a small-group workbook (later named the "rBook"), books and other print materials to be assigned as independent reading for students during the independent reading rotation, teacher's guides and training materials, and other materials. Defs.' 56.1 ¶ 38. Some of these non-software materials were developed by Scholastic exclusively in-house, but many were licensed from third parties, such as copies of *The Adventures of Tom Sawyer* and *Treasure Island* that were sold to school districts as part of the *READ 180* package. Defs.' 56.1 ¶¶ 39-40. Prior to the License, Scholastic also developed software products independently of Vanderbilt and Hasselbring that it later used in *READ 180.* Defs.' 56.1 ¶¶ 36-37.

     *READ 180* was a remarkable success. Over the 20 years since sales of the product began, Scholastic, and now HMH, have made numerous improvements to take advantage of technological advances, add new features, and incorporate pedagogical improvements. Defs.' 56.1 ¶ 44. Numerous scholars from a wide variety of academic institutions have consulted on the products. Defs.' 56.1 ¶ 46. Scholastic and HMH have continued to pay royalties under the License for over twenty years, treating each subsequent version of the *READ 180* student software as royalty-bearing. Defs.' 56.1 ¶ 45. As a result of *READ 180*'s success, the License is the most profitable license of any sort in Vanderbilt's history. Defs.' 56.1 ¶ 72.

    **D.**    **Scholastic's Development of the Other Scholastic Products**

    The success of *READ 180* led Scholastic to develop the Other Scholastic Products:

- *FASTT Math* (launched in 2005), a math intervention program for students in grades 2-9 (Defs.' 56.1 ¶¶ 47-48);

- *System 44* (launched in 2008), a phonics-based intervention program for students reading below the second grade level (Defs.' 56.1 ¶¶ 49-50);

- *iRead* (launched in 2013), a non-intervention reading program for students in grades K-2 (Defs.' 56.1 ¶¶ 51-52); and

- *MATH 180* (launched in 2013), an intervention math program designed to address the needs of older, struggling students. Defs.' 56.1 ¶¶ 53-54.

While Scholastic retained Hasselbring as a consultant for the Other Scholastic Products, the undisputed evidence demonstrates that Hasselbring did not contribute any intellectual property to these products. Defs.' 56.1 ¶¶ 58, 61. Hasselbring was not asked to, nor did he, write any of the source code for any of these other products. Defs.' 56.1 ¶ 65. His role instead involved reviewing and providing suggestions on the software and related work product created by Scholastic's product design and product development teams, and assisting with promotion and speaking at conferences. Defs.' 56.1 ¶ 66. Hasselbring's consulting agreements make clear that these were entirely new products being created by Scholastic. Defs.' 56.1 ¶ 63.

While Hasselbring has been credited as an "Author" of these products, that credit is a common honorific used by educational publishers, including Scholastic and HMH, to acknowledge the thought leadership of consultants from academia, rather than to reflect authorship in the copyright sense. Defs.' 56.1 ¶ 67. Hasselbring's consulting agreements with Scholastic and HMH expressly conveyed the right to use his name for marketing purposes in that manner. Defs.' 56.1 ¶ 68.

### E. Vanderbilt's Longstanding Knowledge and Delayed Pursuit of Its Claims

Vanderbilt has known for more than a decade that: (i) Hasselbring was consulting on Other Scholastic Products, (ii) it was not receiving royalties on Other Scholastic Products and the

9

non-software components of *READ 180*, and (iii) Scholastic was using Vanderbilt's trademarks in precisely the ways Vanderbilt complains about here.

First, as early as 2006, Vanderbilt knew of Hasselbring's consulting work on Other Scholastic Products:

- Hasselbring repeatedly disclosed his ongoing work on Scholastic products on his CV. He provided a copy of his CV to Vanderbilt in 2006 when it sought to rehire him from the University of Kentucky. Defs.' 56.1 ¶¶ 78-79. He provided updated copies of his CV each year, copies of which were posted on Vanderbilt's public website. Defs.' 56.1 ¶ 80 (referring to consulting work for Scholastic and work on *FASTT Math* and *System 44*); Declaration of Ted Hasselbring, dated January 22, 2021 ("Hasselbring Decl.") ¶ 7.

- He informed Camilla Benbow, the Dean of Vanderbilt's Peabody College, and Peter Rousos, of Vanderbilt's Center for Technology Transfer and Commercialization ("CTTC"), of the work he was doing on Other Scholastic Products.[4] Defs.' 56.1 ¶ 84.

- With Dean Benbow's permission, Scholastic hosted conventions, summits, and other events *on Vanderbilt's campus* to promote products on which Hasselbring consulted. For example, in 2008, Vanderbilt hosted a presentation entitled "Working with Publishers: Dr Margery Mayer Dr Ted Hasselbring" during which Margery Mayer (Scholastic Education's President at the time) described her discussions with Dean Benbow concerning *MATH 180*. Defs.' 56.1 ¶¶ 86-87. In

---

[4] The CTTC is the entity at Vanderbilt that negotiated and oversaw the License, and Rousos is responsible for overseeing Peabody's properties. Defs.' 56.1 ¶ 84.

2009, Scholastic hosted its "Response to Intervention Convention," which featured its then-newly released *System 44* program, in Nashville. Defs.' 56.1 ¶ 88. Dean Benbow was invited to give the welcome remarks for the convention, Hasselbring spoke on a panel of contributors to *System 44*, and Scholastic hosted a group dinner for participants at Vanderbilt Defs.' 56.1 ¶¶ 90, 92. In 2013, Scholastic and Vanderbilt co-sponsored a *MATH 180* Leadership Summit, entitled "An Introduction to Math 180." Defs.' 56.1 ¶ 107.

- Dean Benbow repeatedly referred to Hasselbring's work on products that Vanderbilt now contends he had failed to disclose when she was nominating him for a prestigious university-wide award in 2013 and 2014. Defs.' 56.1 ¶¶ 118-119.

In light of this information, Vanderbilt twice investigated whether it was due royalties from Scholastic on Other Scholastic Products—first in 2009 and again in 2013—but it did not exercise its audit right or take further action either time. These investigations also revealed that Scholastic was using Vanderbilt's trademarks in connection with marketing *READ 180* and the Other Scholastic Products in the ways that Vanderbilt's now claims are objectionable:

- In May and June 2009, Vanderbilt discussed Hasselbring's consulting work on *System 44* and *FASTT Math* and investigated whether it was owed royalties on these products. Specifically, in May 2009, Rousos circulated to others at Vanderbilt—including Janis Elsner (the original point person for the Scholastic relationship, and a signatory to the License), Chris McKinney (the then-director of the CTTC), and Jackie Shrago (the first director of the CTTC)—a link to a Scholastic author page for Hasselbring, which identified Hasselbring as an author

of *System 44* and *FASTT Math* Defs.' 56.1 ¶¶ 93-94. The link also displays the

VANDERBILT UNIVERSITY mark under Hasselbring's name to show his

affiliation. Defs.' 56.1 ¶ 95. In June 2009, Rousos followed up by meeting with

Hasselbring to discuss a "number of related products that are marketed as adjuncts

to Read 180," including *System 44*, *FASTT Math*, and the development of *MATH*

*180*. Defs.' 56.1 ¶ 100. At some point in May or June 2009, Shrago considered

Hasselbring's involvement in these products, but saw no need for further action.

Defs.' 56.1 ¶ 97. Shrago observed that these products seemed to rely on research

that Hasselbring did while at Kentucky and not Vanderbilt. Defs.' 56.1 ¶ 99.

- In 2013, Rousos emailed with his colleague, Jason Hinson, about whether
  Vanderbilt was due royalties for *MATH 180* or Other Scholastic Products after
  learning that Hasselbring was listed as a "Lead Author" of *MATH 180* on
  Scholastic's website, Defs.' 56.1 ¶¶ 109-110, with the VANDERBILT
  UNIVERSITY mark displayed below his name to show his professional
  affiliation. Defs.' 56.1 ¶ 114. Vanderbilt again conducted an investigation,
  including by speaking with both Hasselbring and Margery Mayer of Scholastic.
  Defs.' 56.1 ¶¶ 113-116. Again, Vanderbilt determined not to pursue the matter
  further.

Finally, to the extent that Vanderbilt now complains about the way that Scholastic

calculated royalties owed under the License for *READ 180,* it has always had access to the

underlying information—it just chose not to ask for it. Every year, Vanderbilt received royalty

checks—often for millions of dollars—for only the software components of *READ 180*. Defs.'

56.1 ¶ 73. The undisputed evidence demonstrates that Vanderbilt monitored these royalty

statements closely, as this was the most profitable license that it had ever entered into. Defs.'
56.1 ¶ 74. As early as 2007, Vanderbilt setup a special fund to invest the royalties it received
from Scholastic. Defs.' 56.1 ¶ 75. Yet, Vanderbilt did not exercise its audit right or raise any
objection until 17 years after sales began.

F.     **Scholastic's Sale of Its Educational Technology and Services Business to HMH**

In late 2014, HMH and Scholastic began negotiating HMH's acquisition of Scholastic's
Educational Technology and Services business, which included, among numerous other assets,
the *READ 180* program and the Other Scholastic Products. Defs.' 56.1 ¶ 123. Following months
of negotiations and customary due diligence, HMH and Scholastic entered into a Stock and Asset
Purchase Agreement on April 23, 2015. Defs.' 56.1 ¶ 124. In connection with the sale of the
business, Scholastic sought Vanderbilt's consent to assign the License to HMH, which
Vanderbilt provided. Defs.' 56.1 ¶ 125. After the acquisition closed, HMH began paying the
royalties owed to Vanderbilt under the License (and to Hasselbring and Goin under their
consulting agreements), and it has done so ever since. Defs.' 56.1 ¶ 127.

