# **EXHIBIT H**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| VANDERBILT UNIVERSITY, ) | Civil Action No. 3:18-cv-00046 |
| Plaintiff, ) | |
| v. ) | Chief Judge Waverly D. Crenshaw, Jr. |
| ) | Magistrate Judge Jeffery S. Frensley |
| SCHOLASTIC, INC., HOUGHTON MIFFLIN ) | |
| HARCOURT PUBLISHING COMPANY, and ) | JURY DEMAND |
| TED S. HASSELBRING, ) | |
| ) | **CONFIDENTIAL** |
| Defendants. ) | **FILED UNDER SEAL** |
| ) | |

**PLAINTIFF VANDERBILT UNIVERSITY'S RESPONSE TO DEFENDANTS
SCHOLASTIC, INC.'S AND HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   NONE OF VANDERBILT'S CLAIMS ARE TIME-BARRED............................................. 1

   A.   Vanderbilt's breach of contract claims are not time-barred; there are questions of fact for the jury to resolve.................................................................................................. 2

      1.   Legal principles governing the statute of limitation issues........................................... 3

      2.   There are questions for trial on Vanderbilt's claims regarding underpayments of royalties on Read 180..................................................................................................... 5

      3.   There are material fact questions as to whether Vanderbilt's breach of contract claims for royalties on System 44 and FASTT Math are timely............................................. 10

         a)   Defendants Scholastic and HMH hid relevant information from Vanderbilt....... 10

         b)   Dr. Hasselbring misrepresented relevant information to Vanderbilt.................... 11

         c)   There are fact questions for trial about whether Vanderbilt should have earlier discovered its claims on System 44 and FASTT Math......................................... 17

   B.   There are material questions of fact as to when time began to run on Vanderbilt's trademark claims.............................................................................................................. 18

II.   DEFENDANTS' CONTRACT CONSTRUCTIONS ARE CONTRARY TO THE LICENSE AND THE LAW..................................................................................................................... 20

   A.   The contract and other evidence shows that Vanderbilt is entitled to royalties on the product and service revenue, not just the student software ............................................. 20

      1.   How Read 180 is sold ............................................................................................... 20

      2.   Defendants' arguments are contrary to the language of the contract and rules of construction................................................................................................................. 21

      3.   Vanderbilt is entitled to royalties on Read 180 and Derivative Product service and support revenue.......................................................................................................... 26

      4.   Parol evidence supports Vanderbilt's interpretation.................................................. 28

   B.   A royalty is due for the SRI and SRC products sold with Read 180 ................................ 30

   C.   Defendants' promise to pay royalties on derivative products is enforceable .................. 30

      1.   The royalty provision as to future products in Section 6.2 is enforceable................. 31

      2.   If the Court finds the royalty provision of Section 6.2 is unenforceable, Vanderbilt should be allowed to pursue an unjust enrichment claim ............................................ 35

   D.   Defendants' motion regarding its failure to pay royalties on Canadian sales and its arbitrary deductions for shipping expense should be denied............................................. 36

III. DEFENDANTS' ARGUMENT THAT VANDERBILT HAS NO EVIDENCE OF DAMAGES CONCERNING THE DERIVATIVE PRODUCTS IS INCORRECT ........... 37

IV. VANDERBILT'S TRADEMARK CLAIMS PRESENT TRIABLE ISSUES .................... 42

    A. Vanderbilt's claim for trademark infringement involves questions of fact ..................... 43

    B. The relevant factors establish a likelihood of confusion ................................... 43

    C. Defendants intended to benefit from an affiliation with Vanderbilt, the top special education program in the country ..................................................... 44

        1. Defendants' use of Vanderbilt's exact trademarks caused confusion ....................... 45

        2. The parties offer closely related goods and services pertaining to special education 47

        3. Vanderbilt and Defendants ultimately market their goods and services to the same types of customers...................................................................... 48

        4. Sophisticated purchasers can be confused ................................................. 49

        5. There is evidence of actual confusion here and Vanderbilt will continue to be harmed by such confusion ..................................................................... 49

CONCLUSION............................................................................................. 50

# INTRODUCTION

In 1997, Vanderbilt and Scholastic entered into a license (the "License Agreement"), under which Vanderbilt licensed certain "Materials," comprising a prototype software product for teaching reading, called the Peabody Learning Lab (the "PLL") to Scholastic, Inc., in exchange for a royalty on products based on or derived from those Materials. *See generally* License. From the PLL, Scholastic developed Read 180, a computer-based literacy product, marketed and sold it, and paid Vanderbilt royalties on some of the resulting revenue. Dkt No. 116, pp. 8, 27. In this suit, Vanderbilt claims, *inter alia*, that Scholastic and then Houghton Mifflin Harcourt Pub. Company ("HMH," collectively with Scholastic "Defendants") underpaid Vanderbilt for the royalties owed on sales of Read 180. Vanderbilt also contends that Defendants breached the agreement by developing other products based on or derived from the licensed Materials, specifically System 44, FASTT Math, Math 180, and iRead, without telling Vanderbilt or paying royalties on the sale of those products. *See generally* Dkt No. 1.

# ARGUMENT AND CITATION OF EVIDENCE

## I.    NONE OF VANDERBILT'S CLAIMS ARE TIME-BARRED

Defendants argue Vanderbilt's claims for breach of contract, tortious interference, declaratory judgment, and trademark infringement are time-barred. Defendants premise their statute of limitations arguments on the assertion that:

> Vanderbilt has known for more than a decade that: (i) that Hasselbring was consulting on other Scholastic Products; (ii) it was not receiving royalties on [the Derivative] Products and the non-software components of *READ 180*, and (iii) Scholastic was using Vanderbilt's trademarks in precisely the ways Vanderbilt complains about here.

Dkt No. 304 at 9. Each of those assertions is disputed and in fact false. Rather than Vanderbilt *knowing* about Defendant Ted Hasselbring's multiple consulting agreements with Scholastic on the Derivative Products, Hasselbring falsely represented to Vanderbilt that he had NO such

agreements, in breach of his contractual and fiduciary obligations to Vanderbilt. Regarding Vanderbilt 'knowing it was not receiving royalties on the Derivative Products,' Defendants skip over a rather basic point: Vanderbilt did not know it was *owed* royalties because Scholastic repeatedly breached its contractual obligation to inform Vanderbilt it was developing these Derivative Products, and, when Vanderbilt personnel inquired, they were misled. Next, contrary to Defendants' argument, Vanderbilt had no idea it was not receiving royalties on the non-software components of Read 180, because *Scholastic continually breached its obligation to report to Vanderbilt the revenue received from each product sold* or licensed. In fact, Scholastic provided fraudulent royalty statements purporting to show the "Price" it charged for the products, when in fact the amounts shown as the "Prices" were lower amounts Scholastic secretly calculated. Finally, there is no evidence that Vanderbilt knew of Defendants' infringement of Vanderbilt's marks, partly because Defendants *again* breached the contract, by failing to get Vanderbilt's OK to use its marks.

In the face of these damning facts, Defendants rely on random and often irrelevant events that do not establish that Vanderbilt had the knowledge Defendants claim. At minimum, there are material factual disputes as to when Vanderbilt knew or should have known of its injuries, making summary judgment inappropriate.

A.    **Vanderbilt's breach of contract claims are not time-barred; there are questions of fact for the jury to resolve**

Vanderbilt has two breach of contract claims against Defendants: (i) for underpayment of royalties on the initial product Scholastic developed under the License, called Read 180, and (ii) for failing to pay royalties on the later-developed Derivative Products. There is a genuine issue of fact as to whether and when the limitations period was tolled, precluding summary judgment. At worst, Plaintiff's claims for Defendants' underpayments on Read 180 and sales of Derivative

Products should be limited to the damage claims arising since July 2011—six years before the parties executed a tolling agreement in July 2017. Vanderbilt's Statement of Additional Disputed Facts ("SOADF") ¶2.

### 1.    Legal principles governing the statute of limitation issues

The statute of limitations for a breach of contract claim is six years under Tennessee law. Tenn. Code Ann. § 28-3-109(a)(3).[1] Tennessee recognizes the discovery rule: an "equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." *Smith v. Hauck*, 469 S.W.3d 564, 569 (Tenn. Ct. App. 2015). "Ordinarily, the question of whether a plaintiff knew or should have known that a cause of action existed is a question of fact, inappropriate for summary judgment." *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996). Courts applying Tennessee law routinely deny summary judgment on the basis that whether a plaintiff reasonably should have known it had a claim is a question of fact for the jury. *E.g.*, *Gilmore v. Davis*, 185 F. App'x 476, 483 (6th Cir. 2006).

Defendants note that the Tennessee Supreme Court has not affirmed the discovery rule applies to breach of contract claims,[2] but there has been a recent trend among Tennessee appellate courts and federal courts to do so, as it would be unjust to hold that a plaintiff's claim for breach accrues before the plaintiff knew or should have known that the contract had been breached. *See, e.g.*, *Goot v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005); *Gervasi v.*

---

[1] Vanderbilt concurs with Defendants that Tennessee law governs the statute of limitations issues. Dkt. 304, p. 14 n.5.

[2] In *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 712 (Tenn. 2019), the Tennessee Supreme Court declined to decide whether the discovery rule should apply to breach of contract claims.

3

*Warner/Chappell Music, Inc.*, No. 3:12-cv-00627, 2014 WL 348189, at *5 (M.D. Tenn. Jan. 30, 2014). Thus, the accrual is tolled until "the plaintiff knew or should have known that the contract had been breached." *Goot*, 2005 WL 3031638, at *11.

Alternatively, even if the discovery rule does not apply, the doctrine of fraudulent concealment tolls the statute of limitations for the period during which the defendant misled the plaintiff. *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 461 (Tenn. 2012). For fraudulent concealment to toll the limitations period, the plaintiff must prove:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Id*. at 462-63 (internal citations and quotation marks omitted). If a plaintiff establishes fraudulent concealment, the statute of limitations "is tolled until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Id.* at 463.

"Where a contract is severable or divisible, breaches of its severable parts will give rise to separate causes of action accruing at different times. Under these circumstances, the statute of limitation will begin to run at the time of each breach." *Greene v. THGC, Inc.*, 915 S.W.2d 809, 811 (Tenn. Ct. App. 1995). Royalty contract, such as the License, are a "classic example of a severable contract." *Waste Servs. of Decatur, LLC v. Decatur Cty., Tennessee*, 367 F. Supp. 3d 792, 812-13 (W.D. Tenn. 2019); *see also Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 715 (Tenn. 2019) (holding that only the claims

for commissions more than six years before suit-filing were time-barred).[3] Therefore, to the extent the statute of limitations limits any of the contract claims, it would at most only bar damages claims for royalty underpayments or nonpayments prior to July 2011

### 2. There are questions for trial on Vanderbilt's claims regarding underpayments of royalties on Read 180

The discovery rule applies to Vanderbilt's contract claims regarding underpayments of royalties on Read 180, therefore the statute of limitations was tolled until Vanderbilt knew or should have known of said underpayments. As the material facts are disputed, this is a question of fact reserved for the jury. Scholastic hid its underpayments behind false royalty reports.

Scholastic promised to report to Vanderbilt in the annual statements both "the number of [covered] products … sold or licensed" and the "calculation of the amount of revenue pertaining to each such product received by Scholastic during the preceding [year] and the amount of royalties, if any, payable to Vanderbilt." License § 9.2. Scholastic's royalty statements made it appear that Scholastic was keeping its promise. The reports appear to be straightforward, showing the items sold/licensed, "price," the royalty rate, number sold, and the royalty that period. SOADF ¶¶202-216.  The "Royalty this Period" column simply states the result of multiplying: price times the net copies sold times the royalty rate.[4]

In fact, *Scholastic was not reporting the actual price or the revenue received* and <u>was not paying Vanderbilt a royalty on the amount of revenue received for each product</u>. Instead, Scholastic was reporting as the "Price" and paying a royalty on only a *fraction* of the revenues

---

[3] Defendants cite *Indiv. Healthcare* and *Waste Servs* and *seem* to argue, without explanation, that Vanderbilt's claims for royalties on System 44 and FASTT Math would be barred after the first breach (Dkt No. 304 at 15-16), notwithstanding later sales within the six-year statutory period. As shown, not only do these cases not support Defendants' argument, they directly contradict it.