G.     **Vanderbilt's Audit, the Tolling Agreement, and the Present Suit**

In early January 2016, for the first time since entering into the License with Scholastic,
Vanderbilt exercised its contractual right to an audit. Defs.' 56.1 ¶ 150. Vanderbilt retained an
independent accounting firm, RSM US LLP ("RSM"), for that purpose. Defs.' 56.1 ¶ 151.
Vanderbilt has alleged that it was in the context of this audit that it first discovered Scholastic's
and HMH's alleged breaches of the License. *See* Dkt No. 85 ¶¶ 38-43 (FAC). On July 28, 2017,
Vanderbilt signed a tolling agreement with Scholastic and HMH. Defs.' 56.1 ¶ 152. Vanderbilt
commenced this action on January 16, 2018. Dkt No. 1 (Complaint).

13

<u>**ARGUMENT**</u>

**I.    MOST OF VANDERBILT'S CLAIMS ARE TIME-BARRED**

Defenses based on statutes of limitations are particularly well suited to summary judgment "because the facts material to the defense are often undisputed." *Beckwith v. LBMC, P.C.*, No. 2017 Civ. 00972, 2019 WL 1306201, at *2 (Tenn. Ct. App. Mar. 21, 2019). Because the relevant evidence is undisputed and only one conclusion can be drawn from it, accrual is a question of law to be determined by the Court. *See Harvey v. Knox Cty.*, No. CA 1179, 1988 WL 80973, at *1 (Tenn. Ct. App. Aug. 3, 1988); *Americare Sys., Inc. v. Pinckney*, 635 F. App'x 305, 310 (6th Cir. 2016); *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 274 (M.D. Tenn. 2020). Here, Vanderbilt's contractual claims related to *System 44* and *FASTT Math* are barred in full, and its contractual claims related to the non-software components of *READ 180*, at a minimum, are barred to the extent they seek recovery for sales that predate the six-year limitations period.[5] Vanderbilt's declaratory judgment, trademark infringement, and tortious interference claims are also fully time-barred.

**A.    Most of Vanderbilt's Breach of Contract Claims Are Time-Barred**

Vanderbilt's contract claims fall into two broad categories: (i) claims that Scholastic and HMH should have paid royalties on the Other Scholastic Products; and (ii) claims that Scholastic

---

[5] Both New York and Tennessee provide for a six-year statute of limitations for breach of contract. N.Y. C.P.L.R. § 213(2); Tennessee Code Annotated § 28-3-109. Although the License is to be construed according to New York law, *see* Rosenthal Decl. Ex. A § 17, statutes of limitation are procedural and not substantive for purposes of choice of law clauses. *See, e.g.*, *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir.) *cert. denied* 525 U.S. 810 (1998). Applying the six-year statute of limitations here, any claim that accrued prior to July 28, 2011 (six years before the parties entered into a tolling agreement on July 28, 2017) is time-barred.

and HMH owe additional royalties on sales of *READ 180*. Claims in both categories are largely time-barred.

> ### 1. *Vanderbilt's Contract Claims for System 44 and FASTT Math Are Barred in Their Entirety*

In addition to seeking additional royalties related to *READ 180*, Vanderbilt alleged in its Amended Complaint that it is owed royalties on at least six different products: *System 44*, *iRead*, *FASTT Math*, *Math 180*, *Expert 21*, and *Score It*. Dkt No. 85 (FAC) ¶ 61. Vanderbilt is no longer pursuing claims concerning *Expert 21* or *Score It* (Defs.' 56.1 ¶¶ 155-156), and its claims concerning *System 44* and *FASTT Math* are time-barred.[6] Vanderbilt has long known about both products and Hasselbring's role in their development, and its longstanding failure to act prevents its belated attempt to do so now.

Vanderbilt contends that Scholastic's and HMH's unwillingness to pay royalties on *System 44* and *FASTT Math* is a breach of Section 6.2 of the License, which states in part: "It is the express intent of the parties that regardless of the form of future improvements or derivative works, Vanderbilt shall receive royalties … on all software products based on or derived from the [licensed] Materials, pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products."[7] Rosenthal Decl. Ex. A § 6.2. As explained in Point II.D below, Section 6.2 is an unenforceable agreement to agree, but even if it were enforceable, Vanderbilt's breach of contract claims with respect to *System 44* and *FASTT Math* accrued when Scholastic first sold those products without approaching Vanderbilt to agree

---

[6] *iRead* and *MATH 180* were first launched in 2013 within the limitations period for breach of contract claims. Defs.' 56.1 ¶¶ 52, 54. Summary judgment is appropriate as to claims based on those products for the reasons set forth in Point II.

[7] Pursuant to Sections 9.2 and 9.3 of the License, royalties become due "[b]eginning with the first sales of products." Rosenthal Decl. Ex. A §§ 9.2, 9.3.

on a pro rata royalty rate or remitting any royalties. *See Indiv. Healthcare Specialists*, *Inc. v. BlueCross Blue Shield of Tenn., Inc.*, 566 S.W.3d 671, 709 (Tenn. 2019) (holding that "a breach-of-contract cause of action accrues as of the date of the breach") (internal quotation omitted); *see also Waste Servs. of Decatur, LLC v. Decatur Cty, Tenn.*, 367 F. Supp. 3d 792, 810-11 (W.D. Tenn. 2019). The statute of limitations for breach of contract claims is six years, *see* Tennessee Code Annotated § 28-3-109, and both *System 44* and *FASTT Math* were launched and widely distributed well before the start of the limitations period.[8] Defs.' 56.1 ¶¶ 48, 50.

Even if the statute of limitations were not triggered by the first sales of *System 44* and *FASTT Math* without paying royalties, or even offering to negotiate a royalty rate, Vanderbilt's claims concerning royalties on those products would still be time-barred. As shown above, Vanderbilt knew long before the start of the limitations period that: (i) Scholastic was selling *System 44* and *FASTT Math*, (ii) Hasselbring had consulted with Scholastic on the development of those products, and (iii) Hasselbring was being credited as an "author" of those products on Scholastic's website. *See* Defs.' 56.1 ¶¶ 80, 84, 93-94. Scholastic never paid Vanderbilt on these products, or offered to negotiate royalties. Defs.' 56.1 ¶ 77.

The discovery record has eviscerated Vanderbilt's allegations that Hasselbring's consulting activities in relation to these products were hidden from it. Vanderbilt was plainly aware of both Hasselbring's involvement in *System 44* and *FASTT Math* and Scholastic's marketing of Hasselbring's role by 2009 at the latest. Indeed, Vanderbilt investigated in 2009 whether it was owed royalties on these products, but satisfied itself that no action was necessary. Defs.' 56.1 ¶¶ 93-105 (describing Rousos investigation into certain of the Other Scholastic

---

[8] The undisputed evidence establishes that Scholastic began selling *FASTT Math* and *System 44* in 2005 and 2008, respectively. Defs.' 56.1 ¶¶ 48, 50.

Products). Accordingly, Vanderbilt's claims for license royalties on those products are time-barred.

2. *Vanderbilt's Claims Based Upon Alleged Underpayments of Royalties on READ 180 Are Time-Barred*

Consistent with the parties' intent and the express language of the License (*see* Point II), Scholastic and HMH have paid royalties only on the student software component of *READ 180* developed from the Peabody Middle School Literacy Program prototype since the inception of the License. Vanderbilt now not only seeks royalties on the non-software components of *READ 180* (such as third-party books, teacher training, and cloud storage that have no connection to the Licensed Materials), but also contends that it should be entitled to royalties on these other products and services for a period dating back to 2000.

As discussed above, the statute of limitations for breach of contract is six years, and it runs from breach. Tennessee Code Annotated § 28-3-109; *Individual Healthcare*, 566 S.W.3d at 709. Here, the alleged breach was in not paying royalties on the non-software components of *READ 180*. The claim is at a minimum time-barred to the extent Vanderbilt seeks recovery for any period prior to July 28, 2011 (*i.e.*, six years prior to the July 28, 2017 effective date of the tolling agreement entered into by the parties). *See Individual Healthcare*, 566 S.W.3d at 715 ("damages resulting from systemic underpayments before … six years prior to filing suit[] must be dismissed as untimely").

Vanderbilt has alleged that it did not discover Scholastic's and HMH's alleged breaches until it conducted an audit in 2016, *see* Dkt No. 85 ¶¶ 38-43 (FAC), but Vanderbilt's inaction and lack of diligence do not prevent application of the statute of limitations to bar its claims. The Tennessee Supreme Court "has never applied the discovery rule in breach of contract cases," *HCA-Info. Tech. & Servs., Inc. v. Informatica Corp.*, No. 3:10 Civ. 01155, 2012 WL 13042609,

17

at *6 (M.D. Tenn. Apr. 2, 2012), but it recently addressed the issue in *Individual Healthcare*. There, the Tennessee Supreme Court refrained from deciding whether the discovery rule exception to the statute of limitations ever could apply in a breach of contract case, but it held that the rule could not apply unless the breach was "inherently undiscoverable." *Indiv. Healthcare*, 566 S.W.3d at 714; *see also Goot v. Metro. Gov't of Nashville & Davidson Cty.*, No. 2:03 Civ. 02013, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005) *app. denied* 2008 WL 5330502 (Ct. App. Tenn. Sept. 28, 2009).

The decision in *Individual Healthcare* makes clear that Vanderbilt cannot show the elements of an "inherently undiscoverable" breach here. That case involved an underpayment of commissions due to the plaintiff from the defendant. 566 S.W.3d at 713. Chancellor Lyle found that the contract breach was inherently undiscoverable, and the Court of Appeals affirmed, but the Tennessee Supreme Court reversed. *Id.* at 714. The Supreme Court found it dispositive that "although the facts as found by the trial court indicate that the discovery of the breach in this case was not easy, they also establish that, in the early years, [plaintiff] had the same access to information—and the same ability to request information from [defendant]—that it had in 2012." *Id*. The Supreme Court further explained that "sophisticated business entities [are] expected to use due diligence to protect [their] own interests. Due diligence may include asking a contract partner for information needed to verify contractual performance. A royalty owner should exercise due diligence to determine whether charges made against royalty payments are proper and reasonable." *Id.* at 714 (internal citations omitted).[9]

---

[9] Other courts have found contract claims time-barred based on a plaintiff's similar failure to exercise appropriate diligence. *See, e.g., Univ. of Pittsburgh v. Townsend*, 542 F.3d 513, 527 (6th Cir. 2008) ("[T]he discovery rule doctrine itself does not apply because the University did not satisfy a precondition triggering its application, namely the exercise of due diligence.")