[4] The royalty rate listed in the statements is 7% (.0700), as per the License Agreement, § 9.1.

received. Scholastic secretly reduced the revenue base by about ███ before reporting the "Price" and calculating the royalties, so that Scholastic typically paid royalties on only ███ of the revenue from product sales. SOADF ¶235.[5] And that was for products Scholastic agreed were royalty-bearing.  Scholastic also totally excluded some products and service revenue from the reports and royalty calculation. SOADF ¶239.[6] Of the products and services actually included in the reports, Scholastic breached its contract obligations in every royalty report from 2001-2015. SOADF ¶¶202-215, 217-39. Scholastic's purported reason for these secret deductions was to estimate the value of only the student software portion of the Read 180 products SOADF ¶262, a calculation not discussed anywhere in the License.[7]

As a result, Vanderbilt did not know, nor should it have known, that Scholastic was shorting Vanderbilt on the royalties—there is no way to tell from the royalty statements. Scholastic could have disclosed its calculations in the royalty statements as HMH later did beginning in 2017, after the audit uncovered these issues. SOADF ¶223. But the statements Scholastic provided to Vanderbilt omit all this information and affirmatively misrepresent the "price" of Scholastic's products. Not until Vanderbilt personnel saw a 2015 Scholastic press release associated with its sale of the relevant business unit to HMH, did it have indications that Read 180 was responsible for more than ███████ in revenue (SOADF ¶175), which was a

---

[5] Scholastic also subtracted an arbitrary charge, not actual costs, for shipping and handling, without reporting that.

[6] The only exclusion Vanderbilt was aware of was for the reading books Scholastic acquired from third parties. This understanding came from the negotiations.  *See* Section II.A.4 infra. Scholastic also subtracted an arbitrary charge of ████ for shipping and handling, without showing that on the royalty statements. SOADF ¶280.

[7] For example, in the Scholastic Royalty workbook for the 2011 fiscal year, item #054536009 has two different prices in different parts of the worksheet. On the first tab, the Price shown is ███████. On the second tab (showing Vanderbilt), it is ███████. The latter, lower price is what appears on Vanderbilt's royalty statement; nowhere does the higher price appear. SOADF ¶¶226-29.

much larger revenue base than Scholastic had shown in its statemen or paid Vanderbilt royalties on. It was at this point that Vanderbilt started investigating the royalty payments, culminating in the 2016 partial audit, the tolling agreement, and this lawsuit. Based on the preceding evidence, a jury could reasonably find that the statute of limitations began to run no earlier than 2015, well within the six-year period.

Assuming the heightened "inherently undiscoverable" standard cited by Defendants governs the application of the discovery rule,[8] the period is tolled where:

> (1) the breach of contract was difficult for the plaintiff to detect, (2) the defendant was in a far superior position to comprehend the breach and the resulting damage, or (3) the defendant had reason to believe that the plaintiff remained ignorant that it had been wronged.

*Goot*, 2005 WL 3031638, at *11. Applying this test, there is a genuine issue of material fact as to whether the statute of limitations was tolled.  First, the breach of contract was difficult for Vanderbilt to detect, given the false reports Scholastic presented, which were doubly misleading because not only did they misrepresent the "price," in so doing Scholastic breached the contract. And Vanderbilt had no idea of this until Scholastic's 2015 press release raised questions that Scholastic had totally excluded some Read 180 product sales and revenue from the statements and the royalty calculation.[9]

---

[8] Contrary to Defendants' argument, in *Individual Healthcare* the Tennessee Supreme Court did *not* hold that "the [discovery] rule could not apply unless the breach was 'inherently undiscoverable.'" Dkt. 304, p. 18. The Court noted the *plaintiff asked* the court to "adopt the 'inherently undiscoverable' standard in *Goot.*" *Individual Healthcare*, 566 S.W.3d at 712. But the Court not only discussed how "other jurisdictions are split" on applying the discovery rule in breach-of-contract actions, it cited cases where the *general discovery rule* was applied "in breach-of-contract cases in the same way [as] in torts and other types of actions." *Id*. at 711-12. It is therefore not clear which standard should apply under Tennessee law. Vanderbilt submits the general discovery rule should be applied.

[9] Defendants do not contest that Vanderbilt did not know it was being underpaid until after the audit. Dkt. 304, pp. 17-19.

Second, for the same reasons, Defendants were in a far superior position to comprehend their own breach and the resulting damage to Vanderbilt. Defendants purposefully and secretly carved out certain Read 180 products and portions of revenue to reduce the royalties paid to Vanderbilt. The pricing for Read 180 was not publicly available and was variable due to discounts, promotions, and customer negotiations. SOADF ¶¶231-32. Vanderbilt had no ability to compare the "Prices" in the royalty reports with the actual sales prices to detect, or even suspect, these hidden deductions. All the relevant knowledge was held by Scholastic. Third, again for the same reasons, Defendants knew that Vanderbilt remained ignorant that it had been wronged. That was in fact Defendants' goal—to hide their numerous deductions and retain royalties that were rightfully owed to Vanderbilt with false, noncompliant royalty reports. A juror could reasonably find that the breach of contract was inherently undiscoverable, and therefore the discovery rule applies to Vanderbilt's claim for underpayment of royalties on Read 180.

Defendants interpret *Individual Healthcare* as meaning their breaches cannot qualify as "inherently undiscoverable" as a matter of law. But the decision does not go that far, and its facts are very different. The plaintiffs in *Individual Healthcare*, as sales agents for the defendant, had access to and knowledge of their own sales data. 566 S.W.3d at 713-14. While this data was partially incomplete, the plaintiffs enjoyed far greater access to the necessary data than has Vanderbilt. Vanderbilt was wholly reliant on Scholastic to provide it with the Read 180 sales data, and Scholastic had a contractual obligation to do so. Second, the cause of the underpayments in *Individual Healthcare* was faulty commission reporting and the payment software system. *Id*. at 713. Here, underpayments resulted from the deliberate choice by Scholastic to exclude and deduct certain Read 180 revenues, and then report fictitious prices and

revenue totals to Vanderbilt. This is not a case where a party could have double checked that its numbers match up with the other party's numbers, as Defendants were the sole custodians of the sales data. To deny application of the discovery rule because Vanderbilt did not conduct an expensive, third-party audit of Defendants when it had no reason to suspect any wrongdoing would defeat the underlying purpose of the rule: to prevent "the intolerable result of barring a cause of action by holding that it 'accrued' before the plaintiff discovered the injury or the wrong." *Id*. at 710. *Individual Healthcare* does not bar the application of the discovery rule here.

If the discovery rule does not apply, factual questions exist as to whether the doctrine of fraudulent concealment tolls the limitations period. Defendants affirmatively withheld and misrepresented the information regarding the Read 180 revenues realized. Vanderbilt, having exercised reasonable care and diligence, could not and did not discover the misrepresentations or Scholastic's knowing breach of the License. Defendants knew they were depriving Vanderbilt of royalty payments rightfully owed.

Finally, if neither the discovery rule nor the fraudulent concealment doctrine applies, Vanderbilt claims for Read 180 underpayments are only limited, not barred entirely.[10] The royalty reporting and associated payments are made annually. The license is a paradigm of a severable contract. *Waste Servs. of Decatur*, 367 F. Supp. 3d at 812-13. Defendants do not contend otherwise. Further, the License is severable because "the consideration … is susceptible of division and apportionment." *Collins v. Summers Hardware & Supply Co.*, 88 S.W.3d 192, 198 (Tenn. Ct. App. 2002) (employment contract found divisible and damages for each paycheck during the past 6 years found timely). Each underpayment is a separate breach with its own six-

---

[10] Defendants appear to concede the claims arising within six years of the July 28, 2017 tolling agreement are not barred. Dkt No. 304, p. 17.

9

year limitations period.[11] At minimum, Vanderbilt's claims based on underpayments of Read 180 royalties since July 2011 are timely.

> **3. There are material fact questions as to whether Vanderbilt's breach of contract claims for royalties on System 44 and FASTT Math are timely**

Defendants claim that their initial sales of System 44 and FASTT Math without paying royalties or offering to negotiate a royalty rate triggered the statute of limitations. (Dkt. 304, pp. 15-16).[12] This argument fails as it wholly disregards the discovery rule. There are material questions of fact as to when Vanderbilt knew or should have known that System 44 and FASTT Math were derivative of the licensed Materials, because both Scholastic[13] and Hasselbring, who worked on these products, breached their disclosure obligations to Vanderbilt. And even if the statute of limitations was not tolled, only Vanderbilt's damages claims for sales prior to July 28, 2011 should be time-barred.

> *a)    Defendants Scholastic and HMH hid relevant information from Vanderbilt*

Defendants had a duty to inform and consult with Vanderbilt about the development of products based on or derived from the licensed Materials. License § 3.5. The parties would then set a royalty, pro rata, based on the amount of licensed Materials used in the new product. License § 6.2.  But Defendants never informed (much less consulted with) Vanderbilt about the Derivative Products, including System 44 and FASTT Math. SOADF ¶149.

---

[11] Each underpayment or nonpayment would constitute a separate breach of contract action causing with its own statute of limitations under New York law. *See Bulova Watch Co. v. Celotex Corp.*, 46 N.Y.2d 606, 611, 389 N.E.2d 130, 132 (N.Y. 1979); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 260 (S.D.N.Y. 2008).

[12] Defendants do not claim that Vanderbilt's claims for royalties on the other Derivative Products, iRead and Math 180, are barred by the statute of limitations. Dkt. 304, p. 15 n.6.

[13] HMH was not yet in the picture.

b) *Dr. Hasselbring misrepresented relevant information to Vanderbilt*

In the 2000s, after sales of Read 180 had commenced, Hasselbring entered into several consulting agreements with Scholastic, including additional contracts concerning Read 180 and separate consulting contracts for each of the Derivative Products: System 44, FASTT Math, iRead, and Math 180. SOADF ¶101-125.[14] Defendants paid Hasselbring royalties on each of these contracts. *Id.* Hasselbring began receiving additional royalties on Read 180 (direct from Scholastic, on top of the share of Vanderbilt's royalties he was already receiving) in 2003; royalties on FASTT Math every year beginning in 2007; royalties on System 44 every year beginning in 2009; and on iRead beginning in 2013 and Math 180 starting in 2014. SOADF ¶¶112, 117, 120, 123, 126.

Hasselbring had a duty to report these relationships to Vanderbilt. From Hasselbring's return to Vanderbilt in 2006 through his retirement in 2017, Vanderbilt required faculty members to disclose potential conflicts of interest at least annually via written Conflict of Interest ("COI") Disclosure forms. SOADF ¶¶73, 79-80. The COI Disclosure forms asked, in relevant part, under the heading "Business Relationships and Research Activities":

> "Are you … involved as an … employee, consultant, [or] contractor … with (or entitled to receive royalties from) a business that (a) has a contractual relationship with Vanderbilt ….?

SOADF ¶97. The Peabody College, where Hasselbring worked, relies on these forms to ascertain and address potential conflicts. SOADF ¶¶74-75. Hasselbring had a contractual and fiduciary[15]

---

[14] Hasselbring and Scholastic/HMH commonly signed the consulting agreement a year or more after the effective date stated in the agreement. For example, one agreement is dated as of August 1, 2010, but the dates on related emails make clear that the contract was actually entered into in the second half of 2011. SOADF ¶¶47, 124.