18

Vanderbilt's allegations are self-defeating on this score.  Vanderbilt alleges that it "concluded" it had been underpaid only after it conducted an audit in 2016.  Dkt No. 85 ¶¶ 38-43 (FAC).  But Vanderbilt had audit rights all along.  Rosenthal Decl. Ex. A § 9.4 (License).  Like the plaintiff in *Individual Healthcare*, Vanderbilt had the same "access to information" in earlier years that it did in 2016, but it simply chose not to exercise its contractual right to conduct an audit to verify the performance of its contractual counterparty.  The allegations that the purported breach was discovered through the exercise of a contractually provided audit right confirms that the breach was not "inherently undiscoverable."  *Indiv. Healthcare*, 566 S.W.3d at 713.

### B.  Vanderbilt's Claim for a Declaratory Judgment Is Time-Barred

Vanderbilt presents an alternative theory, claiming that it is owed royalties on the Other Scholastic Products because they contain "copyrightable intellectual property" provided by Hasselbring (Dkt No. 85  ¶ 78 (FAC)), which Vanderbilt purports to own by virtue of its Technology Policy.  *Id.* ¶ 79.  Not only is this claim devoid of factual support (*see* Point III), it is time-barred.

Vanderbilt's declaratory judgment claim is subject to a three-year statute of limitations.  17 U.S.C. § 507(b).  A claim for joint ownership of a copyright "accrues only once, and if an action is not brought within three years of accrual, it is forever barred."  *Roger Miller Music v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007).  As the Sixth Circuit has observed, "the statutory period for any action to establish ownership begins to run whenever there is a 'plain and express repudiation' of ownership by one party as against the other."  *Ritchie v. Williams*,

---

(quotation omitted) (applying Pennsylvania law); *Wagner & Brown v. Horwood*, 58 S.W.3d 732, 733 (Tex. 2001).  New York law does not apply a discovery rule to statute of limitations in contract actions at all.  *See Individual Healthcare*, 566 S.W.3d at 712 n. 41 (citing *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581 (2015)).

395 F.3d 283, 288 n.5 (6th Cir. 2005) (internal quotation omitted). However, that repudiation of ownership need not be direct. As is relevant here, "courts have found that a co-owner's claim may be repudiated when she learns she is entitled to royalties she is not receiving." *Everly v. Everly*, 958 F.3d 442, 452 (6th Cir. 2020) (citing *Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016); *Merchant v. Levy*, 92 F.3d 51, 56-57 (2d Cir. 1996); and *Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006)).

Long before the start of the three-year limitations period for this claim (*i.e.*, July 28, 2014), Vanderbilt was aware that it was not receiving royalties on any of the Other Scholastic Products. *See* Point I.A.1. In addition to his 2009 investigation on behalf of Vanderbilt's CTTC concerning *System 44* and *FASTT Math*, Rousos specifically investigated in 2013 whether Vanderbilt was (or should be) receiving royalties on the Other Scholastic Products as well. Defs.' 56.1 ¶ 109. Rousos asked a Vanderbilt colleague to review the latest Scholastic royalty statement to check whether Vanderbilt was receiving royalties on products other than *READ 180*. Defs.' 56.1 ¶ 110. He concluded that Vanderbilt was not. Defs.' 56.1 ¶ 111.

*Santa-Rosa*, which has been cited by the Sixth Circuit on this point (*see Everly*, 958 F.3d at 452), is instructive. There, the First Circuit affirmed dismissal of a co-ownership claim over recordings as untimely. The court noted that "we cannot think of a more plain and express repudiation of co-ownership than the fact that [defendant] openly, and quite notoriously, sold [plaintiff's] records without providing payment to him…" *Santa-Rosa*, 471 F.3d at 228. The same is true here. Scholastic openly sold each of the Other Scholastic Products, promoting them at events held on Vanderbilt's campus no less, without ever paying royalties to Vanderbilt. While this satisfies *Santa-Rosa*, the circumstances here are even more striking. Vanderbilt was aware that it was not receiving royalties on the Other Scholastic Products, having investigated

whether it was entitled to payments on such products in 2009 and 2013, including examining its royalty payments and raising the subject directly with Margery Mayer, then the President of Scholastic Education. Defs.' 56.1 ¶¶ 93-105, 109-117. Despite Scholastic's unequivocal repudiation of any co-ownership interest possessed by Vanderbilt in relation to the Other Scholastic Products, Scholastic and HMH did not agree to toll Vanderbilt's claims until July 28, 2017—four years after Vanderbilt's 2013 investigation and eight years after its 2009 investigation. Defs.' 56.1 ¶ 152. Accordingly, Vanderbilt's declaratory judgment claim is time-barred. *See Santa-Rosa*, 471 F.3d at 228.

### C. Vanderbilt's Claims for Tortious Interference With Contract Are Time-Barred

The core of Vanderbilt's tortious interference claims is that Scholastic and HMH were supposedly aware of Vanderbilt's Technology and Conflict of Interest Policies but interfered with them by engaging Hasselbring as a consultant without disclosing this relationship to Vanderbilt. *See* Dkt No. 85 ¶¶ 111-12 (FAC). These claims are not only without merit (*see* Point IV) but also time-barred.

In Tennessee, tortious interference with contract claims are governed by a three-year statute of limitations. *See* Tenn. Cod. Ann. § 28-3-105; *Smith v. Music City Homes, LLC*, No. 3:12 Civ. 0681, 2015 WL 752011, at *11 (M.D. Tenn. Feb. 23, 2015). And "once a plaintiff discovers its injury and knows that it was caused by the defendant, the cause of action has accrued and the plaintiff cannot bring suit any later than the applicable statute of limitations allows even if it continues to let the injury happen." *Precision Tracking Sols., Inc. v. Spireon, Inc.*, No. 3:12 Civ. 00626, 2014 WL 3058396, at *2 (E.D. Tenn. July 7, 2014) (quotation omitted). As established in Point I.A above, Vanderbilt was aware that Hasselbring was consulting for Scholastic, including on products other than *READ 180*, no later than the moment

Vanderbilt re-hired him from the University of Kentucky in 2006. Vanderbilt was also aware, from Rousos's review of the Scholastic website first in 2009 and later in 2013, that Hasselbring was listed as an author of products other than *READ 180* on Scholastic's website. Defs.' 56.1 ¶¶ 93-105, 109-117. Accordingly, the tortious interference claim should also be dismissed. *See Precision Tracking*, 2014 WL 3058396, at *3 (dismissing interference claim where plaintiff was aware of issue and confronted it more than three years before filing).

### D. Vanderbilt's Trademark Infringement Claims Are Time-Barred

Vanderbilt's trademark infringement claims under the Lanham Act (*see* Dkt No. 85 ¶ 41 (FAC)) are similarly time-barred. Because the Lanham Act does not contain a statute of limitations, courts employ the doctrine of laches to determine whether a claim should be barred. *See Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006). An infringement claim is barred if: (i) the plaintiff's delay in filing the claim was unreasonable; and (ii) that delay materially prejudiced defendant. *See Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000). Both factors favor dismissal.

#### 1. Vanderbilt Unreasonably Delayed Pursuing Its Trademark Claims

A delay is presumptively unreasonable if the analogous state statute of limitations has run. *See Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003) (quoting *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365, 366 (6th Cir.1985)); *see also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002) ("a delay beyond the three-year statutory period is presumptively prejudicial and unreasonable") *cert. denied* 538 U.S. 907 (2003). In Tennessee, the analogous statute of limitations is the three-year statute of limitations for tortious injury to property. *See Johnny's Fine Foods*, 286 F. Supp. 2d at 881 (citing Tenn. Cod. Ann. § 28-3-105). The period of delay begins to run when plaintiff had

"actual or constructive knowledge of the alleged infringing activity." *Nartron*, 305 F.3d at 408 (internal quotation omitted).

Scholastic and HMH referred to Vanderbilt trademarks in two ways. First, certain marketing materials for *READ 180* and the Other Scholastic Products contained "boxes" for their authors and/or advisors, which showed their names and, if applicable, professional affiliations. Defs.' 56.1 ¶ 138. For Hasselbring, that meant identifying him as a professor at Vanderbilt by using the VANDERBILT UNIVERSITY mark and, at times, a Vanderbilt logo. Defs.' 56.1 ¶ 139. This type of identification was done for all product authors and advisors, Defs.' 56.1 ¶ 140, and was repeated in research papers for the products, which were publicly available on Scholastic's—and later HMH's—website. Defs.' 56.1 ¶ 141. Second, Scholastic identified Vanderbilt as the locus of Hasselbring's research on relevant pedagogy and the development of the Peabody Middle School Literacy Program. For example, Scholastic created a timeline of the *READ 180* (and later *System 44*) "history of research" in which the first stage included a Vanderbilt logo to confirm that the Peabody Middle School Literacy Program was created at Vanderbilt between 1985 and 1996, again using the VANDERBILT UNIVERSITY mark and, at times, a Vanderbilt logo Defs.' 56.1 ¶¶ 142-144. This timeline was in use at least as early as 2011, Defs.' 56.1 ¶ 145, and was publicly available on the Scholastic website. *Id.*

Vanderbilt therefore had "actual or constructive knowledge" of these uses of its marks[10] well before the start of the limitations period, but it failed to act. As noted above, in 2009, Rousos located a Scholastic author page indicating that Hasselbring was an author not only of

---

[10] The "use" of Vanderbilt's marks amounted to correctly identifying Hasselbring's (in the case of his "box") and the Peabody Middle School Literacy Program's (in the case of the timeline) affiliation with Vanderbilt. As discussed in Point V below, these are non-trademark uses that are not infringing as a matter of law.