[15] As an employee, Hasselbring owed a fiduciary duty to Vanderbilt. *See Ram Tool & Supply Co., Inc. v. HD Supply Constr. Supply Ltd.*, No. M201302264COAR3CV, 2016 WL 4008718, at *5 (Tenn. Ct. App. July 21, 2016).

duty to answer these forms truthfully. The truthful answer, from 2007 on, was "Yes." (And upon answering yes, Hasselbring would have been required to provide details about the relationship.) SOADF ¶128.  But every year Hasselbring answered: NO. SOADF ¶99.

It was not as if Hasselbring would have forgotten his consulting contracts with Defendants. Scholastic paid Hasselbring approximately ████████ in royalties under these contracts from 2003- 2015. SOADF ¶130. Hasselbring consistently and repeatedly hid and misrepresented his commercial relationships with Defendants, in breach of his contractual and fiduciary duties to Vanderbilt.[16]

It was not until March 2016, that Hasselbring finally answered "Yes" to the conflict question on the COI Disclosure form.  That was *after Vanderbilt had told Hasselbring that it was auditing the License* (SOADF ¶132), and even then his disclosures were incomplete and misleading. He identified his consulting work on Read 180, still hiding the four other royalty-bearing consulting contracts he had signed with Scholastic. SOADF ¶137. Vanderbilt had a right to rely on Hasselbring's representations given his fiduciary duties. His continual nondisclosures in breach of those duties delayed Vanderbilt's discovery of its claims.[17] *French v. First Union Sec., Inc.*, 209 F. Supp. 2d 818, 825 (M.D. Tenn. 2002) (citing *Knox–Tenn. Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988)).

Hasselbring continued to try to avoid producing the agreements or answering questions even after the 2016 audit commenced and Vanderbilt started asking more questions about his

---

[16] In addition to the requirement to annually submit COI Disclosure forms, Vanderbilt's policies required faculty to affirmatively disclose potential conflicts of interest. SOADF 78.

[17] Also, Hasselbring served a three-year term on the Vanderbilt technology review committee, ending in 2013. (Hasselbring Dep. 153:23-154:6).  As part of his duties on that committee, he was responsible for reviewing Vanderbilt's technology and IP policies.  (Hasselbring Dep. 154:7-11).

agreements with Scholastic and HMH. SOADF ¶¶136-37. In 2017, when Dean Benbow once again asked Hasselbring about the agreements and it became clear the truth was going to come out, Hasselbring told a friend that the "shit is about to hit the fan." SOADF ¶145.

Defendants argue that Hasselbring's involvement with the Derivative Products should have been clear from Hasselbring's CV. This argument fails for several reasons. First, that is not the source the University looks to for conflict information. The University has a specific procedure—the COI Disclosures—which Hasselbring's Dean relied on, for providing such information. SOADF ¶¶70,75. Given, *inter alia,* the number of faculty, the length of the resumes, and the fact that some conflict information would not appear on resumes, it is unreasonable to expect administrators to review the CVs for such information. SOADF ¶¶73-75. Hasselbring's CVs prove this point. His 2015 CV is 44 pages long.[18] The reference to Scholastic appears on the 41st page, under "Advisory Boards and Consultancies."[19] *Id.* at 41. And it is terse; it says nothing about the breadth of his work for Scholastic (it could have been on Read 180)*.* A reader of Hasselbring's CV has no way to determine whether the listed relationship implicates Vanderbilt's conflicts policy or transfers Vanderbilt's intellectual property.

Similarly, the terse references to System 44 or FASTT Math on page 20 do not disclose any details of his relationships with Scholastic. The COI Disclosures that Hasselbring was required to complete called for such details. Not only is it infeasible to suggest looking to Hasselbring's 44-page, 12,000-word CV for such information, Vanderbilt had already asked for such information in his yearly disclosure forms, and he answered "None."[20] SOADF ¶95.

---

[18] SOADF ¶3; Exh. 107 to Declaration of Lee Hamilton ("Hamilton Dec.").

[19] Contrary to Defendants assertion (Dkt No. 304, p. 41), the CV does not say Hasselbring consulted with Scholastic.

[20] Hasselbring also alleges that he provided Vanderbilt grant-writing staff with biographies,

Defendants argue that Vanderbilt gained actual knowledge of Hasselbring's involvement with System 44 and FASTT Math in 2009, citing an "investigation" by CTTC employee Peter Rousos. Dkt. 304, pp. 16-17. But the evidence establishes Rousos's colleague reviewed information about System 44 and FASTT Math and reported a reasonable conclusion that Hasselbring's involvement was (i) minimal and (ii) appeared to have taken place when Hasselbring was at the University of Kentucky. Dkt No. 313-22. This supports the reasonable conclusion that this was not related to the licensed Materials. Rousos then met with Hasselbring, a then-trusted professor. He does not recall what was discussed (nor does Hasselbring), from which a reasonable juror could conclude that nothing of concern was disclosed. SOADF ¶¶68, 69. Moreover, Rousos's conduct needs to be evaluated in the context of the years of concealment by Hasselbring and misrepresentations at that time and later. The same year, 2009, Hasselbring represented to Vanderbilt he was not involved in another Scholastic product development, Math 180, when in fact he had already worked on it. SOADF ¶¶ 38, 61. When, in 2013, Rousos asked Hasselbring again about Hasselbring's involvement in Math 180, Hasselbring claimed he was hardly involved and had kept Scholastic at arm's length, when in fact he was heavily involved. (See below.) The question of whether Rousos exercised reasonable diligence is a question of fact for the jury. *Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, 93 F. Supp. 3d 835, 846 (M.D. Tenn. 2015).

Defendants also point to three events in Nashville to support their assertion that Vanderbilt had knowledge of their breaches of the License, specifically: (i) a 2008 presentation about "Working with Publishers;" (ii) a 2009 "Response to Intervention Convention"

citing one email (Dkt No. 301, VU015211). But there is no evidence the recipient read the bio or had any involvement with conflicts issues or was aware of the License Agreement.

conference; and (iii) a 2013 Math 180 Leadership Summit. *Id*. at 20. However, none of them even concerned or discussed FASTT Math. Only one concerned System 44, and that conference (and the 2013 conference) was aimed at Scholastic's customers—school district purchasing officials—not Vanderbilt's faculty or staff. SOADF ¶155. The first event focused on Read 180, on which Scholastic was paying Vanderbilt a royalty. There is no evidence that any Vanderbilt employee other than Hasselbring attended the second or third event.[21] Defendants have not shown that any of these events put Vanderbilt on notice of a potential violation of the License regarding FASTT Math or System 44.

Further, Defendants argue that Hasselbring's status as a lead author should have put Vanderbilt on notice of Hasselbring's work on the Derivative Products. But, simultaneously, Defendants argue that Hasselbring's "lead author" is a mere honorific that does not signify any meaningful contribution to the products.

Moreover, when in 2013 Rousos asked Hasselbring about him being listed as a "lead author" of Math 180, Hasselbring replied "I had almost nothing to do with Math 180" and claimed he purposely kept Scholastic at arms-length. SOADF ¶63. Rousos also asked Mayer about Hasselbring's designation as "Lead author" of Math 180. Per Rousos's notes, Mayer responded that that Hasselbring was added as a lead author "not so much because of his consulting but because he is a name in the industry." SOADF ¶63. The representations of Hasselbring and Mayer lead Vanderbilt to believe that the "lead author" title did not mean that

---

[21]The Math 180 Leadership Summit had nothing to do with System 44 or FASTT Math. There is no evidence that Vanderbilt (beyond Hasselbring) agreed to "co-sponsor" this event; Dean Benbow did not. SOADF ¶169. This 2008 presentation discussed Read 180 on which Vanderbilt was receiving a royalty. There is no discussion of System 44 or FASTT Math. (YouTube video transcript, https://youtu.be/UmYuNo1ByLw?t=4024). And the 2013 conference was *within the six-year limitations period*.

Hasselbring was involved with Math 180. SOADF ¶64.

These representations were false. Hasselbring had been heavily involved in Math 180. In 2010, he described his efforts as "non-stop" (SOADF ¶41), and he attended numerous meetings throughout 2011 and 2012.[22] Hasselbring later declined to review articles about Math 180 saying he had a conflict, because "*I was on the author development team for MATH 180*." SOADF ¶66 (emphasis added). Rousos and others were entitled to reasonably rely on Hasselbring's duty of loyalty to Vanderbilt as a faculty member, but they were misled. This is analogous to *Gilmore v. Davis*, where the Sixth Circuit held that a delay in bringing a claim due to the plaintiff's attorney having assured her that she had no claim could have caused the plaintiff to rationally remain ignorant of her claim. 185 F. App'x 476, 483 (6th Cir. 2006). Just as the plaintiff in *Gilmore* was entitled to rely on her lawyer, Vanderbilt was entitled to rely on Hasselbring, who owed Vanderbilt a duty of loyalty. The question of diligence is one of fact for the jury to decide, and a jury could reasonably find that Vanderbilt did not and should not have known of the breach of contract due to the University's long-standing relationship with Hasselbring, his deceptions made in breach of his duty of loyalty, and Mayer's less-than-candid answers.

Defendants point to a pair of letters that Dean Benbow sent to the faculty Senate in 2013 and 2014, recommending Hasselbring for a faculty award, which include general remarks about Hasselbring's career. But these letters are immaterial as they are within the limitations period. Moreover, Dean Benbow did not prepare the letters and did not know what the relationship was between the products mentioned and the License. SOADF ¶171-72. Again, Dean Benbow relied

---

[22] SOADF ¶44. A Scholastic Senior Vice President for Product Development explained "we've developed MATH 180 in collaboration with [Hasselbring] and [Goin], leveraging the research base and refining together **the original learning sequences and models from [Hasselbring's] work.**" SOADF ¶40.

on the Conflict of Interest Disclosures to inform her of possible conflicts. SOADF ¶71.

> c) *There are fact questions for trial about whether Vanderbilt should have earlier discovered its claims on System 44 and FASTT Math*

Given the repeated concealments and misrepresentations of key information by Scholastic and Hasselbring, there is are material questions for the jury as to whether the time limit on Vanderbilt's claims for royalties on System 44 and FASTT Math should be tolled, even applying the "inherently undiscoverable" standard. First, Scholastic's contract breaches were difficult for Vanderbilt to detect. Vanderbilt was unaware that System 44 and FASTT Math were derivative of the licensed Materials, in large part because both Scholastic and Hasselbring breached their respective duties to inform Vanderbilt of the relevant facts and later were not forthcoming with the truth when asked. Furthermore, at issue are complicated educational products sold to schools or school districts. Determining whether a product is based on or derived from the licensed Materials is not trivial.[23] And Defendants' and Hasselbring's track record shows that any further inquiries would have been futile.

As for the second factor, Defendants were in a far superior position to comprehend their own breaches and the resulting damage to Vanderbilt. Defendants knew how System 44 and FASTT Math were developed, that Hasselbring was heavily involved, and that the licensed Materials were incorporated into the products. SOADF ¶¶22, 32, 36, 56-57, 110, 115, 189. Vanderbilt, in contrast, had no reason to believe that System 44 or FASTT Math were derivative products, for the reasons discussed above. As for the third factor, Defendants knew that Vanderbilt remained ignorant that it had been wronged. That again was Defendants' goal. Hence

---

[23] Vanderbilt has spent significant resources in discovery on this question, retaining software and educational experts to analyze the products and materials produced in discovery, information Vanderbilt would not have had access to absent litigation.

their concealment of the products' development, in breach of their contractual obligations. In summary, there are at least questions of material fact about the diligence of Vanderbilt and whether the 'inherently undiscoverable' standard has been met, particularly given the repeated misrepresentations and concealments by Hasselbring and Defendants.