*READ 180*, but of *System 44* and *FASTT Math*, which displayed the VANDERBILT

UNIVERSITY mark to display his affiliation. Defs.' 56.1 ¶¶ 94-95. In 2013, Rousos again

circulated a link to a Scholastic webpage that identified Hasselbring as a lead author of *MATH*

*180* again using the Vanderbilt mark. Defs.' 56.1 ¶¶ 113-114. Vanderbilt also had every ability

to review the "timeline", which was publicly available on Scholastic's website at least since

2011. Defs.' 56.1 ¶ 145.

       2.     *Vanderbilt's Unreasonable Delay Has Prejudiced Scholastic and HMH*

Vanderbilt's unreasonable delay in asserting its trademark claims prejudiced Scholastic

and HMH. As the Sixth Circuit has held, "*any* prejudice is sufficient, including an increase in

potential damages or a loss of evidence." *See*, *e.g.*, *Nartron,* 305 F.3d at 411 (emphasis in

original). Here, Vanderbilt seeks to go back twenty years, over a period during which Scholastic

not only developed the Other Scholastic Products, but engaged in a significant transaction in

which HMH—with no notice or knowledge that Vanderbilt might later object and assert claims

concerning these longstanding, transparent uses of its marks to identify Hasselbring's academic

affiliation and the locus of his research. Defs.' 56.1 ¶ 114. And given the limited use of the

marks, Defendants easily could have stopped using them if Vanderbilt had timely objected. This

is obviously prejudicial. *See Nartron*, 305 F.3d at 411 (finding prejudice where potential

damages increased each year that the mark was used and timely suit could have resolved whether

the mark could have been used in the future). Accordingly, Vanderbilt's trademark claims

should be dismissed as time-barred.

## II.    VANDERBILT'S UNTIMELY CONTRACT CLAIMS ALSO FAIL AS A MATTER OF LAW

Vanderbilt contends that Scholastic and HMH have breached the License by failing to

pay royalties on: (i) the non-software components of *READ 180* and the Other Scholastic

Products; (ii) other independently developed software products that Scholastic sold with the licensed *READ 180* student software; and (iii) the Other Scholastic Products.[11] The first two categories are foreclosed by the plain language of the License. With respect to the Other Scholastic Products, the license provision on which Vanderbilt relies is an unenforceable agreement to agree and, in any event, Vanderbilt has no competent evidence of damages for the alleged breach.

### A. The Undisputed Evidence Establishes that Vanderbilt Is Not Entitled to Royalties on Sales of Non-Software Products and Services

#### 1. *The Plain Language of the License Forecloses Vanderbilt's Claims for Royalties on Sales of Non-Software Products and Services*

Under New York law, which governs the contract claims here, *see* Rosenthal Decl. Ex. A §17 (License), both the interpretation of an unambiguous contract and the determination of whether a contract provision is ambiguous are questions of law to be addressed by the Court. *See, e.g., Wells Fargo Bank, N.A. v. Wrights Mill Holdings,* LLC, 127 F. Supp. 3d 156, 168 (S.D.N.Y. 2015). The Court's primary objective is to give effect to the parties' intent, as expressed in the contract language they chose. *See, e.g., Sarinsky's Garage Inc. v. Erie Ins. Co*., 691 F. Supp. 2d 483, 485 (S.D.N.Y. 2010). When a contract is clear on its face, a court must enforce the contract pursuant to its express terms without resort to extrinsic evidence. *W.W.W.*

---

[11] Vanderbilt also asserts contract claims for unpaid royalties on Scholastic's Canadian sales and on shipping and handling costs for *READ 180*. Scholastic concedes that Vanderbilt was not paid royalties on its Canadian sales. As to shipping and handling, the License clearly permits Defendants to deduct "shipping and handling costs" from "Net Sales" (on which royalties are paid), so summary judgment should be granted on this claim as well. Rosenthal Decl. Ex. A § 1.7. Even if this motion does not resolve these issues, the Court's decision on the rest of Vanderbilt's contract claims would significantly limit the issues for trial and improve settlement prospects—given that the allegedly unpaid royalties on Canadian sales and shipping and handling costs represent less than 1% of Vanderbilt's damages claim, and are offset by Scholastic's overpayment counterclaim.

*Assocs., Inc. v. Giacontieri*, 77 N.Y.2d 157, 162-63 (1990). Summary judgment is appropriate if the contract language is unambiguous, and "[a] contract is not ambiguous just because the parties ask the Court to construe it differently." *Wells-Fargo*, 127 F. Supp. 3d at 168; *see also Sarinsky's Garage*, 691 F. Supp. 2d at 485 (citing *Burke v. Ulico Cas. Co.*, 165 Fed. Appx. 125, 126-27 (2d Cir. 2006)). Moreover, it is "black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical." *Wells Fargo*, 127 F. Supp. 3d at 174.

Since the initial launch of *READ 180* more than 20 years ago, Scholastic (and later HMH) sold the software developed from the Peabody Middle School Literacy Program pursuant to the License, together with a variety of books, workbooks, and/or other courseware licensed to Scholastic by third parties or independently created by Scholastic. Defs.' 56.1 ¶ 34, 129. Scholastic and HMH also have offered various services to *READ 180* customers, including teacher training, web hosting, and cloud storage. Defs.' 56.1 ¶ 41, 130. Vanderbilt made no contribution whatsoever to the development or sale of these other products and services, Defs.' 56.1 ¶¶ 43, 56, 134, and the plain language of the License forecloses any claim by Vanderbilt for royalties from their sale. It is also illogical and commercially unreasonable to believe that Scholastic agreed to pay Vanderbilt a royalty in perpetuity for products and services having nothing to do with the Materials that it licensed from Vanderbilt, including for products and services like cloud storage that did not even exist at the time of the License, or for products that Scholastic licensed from third parties or paid third parties to develop on its behalf.

Section 9.1 sets forth the royalties to be paid under the License and provides that Vanderbilt is entitled to a specified percentage of "Net Sales" for "all sales or licenses of the **Materials** or the **Literacy Program**." Rosenthal Decl. Ex. A § 9.1 (emphasis in original).

"Materials" and "Literacy Program" are defined terms in the License, and neither definition encompasses the third-party books, other courseware, or services that have been sold with the software developed by Scholastic and HMH under the License.

"Materials" are defined in Section 1.6 to mean "the Software and LTC Literacy Units, together with a written description of the key academic concepts or techniques that form the pedagogical basis for the Literacy Units as described in Exhibit A." Rosenthal Decl. Ex. A. § 1.6. The "Software" is defined in both the first recital and in Section 1.1 and refers to the computer software entitled the "Peabody Middle School Literacy Program," which was created under Hasselbring's direction and (by the time the License was executed) was owned by Vanderbilt and its Learning Technology Center. Rosenthal Decl. Ex. A at Recital A & § 1.1. The "LTC Literacy Units" are defined to refer to three specific interactive, multimedia CD-ROMs "containing instructional materials in middle school literacy" that were developed by Vanderbilt "to be used in conjunction" with the Peabody Middle School Literacy Program. Rosenthal Decl. Ex. A § 1.4. Vanderbilt's claim for royalties for non-software components and services cannot be based on the reference in Section 9.1 to "sales or licenses of the Materials," as neither Scholastic nor HMH has ever sold or licensed any of the Materials to anyone. Defs.' 56.1 ¶¶ 31, 132. In any event, none of the third-party books, other courseware, or services sold together with the licensed "Literacy Program" constitute Materials, which are limited to the Software, the LTC Literacy Units, or the written description of key academic concepts and techniques attached as Exhibit A to the License. *See* Rosenthal Decl. Ex. A § 9.1.

The reference in Section 9.1 to "sales or licenses of the Literacy Program" does not help Vanderbilt either. Rosenthal Decl. Ex. A at § 9.1. "Literacy Program" is defined as "a group of no less than four Literacy Units for upper elementary and middle school grades . . . together with

27

the Software as modified by Scholastic pursuant to this agreement, including software products

derived from the Materials or the Software." Rosenthal Decl. Ex. A § 1.5. To fall within the

definition of "Literacy Program," items must be one of the following: (i) an interactive,

multimedia CD-ROM designed to be used in conjunction with the licensed Software; (ii) a

modified version of the licensed Software; or (iii) a software product derived from the Materials

or the Software designed to be used in conjunction with the Literacy Units. *See id.* Because

third-party books, other non-software products, and services such as teacher training, web

hosting and cloud storage all fall outside the definition of "Literacy Program," they are not

royalty-bearing under the License either, regardless of whether they are sold independently or

together with the software products and CD-ROMs that do fall within the definition of "Literacy

Program" and therefore are royalty-bearing under Section 9.1. *See id.*

Other provisions of the License confirm this clear distinction between sales or licenses of

the software and CD-ROMs that constitute the "Literacy Program" (which are royalty-bearing)

and sales or licenses of third-party books, other courseware or services (which are not). For

example, the exclusive grant of rights in Section 2.1 provides a license to the Materials to

produce, market, and distribute "the Literacy Program embodying the Materials (together with

courseware in film, videodisc, videotape format, or in written or other appropriate form)."

Rosenthal Decl. Ex. A ¶ 2.1. This provision not only makes plain that the Literacy Program was

conceptually distinct from other types of courseware, but also reflects the parties' understanding

that the Literacy Program would be marketed and distributed together with other courseware that

was not royalty-bearing. If such courseware sold together with the Literacy Program were

considered to be part of the "Literacy Program," then the parenthetical in Section 2.1 would be

surplusage. New York law forbids such an interpretation: contracts must be interpreted to avoid

a construction that would "render any portion meaningless." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007).