Even if the discovery rule does not apply, the doctrine of fraudulent concealment tolls the statutes of limitations. Defendants affirmatively withheld information regarding System 44 and FASTT Math, despite the contractual notice requirement. Vanderbilt, having exercised reasonable care and diligence, could not and did not discover the breach of contract. Defendants knowingly breached the License and injured Vanderbilt by depriving it of royalty payments rightfully owed. There are at minimum factual disputes for each element of fraudulent concealment. Defendants' motion for summary judgment on the contract claims about System 44 and FASTT Math should be denied.

Finally, even if Defendants' version of the facts were true, Vanderbilt would still be entitled to damages for each sale or license of System 44 and FASTT Math since July 2011. As explained above, the License is a royalty contract, including for the Derivative Products, and is a classic example of a severable contract. Each sale of System 44 or FASTT Math obligated Defendants to pay a royalty, and each unpaid royalty triggered a new statute of limitations period. Vanderbilt's damages claim for non-payments of royalties on System 44 and FASTT Math sales since July 28, 2011 is timely.

**B.     There are material questions of fact as to when time began to run on Vanderbilt's trademark claims**

"The Lanham Act does not contain a statute of limitations, so determining whether a Lanham Act claim is time-barred depends upon the defendant's ability to show that the claim is barred by laches." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 584

(6th Cir. 2015) (internal quotations omitted). The Tennessee limitations periods analogous to trademark infringement claims is three years. *Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003). The laches period does not begin to run until "the plaintiff has actual or constructive knowledge of the alleged infringing activity." *Kehoe*, 796 F.3d at 584. If the claim is filed within the laches period, then the claim is presumed to be timely and not barred. *Id*. When Vanderbilt had actual or constructive knowledge of Defendants' infringing use of the Vanderbilt marks is a question of fact. As the material facts are in dispute, summary judgment is inappropriate.

Documents produced in this litigation show that Defendants used the Vanderbilt mark in connection with the sale of a variety of its products. These uses include, *inter alia*, PowerPoint presentations where the Vanderbilt mark is used in connection with iRead (SOADF ¶190) and System 44 (SOADF ¶¶188, 189). The sales process for these products involved a "consulted" technical sale based on interactions between Scholastic/HMH salespeople and school district representatives. Vanderbilt had no feasible way to monitor what slides the salespeople used in their presentations or what they distributed to customers. Vanderbilt did not know about the number or scope of these various uses before Defendants produced the sales presentations in discovery. SOADF ¶¶158, 167-69. This is in large part because *Defendants breached their contractual duty to obtain Vanderbilt's consent before using the Vanderbilt marks*. License § 6.4.

Defendants again try to shield themselves from liability behind the "investigations" of Rousos in 2009 and 2013.[24] But in addition to the fact that the two usages Defendants cite are not of Vanderbilt stylized marks, neither Rousos nor others at the CTTC had any responsibility for policing Vanderbilt's trademarks. SOADF ¶186. Under Tennessee law, a corporation is charged

---

[24] Rousos was not investigating potential trademark infringement.

with constructive knowledge only if the agent acquired said knowledge "while acting in the course of his employment within the scope of authority." *Murphey v. Lattimore, Black, Morgan & Cain*, No. 3:10-CV-00490, 2011 WL 4402960, at *3 (M.D. Tenn. Sept. 20, 2011). Any knowledge that Rousos gained about an instance of usage of the Vanderbilt trademark was outside of the scope of his authority. His personal knowledge, and that of anyone else at the CTTC, who received his email, does not qualify as *Vanderbilt's* knowledge. There is no indication that Vanderbilt knew of Defendant's rampant misuse of the Vanderbilt trademarks to market its various products until after litigation commenced.

Vanderbilt's trademark claim is therefore not barred by laches. At most, Defendants point to disputed facts regarding what various Vanderbilt employees were told or saw, what they gleaned, and whether they acted diligently, which at most creates questions of fact about whether Vanderbilt should have known earlier of the violations. Defendant's motion for summary judgment on the statutes of limitations should be denied.

## II. DEFENDANTS' CONTRACT CONSTRUCTIONS ARE CONTRARY TO THE LICENSE AND THE LAW

### A. The contract and other evidence shows that Vanderbilt is entitled to royalties on the product and service revenue, not just the student software

Defendant argues that royalties should be paid only on some estimated value of the student software, not the overall Read 180 *products sold* or Derivative Products sold, and that service and support revenue arising from the sale, licensing and use of the products should be excluded. Defendants' arguments are contrary to the plain language of the License, the rules of contract interpretation, and the parties' intent. They should be rejected.

#### 1. How Read 180 is sold

To understand the practical effect of this dispute, it is important to understand how Read 180 products are sold and how service and support revenue is added. Defendants sold Read 180

in "stages," and required that customers first purchase an entire stage of Read 180 before they could purchase additional, individual Read 180 items. SOADF ¶257. Each "Stage" of Read 180 included the Read *180* student and teacher software licenses, Read 180 teacher resources, Read 180 teacher training, Read 180 workbooks (e.g. the "rBook", audiobooks, print books, and other software used for implementing Read 180 teaching (Reading Counts, Reading Inventory, and Phonics Inventory). Hamilton Dec. Ex. 27 at VU71783. After customers purchased a stage of Read 180, Defendants encouraged them to buy annual Read 180 technical support services, and monthly Read 180 coaching on how to effectively use Read 180. SOADF ¶256. Additionally, customers who had purchased a stage could buy individual items for additional students, and purchase replacement items as needed. SOADF ¶257.

While all versions of Read 180 include software, the way that Scholastic delivered the software changed over time. Early versions of Read 180 were distributed to customers on CD ROMs and used with a computer/server that would typically be located on site at the school district. SOADF ¶258. Today, Defendants offer Read 180 "hosting" plans to customers. In a "hosting" plan, the Defendants allow customers to use Read 180 software that the Defendants run and maintain on a third-party web server. SOADF ¶266. Customers then pay Defendants a subscription fee to use the hosted Read 180 software. SOADF ¶268. When a customer purchases hosting, the customer no longer has to maintain their own server to use Read 180. SOADF ¶267.

### 2. Defendants' arguments are contrary to the language of the contract and rules of construction

The contract makes clear that royalties are owed on *products*, not just the student software. Section 9.1 provides that Scholastic shall pay "royalties based on the sale or licensing or all *products* using or based on the Materials …." (Emphasis supplied.) Similarly, regarding Derivative Products, Section 6.2 provides that "Vanderbilt shall receive royalties pursuant to

Section 9 … on all software *products* based on or derived from the Materials ….”

Moreover, royalties are paid on "Net Sales." License § 9.1(a). Section 1.7 excludes from Net Sales certain deductions, such as discounts, shipping costs, and credits and returns, that apply to *products* sold or licensed. The remainder of Section 1.7 confirms that royalties are on *products* as a whole, stating "*Products* subject to royalty payments shall be deemed sold when paid for." (Emphasis supplied.) And the term "Literacy Program"—all income from the sale, licensing, or use of which is royalty-bearing under Section 1.7—is defined in Section 1.5 as "including software *products* derived from the Materials or the Software." (emphasis added). Accordingly, Defendants owe royalties on the income they receive from the sale, licensing, or other use of software *products* derived from the Materials or the Software, not just the software portion.

Under New York law, "[c]lear and unambiguous terms should be understood in their plain, ordinary, popular and non-technical meaning." *Lopez v. Fernandito's Antique, Ltd.*, 760 N.Y.S.2d 140, 141 (N.Y. App. Div. 2003); *Wenig v. Glens Falls Indem. Co,* 294 N.Y. 195, 203 (1945) ("The purport and effect of words and acts often depend upon their setting. Words and acts must be given effect in accordance with the meaning which they then convey to reasonable men.") The most applicable definition of "product" in Merriam-Webster is "something (such as a service) that is marketed or sold as a commodity." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/product (last visited Feb. 5, 2021). Applying that definition to the term "product" in the License underscores that royalties are owed on products as a whole, not some undefined portion of the product sold.

Vanderbilt's interpretation is further supported by Section 9.2, which requires Scholastic/HMH to send Vanderbilt an annual statement "showing the number of *products*

subject to the Agreement sold or licensed and the calculation of the *amount of revenue pertaining to each product received by Scholastic* during the preceding annual period *and the amount of royalties, if any, payable to Vanderbilt*." (Emphasis supplied.)

A fundamental flaw in Defendants' argument is that they ask the court to consider only the adjective "software" divorced from the rest of the contract, even divorced from the noun it modifies, *product.* The contract needs to be considered as a whole, and all provisions need to be given meaning. *Galli v. Metz,* 973 F.2d 145, 149 (2d Cir.1992). The License concerns software products and Read 180 is a software product (what Defendants sometimes market as programs[cite]), as are the Derivative Products.[25] If the intent can be discerned from the plain meaning of the contractual language, the court should look no further. *Evans v. Famous Music Corp.*, 1 N.Y.3d 452 (1945).

Moreover, Defendants' argument the royalty obligation is limited to the *software* (in fact, Defendants claim a further baseless limitation, that only *the student* software is royalty-bearing) appears to be an after the fact justification for Defendants' unilateral decision to pay royalties on less than all product revenue. Scholastic's representative testified that the reason why they deducted revenue before calculating Vanderbilt's royalty was to represent the value of the Read 180 CD-ROM/Installer (which includes the software), and the Topic CDs, which Scholastic viewed as representing what was licensed from Vanderbilt. SOADF 262. That encompasses more that the software (and certainly more than the student software). It includes the Topic CDs

---

[25] Scholastic has used the term "software product" consistently with this understanding. Scholastic licensed content from a third party (Mindset Works Inc.) for use in Math 180. SOADF ¶30. The agreement states that "The mSpace book is a component of Scholastic's MATH 180 *software product*." SOADF ¶31. (Emphasis supplied.) Math 180 is defined as a software product and the defined product includes the mSpace book. This is consistent with Vanderbilt's interpretation of the License Agreement in this case—that Read 180 and the Derivative Products are software products and the "product" sold includes the components sold with it.

that are part of the PLL that Vanderbilt licensed to Scholastic, but as with the new argument that royalties should be paid on only the software, the license says nothing about limiting the royalties to the CD-ROM/Installer and the Topic CDs.

Defendants' construction is also contradicted by the definition of "Net Sales," which shows that the royalty obligation broadly covers *all* related income received by Scholastic. Per Section 9.1(a), royalties are paid on the "Net Sales" from any sales or licenses of the Materials or Literacy Program. Section 1.7, in turn, defines 'Net Sales' as "*all income received by* Scholastic from the *sale, licensing or other use* of the Materials or Literacy Program" (less certain deductions and exclusions). And as noted, the term Literacy Program includes "software products derived from the Materials or the Software."

So, putting the contractual definitions together, royalties are owed under the License on *all income received by* Scholastic from the sale, licensing, or other use of, *inter alia,* software products derived from the Materials or the Software." "All income" does not mean just some unilaterally determined portion of income allocated to the software, as Defendants contend. Put another way, the income received is what the customer paid for what it purchased. Defendants' interpretation would render the "all income" statement meaningless or rewrite it to include limitations that are not in the contract. But a contract must not be interpreted so as to render a clause superfluous or meaningless. *Galli,* 973 F.2d at 149. These contract provisions and the principles of contract construction make clear that royalties are owed on all income from the sales of each product as a whole—not just the software portion.