Section 2.2 ("Reserved Rights") also makes plain that both Vanderbilt and Scholastic understood "Literacy Program" to refer to software and associated CD-ROMs developed from the Licensed Materials, rather than other products licensed or developed to facilitate independent reading by students. Rosenthal Decl. Ex. A § 2.2. Section 2.2 provides that "Vanderbilt reserves the unlimited right to distribute through its LTC in teacher development programs or workshops a restricted demonstration version of the Literacy Program that embodies the Materials." *Id.* But Vanderbilt could not reserve for itself, and Scholastic could not have granted, the unlimited right to distribute third-party copyrighted novels such as *Treasure Island* or software programs developed by third parties, even though such works were sold as courseware together with the licensed Literacy Program. Indeed, the qualification of the reservation to a "restricted demonstration version" of the Literacy Program only makes sense in the context of the modified software program and Literacy Units that Scholastic was licensed to develop, not any of the other products or services that might be sold with such software or Literacy Units. *See id.*

Section 6.2 ("Improvements") further confirms that Vanderbilt's strained interpretation of the royalty provision as encompassing books and other non-software products (let alone teacher training, cloud storage and other services) fails. Rosenthal Decl. Ex. A § 6.2. In Section 6.2, Scholastic and Vanderbilt expressly recognized that future improvements may result in software products that are "different in form, content, or medium" from the Software, LTC Literacy Units, and the written description of key academic concepts and techniques provided to Scholastic under the License. *Id.* The parties agreed to negotiate future royalties on "***all software products*** based on or derived from" the Licensed Materials according to the pro rata amount of the

Materials incorporated into those software products, but there is no comparable provision for any type of product other than software. *Id.* (emphasis added). This provision is the basis for which Vanderbilt seeks royalties under the License for the Other Scholastic Products. Thus, while Vanderbilt might argue—unsuccessfully, as shown in Point II.D below—that future improvements *could be* royalty-bearing if they were software products "based on or derived from" the Licensed Materials, the License explicitly provides that there is no obligation for Scholastic to pay royalties for *non-software* products, such as printed materials and services, regardless of any connection to the Materials. Rosenthal Decl. Ex. A § 6.2.

Finally, Section 10.2 ("Scholastic Warranties") confirms that the parties understood "Literacy Program" to refer to the software developed under the License and not third-party books or other courseware sold together with that software. That section required Scholastic to represent and warrant that "the Literacy Program produced by Scholastic under this Agreement shall be of the high quality it maintains for its other comparable software products and shall conform to prevailing educational standards and requirements as apply to audio-visual and multi-media software." Rosenthal Decl. Ex. A § 10.2. Vanderbilt's overbroad interpretation of "Literacy Program" as inclusive of *non-software* products and services renders this representation illogical.

In sum, the License's royalty provision only requires payments to Vanderbilt on sales or licenses of the Materials or the Literacy Program. There is no provision that required either Scholastic or HMH to pay royalties on the non-software products and services sold together with the *READ 180* student software (*i.e.*, the licensed Literacy Program) or the Other Scholastic Products. Accordingly, Vanderbilt's contract claims arising out of such products and services are foreclosed by the plain language of the License.

2.    *If the Court Were to Consider Extrinsic Evidence, Such Evidence Confirms that Vanderbilt Is Not Entitled to Royalties on Sales of Non-Software Products and Services*

Under New York law, a court may not consider extrinsic evidence where, as here, the plain language of the License forecloses Vanderbilt's claim that it is entitled to royalties on books, workbooks, and non-software products and services sold together with the licensed Literacy Program. *See, e.g.*, *Stroll v. Epstein*, 818 F. Supp. 640, 643 (S.D.N.Y.) ("Where a contract is unambiguous on its face, the Court may not consider evidence extrinsic to the contract to determine the parties' intent.") (internal quotation omitted) *aff'd* 9 F.3d 1537 (2d Cir. 1993). If the Court were to consider such extrinsic evidence, however, that evidence overwhelmingly confirms that such products and services are not royalty-bearing under the License. *See, e.g.*, *3com Corp. v. Banco Do Brasil, S.A.*, 171 F.3d 739 (2d Cir. 1999) ("[T]he court may resolve ambiguity in contractual language as a matter of law if evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary.") (internal quotation omitted).

The negotiation history of the License establishes both that: (i) Scholastic and Vanderbilt understood that Scholastic would sell non-software products together with the Literacy Program; and (ii) Scholastic repeatedly rejected proposed language that could arguably sweep such non-software products within the scope of the royalty obligations. The Court should reject Vanderbilt's effort to capture via this lawsuit—more than 20 years later—a royalty stream that it agreed to forego at the negotiating table.

For example, Vanderbilt originally proposed a definition of "Literacy Program" that would include, in addition to "Literacy Units" and the modified software, "products derived from the Materials or the Software." Defs.' 56.1 ¶ 18. In comments on Vanderbilt's draft transmitted by Scholastic, Scholastic inserted the qualifier "software" before "products," to limit

31

Vanderbilt's overbroad proposed definition. *Id.* Mark Seidenfeld, the Scholastic attorney who was responsible for reviewing and commenting on drafts of the License, explained that Scholastic inserted the word "software" as a modifier for "products" in the definition of "Literacy Program" precisely because Scholastic "wanted to be clear that … it was only the non print, that it was software products that we were talking about." Defs.' 56.1 ¶ 21. The margin notes on the draft returned to Vanderbilt reflect this intent to distinguish between software products (which would be royalty-bearing) and print products (which would not). *Id.* Vanderbilt accepted Scholastic's proposed edit to the definition of "Literacy Program" to clarify that it was limited to software and the CD-ROMs constituting "Literacy Units" without objection. Defs.' 56.1 ¶ 22.

Scholastic insisted on—and Vanderbilt also accepted without objection—a similar limitation in Section 6.2. Defs.' 56.1 ¶ 27. As noted in Point II.A above and discussed further in Point II.D below, Scholastic and Vanderbilt agreed that future improvements to the Literacy Program may result in software products that are "different in form, content, or medium" from the Materials delivered to Scholastic. But this provision did not transform Scholastic's obligation to pay royalties on the "Literacy Program" into an obligation to pay royalties on print products, other courseware, or services. While Scholastic expressed its willingness to negotiate future royalties for "all *software* products based on or derived from the Materials," Rosenthal Decl. Ex. A § 6.2 (emphasis added), Scholastic rejected sweeping language proposed by Vanderbilt that would have purported to impose an obligation to negotiate royalties for "all products based on or derived from the Materials or the ideas contained therein." Defs.' 56.1 ¶ 18. Seidenfeld's margin notes on comments on a subsequent draft of the License again reflect the distinction between software products and print materials such as program guides, Defs.'

56.1 ¶ 21, and the final version of Section 6.2 contains the qualifying language inserted by Scholastic to make its limitation to software products explicit.  Rosenthal Decl. Ex. A § 6.2.

The evolution of the definition of "Net Sales" underscores that Scholastic had no obligation to pay royalties on print products, other courseware, and services that fall outside the unambiguous definitions of "Materials" and "Literacy Program."  Vanderbilt proposed to define "Net Sales" as "all income received by Scholastic from the sale, licensing, or other use of the Materials or Literacy Program, or products based on or derived from the Materials or Literacy Program."  Defs.' 56.1 ¶ 23.  Scholastic struck the phrase "or products based on or derived from the Materials or Literacy Program" to exclude income received from any other products that do not fall within the carefully circumscribed definitions of "Materials" and "Literacy Program." *See id*.  Vanderbilt accepted the deletion.  Rosenthal Decl. Ex. A § 1.5.

This drafting history is clear:  Scholastic repeatedly clarified the language proposed by Vanderbilt so that any royalty obligations would be limited to software products or CD-ROMs comprising Literacy Units and would exclude print products or other non-software products or services sold with the Literacy Program.  In each case, Vanderbilt agreed to the clarification.

### B.  Vanderbilt Is Not Entitled to Royalties on Software Products That Were Independently Developed by Scholastic Prior to the License

Vanderbilt also claims entitlement to royalties arising out of sales of certain software products that were sold together with *READ* 180—namely, Scholastic Reading Inventory and Scholastic Reading Counts, and the subsequent versions of those products sold by HMH. However, the undisputed evidence shows that both of these programs were developed by Scholastic *prior to* entering into the License or receiving any of the Materials.  Defs.' 56.1 ¶ 37. Vanderbilt cannot point to any provision in the License that would entitle it to royalties on sales of software products that were independently developed, let alone independently developed prior

33

to the License.  Thus, Vanderbilt's contention that it should have been paid royalties on sales of such programs fails as a matter of law.

### C. Vanderbilt's Has No Contractual Claim for Royalties on Products Other Than *READ 180* Because Section 6.2 of the License Is an Unenforceable Agreement to Agree

Vanderbilt's contention that it is entitled to royalties under the License on the Other Scholastic Products is wrong for two additional reasons.  None of the Other Scholastic Products are, in fact, "based on or derived from" the Licensed Materials.  But the Court need not decide this issue because even if they were, Vanderbilt's contract claims would still fail.  Section 6.2 of the License, on which Vanderbilt relies for this claim (*see* Dkt No. 85 ¶ 31 (FAC)) is at most an agreement to agree and thus is unenforceable as a matter of New York law.