If the parties had intended that Vanderbilt receive royalties on only the software portion, Scholastic knew how to draft a contract that limited the royalty base to specific components. For example, Scholastic entered into a consulting agreement with C.A.S.T., Inc. ("CAST") dated as

of May 1, 1997, for services related to the "'Scholastic Read 180' program (the 'Program').

SOADF ¶25. The parties specifically limited the royalty obligation to only 

(Emphasis supplied.) SOADF ¶¶27-28.

Here, the License contains no such limiting language.[26]

As discussed in Section I.A.2 above, Scholastic's royalty statements did not show the price charged the customer or the revenue received by Scholastic. Rather, the amounts shown in the "Price" column were actually the lower, net number after Scholastic took undisclosed deductions to purportedly estimate the portion of the price attributed to the software. SOADF ¶¶218-219, 221. Scholastic deducted approximately ▮ of the customer's purchase price, so that it paid a royalty on only roughly ▮ of the revenue received for most of the Read 180 products sold through 2015, at which time HMH assumed Scholastic's license obligations. SOADF ¶235.[27] Once HMH took over the calculation of royalties, it took even larger deductions, sometimes paying a royalty on as little as ▮ of the price charged the customer.[28] SOADF ¶237. Significantly, HMH discounted the royalties owed on stages, classroom packs, and bundles of Read 180 by ▮ so it paid a royalty on ▮ of the revenue from those sales. *Id.*

---

[26] Similarly, Scholastic's 2002 consulting agreement with Dr. Hasselbring concerning Read 180 includes a precise definition of what components of Read 180 are royalty bearing— using both the titles and ISBN numbers. SOADF ¶29.

[27] Even on the few sales of only software, Scholastic only reported and paid a royalty on ▮ of the revenue received. SOADF ¶236.

[28] After the audit, HMH began including the percentage of the price that a royalty was paid on in the royalty statements provided to Vanderbilt. But that started after the audit, the year the tolling agreement was executed.

Furthermore, Scholastic and HMH did not pay a royalty on approximately ███ in revenue from some software licenses, specifically from teacher licenses of the software. SOADF ¶277. There is NO support for this exclusion in the License, even under Defendants' strained interpretation.

These deductions by Scholastic and HMH, which they refer to as a 'royalty pool allocation,' are contrary to the contract. When Scholastic or HMH sold a Stage of Read 180, that as noted being the minimum unit every new Read 180 customer is required to purchase, the complete Stage was the product the customer bought and Scholastic received revenue on. Under the License, Scholastic owed a royalty on the revenue received for that product, he Stage, not on some internally calculated fraction of the revenue received.

Had the parties intended for Scholastic to calculate the royalty only after taking the various deductions and exclusions Scholastic and HMH took, the parties would have addressed these terms in the agreement and certainly would have included a reporting requirement for the calculation of what is excluded or deducted. Instead, the License does not discuss "deductions" or "exclusions" at all, and § 9.2 (concerning the Royalty Statements) only requires reporting of the number of products subject to the agreement sold, the revenue for each product, and the amount of royalties. The simple report described in § 9.2 makes sense if but only if Vanderbilt's interpretation of the agreement is correct.

### 3. Vanderbilt is entitled to royalties on Read 180 and Derivative Product service and support revenue

Defendants' brief glosses over the fact that they have generated substantial revenue from charges for service and support of Read 180 after the customers' purchase (or license) of and subsequent use of Read 180, and they have increasingly been receiving revenue from "hosting" the customer's software, instead of selling and delivering the software. This revenue, which

Scholastic sometimes called 'maintenance' revenue, has included coaching and hosting services, and other service and support, and has grown hugely since Scholastic first started selling Read 180. SOADF ¶265. In 2006, the total of such revenue was ███████. SOADF ¶270. By 2015, the service and support revenue accounted for more than ██████████████████████ ████████████████████████████████████████████████. SOADF ¶¶269-70.

One reason for that increase is that the method of delivering the software has evolved in the past 20 years. Just as music used to be delivered by records then CDs and now is delivered by online streaming subscriptions hosted by Apple, etc., Scholastic now sells subscriptions to its customers to access "hosted" software via the Internet. SOADF ¶¶ 266, 268.  But music lovers are still buying the same songs regardless of how they are delivered. So, too, for Defendants' customers—they are still buying the same product, even if they access and pay for it a different way.

The hosting charges, and the service/support (or maintenance) revenue overall, clearly derives from the sale, licensing, and use of the Read 180 software (and thus from the sale, licensing and use of the licensed Materials and Literacy Program). SOADF ¶274. Again, under the License, royalties are owed on "*all income* received by Scholastic from the *sale, licensing or other use of* the Materials or Literacy Program." (Emphasis supplied.) Scholastic would like to read that clause out of the agreement, but that is not allowed by the rules of construction; all provisions must be given meaning. Scholastic and HMH's contractual royalty obligation includes paying royalties on income from hosting, coaching, and other service and support revenue. That revenue flows directly from—and would not be realized in the absence of—the sale or licensing of Read 180 and the customers' use of the software. In fact, the hosting charges now substitute

for sales of the software. At a minimum, there is a question of fact about this issue.

In addition, Defendants argument that Vanderbilt is not entitled to royalties on the Read 180 hosting revenue totally ignores § 6.2 of the License, which provides that "future improvements may result in products different in form, content, or medium." License § 6.2. As noted above, the delivery of the software has changed from selling and the customer using "CD-ROM/Installer," which Scholastic considered a royalty bearing component of the original Read 180 product (SOADF ¶260), to "hosted" versions of Read 180 that the students access using a web browser. SOADF ¶266. As a result, the CD-ROM/Installer has been replaced by a server and internet connection. The form and medium may have changed, but the customers are still buying access to the Read 180 product. This is exactly the kind of change to the "form, content, or medium" that Section 6.2 of the License contemplates. Similarly, Scholastic also configured some versions of Read 180 to be hosted "locally" (i.e., on a server controlled by the school or school district). SOADF ¶258. But, again, this kind of hosting is just another change to the form in which Read 180 is accessed by students and is again analogous to the CD-ROM/Installer system used by original copies of Read 180. This is another reason why Defendants should pay royalties on the "hosted" and "locally" hosted versions of Read 180.[29]

### 4. Parol evidence supports Vanderbilt's interpretation

Finally, if the Court concludes that the agreement is ambiguous or unclear and considers parol evidence, that evidence supports—and certainly does not contradict—Vanderbilt's position. Janis Elsner and attorney Kevin Davis negotiated the License for Vanderbilt and they both testified the intent was for Vanderbilt to be paid on everything but the reading books

---

[29] Defendants separately argue that no royalty is owed on the portion of the Read 180 price that is attributable to Scholastic Reading Inventory (SRI) or Scholastic Reading Counts (SRC). As Defendants' did in their brief, Vanderbilt will address this in a later section.

provided to Scholastic by third parties (which Elsner called "trade books"). SOADF ¶¶10, 11.[30]

Vanderbilt understood that the "trade books" would be carved out, but royalties were to be paid on everything else. SOADF ¶12. Elsner believes she discussed this understanding with Mark Seidenfeld, in-house counsel at Scholastic, who negotiated the License for Scholastic, and his concern was the trade books. SOADF ¶14. Ms. Elsner's testimony about the discussions is unrebutted, as the two Scholastic employees involved in the negotiations, Mark Seidenfeld and Margery Mayer, do not remember any discussions with Vanderbilt about the terms of the License. SOADF ¶15.

Finally, Defendants' reading of the License results in an outcome that was never contemplated by the parties. Specifically, Defendants have taken the position that Vanderbilt is only owed revenue on the initial sale or upgrade of software license, but Defendants sell perpetual licenses to Read 180. SOADF ¶263. Therefore, once a school district has enough licenses to cover their students, they do not need to purchase additional licenses unless the population of students using Read 180 increases. Under Defendant's reading of the contract, the royalties owed to Vanderbilt could decline or fall to zero, no matter how many students are using Read 180 or how much Read 180 revenue Defendants earn. Or Scholastic could give Read 180 student licenses away for a nominal price and charge an increased price for books, teacher materials, etc., and claim little or no royalty is owed. This is clearly not what was intended by the License; it requires royalties on all income from the sale, license or use of products based on or derived from the Materials. And the License does not specify what modality or business model

---

[30] Contrary to Defendants' argument (Dkt No. 304 at 11), Vanderbilt is not claiming royalties on the books written by third parties unrelated to Read 180, the trade books. Vanderbilt's damages expert Christopher Lovin excluded trade books from his damages calculation. (Lovin Report § 6).

Scholastic was to use in commercializing Read 180 during the entirety of the contract term. Rather, it anticipated changes in "form, content, or medium" of the products. License §§ 1.7, 6.2.

### B. A royalty is due for the SRI and SRC products sold with Read 180

Defendants' contention that they do not owe a royalty on sales of Scholastic Reading Counts ("SRC") and Scholastic Reading Inventory ("SRI")[31] because they were developed prior to the License (Dkt No. 304 at 34) is incorrect. SRI was configured to work with and be sold with Read 180; it is part of any overall system offered to customers. SOADF ¶275. Scholastic bundled these programs with Read 180 (see generally Scholastic price list Hamilton Dec. Exhibit 27). For example, the sale of what Scholastic called a Read 180 "Stage" includes SRI and SRC. SOADF ¶272. Had Scholastic not included these programs with Read 180, customers could have used other measures of reading comprehension.[32] Read 180, derived from the licensed Materials, is what drove the sales of the SRI and SRC components. As discussed above royalties are owed on the sale or licensing of the Read 180 products and on *all income* from the sale, licensing, or other use software products based on or derived from the Materials. License §1.7. Under the agreement Vanderbilt is entitled to a royalty when SRI and/or SRC are sold or licensed as part of Read 180.

### C. Defendants' promise to pay royalties on derivative products is enforceable

Defendants argue that the royalty provision in Section 6.2 of the License, covering future products, is an unenforceable "agreement to agree." Defendants' argument is incorrect; the

---

[31] SRI and SRC are programs for measuring a student's Lexile score and reading comprehension. (Hamilton Dec. Ex. 12 at VU081875). After the sale of the Scholastic Educational Technology Division to HMH these programs were renamed HMI and HRC.

[32] The Lexile framework has been used by a wide variety of educational publishers other than Scholastic https://metametricsinc.com/education-companies/lexile-for-reading-and-writing/education-companies-using-lexile/)

clause is sufficiently definite, and the royalty rate can be objectively determined. The clause is enforceable. If, however, the Court disagrees, Vanderbilt should be allowed to pursue a related claim for unjust enrichment. Defendants have benefited for years from the Materials Vanderbilt licensed by selling ███████████████████ of Derivative Products and should not be allowed to escape paying fair compensation to Vanderbilt.

### 1. The royalty provision as to future products in Section 6.2 is enforceable

Where an "agreement to agree" has left a material term, such as price or payment, for future negotiation, the contract may be unenforceable on the basis that the parties have not agreed on all material terms. *See Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08CIV.10578(RJS), 2010 WL 1257326, at *5. But finding a contract indefinite and unenforceable is a "last resort" only taken if the term cannot be "rendered reasonably certain." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.E.2d 203, 206 (1989). To hold parties to their promises, price terms in particular are considered "sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage." *Id.*

In *Piven*, the court recognized that "New York courts have enforced agreements in which a price term was not explicitly stated but was nevertheless determinable from the language of the agreement." 2010 WL 1257326, at *5. The plaintiff sought to enforce a referral agreement with the defendant contingency-fee law firm ("WHAFH"), which had allegedly agreed to pay the

plaintiff "between 10% and 20% of net fees received," depending on listed factors. *Id*. at *2.[33]

Denying WHAFH's motion to dismiss, the court held the agreement was not a "mere 'agreement to agree'" because the parties agreed to the factors for the defendant to calculate plaintiff's referral fees. *Id*. at *6. The predetermined criteria to calculate future payments were sufficiently definite and objective, despite giving one of the parties' discretion to set the amount. *Id*. at *6, 12.