Section 6.2 provides that, in the event that Scholastic in the future developed other "software products based on or derived from the Materials," the royalties for any such software products would be determined "pro rata, pursuant to the *future mutual agreement* of the parties as to the amount of the Materials incorporated into such products."  Rosenthal Decl. Ex. A § 6.2 (emphasis added).  In order for a court to enforce a promise, however, that promise must be "sufficiently certain and specific so that what was promised can be ascertained."  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y. 2d 105, 109 (1981).  Otherwise, the court "would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which [the contracting parties] have mutually committed themselves."  *Id.*  Accordingly, a mere agreement to agree, in which a material term—such as a royalty rate—is left for future negotiations, is unenforceable.  *Id.*

Courts routinely recognize agreements to agree as unenforceable where, as here, there is no clear methodology or objective extrinsic event, condition or standard to account for the missing material term.  *See, e.g., Total Telcom Group Corp. v. Kendal on Hudson*, 157 A.D.3d

746, 747 (2d Dep't 2018) (affirming grant of summary judgment on breach of contract claim where lack of material term in contract regarding price or fees to be paid); *Teutul v. Teutul*, 79 A.D.3d 851, 853 (2d Dep't 2010) (finding option to purchase shares "for fair market value, as determined by a procedure to be agreed to by the parties as soon as practicable" not valid or enforceable); *Martin Delicatessen*, 417 N.E.2d at 543-44 (finding lease renewal provision unenforceable where rental price was "to be agreed upon" and contract contained no methodology or objective standard to determine rental price).[12]

Section 6.2 of the License reflects only an intent to negotiate a future royalty rate for other software products that are "based on or derived from" the Licensed Materials. Rosenthal Decl. Ex. A § 6.2. It provides no clear, objective methodology for assessing the "pro rata" incorporation of the Licensed Materials into future derivative software products, and the Vanderbilt personnel involved in negotiating the License acknowledged that the parties would have had to negotiate an applicable rate. Defs. 56.1 ¶ 28 (Rosenthal Decl. Ex. L 85:4-21, 86:24-87:17, 150:19-151:5 (testifying that there was no specific royalty rate for the Other Scholastic Products and that the parties "kicked the can down the road" for future discussion); Ex. K at 57:13-58:6 (explaining "need to come back together to talk about" any future derivative works); *see also* Ex, J at 93:13-94:24, 102:18-103:23)). That the parties here disagree as to whether there

---

[12] The unenforceability of Section 6.2 does not affect the rest of the contract: under New York law, the unenforceable provision is treated as severable. *See Nutley v. SkyDive the Ranch*, 65 A.D.3d 443, 444 (1st Dep't 2009) (finding provision void and leaving "rest of the contract intact"); *Caruso v. Allnet Commc'n Servs., Inc.*, 242 A.D.2d 484, 485 (1st Dep't 1997) (recognizing viability of breach of remainder of contract claim because "[r]ather than consider the illegal contract as void *in toto,* the better view is to sever the offending provision and validate the basic agreement"). Moreover, the parties expressly intended for unenforceable provisions to be severed without effect on the remainder of the agreement. *See* Rosenthal Decl. Ex. A § 18 (License).

was *any* incorporation of Licensed Materials into the Other Scholastic Products only underscores that Section 6.2 is at most an unenforceable agreement to agree.[13]

### D. In Any Event, Vanderbilt Has No Competent Evidence of Damages Concerning the Other Scholastic Products

Under New York law, damages is a required element of a prima facie case for breach of contract. *See, e.g., Franconero v. Universal Music Corp.*, No. 02 Civ. 1963, 2011 WL 566794, *4 (S.D.N.Y. Feb. 11, 2011), *aff'd sub nom. Franconero v. UMG Recordings, Inc.*, 542 F. Appx. 14 (2d Cir. 2013). With respect to its contractual claims concerning the Other Scholastic Products, Vanderbilt has failed to adduce any competent evidence of what the purported damages arising from the alleged breach would be. That failure is fatal to its claims. *See, e.g., Cramer v. Spada*, 203 A.D.2d 739, 741 (3d Dep't 1994).

Vanderbilt relies solely on its damages expert, Christopher Lovin, to establish the alleged contract damages associated with the Other Scholastic Products, but his testimony in this regard is not competent and must be excluded. As explained in Defendants' accompanying *Daubert* motion, Lovin made no effort in his expert report to analyze the pro rata amount of the Licensed Materials incorporated into Other Scholastic Products, let alone to assess how the parties would have reached mutual agreement on that topic. Rosenthal Decl. Ex. O (Lovin report). He simply applied the 7% royalty rate applicable to *READ 180* to the Other Scholastic Products without any further analysis. *Id.* at 27-29. Although he tried to fix this failing in an untimely "response report," here too he failed because the expert he relies upon for his new analysis (Dr. Timothy

---

[13] Janis Elsner of Vanderbilt testified that Vanderbilt would have relied on Hasselbring to guide their analysis of how much of the Licensed Materials were incorporated into future products. Defs. 56.1 ¶ 29.

Shanahan) testified that he did not conduct a pro rata analysis either.[14]  Rosenthal Decl. Ex. P

(Lovin "response report"); Defs. 56.1 ¶ 156.  Expert testimony that is inadmissible under the

*Daubert* standard does not create a genuine issue of material fact on the element of damages.

*See Scentsational Techs., LLC v. Pepsico, Inc*., No. 13 Civ. 8645, 2018 WL 2465370, at *9-11

(S.D.N.Y. May 23, 2018), *aff'd*, 773 F. App'x 607 (Fed. Cir. 2019) (granting summary judgment

on contract claims where plaintiffs' damages experts were excluded and plaintiffs' alleged

damages was "unsupported speculation" and "more properly viewed as a lottery ticket");

*Franconero*, 2011 WL 566794, at * 4-6 (granting summary judgment).

  **E. Vanderbilt's Additional Contract Claims Against Scholastic Also Fail**

  Vanderbilt also asserts contract claims for unpaid royalties on Scholastic's Canadian

sales and on shipping and handling costs for *READ 180*.  Scholastic concedes that Vanderbilt

was not paid royalties on its Canadian sales.  As to shipping and handling, the License clearly

permits Defendants to deduct "shipping and handling costs" from "Net Sales" (on which

royalties are paid), so summary judgment should be granted on this claim as well.  Rosenthal

Decl. Ex. A § 1.7.[15]

**III. VANDERBILT'S UNTIMELY CLAIM FOR A DECLARATORY JUDGMENT THAT IT HAS AN OWNERSHIP INTEREST IN THE OTHER SCHOLASTIC PRODUCTS ALSO FAILS AS A MATTER OF LAW**

  Vanderbilt's claim for declaratory judgment of an ownership interest in the Other

Scholastic Products is predicated on the following misguided theory:  Vanderbilt owns any

---

[14] Defendants separately have moved *in limine* to preclude Vanderbilt's experts from offering opinions not disclosed in their initial expert reports and only belatedly raised in so-called "response reports."  *See* Dkt No. 273.

[15] Even if this motion does not resolve these issues, the Court's decision on the rest of Vanderbilt's contract claims would significantly limit the issues for trial and improve settlement prospects—given that the allegedly unpaid royalties on Canadian sales and shipping and

technology developed by Hasselbring while he was employed by Vanderbilt as a result of Vanderbilt's employment policies, meaning that it would own any intellectual property that Hasselbring contributed to the Other Scholastic Products, and would possess an ownership interest in those products as a result.

In addition to being foreclosed by the applicable statute of limitations (*see* Point I.B above), Vanderbilt's declaratory judgment claim fails as a matter of law for at least two other reasons. First, Vanderbilt cannot identify any copyrightable (or other protectable) contribution by Hasselbring to any of the Other Scholastic Products. This is not surprising because there was not one. Defs.' 56.1 ¶¶ 65-66; Hasselbring Decl. ¶ 17. At best, Vanderbilt can show that Hasselbring consulted with Scholastic on the development of those products and that those products, to varying degrees, use some of the pedagogical concepts and techniques that Hasselbring (among many others) has addressed in his published academic research. Defs.' 56.1 ¶ 66. Neither implicates a conveyance of intellectual property, let alone intellectual property in which Vanderbilt has any conceivable interest.[16] *See* 17 U.S.C. §102(b) ("In no case does copyright protection in an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

---

handling costs represent less than 1% of Vanderbilt's damages claim, and are offset by Scholastic's overpayment counterclaim.

[16] As noted above, while Hasselbring has been referred to as a "author" for some products, the undisputed record makes plain that the term "author" is used as an honorific in educational publishing to refer to academics who provide thought leadership on the subject matter of the program, rather than to identify individuals who actually write the programs. Defs.' 56.1 ¶ 67 (Rosenthal Decl. Ex. S at 169:11-171:13 (reference to Hasselbring as author never referred to "somebody who puts pen to paper or text to keyboard and makes a book")).

Second, Vanderbilt cannot show any intent by the parties to be co-owners of the Other Scholastic Products, which is required to establish co-ownership of a copyrighted work. *See e.g.*, *Childress v. Taylor*, 945 F.2d 500, 505-506 (2d Cir. 1991); *Hemby v. Winans*, No. 3:06 Civ. 0979, 2010 WL 793681, at *1-3 (M.D. Tenn. Mar. 5, 2010). Vanderbilt's theory of liability is not that Scholastic and HMH intended to be co-owners any interest in the Other Scholastic Products but rather that Scholastic and HMH intended to *deprive* Vanderbilt of any interest in the Other Scholastic Products. If Vanderbilt could show that Scholastic or HMH incorporated intellectual property owned by Vanderbilt into Other Scholastic Products, Vanderbilt might have a claim for infringement (which would fail for other reasons), but the absence of a mutual intent to be co-owners is fatal to its declaratory judgment claim.

Notably, Vanderbilt's contention that the Other Scholastic Products are royalty-bearing under the License, while wrong, also is inconsistent with its declaratory judgment claim. Section 6.2 of the License not only reflects the absence of any intent to be co-owners of future products, it expressly provides that Scholastic "shall own any and all proprietary rights, including copyright" in future software products "based on or derived from" the Licensed Materials. Rosenthal Decl. Ex. A § 6.2. Thus, even if Vanderbilt could show that the Other Scholastic Products incorporated protectable elements of the Licensed Materials (and it cannot), it still would be foreclosed from a declaratory judgment of an ownership interest.

## IV.    VANDERBILT'S UNTIMELY CLAIMS FOR TORTIOUS INTERFERENCE ALSO FAIL AS A MATTER OF LAW

Vanderbilt's claims for tortious interference with contract fail because Vanderbilt cannot show that either Scholastic or HMH intended to induce a breach of Hasselbring's employment contract with Vanderbilt or that either acted with malice, which are both required elements of its claim. *See Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 405 (Tenn. 2002)

(citing *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994)).

Vanderbilt also cannot show the requisite damages arising from any alleged interference.