Similarly, in *Barry v. Liddle, O'Connor, Finkelstein & Robinson,* 98 F.3d 36, 37–38 (2d Cir. 1996), the court held that an employment agreement compensation term entitling plaintiff to a "minimum of 50% of pretax revenues" "less full costs" was enforceable. The court rejected the argument that the contract was too indefinite, noting "New York law does not set a high standard for precision." *Id.* at 40.

The *Piven* court cited *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203. In *Cobble* a plaintiff leasing a nursing home sought to enforce an option to purchase the home where no price was set; the New York Department of Health would set the price in accordance with applicable rules and regulations. *Id.*at 204. The court held the price term was sufficiently definite: "[I]t is apparent from the agreement that these parties reposed discretion in the Department to make the price determination, limited only by the requirement that it apply provisions that were suitable, pertinent and appropriate for the task at hand." *Id.* at 207. The court granted specific performance, finding that voiding the agreement would "defeat[ ] the reasonable expectations

---

[33] The factors were "(i) the "multiplier" that WHAFH received on its time; (ii) whether WHAFH received additional clients in the same matter from any other referral source; and (iii) whether WHAFH had a preexisting commitment to pursue a case with a client introduced by another law firm who had agreed to a joint representation with WHAFH." *Piven*, 2010 WL 1257326, at *2.

of the parties in entering into the contract." *Id.* at 208.

Like the agreements in *Piven*, *Cobble Hill*, and *Barry*, the royalty provision for Derivative Products in Section 6.2 is enforceable. Section 6.2 states that "Vanderbilt shall receive royalties pursuant to Section 9 below on all software products based on or derived from the Materials, pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products." There is a ceiling on royalties in the License. Once a cumulative sales threshold is met, the royalty rate is 7%.[34] Since not more than 100% of the licensed Material could be used in a future product "based on or derived from" the Materials, it is clear from the 'pro rata' language of section 6.2 that the royalty for a derivative product would be no greater than 7% and would fall somewhere between zero and the ceiling of 7%, "pro rata," based on "the amount of the Materials incorporated." This approach to anchoring the royalty rate is similar to the fee range of 10-20% enforced in *Piven* and the "minimum of 50%" of revenues enforced in *Barry*. Section 6.2 sets out the mechanism to determine the royalty rate—pro rata, based on "the amount of the Materials incorporated into such products"—which is similar to the list of factors found sufficiently objective in *Piven* and is an "objective standard", even if there is no direct "computational formula." *See Cobble Hill*, 74 N.Y.2d at 483 ("a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula."). Section 6.2 of the License is sufficiently definite and should be enforced.

Defendants' argument that Section 6.2 "reflects only an intent to negotiate a future royalty rate" for Derivative Products (Dkt No. 304, p. 35) misconstrues the agreement. Section

---

[34] Section 9.1(a) states that Vanderbilt will receive ███████████████████████████████████████████████████████████████████████.

6.2 does not contemplate some open-ended negotiation. The *only* factor to be 'agreed on' is the amount of licensed Material in the new product, then the rate is set, pro rata.[35]

The cases cited by Defendants are factually inapposite; in those cases there was no agreed metric for determining the open term and no baseline or ceiling, as there is here. In *Total Telcom Group Corp. v. Kendal on Hudson*, the court found the agreement indefinite due to the lack of *any* price to quantify the relevant fee. 157 A.D.3d 746, 747 (N.Y. Sup. Ct. App. Div. 2d Dep't 2018). In *Joseph Martin, Jr., Delicatessen v. Schumacher*, the court rejected a tenant's attempt to compel a lease renewal where the contract only said the renewal would be "at annual rentals to be agreed upon." 52 N.Y.2d 105, 108 (N.Y. N.Y. Ct. App. 1981). Finally, *Teutul v. Teutul* concerned an option to purchase shares at a "fair market value, as determined by a procedure to be agreed to by the parties." Because no methodology was agreed to and it was a closely-held company,[36] the court found it to be unenforceable. 79 A.D.3d 851, 853 (N.Y. Sup. Ct. App. Div. 2010).

Notably, in the cases Defendants cite, no party had unfairly benefitted from the bargain found unenforceable. In *Joseph Martin,* for example, the commercial tenant sought to compel a lease renewal *going forward.* Here, by contrast, Defendants already have benefitted for years, receiving over ███████ in revenue (SOADF ¶290), from the Derivative Products developed from the licensed Materials.[37] Now, after breaching their duties to inform Vanderbilt of the

---

[35] That the parties might have reached a stalemate on the amount of Material incorporated, if Defendants had complied with their obligation of informing Vanderbilt of the new products and the parties had attempted to determine the rate, is not determinative. "[T]he court may break a stalemate by determining [FMV] itself." *Teutul* v.*Teutul*, 79 A.D. 3d 851, 853 (2d Dep't. 1991).

[36] The court noted that "a price term of 'fair market value' in and of itself may be 'sufficiently precise' in that generally fair market value can be determined objectively." *Teutul*, 79 A.D.3d 851, 852.

[37] Defendants' motion does not contest that claimed Derivative Products (System 44, iRead,

development of the Derivative Products (License § 3.5), Defendants seek to escape their royalty obligation.

"Even where parties explicitly designate a material term 'to be mutually agreed upon in the future' … courts may still find the presence of a binding agreement where 'the parties intend to enter into a binding contractual relationship.'" *H/R Stone, Inc. v Phoenix Business Systems, Inc.*, 660 F. Supp. 351, 356 (S.D.N.Y. 1987). That is the case here; Section 6.2 of the License states "[it] is the *express intent* of the parties that regardless of the form of future improvements or derivative works, Vanderbilt shall receive royalties pursuant to Section 9 below on all software products based on or derived from the Materials, pro rata …." (Emphasis supplied.) As New York's highest court noted in *Cobble Hill*, "to declare this defendant's promise meaningless—thus allowing it to walk away with its property after enjoying the benefits of the bargain—defeats the reasonable expectations of the parties in entering into the contract and is a misuse of the definiteness doctrine." *Id.* at *208.

### 2.    If the Court finds the royalty provision of Section 6.2 is unenforceable, Vanderbilt should be allowed to pursue an unjust enrichment claim

Defendants did not assert unenforceability as an affirmative defense. Dkt Nos. 115, 116. Vanderbilt initially included a count for unjust enrichment. Dkt No. 85, pp. 54. The Court granted Defendants' motion to dismiss that claim on the basis of copyright preemption. Part of the Court's analysis was that recovery on a theory of unjust enrichment is premised upon whether there is "*no* existing, enforceable contract between the parties covering the same subject matter" whereas here the parties have entered into the License. Dkt No. 106, pp. 44, 45.

---

FASTT Math, Math 180) are based on or derived from the licensed Materials; Defendants' argument is that the royalty term is unenforceable.

But if the Court accepts Defendants' belated defense that Section 6.2 is unenforceable, there will be no "enforceable contract … covering the same subject matter." *Id.* In that event, Vanderbilt's unjust enrichment claim should be allowed to proceed as to the later-developed products. As held in *Piven*¸ 2010 WL 1257326, at *5 n. 6, in cases where the defendant disputes the existence of a valid, enforceable contract, the plaintiff should be permitted to proceed on both contractual and quasi-contractual theories. *See Missigman v. USI Ne., Inc.,* 131 F. Supp. 2d 495, 513-14 (S.D.N.Y.2001).

### D. Defendants' motion regarding its failure to pay royalties on Canadian sales and its arbitrary deductions for shipping expense should be denied

Defendants motion regarding its failure to pay royalties on Canadian sales and its arbitrary deductions for shipping expense should be denied. The first reason these arguments should be rejected is that Defendants have failed to support them with any citation to evidence (or barely any argument). Dkt No. 304 at 37. And as to one, Scholastic admits it breached the contract in their argument!

Regarding the first argument, the license required Scholastic to pay royalties on sales of Read 180 on foreign sales, which of course includes Canada. License §§ 5, 9.1(b). And Scholastic admits it sold Read 180 in Canada and has not paid royalties and offers no excuse. Dkt No. 304 at 37 ("Scholastic concedes that Vanderbilt was not paid royalties on its Canadian sales.") Based on that admission, the Court should enter summary judgement sua sponte in favor of Vanderbilt on this issue. At minimum, Defendants' motion should be denied.

As for shipping and handling, Scholastic was entitled to deduce actual shipping and handling *costs*. SOADF ¶278. But Scholastic did not do that. Instead, Scholastic deducted an arbitrary amount of ▇▇ per product, and cannot provide actual expenses. SOADF ¶¶279, 280. The agreement does not allow for Scholastic to deduct an arbitrary, fixed amount. At a

minimum, the validity of Scholastic's arbitrary deduction is a factual question for the jury.

## III. DEFENDANTS' ARGUMENT THAT VANDERBILT HAS NO EVIDENCE OF DAMAGES CONCERNING THE DERIVATIVE PRODUCTS IS INCORRECT

Defendants are correct that damages are a required element of a case for breach of contract, but their motion confuses questions of *causation* with the *calculation* of the damages.[38] What Vanderbilt must show regarding damages for breach of contract are: (1) that the breach caused damages ("causation") and (2) that those damages are sufficiently ascertainable to support a jury verdict for those damages ("calculation"). *Franconero v. Universal Music Corp.*, No. 02 CIV.1963(BSJ), 2011 WL 566794, at *5 (S.D.N.Y. Feb. 11, 2011). Vanderbilt can show both.

On the first point, Defendants ignore the fact that causation as to Vanderbilt's contract damages is clearly established. Defendants have not challenged in their motion Vanderbilt's allegation that they developed products based on or derived from the licensed Materials in addition to Read 180, specifically System 44, FASTT Math, iRead, and Math 180 (the "Derivative Products"). And the contractual damages for doing so and not paying a royalty are, as discussed above, fairly well-defined in the License: a royalty that is some portion of the maximum of 7%, pro rata, based on the amount of licensed Materials used in the Derivative Products. License §§ 6.2, 9.1.a. Vanderbilt's asserted damages, *unpaid contractual royalties*, are directly caused by Defendants' breach; this is not a case of consequential or speculative damages.

---

[38] Vanderbilt objects to Defendants' argument that Vanderbilt has no competent evidence of damages as to the Derivative Products. (Dkt No. 304 at 36). Defendants had a combined limit of 50 pages for their summary judgment brief and have exceeded it in this argument, without seeking leave, by incorporating argument from their separate Daubert motion. *Id.* Vanderbilt submits that this argument should be denied for that reason alone.

The cases Defendants cite are therefore inapposite, as they focus on causation. In *Scentsational Technologies, LLC v. Pepsico, Inc.*, No. 13 Civ. 8645, 2018 WL 2465370 (S.D.N.Y. May 23, 2018), *aff'd* 773 F. App'x 607 (Fed. Cir. 2019), the plaintiff ("ST") brought claims for trade secret misappropriation and breach of contract alleging that Pepsi's disclosure of its trade secrets after wrongfully obtaining them caused a third party, Coca-Cola, to terminate a project with ST and caused $70 million in lost profits. The court granted summary judgment to the defendants principally because ST failed to prove *causation*: it was too speculative that the contemplated project with Coca-Cola would have ever been commercialized. *Id.* at *4, 5, 7, 8, 10. "No reasonable juror could conclude that [IP] issues proximately caused Coke's termination of [the] Project." *Id.* at 8. Holding that "the claim for $73 million is unsupported speculation" because the posited commercialization was so uncertain that "damages built on an undiscounted view of certain, successful, and global commercialization cannot withstand scrutiny," the court equated the $73 million damages claim to "a lottery ticket." *Id.* at *9. That is far different from the case here. Defendants here have already commercialized the products and received the revenue on which Vanderbilt is owed a royalty. Both causation, for purposes of this motion, and the revenues at issue are clearly established.