> **A.    Vanderbilt Cannot Show that Scholastic or HMH Intended to Induce Hasselbring to Breach a Contract With Vanderbilt or Acted With Malice**

Section 4.2 of the License expressly permitted Scholastic and later HMH to enter into

consulting agreements with Hasselbring "subject to Vanderbilt's policies on outside employment

and conflicts of interest."  Rosenthal Decl. Ex. A § 4.2.  Vanderbilt nonetheless contends that

Scholastic and HMH's entry into consulting agreements with Hasselbring for Other Scholastic

Products constitutes tortious interference with Vanderbilt's agreements with him, even though

Hasselbring warranted and represented to Scholastic and HMH that he had the right and

authority to enter into and perform under these agreements.[17]   Under Tennessee law, however,

"[a] contractual warranty is an assurance by one party to the contract of the existence of a fact

upon which the other contracting party may rely."  *Sikora v. Vanderploeg*, 212 S.W.3d 277, 285

(Tenn. Ct. App. 2006) (citation omitted).  A warranty is "intended to relieve the promisee of any

duty to ascertain the fact for himself or herself . . . ."  *Id.*  Hasselbring's warranties, therefore,

belie any allegation that Scholastic or HMH acted with intent to induce a breach of Hasselbring's

obligations to Vanderbilt, let alone with malice.  *See Riggs v. Royal Beauty Supply, Inc.*, 879

S.W.2d 848, 851 (Tenn. Ct. App. 1994) (stating that malice for the purposes of tortious

---

[17] In entering into the consulting agreements, Hasselbring represented and warranted that "(i) [he] is the sole owner and has full power and authority to grant [the publisher] all of the rights granted under this Agreement; (ii) [he] has full power to enter into this Agreement; . . . ; and (iv) [his] work under this Agreement is original and does not violate or infringe upon the right of privacy or any other right of any person or corporate entity including but not limited to any trademark, property right, or statutory or common law copyright of any person or corporate entity."  Defs.' 56.1 ¶ 69 § 11(a).

interference requires "a wilful [sic] violation of a known right . . . [or] the absence of justification.").

Summary judgment also should be granted because Vanderbilt has no evidence to support the intent and malice elements of its cause of action. Scholastic's and HMH's alleged knowledge of Hasselbring's contractual obligations to Vanderbilt (*see* Dkt No. 85 ¶ 111 (FAC)) is "insufficient . . . to establish both the knowledge and intent elements of the tort." *Keith v. Aerus, LLC*, No. 2:09 Civ. 297, 2010 WL 3883434, at *5 (E.D. Tenn. Sept. 29, 2010) (dismissing a tortious interference claim because "simple knowledge of [a] contract cannot be automatically equated with intent to induce a breach" and plaintiff must allege "plausible facts to show an intent to ***induce*** a breach") (emphasis in original). Even if Hasselbring did not provide disclosures in Vanderbilt's preferred format, Vanderbilt was unquestionably informed of Hasselbring's consulting role with Scholastic in 2006 when it rehired Hasselbring from the University of Kentucky, and it was apprised on an annual basis thereafter of his relationship with Scholastic and then HMH. Defs.' 56.1 ¶¶ 78-80. Moreover, Vanderbilt has no evidence to show that Scholastic or HMH had any reason to question the crystal-clear warranties he provided. Indeed, his consulting activities with them were disclosed in copies of his CV that Vanderbilt posted to its public-facing website. Defs.' 56.1 ¶¶ 81-83; Hasselbring Decl. ¶¶ 7-9. And as for HMH, there is no evidence in the record that it was ever aware of, or received copies of, Vanderbilt's Technology or Conflict of Interest policies, another necessary predicate for a tortious interference claim. *See, e.g., Nave v. Life Bank*, 334 B.R. 586, 594 (M.D. Tenn. 2005) (noting elements including "the wrongdoer knew of this contract").

### B.    Vanderbilt Has No Competent Evidence of Damages Arising From the Alleged Interference

In order to establish a prima facie case for tortious interference with contract, Vanderbilt also must prove damages resulting from the alleged breach.  *See, e.g.*, *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 832 (E.D. Tenn. 2004).  In its First Amended Complaint, Vanderbilt conclusorily alleged that it has suffered "a loss of revenue and other legitimate business interests" arising out of Hasselbring's alleged breach of its policies on outside consulting.  Dkt No. 85 ¶ 114 (FAC).  But there is no evidence in the record to support the allegation.  Vanderbilt's damages expert conceded that he made no effort to ascertain damages arising from that alleged breach.  Defs.' 56.1 ¶ 158.  Scholastic and HMH are thus entitled to summary judgment on Vanderbilt's tortious interference claim for the independent reason that Vanderbilt has no proof of damages related to that claim.  *See Tenn. Walking Horse Breeders' & Exhibitors' Ass'n v. Nat'l Walking Horse Ass'n*, 528 F. Supp. 2d 772, 785 (M.D. Tenn. 2007); *Stratienko v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 435 S.W.3d 189, 202 (Tenn. Ct. App. 2013).

## V.    VANDERBILT'S UNTIMELY CLAIMS FOR TRADEMARK INFRINGEMENT ALSO FAIL AS A MATTER OF LAW

At the outset of this litigation, Scholastic and HMH moved to dismiss Vanderbilt's claims for trademark infringement on the ground that Vanderbilt had not alleged Scholastic and HMH were making trademark uses of Vanderbilt marks, but rather had alleged only that Scholastic and HMH had used the marks to identify Vanderbilt as Hasselbring's employer.  *See* Dkt No. 88.  When a defendant is "only using [the] trademark in a 'non-trademark' way—that is, in a way that does not identify the source of the product—then trademark infringement and false designation of origin laws do not apply."  *Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687 (6th Cir. 2003).  The Court recognized that no trademark claim arises from the

accurate identification of Hasselbring as a Vanderbilt professor. *See* Dkt No. 106 at 14-15 (citing *Review Directories Inc. v. McLeodUSA Publ'g Co.*, 236 F. Supp. 2d 810, 813 (W.D. Mich. 2001) and *Bus. Trends Analysts, Inc. v. Freedonia Grp., Inc.*, 700 F. Supp. 1213, 1233 (S.D.N.Y. 1988)); *see also Sazerac Brands, LLC v. Peristyle, LLC,* 892 F.3d 853, 858-59 (6th Cir. 2018); *Hensley Mfg. v. ProPride, Inc*., 579 F.3d 603, 612 (6th Cir. 2009). Drawing all inferences in Vanderbilt's favor, however, the Court held that for purposes of deciding the motion to dismiss Vanderbilt had sufficiently alleged business uses of Vanderbilt marks beyond that mere identification to survive this threshold inquiry and was entitled to discovery to try to establish a likelihood of confusion. *See* Dkt No. 106 at 17-18.

With the discovery record now closed, Vanderbilt cannot meet its burden of proof. Courts examine eight factors in determining whether a plaintiff has demonstrated that the defendant's use of a mark is likely to cause confusion among consumers concerning the origin of the goods offered by the parties: the strength of the plaintiff's mark, the relatedness of the parties' goods, the similarity of the marks, evidence of actual confusion, marketing channels used, likely degree of purchaser care, defendant's intent in selecting the mark, and likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 648 (6th Cir. 1982). Application of these factors to the undisputed evidentiary record compels a grant of summary judgment to Scholastic and HMH.

## A.    There Is No Evidence of Actual Confusion

As the Sixth Circuit noted in *Frisch*, although "evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." *Id.,* 670 F.2d at 648 (quoting *Amstar Corp. v. Domino's Pizza, Inc*., 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 899 (1980)). Here, Vanderbilt has failed to identify *any* evidence of any actual confusion on the part of consumers. Vanderbilt's designated

Rule 30(b)(6) representative testified that Vanderbilt has not received a single call or communication from a customer regarding the products or showing consumer confusion. Defs.' 56.1 ¶ 148. Given that the products have been on the market for years, and that Scholastic and later HMH used Vanderbilt marks to identify Hasselbring as a Vanderbilt professor and to credit his work at Vanderbilt in marketing materials but not on the product itself for almost the entirety of this time,[18] the lack of actual confusion, alone, is persuasive evidence that there is no likelihood of confusion. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 517 (6th Cir. 2007) ("Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."). Indeed, the lack of actual confusion is especially striking given the proclaimed strength of Vanderbilt's marks. *See McDonald's Corp. v. Shop at Home*, 82 F. Supp. 2d 801, 809-10 (M.D. Tenn. 2000) (recognizing instances of actual confusion should be greater for strong marks). This factor thus weighs heavily in favor of Scholastic and HMH.

### B. All But One of the Remaining Factors Also Favor Scholastic and HMH

For purposes of this motion only, Scholastic and HMH do not dispute that Vanderbilt has strong marks, but the alleged strength of its marks is the *only* element that favors Vanderbilt and cannot outweigh the fact that the other remaining factors all favor Scholastic and HMH. *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004) ("[T]he fact that a mark is strong does not impact our analysis of the similarity of the marks, the relatedness of the products and services, or any of the other factors in the likelihood-of-confusion test.").

*First*, Vanderbilt and the publishers do not offer similar goods or services. Vanderbilt has admitted that it does not sell any literacy or math products, Defs.' 56.1 ¶ 149, which favors

---

[18] As noted above, Hasselbring was employed by the University of Kentucky for six years. Defs.' 56.1 ¶¶ 5-6. During that time, Scholastic's marketing materials identified him as a professor at that university, rather than at Vanderbilt. Defs.' 56.1 ¶ 146.

Scholastic and HMH.  *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002) (that goods existed in the same "very broad industry" did not make them related).  *Second*, and relatedly, there is no evidence in the record that Vanderbilt has any intent of expanding its offerings to include products of that nature.  *See Truckstops Corp. of Am. v. C-Poultry Co*., 596 F. Supp. 1094, 1100 (M.D. Tenn. 1983) (fact that there was "no proof presented" that plaintiff intended to expand weighed against finding of likelihood of confusion).

*Third,* there is no overlap in marketing channels.  *Therma-Scan, Inc.,* 295 F.3d at 640 (failure to "establish common marketing approaches" outside of common use of the internet "supports a finding that confusion is not likely to occur").  There is no evidence in the record that Vanderbilt's services are marketed through the lengthy process that *READ 180* or the Other Scholastic Products are.