*Franconero v. Universal Music Corp.*, No. 02 Civ. 1963, 2011 WL 566794 (S.D.N.Y. 2011), also cited by Defendants, is similarly inapposite. The plaintiff singer sued Universal Music ("UMG") for breach of contract for including her records on compilation albums with songs from other artists without her consent. After ruling that a later agreement barred her claim (*Id.* at *3), the court ruled that even if the later agreement was not a bar, there is no evidence the plaintiff suffered any damages as a result of the alleged breach. The court rejected the plaintiff's damages expert's report because he posited the damages should be *all the revenue* UMG

received from coupled uses, when New York law bars disgorgement as a remedy for contract breach. *Id.* at \*4. The court then rejected an affidavit offered by the plaintiff's expert to oppose summary judgment because it was procedurally improper and *there was no proof of causation* as to the new damages theory offered. *Id.* at \*5-6. Again, here Vanderbilt has no difficulty proving that the Defendants' breach caused Vanderbilt damages and there no claim for speculative disgorgement.[39] (Notably, the *Franconero* court denied UMG's motion for summary judgment on the plaintiff's claim for underpaid royalties. *Id.* at \*7.)[40]

Regarding the second factor, the amount of damages, "[i]t is well settled that once a plaintiff has proved that it is more probable than not that he has been damaged, plaintiff need only show the amount of his damages with reasonable certainty." *W. L. Hailey & Co. v. Niagara County*, 388 F.2d 746, 753-54 (2d Cir. 1967), The court stated:

'When it is certain that damages have been caused by a breach of contract, and the only uncertainty is to their amount, there can rarely be good reason for refusing on account of such uncertainty any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain. "

---

[39] Under New York law, the proof requirements are much more stringent with respect to damages for loss of goodwill, business reputation or future profits, not the kind of damages Vanderbilt is seeking. *ESPN, Inc.,* 76 F. Supp. 2d at 418, *citing Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 781–782 (2d Cir.1994).

[40] The third case Defendants cite, *Cramer v. Spada*, 203 A.D.2d 739 (3d Dep't 1994), also turned on the failure to prove causation. The plaintiff sued the defendants—lawyers who had represented the plaintiff in selling shares of a company in exchange for a promissory note—for malpractice for not making the plaintiff a secured creditor after the note debtor defaulted and went bankrupt. The court held that, even if the plaintiff were a secured creditor, he would not have shared in the debtor's assets in bankruptcy because they were totally consumed in satisfying higher-priority liens. Therefore, the plaintiff suffered no cognizable damages. *Id.* at 740.

39

*Id.*[41]

Vanderbilt can make that showing here. As discussed, the License provides for a royalty on the sales or licensing of the Derivative Products, pro rata, based on the amount of licensed Material included in the new product. License § 6.2. Vanderbilt's educational expert, Dr. Timothy Shanahan, has addressed the amount of the licensed Materials used in the Derivative Products.[42] Specifically, Dr. Shanahan has identified what he opines are the key features of the Peabody Learning Lab licensed to Defendants, as described in Exhibit A to the License. Then he has examined each of the Derivative Products and determined how many of the key features are present in each of those products. For example, he opines that *all* the 13 features he identified as the key features of the licensed Peabody Learning Lab (the "PLL") are incorporated into System 44. SOADF 285. Defendants' pedagogical expert, Dr. Cynthia Okolo, agreed with that assessment. SOADF ¶286.

Defendants' statement that Dr. Shanahan said he did not perform a pro rata analysis is incorrect. What Defendants are mainly referring to is Dr. Shanahan's testimony that he did not attempt to weigh what proportion of a Derivative Product consist of the key features of the PLL. But that is a different question than determining how much of the licensed Materials, or using Dr. Shanahan's benchmark, how many of what he found to be the key features of the PLL, are present in each of the Derivative Products. Defendants' argument is based on a misunderstanding

---

[41] The burden of uncertainty as to the number of damages is upon the wrongdoer. *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, No. 88-CV-819, WL 121726 at * 34 (N.D.N.Y. May 23, 1992), citing *Lamborn v. Dittmer*, 873 F.2d 522, 532–33 (2d Cir.1989).

[42] Vanderbilt's software expert has also done an assessment of how much of the functionality of the licensed PLL software appears on the Derivative Products. Defendants' damages expert has used that analysis rather than Dr. Shanahan's analysis for her calculation of royalties due to Vanderbilt for the Derivative Products. SOADF ¶289.

of Section 6.2 of the License. The pro rata calculation described in Section 6.2 is based on "the amount of the Materials incorporated into such products." It is **not** based on how much of the functionality or how many of the features of the derivative product are based on the licensed Materials.[43]

In his initial report, Vanderbilt's damages expert, Mr. Lovin, opined the royalties for the Derivative Products could be *up to* 7% (the maximum rate in the License), and showed the calculation of the maximum damages for each Derivative product for each Defendant at that rate. (Contrary to Defendants' argument, Lovin did **not** opine that the royalty rate for damages **is** 7%.) SOADF ¶287. In his response report to Defendants' damages expert, Lovin calculates the royalty based on Dr. Shanahan's pro rata analysis of how many of the key features of the PLL are present in each Derivative Product. SOADF ¶288. Defendants have asked the Court to exclude Lovin's response report. As addressed in other briefing, Vanderbilt submits that his response report should be allowed, but if it is not, the jury can do the same math themselves, based on Dr. Shanahan's analysis or perhaps other evidence. Dr. Shanahan's testimony is a sufficient basis for the jury to award 7% royalties on System 44 sales.[44]

In that regard, damages for breach of contract can be established without a damages expert. *Abraham v. Leigh*, 471 F. Supp.3d 540, 556 (S.D.N.Y. 2020) (noting if the plaintiff established a contract breach and her testimony was credible, the jury could award reliance

---

[43] See Vanderbilt's response to Defendants SOMF ¶ 155. Defendants' damages expert makes the same error of trying to re-write the contract language in her damages analysis by instead basing her analysis on an "overlap ratio" not contemplated by Section 6.2 of the Agreement. SOADF ¶289.

[44] This simple calculation requires only that the jury multiply the fraction of the licensed features used in each derivative product by the 7% royalty rate found in the license agreement to determine pro-rata rate for each derivative product. The jury could also multiply the damages for each product in Lovin's original report by the fraction of the licensed features used in each derivative product.

damages based upon her testimony alone, without even supporting documents); *W. L. Hailey & Co. v. Niagara County*, 388 F.2d 746, 753-54 (2d Cir. 1967) (upholding portions of subcontractor's damages claim based on testimony of president, including attributing expenses to each claim without documentation, but remanding others); *George A. Fuller Co. v. Kensington-Johnson Corp.*, 234 A.D.2d 265, 266-67 (2d Div. 1996) (rejecting counterclaim plaintiff's expert's damages calculation of over $4.5 million and awarding $1.7 million based on other evidence). Even if this court excludes portions of Vanderbilt's damages expert's reports, there is still sufficient evidence in the record for the jury reasonably estimate Vanderbilt's royalty damages.

Defendants will no doubt quibble that Dr. Shanahan did not evaluate whether every iota of the licensed Material was included in each Derivative Product. But damages do not have to be precise. "Evidence that, as a matter of just and reasonable inference, shows the existence of damages and the extent thereof will suffice, even though the result is only an approximation." *Trans World Airlines, Inc. v. 47th Street Photo, Inc.,* 751 F. Supp. 439, 440 (S.D.N.Y.1990). Moreover, "[f]lexibility in permitting proof of damages is particularly appropriate where … it is the defendant's allegedly wrongful conduct that frustrates more precise calculations." *Lamborn v. Dittmer*, 873 F.2d 522, 533 (2d Cir.1989). That principle applies here. If Defendants had not breached their contractual duty to inform Vanderbilt of the development of derivative products at the time, the parties would not be in this posture now, years later. A rate could have been established at the time, as contemplated under Section 6.2.

## IV. VANDERBILT'S TRADEMARK CLAIMS PRESENT TRIABLE ISSUES

Defendants' trademark summary judgment motion asks the Court to rule, as a matter of law, that a party can break its contractual promise not to use a licensor's federally registered trademark without prior authorization, ignore the licensor's express refusal to authorize such use,

and then claim without support that its unauthorized use was not made "in a trademark sense" even though it caused a likelihood of confusion. Defendants' motion should be denied.

### A.     Vanderbilt's claim for trademark infringement involves questions of fact

The 6th Circuit considers eight factors to determine whether there is a likelihood of confusion: (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100 (6th Cir. 2012). "Factual findings must be made with respect to [these] likelihood of confusion factors." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F. 2d 1100, 1107 (6th Cir. 1991). And while the ultimate likelihood of confusion determination is a legal conclusion, "[e]ach case presents its own complex set of circumstances and not all of these factors . . . may be particularly helpful in any given case." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). Thus, trial courts disfavor deciding trademark cases in summary judgments because the ultimate issue is so inherently factual." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 733 (6th Cir. 2012).

### B.     The relevant factors establish a likelihood of confusion

Defendants admit that Vanderbilt's trademarks are strong. "The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Vanderbilt's trademarks are distinctive and very well recognized, and Defendants correctly admit this factor. (Dkt. 304, p. 44). The Vanderbilt marks identify a leading, national research university (e.g., https://www.usnews.com/best-colleges/rankings/national-universities; Vanderbilt recently ranked 14th in U.S.), and the Peabody College's special education program

is consistently ranked either first or second in the country. SOADF ¶195. The Vanderbilt trademarks symbolize that extraordinary goodwill and reputation; their considerable strength weighs heavily in favor of a likelihood of confusion.

### C. Defendants intended to benefit from an affiliation with Vanderbilt, the top special education program in the country

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111. Direct evidence of intentional copying is not necessary; rather, the mere use of an infringing mark "with knowledge of the protected mark at issue can support a finding of intentional copying." *Daddy's Junky Music Stores*, 109 F.3d at 286.

Here, Defendants sought to benefit from the strength of the Vanderbilt trademarks from the very beginning.  The License unambiguously required Vanderbilt's prior approval: "The use of Vanderbilt's name and trademark rights in that name shall be subject to Vanderbilt's approval." License §§ 6.4, 16.2. In 1998, Scholastic, recognizing the benefit of affiliating its upcoming educational product with the powerful Vanderbilt trademarks, requested to name what became "Read 180" as "The Vanderbilt Intervention Program." Consistent with its policy against using a Vanderbilt mark to endorse a third-party commercial product, Vanderbilt refused, stating: "Vanderbilt, as a rule, does not permit another party to use the University's name in the manner you have proposed…." SOADF ¶179. Despite that denial, both Scholastic and HMH proceeded to use the Vanderbilt marks on multiple products without ever obtaining, or even requesting, prior approval. SOADF ¶¶181, 183. Scholastic's initial request reflected its knowledge of Vanderbilt's strong trademark rights. That knowledge, when combined with Vanderbilt's initial denial and Defendants' later unauthorized uses without even seeking prior approval, constitutes compelling evidence of Defendants' bad faith.

Defendants contend that their use was made in good faith to identify Prof. Hasselbring as an employee of Vanderbilt, and not to "trade on Vanderbilt's goodwill."[45] That excuse fails, first, because Defendants' use caused confusion as shown by the Ezell study. Defendants' excuse furthermore begs the question: if all Defendants sought to do was to inform of Prof. Hasselbring's employer, why use both Vanderbilt's name and logo? Such information could have been provided in text in a footnote. Instead, Defendants routinely displayed both the Vanderbilt name and logo. Defendants recognized the strength and sought to benefit from the power of the Vanderbilt marks. While the remaining factors likewise support a likelihood of confusion, the strength of the marks and Defendants' intent, standing alone, preclude summary judgment for Defendants. *Homeowners Grp., Inc.*, 931 F.2d at 1111.; *General Motors Corp. v. Keystone Auto Index, Inc.* 453 F. 351, 357 (6th Cir. 2006).