*Fourth*, customers for *READ 180* and the Other Scholastic Products are sophisticated school districts.  Defs.' 56.1 ¶ 136.  As Scholastic and HMH representatives testified, the process for purchasing these products is lengthy and requires thoughtful research by the consumer.  Defs.' 56.1 ¶ 137.  Given this high degree of care, this factor weighs decidedly in favor of Scholastic and HMH.  *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir. 1991) ("when the relevant buyer class is composed of such professional purchasers the likelihood of confusion is lower"); *Tennessee Walking Horse Breeders'*, 528 F. Supp. 2d at 782-83 (holding this factor weighed heavily in favor of defendants where consumers exercised enhanced degree of care).

*Fifth*, Scholastic and HMH used the marks in good faith—solely in certain marketing materials to identify Hasselbring's professional affiliation and the locus of his research, Defs.' 56.1 ¶ 139, not to steal Vanderbilt's customers or otherwise trade on Vanderbilt's goodwill.

*McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 808 (M.D. Tenn. 2000) (finding

marks used in good faith and no trademark infringement where defendant did not intend to

capitalize on goodwill in plaintiff's mark).  There also is no evidence that either Scholastic or

HMH have ever used Vanderbilt marks on the products themselves.  Instead, at all times,

Scholastic and HMH prominently used their own marks to signify the source of the products for

consumers both on the product packaging and in their marketing materials.[19]

> ### C.     The Proffered Testimony of Vanderbilt's Trademark Survey Expert Does Not Create a Genuine Issue of Material Fact

Because the record contains no other evidence to support a finding of confusion,

Vanderbilt must rely solely on its expert, Matthew G. Ezell.  Rosenthal Decl. Ex. IIII  (Ezell

report).  But for the reasons set forth in Defendants' *Daubert* motion filed concurrently herewith,

Ezell's testimony is inherently unreliable, should be excluded, and therefore does not create a

genuine issue of material fact.  *See, e.g.*, *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F.

Supp. 3d 1230, 1240 (M.D. Fla. 2017) (holding that that survey expert testimony inadmissible

under *Daubert* could not create factual dispute to defeat summary judgment); *Leelanau Wine

Cellars, Ltd v. Black & Red, Inc.,* 452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd* 502 F 3d 504

(6th Cir. 2007) (finding serious flaws with survey design and according it little weight in

summary judgment ruling); *see also Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261,

1267-68 (6th Cir. 1985) (questioning survey methodology for suggesting a certain response to

---

[19] The similarity of the marks factor is largely irrelevant here in an association case rather than a palming off case, particularly as there is no dispute that the marks consistently appeared along with Scholastic or HMH marks.  *See Therma–Scan, Inc.,* 295 F.3d at 634 ("[T]he presence of [a house mark on a product] does not eliminate the similarity between the trademarks. Instead, this labeling diminishes the likelihood of confusion created by the comparable marks and reduces the importance of this factor."); *AutoZone*, 373 F.3d at 797 ("The co-appearance of a junior mark and a house mark is not dispositive of dissimilarity, but it is persuasive.").

respondents and according survey "little if any weight" in affirming denial of preliminary injunction). This becomes self-evident by the corrected survey conducted by Defendants' survey expert, Hal Poret, which yielded only a 1.5% gross confusion rate. Rosenthal Decl. Ex. JJJJ (Poret expert report) at 4. Such a low rate is insufficient as a matter of law to show an infringing likelihood of confusion. *See CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (2% confusion rate insufficient to show infringing likelihood of confusion); *Truckstops*, 596 F. Supp. at 1099 (4% maximum rate of confusion not sufficient to demonstrate a likelihood of confusion).

### D. Vanderbilt Has No Competent Evidence of Damages for the Alleged Infringement

Vanderbilt's trademark infringement claims suffer from two additional flaws. First, Vanderbilt has no competent evidence of damages for the alleged infringement. Since Vanderbilt does not make competing products and cannot identify any actual confusion (*see* Points V.A-B), it cannot show any lost sales. Vanderbilt thus relies solely on its damages expert, Christopher Lovin. But here again, Lovin fails to provide competent evidence that could create a genuine issue of material fact. As explained in Defendants' accompanying *Daubert* motion, in attempting to develop a reasonable rate for the allegedly infringing uses of Vanderbilt marks, Lovin relied solely on inapposite apparel and merchandise licenses (*e.g.*, licenses to sell t-shirts with the Vanderbilt name and mark) —where the entire value of the license is the ability to use a Vanderbilt trademark. Rosenthal Decl. Ex. O (Lovin report). As courts have recognized, "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). Accordingly, Vanderbilt's claims for trademark damages should be dismissed. *See* Thomas McCarthy, *McCarthy on Trademarks*

*and Unfair Competition*, § 30.85 (5th ed.) ("If a trademark owner claims entitlement to a reasonable royalty but fails in discovery to identify a method of calculating a royalty rate, on a motion for summary judgment the court may dismiss the claim for a recovery of damages measured by a reasonable royalty.").

Vanderbilt also is not entitled to disgorgement under the Sixth Circuit's six-factor test. *See Laukus v. Rio Brands, Inc*., 391 F. App'x 416, 424 (6th Cir. 2010) (listing factors). *First*, Vanderbilt has not presented any evidence that the Defendants used Vanderbilt's Marks with an "intent to confuse or deceive." Rather, as Amy Dunkin testified, the presence of the Marks in marketing materials for the Products served to identify the fact that Dr. Hasselbring was a Vanderbilt professor, Defs.' 56.1 ¶ 139, a practice that was used with all of the authors and advisors. Defs.' 56.1 ¶ 140. *Second*, no sales were diverted from Vanderbilt as a result of Defendants' use of Vanderbilt Marks, as Vanderbilt has admitted that it does not sell literacy or math products. Defs.' 56.1 ¶ 148. *Third*, Vanderbilt has other remedies—it is seeking a reasonable royalty for this same alleged infringement. Rosenthal Decl. Ex. O (Lovin Report) at 3. *Fourth*, as detailed in Point I.D, Vanderbilt unreasonably delayed in bringing suit. *Fifth*, public interest is not served in rewarding Vanderbilt with a share of Defendants' profits, as they have no presence in market for educational programs. *See Fed. Deposit Ins. Corp. v. Homestead Mortg. Co*., No. 04 Civ. 74842, 2011 WL 717456, at *6 (E.D. Mich. Feb. 22, 2011) (public interest did not support disgorgement where owner of mark had made no attempt to enter market). *Sixth* and finally, this is not a case about palming off. Accordingly, Vanderbilt's request for disgorgement should be denied. *Id.*, at *7 (denying award of profits where all but one of the factors favored alleged infringer).

## CONCLUSION

For all of the reasons set forth herein, Scholastic and HMH's motion for summary judgment should be granted.

Dated: January 22, 2021

/s/ Edward H. Rosenthal
Edward H. Rosenthal (pro hac vice) (NY Bar No. 1731835)
Caren Decter (pro hac vice) (NY Bar No. 4456992)
Kimberly M. Maynard (pro hac vice) (NY Bar. No. 4767844)
Nicole Bergstrom (pro hac vice) (NY Bar No. 5236344)
Viviane K. Scott (pro hac vice) (NY Bar No. 5468996)
FRANKFURT KURNIT KLEIN & SELZ, PC
28 Liberty Street
New York, New York 10005
Phone: (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
cdecter@fkks.com
kmaynard@fkks.com
nbergstrom@fkks.com
vscott@fkks.com


/s/ Thor Y. Urness
Thor Y. Urness (BPR No. 13641)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, TN 37203
(615) 252-2384
turness@bradley.com
*Attorneys for Defendant/Counterclaim-Plaintiff Scholastic Inc.*


/s/ David J. Lender
David J. Lender (pro hac vice) (NY Bar No. 2583722)
Benjamin E. Marks (pro hac vice) (NY Bar No. 2912921)
Sara Lonks (pro hac vice) (NY Bar No. 5445630)
Taylor Dougherty (pro hac vice) (NY Bar No. 5526561)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
david.lender@weil.com
benjamin.marks@weil.com
sara.lonks@weil.com
taylor.dougherty@weil.com

Michael G. Abelow (No. 26710)
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, TN  37201
(615) 742-4200
mabelow@srvhlaw.com
*Attorneys for Defendant Houghton Mifflin Harcourt*
*Publishing Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2021, true and correct copies of the foregoing Defendants Scholastic Inc. and Houghton Mifflin Harcourt Publishing Company's Memorandum of Law In Support of Motion for Summary Judgment were served by operation of the Court's CM/ECF system upon the following:

| | |
|---|---|
| Paige W. Mills<br>Audrey Jane Anderson<br>Robert E. Cooper, Jr.<br>Ashleigh D. Karnell<br>Mary Leigh Pirtle<br>**BASS BERRY & SIMS PLC**<br>150 Third Avenue South, Suite 2800<br>Nashville, TN 37201<br>pmills@bassberry.com<br>audrey.anderson@bassberry.com<br>ashleigh.karnell@bassberry.com<br>mpirtle@bassberry.com<br>rcooper@bassberry.com | John W. Harbin *(pro hac vice)*<br>Mary Katherine Bates *(pro hac vice)*<br>**MEUNIER CARLIN & CURFMAN, LLC**<br>999 Peachtree Street, NE<br>Suite 1300<br>Atlanta, GA 30309<br>(404) 645-7700<br>jharbin@mcciplaw.com<br>kbates@mcciplaw.com |
| *Attorneys for Plaintiff/Counterclaim-Defendant Vanderbilt University* | |
| Thomas H. Dundon<br>Aubrey B. Harwell, Jr.<br>Erik C. Lybeck<br>Neal & Harwell, PLC<br>1201 Demonbreun Street, Suite 1100<br>Nashville, TN 37203<br>(615) 244-1713<br>aharwell@nealharwell.com<br>tdundon@nealharwell.com<br>elybeck@nealharwell.com | |
| *Attorneys for Defendant Ted S. Hasselbring* | |

/s/ Thor Y. Urness

Thor Y. Urness

51