### 1. Defendants' use of Vanderbilt's exact trademarks caused confusion

Similarity of the marks is a factor of considerable weight. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997). Use of an identical mark on competitive goods are "open and shut" and do not require "protracted litigation to determine liability for trademark infringement." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1191 (6th Cir. 1988). Here, Defendants used Vanderbilt's *exact trademarks*—both the Vanderbilt name and logo. Defendants even went so far as to use a discontinued Vanderbilt logo. SOADF ¶182. When asked how they came to possess the Vanderbilt marks for reproduction, Defendants professed ignorance. SOADF ¶198. The Defendants have no explanation for their unauthorized copying and use of the identical Vanderbilt marks.

---

[45] Defendants overstate the Court's findings on their motion to dismiss. The Court expressly recognized that infringement may exist where a mark is used "in such a manner that goes beyond mere identification" of a professor's place of employment. Dkt. 106, pp. 14-17.

Unable to explain away their copying, Defendants argue that their use was made "in a non-trademark way." That assertion is false, as shown by at least the use of Vanderbilt's logo. But also, it is well established that a non-trademark use is one that does not cause consumer confusion. *See Hensley Mfg. v. ProPride, Inc.*, 579 F. 3d 603, 610 (6th Cir. 2009); *Sazerac Brans, LLC v. Peristyle, LLC*, 892 F 687, 6959-6 (6th Cir. 2018). Here, as shown by the Ezell study, the Defendants' use caused confusion and therefore is not a "non-trademark use." Applying recognized and accepted survey techniques, the Ezell survey establishes that a significant number of respondents, 29%, were in fact confused by Defendants' unauthorized use of the exact Vanderbilt marks. That level of confusion is probative. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 535 (S.D.N.Y. 2011) (net confusion results of 27.8% and 22.5% support a finding of likelihood of confusion.). The Ezell survey is evidence of actual respondents from the subject universe, educational professionals who purchase programs for their districts and schools, who were confused by Defendants' use of the Vanderbilt name and logo. Defendants' use of the Vanderbilt name and logo is not a "non-trademark use" because it confused relevant purchasers into the mistaken belief that Vanderbilt had sponsored or endorsed or was in some way connected with the Defendants' products. *See Ferrari S.P.A. v. Roberts*, 944 F 2d 1235, 1245 (6th Cir. 1991) (evidence of actual confusion is not limited to purchasers and "the survey evidence in this case showed that member of the public . . . were actually confused by the similarity of the products."); *accord Innovation Ventures, LLC v N2G Distrib., Inc*., 763 F. 3d 524, 536 (6th Cir 2014). Defendants use of the Vanderbilt name and logo did much more than merely inform potential purchasers that Dr. Hasselbring worked at Vanderbilt, it caused confusion.

Defendants next argue that their use of identical Vanderbilt trademarks is irrelevant

because this is an association case, and their uses of the Vanderbilt name and logos appeared

alongside Defendants' marks. However, the cases Defendants rely on are dissimilar and

unpersuasive; the defendants in those cases did not use the plaintiffs' exact trademarks.

*AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795-96 (6th Cir. 2004) ("AutoZone" as compared

to "PowerZone"); *Therma-Scan, Inc. v. Thermoscan*, Inc., 295 F.3d 623, 633-34 (6th Cir. 2002)

("THERMA-SCAN" as compared to "THERMOSCAN"). And he disputed marks in the cited

cases were product marks that appeared next to house marks. Here, respondents in the Ezell

study were expressly told that the product was provided by Scholastic (i.e., the house mark) and

respondents were still confused. SOADF ¶192. In other words, not only are the cases cited by

Defendants inapplicable, but Vanderbilt's trademarks are also so strong that people were still

confused despite being told that the product was provided by Scholastic.

## 2. The parties offer closely related goods and services pertaining to special education

The Sixth Circuit recognizes three general categories of cases when analyzing the

relatedness of the services or goods:

> (1) direct competition of services, in which case confusion is likely if the marks are
> sufficiently similar; (2) services are somewhat related but not competitive, so that
> likelihood of confusion may or may not result depending on other factors; and (3)
> services are totally unrelated, in which case confusion is unlikely.

*Homeowners Grp., Inc.*, 931 F.2d at 1108. Defendants only acknowledge the first category and

argue that there is no confusion likely because Vanderbilt does not sell competing products.

Defendants miss the point. Defendants unauthorized use of the Vanderbilt trademarks utilized

Vanderbilt's goodwill to enhance the credibility of their educational programs. Defendants made

it appear that Vanderbilt in some way endorsed or was connected with their products when

Vanderbilt was not. Read 180 and some Derivative Products are aimed at students struggling

with reading or math. Vanderbilt's Peabody College, consistently ranked as one of the top two

47

special education programs in the nation, offers undergraduate, graduate, and professional degree programs targeted towards special education and the needs of such children, and Peabody promotes its programs and services to the school districts that comprise Defendants' customers. SOADF ¶¶195-96. Even absent "direct competition," use of the Vanderbilt name and logo in connection with a special education product such as those offered by the Defendants creates an undeniable relationship between the top special education program in the nation and the special education programs sold by Defendants. The fact that Read 180 was developed from the PLL created at Peabody demonstrates that close relationship.  Even if the parties' respective goods and services are deemed "somewhat related," which they at minimum are, the relatedness of the goods and services still weighs in favor of a likelihood of confusion. *See Maker's Mark Distillery, Inc. v Diageo N. Am, Inc.*, 679 F.3d 410, 423 (6th Cir 2012).

### 3. Vanderbilt and Defendants ultimately market their goods and services to the same types of customers

If the parties have the same customers and market their goods and services in similar ways, then the likelihood of confusion increases. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002). The sole case cited by Defendants is inapposite. Therma-Scan involved two companies with different customer bases and no similar marketing approaches. Id. at 637. Here, professional educators are the customers of both Vanderbilt and the Defendants. SOAD ¶196. Current or future professional educators purchase services from Vanderbilt in the form of undergraduate, graduate, and professional programs (including special education programs). Those same professional educators become purchasers of Scholastic and HMH products for their schools or districts. Although not every such educator would have attended Vanderbilt, the number of Vanderbilt graduates that work as educators is substantial. SOADF ¶193. And other educators may be presumed to be aware of Vanderbilt's remarkable reputation,

especially in the field of special education.

### 4. Sophisticated purchasers can be confused

Defendants argue that the customers here are sophisticated and that a presumed resulting greater amount of purchaser care will diminish the likelihood of confusion. But when there is a high degree of similarity between the two marks at issue, the significance of this factor "decreases considerably." *Thermascon*, 295 F. 3d at 638. because "confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the [product] that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party." *Daddy's Junky Music Stores*, 109 F.3d at 286. Purchasers here, while sophisticated, would have no reason to think that Vanderbilt did not explicitly or implicitly endorse the Defendants' products. There is no indication that extra research by a potential customer would clear up the confusion caused by Defendants' infringing use of Vanderbilt's trademarks. Therefore, it is irrelevant whether the purchasers were sophisticated or exercised greater care, and this factor should be afforded no weight.

### 5. There is evidence of actual confusion here and Vanderbilt will continue to be harmed by such confusion

While the Defendants rely heavily on an alleged lack of actual confusion, the Sixth Circuit has made it clear that "[d]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Daddy's Junky Music Stores*, 109 F.3d at 284. Thus, even if Defendants were correct that there was no evidence of actual confusion, that would not be significant. But here, the Ezell study is evidence of actual confusion. *See Ferrari S.P.A. v. Roberts*, 944 F 2d at 1245; *Innovation Ventures, LLC v N2G Distrib., Inc*., 763 F. 3d 524, 536 (6th Cir 2014). And Vanderbilt continues to do cutting edge research and to commercialize that research, when and as appropriate. It is and continues to be Vanderbilt policy not to allow third

party commercial vendors to use the Vanderbilt name and marks in association with such products, especially where they overlap with Vanderbilt's educational mission. Vanderbilt's trademark policy preserves its academic integrity and independence. SOADF ¶199.

If a third party can break its promise to obtain prior approval and use the Vanderbilt name and marks in a way that is likely to confuse even sophisticated purchasers into believing that Vanderbilt is affiliated with a given product when it is not, Vanderbilt loses control over its own marks and such actual confusion will continue. Considering all of the relevant factors, Defendants' motion for trademark summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Respectfully submitted,

/s/ *John W. Harbin*
John W. Harbin (*pro hac vice*)
(Georgia Bar #324130)
Mary Katherine Bates (*pro hac vice*)
(Georgia Bar #384052)
Meunier Carlin & Curfman LLC
999 Peachtree Street NE, Suite 1300
Atlanta, Georgia 30309
(404) 645-7700
jharbin@mcciplaw.com
kbates@mcciplaw.com

Paige W. Mills #016218
Audrey J. Anderson #031910
Mary Leigh Pirtle #026659
Ashleigh Karnell #036074
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-6200
pmills@bassberry.com
audrey.anderson@bassberry.com
mpirtle@bassberry.com

ashleigh.karnell@bassberry.com

*Attorneys for Plaintiff Vanderbilt University*

## CERTIFICATE OF SERVICE

I certify that on _____ by filing with the Court's ECF system, I caused to be served a true and accurate copy of **Plaintiffs' Response Brief MTE**, on the following:

Caren Decter (*pro hac vice*)
Edward H. Rosenthal (*pro hac vice*)
Viviane K. Scott (*pro hac vice*)
Frankfurt, Kurnit, Klein & Selz, P.C
28 Liberty Street
    New York, NY 10005
(212) 826-5524
    cdecter@fkks.com
erosenthal@fkks.com vscott@fkks.com

Nicole Bergstrom (*pro hac vice*)
Frankfurt, Kurnit, Klein & Selz, PC
28 Liberty Street, 35th Floor
New York, NY 10005
(212) 705-4858
nbergstrom@fkks.com

    Thor Y. Urness, #13641
    Kimberly M. Ingram #35191
    Bradley Arant Boult Cummings LLP
1600 Division Street, Suite 700
    Nashville, TN 37203-0025
    (615) 244-2582
    turness@bradley.com
    kingram@bradley.com

*Attorneys for Defendant Scholastic Inc.*

Benjamin E. Marks (*pro hac vice*)
David J. Lender (*pro hac vice*)
Jessica Falk (*pro hac vice*)
Sara Lonks (*pro hac vice*)
Taylor Dougherty (*pro hac vice*)
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
benjamin.marks@weil.com
david.lender@weil.com
jessica.falk@weil.com
sara.lonks@weil.com
taylor.doughrty@weil.com

Michael G. Abelow, #26710
Sherrard Roe Voight & Harbison, PLC
150 Third Avenue South
Suite 1100
Nashville, TN 37201
(615) 742-4532
mabelow@srvhlaw.com

*Attorneys for Defendant Houghton Mifflin Harcourt Publishing Company*

    Aubrey B. Harwell, Jr., #2559
    Thomas H. Dundon, #4539
    Erik C. Lybeck, #35233
    Neal & Harwell, PLC
    1201 Demonbreun Street, Suite 1000
    Nashville, TN 37203
    (615) 244-1713
    aharwell@nealharwell.com
tdundon@nealharwell.com
elybeck@nealharwell.com

*Attorneys for Defendant Ted S. Hasselbring*

*/s/ John W. Harbin*
    John W. Harbin