**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:18-cv-00046** |
| | ) | |
| **SCHOLASTIC, INC.;** | ) | |
| **HOUGHTON MIFFLIN HARCOURT** | ) | |
| **PUBLISHING COMPANY; and** | ) | |
| **TED S. HASSELBRING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

In the hit television series, Shark Tank, investor Kevin O'Leary, a.k.a. "Mr. Wonderful," is partial to deals structured with royalties.[1] Royalties are payments made over a period of time, sometimes in perpetuity, based on someone's licensure of intellectual property. Most entrepreneurs who appear on the show are wary of the potential headaches caused by such a deal. The parties' deal in this case may be an example of why.

Vanderbilt University brought this action against one of its long-time professors, Ted S. Hasselbring, along with publishers Scholastic, Inc. and Houghton Mifflin Harcourt Publishing Company, alleging underpaid royalties for a special education technology product that Vanderbilt claims was its intellectual property.

Pending before the Court are three, fully briefed motions for summary judgment: (1) one by individual Defendant Hasselbring pertaining to Vanderbilt's remaining claims against him

---

[1] For a more detailed discussion of O'Leary's affection for royalties, see Taylor Locke, *Kevin O'Leary on negotiating: 'The very best deals are when you feel you left something on the table'*, CNBC, https://www.cnbc.com/2020/10/29/kevin-oleary-how-to-make-the-best-deals-when-negotiating.html (last visited May 26, 2021).

(Doc. Nos. 295, 297, 298, 333, 336, 340, 353, 354); (2) one by corporate defendants Scholastic and Houghton Mifflin Harcourt ("the Corporate Defendants") pertaining to Vanderbilt's remaining claims against them (Doc. Nos. 296, 304, 307, 337, 344, 345, 360, 362-1); and (3) one by Vanderbilt pertaining to Defendant Scholastic's two remaining counterclaims against it (Doc. Nos. 303, 305, 306, 326, 327, 355, 356). For the following reasons, Hasselbring's Motion for Summary Judgment, (Doc. No. 295), will be denied; Scholastic and Houghton Mifflin's Joint Motion for Summary Judgment, (Doc. No. 296), will be granted in part and denied in part; and Vanderbilt's Motion for Summary Judgment, (Doc. No. 303), will be granted in part and denied in part. The Court will dismiss Vanderbilt's claim for Declaratory Judgment (Count 2), Vanderbilt's claim for Tortious Interference (Count 7), and Scholastic's Counterclaim for Unjust Enrichment. The remaining claims will proceed to trial.

## I. FACTUAL OVERVIEW[2]

Briefing on the pending motions exceeds 750 pages, including the various statements of facts and responses thereto. Exhibits appended to the briefings add another several hundred pages. Therefore, to provide an overview to the arguments addressed below, the Court will begin by summarizing the factual allegations. The Court will expand upon the allegations, where appropriate, to analyze the claims more fully below.

Dr. Hasselbring is Professor of Special Education, Emeritus at Vanderbilt University. He became one of the nation's foremost experts in the field of special education and gained a reputation for developing technology to assist students with learning disabilities. (Doc. No. 345 ¶ 1; see also Doc. No. 304 at 4). In 1984, Hasselbring became the Associate Director, and eventually

---

[2] The Court draws the undisputed facts of this case from the parties' Summary Judgment briefings (Doc. Nos. 297, 304, 305, 326, 333, 337, 353, 355, 360) along with the parties' various responses to the respective Statements of Facts filed contemporaneously with those briefings (Doc. Nos. 327, 336, 345, 354, 356, 362-1).

co-director, of Vanderbilt's Learning Technology Center. (Doc. No. 345 ¶ 4). In that role, he played a crucial part in creating the Peabody Middle School Literacy Program along with consultant Laura Goin. The program was aimed at helping middle school students with reading difficulties. (Id. ¶ 8). Initial testing of the program showed promise, and it drew the attention of Scholastic, Inc., one of the world's leading providers of print and digital education programs. (Doc. No. 305 at 3; see also Doc. No. 116 at 3).

In 1997, Vanderbilt and Scholastic entered into a License Agreement ("the License"). (Doc. No. 345 ¶ 30). Under the License, Vanderbilt conveyed the rights to the Peabody Middle School Literacy Program software in exchange for royalties on certain products derived from that software. Scholastic then used the software as a prototype to develop a program it later branded as Read 180. (Doc. No.345 ¶ 32). Scholastic hired Hasselbring as a consultant to assist with the development of Read 180. (Doc. No. 345 at ¶ 57). Read 180 became wildly successful, and at one point in time was the most profitable license in the history of Vanderbilt University. (Doc. No. 345 ¶ 72).

Capitalizing on the success of Read 180, Scholastic developed additional products, including FASTT Math, System 44, iRead, and Math 180 ("the Other Scholastic Products"). (Doc. No. 245 at ¶ 62). Scholastic retained Hasselbring to assist with these ventures as well. In 2014, Scholastic sold its educational technology business, and assigned the License, along with Hasselbring's consulting agreements, to Defendant Houghton Mifflin Harcourt Publishing Company. (Doc. No. 345 at ¶¶ 124–26).

In January 2016, Vanderbilt exercised its contractual right under the License to an audit. (Doc. No. 345 at ¶ 150). Vanderbilt claims that the audit uncovered several License breaches by Hasselbring and the Corporate Defendants, including an underpayment in royalties for: (1) the

3

Read 180 program; and (2) the Other Scholastic Products that Hasselbring helped develop, and, as a result, incorporated Vanderbilt's intellectual property. The parties signed a tolling agreement on July 28, 2017, (Doc. No. 345 at ¶ 152), and on January 16, 2018, Vanderbilt commenced this action. (See Doc. No. 1). On July 15, 2019, the Court dismissed several claims brought by Vanderbilt (See Doc. No. 106). Accordingly, the following claims remain: (1) breach of contract in violation of New York law as to the Corporate Defendants (Count 1); (2) a claim for a declaratory judgment of ownership interest in the "Other Scholastic Products" (Count 2); (3) infringement of federally-registered trademarks by the Corporate Defendants (Count 3); (4) breach of contract in violation of Tennessee law as to Hasselbring (Count 5); (5) breach of duty of loyalty in violation of Tennessee law as to Hasselbring (Count 6); (6) tortious interference with contract in violation of Tennessee law as to the Corporate Defendants (Count 7); and (7) fraud as to Hasselbring (Count 9). (See id.).

Scholastic also brought a counterclaim against Vanderbilt, the remaining claims of which include: (1) breach of the implied duty of good faith and fair dealing; and (2) unjust enrichment because of Scholastic's alleged overpayment of royalties for Read 180 from 2011-2015. (Doc. No. 305 at 1; see also Doc. No. 178).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Griffith v. Franklin Cty., 975 F.3d 554, 566 (6th Cir. 2020) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over

4

material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. HASSELBRING'S MOTION FOR SUMMARY JUDGMENT

Hasselbring argues that summary judgment should be granted in his favor on the three remaining claims against him: (1) breach of contract in violation of Tennessee law (Count 5); (2) breach of duty of loyalty in violation of Tennessee law (Count 6); and (3) fraud (Count 9). (See Doc. No. 106).

By way of additional background, Hasselbring notes that Vanderbilt's remaining claims all rely on the same factual presuppositions: 1) Hasselbring created certain intellectual property while a Vanderbilt professor; 2) that intellectual property belonged to Vanderbilt under the terms of the respective Technology policies; 3) Hasselbring conveyed that intellectual property to Scholastic; 4) Scholastic incorporated that intellectual property into various learning products; and 5) Scholastic paid Hasselbring a royalty in return for this contribution of Vanderbilt's intellectual property. (See Doc. No 297 at 19–20). Vanderbilt thus seeks 60% of all royalties Hasselbring

5

received directly from the Corporate Defendants, which is the percent of the proceeds it would be entitled to for the commercialization of Vanderbilt's intellectual property under the terms of Vanderbilt's Technology policy. (See Doc. No. 297 at 20).

Hasselbring argues that he is entitled to summary judgment on all claims for two reasons: (1) nearly all of Vanderbilt's claims are time-barred; and (2) he did not convey intellectual property to any Scholastic program. Vanderbilt counters that: (1) genuine disputes of material fact exist as to whether Hasselbring conveyed intellectual property to Scholastic; (2) genuine disputes of fact exist as to whether the statute of limitations was tolled; and (3) regardless of whether Hasselbring conveyed intellectual property, he breached his duty of loyalty to, and committed fraud on, Vanderbilt, causing harm. The Court will discuss each claim in turn.

A. Timeliness

As an initial matter, Hasselbring argues that most of Vanderbilt's claims are time-barred. (Doc. No. 297 at 23–25).[3] In Tennessee, the relevant statutes of limitations are three (3) years for fraud and breach of duty of loyalty and six (6) years for breach of contract.[4] See Tenn. Code Ann. §§ 28-3-105; 28-3-109. Here, Vanderbilt filed the instant action on January 16, 2018, (see Doc. No. 1). Hasselbring thus argues that claims are time-barred if Vanderbilt knew or should have known of its claims against Hasselbring on or before January 16, 2015 for fraud and duty of loyalty claims and January 16, 2012 for a breach of contract claim. (See Doc. No. 297 at 23).

But, as will also be discussed in greater detail in Section III.D infra, the Court finds that

---

[3]     The Court notes that Hasselbring raises his timeliness arguments last; however, the Court discusses them first for ease of analysis.

[4]     As each party acknowledges, the statute of limitations issues in this case are procedural rather than substantive for choice of law purposes; as such, Tennessee law applies. See Cole v. Mileti, 133 F.3d 433, 437 (6th Cir. 1998); (see also Doc. Nos. 304 at 14 n. 5, 337 at 2).

6

genuine disputes of material fact exist as to when Vanderbilt became aware of the claims and whether Hasselbring fraudulently concealed his transfer of intellectual property. Each may well toll the statutes of limitations here. Summary judgment is not appropriate where there is "at least a genuine issue of material fact as to when [a party] became aware, or should have become aware, of [the injury]. . . ." Coate v. Montgomery County, No. 99-6123, 234 F.3d 1267 (Table), 2000 WL 1648131, at *4 (6th Cir. 2000) (citing Agristor Financial Corporation v. Van Sickle, 967 F.2d 233, 240 (6th Cir. 1992)); see also Ott v. Midland-Ross Corp., 600 F.2d 24, 30 (6th Cir. 1979).

Here, the parties disagree as to when Vanderbilt was placed on notice of the potential claims. Hasselbring argues that Vanderbilt learned of the injuries through Peter Rousos, senior staffer of the Center for Technology, Transfer and Commercialization ("CTTC"), the organization tasked with protecting Vanderbilt's intellectual property. Hasselbring argues that Rousos opted to "close" an investigation into Hasselbring regarding any intellectual property issues, despite the fact that his consulting might have, in Vanderbilt's own words, been "a bit more substantive than [Hasselbring] characterized it." (Doc. No. 297 at 24–25). Hasselbring argues Rousos's decision suggests that Vanderbilt knew of, and then ultimately ignored, any potential violations. (Id.). Vanderbilt counters that a reasonable jury could find that Rousos reasonably believed Hasselbring's continued assurances that he was not "involved as [a] . . . consultant . . . (or entitled to receive royalties from) a business that . . . has a contractual relationship with Vanderbilt." (Doc. No. 354 ¶¶ 23–25; see also Doc. No. 336-36 at 17).

The Court finds that these disputes of fact would be sufficient to trigger the discovery rule. As discussed more fully in Section IV.B.I infra, Tennessee courts have increasingly recognized the rule for breach of contract actions, which "tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury

7

has been sustained." <u>Pero's Steak and Spaghetti House v. Lee</u>, 90 S.W.3d 614, 621 (Tenn. 2002). And "the time at which a plaintiff discovers or reasonably should discover a cause of action is typically a question of fact for the trier of fact to decide." <u>Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.</u>, 93 F. Supp. 3d 835, 846 (M.D. Tenn. 2015). Here, the Court notes that there is a genuine issue of material fact as to when Vanderbilt knew or should have known about the potential violations. Such issues are best left for a jury. <u>See</u> <u>Agristor</u>, 967 F.3d at 240 (finding that where there is a genuine dispute of material fact as to whether a party "knew or should have known of the alleged fraud," summary judgment is inappropriate).

Having found a genuine factual dispute on the issue of timeliness, the Court will next turn to the merits of each claim.

### B. Breach of Contract

Hasselbring also argues that there was no breach of any employment contract, and that Vanderbilt is not entitled to any royalties, because he did not convey any intellectual property to the Corporate Defendants (<u>See</u> Doc. No. 297 at 19–20). Hasselbring contends that because he did not contribute any intellectual property to any of the products at issue, his conduct did not cause any damages and he is entitled to summary judgment on all remaining claims. (Doc. No. 297 at 23).

To establish a claim for breach of contract in Tennessee, a plaintiff must prove: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of contract, and (3) damages caused by a breach of contract." <u>BancorpSouth Bank, Inc. v. Hatchel</u>, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006); <u>see also</u> <u>Life Care Ctrs. Of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.</u>, 79 F.3d 496, 514 (6th Cir. 1996) (reciting the elements for a breach of contract claim under Tennessee law). Here, the parties do not dispute the existence of an

enforceable contract, namely Vanderbilt's Technology Policy (Doc. No. 336-7). Rather, the dispute is over whether Hasselbring breached that contract by conveying intellectual property, and thus whether there were resulting damages. (See Doc. Nos. 297 at 19–23; 333 at 1, 14).

Hasselbring maintains that Vanderbilt points merely to "suspicious facts," rather than any evidence of actual intellectual property conveyed to the Corporate Defendants or the products at issue. (Doc. No. 353 at 1–2). He argues that the royalty payments for his work on the Read 180 product were not related to his conveying of intellectual property, but were instead geared toward consulting work and aimed "to motivate [him] to stay involved in the marketing and to consult on the further development of Read 180, not as compensation for providing new intellectual property." (Doc. No. 297 at 20 (citing Doc. No. 297-13 at 6–7)). With respect to the Other Scholastic Products, Hasselbring makes similar arguments. For example, he contends that Vanderbilt cannot claim royalties on the FASTT Math product because it has not identified any intellectual property contribution to it aside from "the alleged similarities between [it] and the Peabody Learning Lab." (Doc. No. 297 at 21). Instead, Hasselbring contends, he "began incorporating many of the techniques that make up the FASTT Model into software before he even came to Vanderbilt." (Id. at 22). And with respect to the System 44, iRead, and Math 180 products, he "merely responded to work being done by Scholastic and did not contribute any of Vanderbilt's intellectual property to the creation of these products." (Doc. No. 297 at 22–23).

Vanderbilt counters that several facts are in dispute that show Hasselbring did indeed convey intellectual property to the Corporate Defendants. (Doc. No. 333 at 1). Specifically, Vanderbilt argues the record evidence sufficiently establishes "that Hasselbring contributed to and was involved with" the products at issue. (Doc. No. 336 ¶ 74 (citing Doc. No. 336-20 at 2)). For example, Vanderbilt's own expert testified that he understood Hasselbring to be "involved with"

9

various products at issue. (Doc. No. 336-20 at 2). And Hasselbring transferred all rights he had in the original Peabody Learning Lab, on which the Read 180 product was based, to Vanderbilt (Doc. No. 354 ¶ 34). Vanderbilt also disputes whether Hasselbring's licensure of various Other Scholastic Products, such as FASTT Math, were valid, as "Hasselbring and Goin did not own the FASTT Model and Scholastic had contractually agreed in the License Agreement that it would not contract with Hasselbring in violation of Vanderbilt policies." (Doc. No. 336 ¶ 52). Vanderbilt further claims that Hasselbring contributed intellectual property to System 44, Math 180, and iRead because the record evidence establishes, or at least is in dispute as to, whether he was the "chief scientist" for System 44, (Doc. Nos. 336 ¶ 81, 354 ¶ 81); whether he "worked non-stop on the design for the new Math 180 program," (Doc. No. 336 ¶ 83); and whether Scholastic required Hasselbring to approve iRead's program design, (Doc. No. 354 ¶ 90).

After reviewing the record in the light most favorable to Vanderbilt, the Court finds that a reasonable juror could conclude that Hasselbring contributed intellectual property to the Corporate Defendants and products at issue. The record evidence creates a genuine dispute of material fact as to whether the significant royalty payments to Hasselbring, particularly for the Read 180 product, were for mere consulting work or for more substantive assistance. Hasselbring himself admits that the Corporate Defendants "amended the 2005 consulting contract on Read 180 to increase the amount of royalties Hasselbring could earn by a factor of four—from $1 million to $4 million." (Doc. No. 354 ¶ 72). At the very least, such a drastic increase signals a dispute of material fact as to the conveyance of intellectual property versus consulting work. The record evidence also creates a genuine dispute of material fact as to whether Hasselbring developed Other Scholastic Products during, rather than before, his tenure at Vanderbilt. By way of example, the record

evidence reflects that Vanderbilt arguably obtained the grant through which Hasselbring developed concepts for products such as FASTT Math (See Doc. Nos. 336 ¶ 17, 354 ¶ 43).

In sum, having extensively reviewed the record in the light most favorable to Vanderbilt, the Court finds that Hasselbring is not entitled to summary judgment on Vanderbilt's breach of contract claim because there are genuine disputes of material fact as to whether Hasselbring conveyed intellectual property to the Corporate Defendants.

C. <u>Breach of Duty of Loyalty</u>

As with Vanderbilt's contract claim, Hasselbring argues he is entitled to summary judgment on Vanderbilt's breach of duty of loyalty claim because he did not convey any intellectual property to the Corporate Defendants. (Doc. No. 297 at 23). Under Tennessee law, "an employee owes his employer a fiduciary duty of loyalty." <u>Williams-Sonoma Direct, Inc. v. Arhaus, LLC</u>, 304 F.R.D. 520, 529 (W.D. Tenn. 2015). As part of that duty, "[a]n employee must act solely for the benefit of the employer in matters within the scope of his employment," and "[t]he employee must not engage in conduct that is adverse to the employer's interests." <u>Id.</u> (quoting <u>Efird v. Clinic of Plastic & Reconstructive Surgery, P.A.</u>, 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003)).

Hasselbring argues that he did not convey intellectual property, and therefore, did not act counter to Vanderbilt's interests. (<u>See</u> Doc. No. 297 at 23). The Court need not recite Hasselbring's arguments from Section III.A *supra* on these points. Instead, the Court will incorporate that discussion as if set forth herein and will turn to the evidence presented in support of Vanderbilt's counterarguments to determine whether it, as with the breach of contract claim, establishes a genuine dispute of material fact that precludes summary judgment.

11

In its response brief, Vanderbilt argues that Hasselbring "took actions adverse to the employer's interest" by agreeing to several non-compete provisions as well as failing to disclose his various consulting contracts. (Doc. No. 333 at 18 (citing GCA Services Group, Inc. v. Parcou, LLC, 2017 WL 5496564, at *16 (W.D. Tenn. Oct. 3, 2017))). Vanderbilt offers record evidence that, between 2007 and 2015, Hasselbring answered "No" to a conflict of interest disclosure form inquiring whether he was "involved as [a] . . . consultant . . . (or entitled to receive royalties from) a business that . . . has a contractual relationship with Vanderbilt." (Doc. No. 354 ¶¶ 23–25; see also Doc. No. 336-36 at 17). Hasselbring himself admits that in 2016, he informed the Office of Conflict of Interest that the only contract he had with Houghton Mifflin Harcourt was on an "event-by-event basis," despite having received royalties on various consulting contracts. (Doc. No. 354 ¶ 108).

Hasselbring attempts to explain away this record evidence by suggesting he: "checked the wrong box," (see Doc. No. 297 at 17–18); that he properly divulged his consulting work in his curriculum vitae and other documentation, (see Doc. No. 354 at 16; see also Doc. No. 297-37); and that Vanderbilt was aware of his work with the Corporate Defendants, (Doc. No. 297 at 24–25). The Court is not persuaded by these arguments because there is disputed evidence from which the jury could find for Vanderbilt on the duty of loyalty claim. See Vraney v. Medical Specialty Clinic, P.C., No. W2012-02144-COA-R3-CV, 2013 WL 4806902, at *10 (Tenn. Ct. App. Sep. 9, 2013). Where questions of fact exist and a party fails "to establish an indisputable breach that would make submission to a jury inappropriate," summary judgment is not an option. GCA Services Group, Inc. v. Parcou, LLC, No. 2:16-cv-02251-SHL-cgc, 2017 WL 5496564, at *16 (W.D. Tenn. Oct. 3, 2017).

12

Thus, upon reviewing the record evidence in the light most favorable to Vanderbilt, the Court finds that a reasonable juror could conclude that Hasselbring did "engage in conduct that is adverse" to Vanderbilt's interests. Williams-Sonoma Direct, Inc., 304 F.R.D. at 529. Accordingly, the Court finds that Hasselbring is not entitled to summary judgment on Vanderbilt's breach of duty of loyalty claim because, as with Vanderbilt's contract claim, there are genuine disputes of material fact as to whether Hasselbring acted adversely to Vanderbilt's interests by conveying intellectual property.

D. Fraud

Last, Hasselbring argues he is entitled to summary judgment on Vanderbilt's fraud claim. As with Vanderbilt's other claims, Hasselbring argues he did not convey any intellectual property to the Corporate Defendants and therefore did not commit fraud. (See Doc. No. 297 at 17). To establish fraud in Tennessee, a party must show: "(1) the defendant made a representation of existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation." Dixon v. Producers Agric. Ins. Co., 198 F. Supp. 3d 832, 837 (M.D. Tenn. 2016) (citing Walker v. Sunrise Pontiac—GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008)). Tennessee also recognizes fraudulent concealment as an additional theory of fraud, which involves "acts, statements or omissions that entail as an attribute of fraud, conduct which reasonably can be expected to influence the conduct of others." Kincaid v. S. Tr. Bank, 221 S.W.3d 32, 39 (Tenn. Ct. App. 2006) (internal quotations omitted).

Vanderbilt argues that "Hasselbring made false statements through his [conflict of interest] Disclosure Forms and that Vanderbilt relied on those statements." (Doc. No. 333 at 21 (citing Doc.

No. 354 ¶¶ 19–25)). Hasselbring rebuts that because the undisputed facts show he did not convey any intellectual property, any fraud claim "can only survive if [his] supposed failure to disclose his consulting prevented Vanderbilt from learning that the Other Scholastic Products existed and were potentially based on or derived from the Peabody Learning Lab." (Doc. No. 353 at 5) (internal quotations omitted). Hasselbring also contends that Vanderbilt was aware of these allegedly "derived" products for years. (See Doc. No. 353 at 5–6). As discussed above, Hasselbring again notes that Peter Rousos, senior staffer of the CTTC, opted to "close" an investigation into Hasselbring regarding any intellectual property issues, even though his consulting might have, in Vanderbilt's own words, been "a bit more substantive than [Hasselbring] characterized it." (Doc. No. 297 at 24–25).

But after reviewing the record evidence in the light most favorable to Vanderbilt, the Court concludes that a genuine dispute of material fact again exists regarding whether Hasselbring undertook fraudulent behavior. Hasselbring himself admits that he answered in the negative as to whether he was "involved as [a] . . . consultant . . . (or entitled to receive royalties from) a business that . . . has a contractual relationship with Vanderbilt." (Doc. No. 354 ¶¶ 23–25; see also Doc. No. 336-36 at 17). And because the Court has already found there was a dispute of material fact as to whether Hasselbring conveyed intellectual property to the Corporate Defendants, the Court also concludes that a dispute of fact exists as to whether Hasselbring knowingly made this potentially false representation and whether Vanderbilt, in turn, relied on such a representation. A reasonable juror could so find.

Accordingly, Hasselbring's claim for summary judgment on Vanderbilt's fraud claim is not warranted. All three of Vanderbilt's individual claims against Hasselbring will therefore proceed to trial.

## IV. CORPORATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Corporate Defendants argue that summary judgment should be granted in their favor on the remaining claims against them: (1) breach of contract in violation of New York law (Count 1); (2) Claim for Declaratory Judgment of Ownership Interest in the Ancillary Products (Count 2); (3) Infringement of Federally-Registered Trademarks (Count 3); and (4) Tortious Interference with Contract in Violation of Tennessee law (Count 7). (See Doc. No. 106). Specifically, the Corporate Defendants argue that they are entitled to summary judgment on these claims because: (1) most of Vanderbilt's claims are time-barred, and, alternatively, that (2) each claim fails as a matter of law. The Court will now turn to each claim, first addressing any timeliness issues before addressing the merits.

### A. Abandoned Claims

As an initial matter, the Court finds that Vanderbilt has forfeited certain claims by failing to address them in its response to the Corporate Defendants' Motion for Summary Judgment. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013) (citing Hicks v. Concorde Career Coll., 449 F. App'x 484, 487 (6th Cir. 2011)). In its response, Vanderbilt has failed to address its Declaratory Judgment or Tortious Interference claims. (See Doc. No. 360 at 1 (citing Campbell v. Hines, No. 12 Civ. 4329, 2013 WL 7899224, at *4 (6th Cir. Aug. 8, 2013))). Accordingly, the Court will grant summary judgment for the Corporate Defendants on Vanderbilt's Declaratory Judgment claim (Count 2) and its Tortious Interference Claim (Count 7).

15

B. <u>Breach of Contract Claim</u>

Vanderbilt argues that the Corporate Defendants' breached the License Agreement[5] by underpaying royalties on the Read 180 product as well as on two derivative products, the System 44 and FASTT Math products. (Doc. No. 337 at 2). The Corporate Defendants contend that these claims are time-barred. Vanderbilt counters that there is a genuine issue of fact as to whether the limitations period was tolled on its breach of contract claims, and at worst, Vanderbilt argues that the underpayments should be limited to claims after 2011, which is 6 years before the parties executed the July 2017 tolling agreement (Doc. No. 337 at 2–3).

1. Timeliness

The Corporate Defendants begin by arguing that Vanderbilt's contractual claims regarding the Other Scholastic Products, including System 44 and FASTT Math are barred in full, while its contractual claim for Read 180 is at least "barred to the extent they seek recovery for sales that predate the six-year limitations period." (Doc. No. 304 at 14). The Corporate Defendants also argue that Vanderbilt's trademark infringement claim is fully time-barred. (<u>Id.</u> at 14). Vanderbilt disagrees and maintains that its claims are timely because it relied upon Hasselbring's assurances that he had no consulting agreements with Scholastic on the derivative products and Vanderbilt did not know it was owed royalties because Scholastic breached its contractual obligation to inform Vanderbilt it was developing said products. (Doc. No. 337 at 1–2).

All claims for alleged underpayment of royalties prior to July 28, 2011 would be time-barred unless an exception applies, such as either the discovery rule or fraudulent concealment doctrine. In Tennessee, the statute of limitations for a breach of contract claim is six (6) years. <u>See</u>

---

[5]     The parties agree that New York law applies to the License Agreement. <u>See</u> Doc. No. 304 at 14 n. 5.

Tenn. Code Ann. § 28-3-109(a)(3).[6] The Discovery Rule is an "equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." Smith v. Hauck, 469 S.W.3d 564, 569 (Tenn. Ct. App. 2015).

The Court notes, however, that the law on the discovery rule in breach of contract cases remains unsettled in Tennessee. The Tennessee Supreme Court has not yet adopted the discovery rule for breach of contract actions. See Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc., 566 S.W.3d 671, 708–09 (Tenn. 2019). Yet, the prevailing trend in the appellate courts has been to apply the rule. See Goot v. Metro Gov't of Nashville & Davidson Cnty., No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005). In those cases, the statute of limitations is tolled until "the plaintiff knew or should have known that the contract had been breached." Goot, 2005 WL 3031638, at *11. Many courts that have chosen to apply the discovery rule to breach of contract claims have also done so under a heightened standard, where the alleged breach was "inherently undiscoverable." Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc., 566 S.W.3d 671, 714 (Tenn. 2019). Under this heightened standard, the injured party must be "unlikely to discover the wrong during the limitations period despite due diligence," and "must be unknown to the plaintiff because of their very nature [rather than] because of any fault of the plaintiff." Goot, 2005 WL 3031638, at *11 n. 31.

Regarding the Read 180 product, Vanderbilt argues that the Corporate Defendants underpaid royalties owed dating back to the year 2000. The Corporate Defendants counter in

---

[6]     As discussed in footnote 4, *supra*, the statute of limitations issues in this case are procedural rather than substantive for choice of law purposes; as such, Tennessee law applies. See Cole v. Mileti, 133 F.3d 433, 437 (6th Cir. 1998); (see also Doc. Nos. 304 at 14 n. 5, 337 at 2).

similar fashion to Hasselbring's argument, as discussed in Section III.A, *supra*: the claim is time-barred because it falls outside the six-year statute of limitations and was not "inherently undiscoverable." (Doc. No. 304 at 19 (citing Individual Healthcare, 566 S.W.3d at 714)). Alternatively, the Corporate Defendants argue that the claim is "at a minimum time-barred prior to July 28, 2011," six years before the date of the tolling agreement signed by the parties. (Doc. No. 304 at 17 (citing Individual Healthcare, 566 S.W.3d at 715) ("damages resulting from . . . underpayment before . . . six years prior to filing suit[] must be dismissed as untimely")). Vanderbilt counters there is a question of fact as to whether it knew or should have known of the alleged royalty underpayments. (See Doc. No. 337 at 5); see also City State Bank v. Dean Witter Reynolds, Inc., 948 S.W.2d 728, 735 (Tenn. Ct. App. 1996) (noting that "the question of whether a plaintiff knew or should have known that a cause of action existed is a question of fact, inappropriate for summary judgment"); see also Sherrill v. Souder, 325 S.W.3d 584, 596–97 (Tenn. 2010). Vanderbilt then reasons that reasonable jurors could therefore find that "Scholastic hid its underpayments behind false royalty reports." (Doc. No. 337 at 5). According to Vanderbilt, Scholastic "secretly reduced the revenue base by about 31% before reporting the price associated with the royalty rate, thereby paying royalties on "only 69% of the revenue from product sales." (Doc. No. 337 at 5–6 (citing Doc. No. 344 ¶ 235)). Vanderbilt also argues that the record shows that Scholastic "excluded some products and service revenue from the reports and royalty calculation. (Id. (citing Doc. No. 344 ¶ 239)). Thus, Vanderbilt argues that there is evidence for a jury to find that it could not have known Scholastic was underpaying Vanderbilt because the calculations were not disclosed until after the 2017 audit. (Doc. No. 337 at 6 (citing Doc. No. 334 ¶¶ 223,  231–32)).

Having reviewed the facts in the light most favorable to Vanderbilt, the Court concludes

that, because genuine issues of fact exist as to when Vanderbilt knew or should have known of the underpayments, summary judgment on the issue of timeliness is not warranted. See Allied Waste, 93 F. Supp. 3d at 846. Moreover, because there is supporting evidence here, the issue of whether "the plaintiff exercises reasonable care and diligence in discovering a compensable injury within the period of limitations is a question of fact for the jury where different inferences may be drawn from the proof." Id. (citing Gosnell v. Ashland Chemical, Inc., 674 S.W.2d 737 (Tenn. App. 1984)).[7]

Regarding the System 44 and FASTT Math products, Vanderbilt contends that the royalty underpayments breached Section 6.2 of the License, which states: "[i]t is the express intent of the parties that regardless of the form of future improvements or derivative works, Vanderbilt shall receive royalties . . . on all software products based on or derived from the [licensed] Materials, pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products." (Doc. No. 311-3 § 6.2). The Corporate Defendants contend that Vanderbilt's claims are time-barred because it "has long known about [System 44 and FASTT Math] and Hasselbring's role in their development . . . ." (Doc. No. 304 at 15). According to the Corporate Defendants, the record shows that Vanderbilt investigated whether it was due royalty payments for these products in 2009 but took no action (Doc. No. 304 at 16; see also Doc. No. 345 ¶¶ 93-105).

Vanderbilt contends that, irrespective of its internal investigation, there are material fact issues as to whether its breach of contract claims for royalties on the Other Scholastic Products are timely (Doc. No 337 at 10). Specifically, Vanderbilt relies upon evidence that shows the Corporate

---

[7]     The Court notes that the record evidence, taken in the light most favorable to Vanderbilt, would also support the "inherently undiscoverable" standard, were it to apply. See Individual Healthcare, 566 S.W.3d at 713–714.

Defendants hid relevant information, in violation of a duty to inform pursuant to the License, § 3.5, about the development of the Derivative Products. (Doc. No. 337 at 10 (citing Doc. No. 344 ¶ 149). Vanderbilt again relies upon evidence that Hasselbring misrepresented information on these products, in violation of his duty to report under relevant Vanderbilt policies. (Doc. No. 337 at 11 (citing Doc. No. 344 ¶¶ 73, 79–80, 99, 101–25, 132, 137)). Vanderbilt finally argues, as discussed in Section III.A *supra*, that it relied upon Hasselbring's misrepresentations, despite the investigation by Rousos and his colleagues. (Doc. No. 337 at 12, 14). Indeed, Hasselbring replied to Rousos in 2013 that he "had almost nothing to do with Math 180," among other representations. (Doc. No. 344 ¶ 63).

Having reviewed the record in the light most favorable to Vanderbilt, the non-moving party, the Court again finds that a genuine issue of material fact exists on this issue, and that a reasonable juror could find that Defendants withheld relevant royalty and disclosure information despite Vanderbilt's internal investigation. Whether Vanderbilt and Rousos were reasonably diligent in investigating potential misdeeds will be determined at trial by the jury. See Allied Waste, 93 F. Supp. 3d at 846.

Accordingly, the Court finds that the Corporate Defendants are not entitled to summary judgment on the breach of contract claim for timeliness reasons.

## 2. Merits

The Court turns next to the merits of Vanderbilt's breach of contract claim. The Corporate Defendants argue that Vanderbilt's contract claims fail as a matter of law because: (1) the undisputed evidence establishes Vanderbilt is not entitled to royalties; (2) Vanderbilt has no contractual claim for royalties on products other than READ 180 because Section 6.2 of the License is an unenforceable agreement to agree; and (3) Vanderbilt has no evidence of damages

concerning the "Other Scholastic Products." (Doc. No. 304 at 25–37). "Under New York law, a breach of contract claim requires (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farliegh Int'l Ltd., 483 F. Supp. 3d 195, 209 (S.D.N.Y. 2020) (internal citations and quotations omitted).

For ease of analysis, the Court begins with the Corporate Defendants' argument that Section 6.2 of the License constitutes an unenforceable agreement to agree. (Doc. No. 304 at 34). Section 6.2 provides that if Scholastic developed other "'software products based on or derived from the Materials,' the royalties for any such software products would be determined 'pro rata, pursuant to the future mutual assent of the parties as to the amount of the Materials incorporated into such products.'" (Doc. No. 311-3 § 6.2). Contracts may be found unenforceable where there is no price term. See Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P., No. 08CIV.10578(RJS), 2010 WL 1257326, at *5 (S.D.N.Y. Mar. 12, 2010). But courts only make this finding as a "last resort" where the missing term cannot be "rendered reasonably certain." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 548 N.E.2d 203, 206 (N.Y. 1989). Courts have thus found price terms "sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage." Cobble Hill, 548 N.E.2d at 206.

Here, the Corporate Defendants argue that Section 6.2 is, as a matter of law, not an enforceable promise because it was not sufficiently certain or specific. (Doc. No. 304 at 34 (citing Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher, 52 N.Y. 2d 105, 109 (1981))). The Corporate Defendants clarify that should the Court find the provision unenforceable, such a finding would

not nullify the rest of the contract (Doc. No. 304 at 35 n. 12 (citing Nutley v. SkyDive the Ranch, 65 A.D.3d 443, 444 (N.Y. App. Div. 1st Dep't 2009))). Vanderbilt counters that the Section 6.2's promise to pay is enforceable and sufficiently definite (Doc. No. 337 at 30–31). "[A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula." Cobble Hill, 548 N.E.2d at 206. "Where at the time of the agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties." Id. And to determine the amount, courts may look to the agreement's reference to "an extrinsic event, commercial practice or trade usage." Id. (citing Metro-Goldwyn-Mayer, Inc. v. Scheider, 40 N.Y.2d 1069, 1070–71 (N.Y. 1976)).

In the agreement at issue, of which there is no evidence suggesting the parties failed to manifest "their intent to be bound," there are clear terms that reflect the parties' intent for the Court to objectively determine the amount "without the need for new expressions." Id. For example, Section 9.1 caps the royalty payments at 5% "of the Net Sales from such sales or licenses until such time as cumulative Gross Sales from such products total $15 million." (Doc. No. 311-3 § 9.1(a)). After that point, the License caps the royalties at 7% of Net Sales into perpetuity. Id. The Court finds this language constitutes an "unmistakable intent that price was to be fixed" by a percentage of Net Sales. Cobble Hill, 548 N.E.2d at 207. Such a benchmark "provide[s] an objective standard without the need for further expressions by the parties." (Id.) (internal citations omitted). Accordingly, the Court rejects the Corporate Defendants' argument that Section 6.2 is an unenforceable agreement to agree.

The Corporate Defendants' next argument does not dispute the enforceability of the License Agreement; instead, it challenges the parties' intent regarding royalty payments owed to

22

Vanderbilt. (Doc. No. 304 at 25). "Under New York law, '[t]he cardinal principle for the construction and interpretation of contracts is that the intentions of the parties should control.'" Two Locks, Inc. v. Kellogg Sales Co., 68 F. Supp. 3d 317, 328 (E.D.N.Y. 2014) (citing Roswell Capital Partners LLC v. Alternative Const. Technologies, No. CIV. 10647(DLC), 2009 WL 497578, at *2 (S.D.N.Y. Feb. 27, 2009)). To divine the parties' intent, "a court should look first within the 'four corners' of the document' and should give effect to the 'plain and ordinary' meaning of its language." Id. (internal quotations omitted); see also Muze, Inc. v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 128 n. 9 (S.D.N.Y. 2000).

Here, the Corporate Defendants argue that various plain terms under the License show no entitlement to royalties. (Doc. No. 304 at 25–26). Under the License, the Corporate Defendants sold the software developed from the Peabody Middle School Literacy Program (Doc. No. 304 at 26 (citing Doc. No. 307 ¶¶ 34, 129)). Since then, the Corporate Defendants argue they have "offered various services to Read 180 customers, including teacher training, web hosting, and cloud storage," to which Vanderbilt has neither contributed nor assisted in development. (Doc. No. 304 at 26 (citing Doc. No. 307 ¶¶ 41, 43, 56, 130, 134)). The Corporate Defendants first point to Section 9.1 of the License, which outlines royalties to be paid, providing that Vanderbilt is entitled to a certain percentage of "Net Sales" for "all sales or licenses of the Materials or the Literacy Program." (Doc. No. 311-3 § 9.1). According to the Corporate Defendants, neither the terms Materials nor the Literacy Program, as defined in the License, include these various other services offered to Read 180 customers. (See Doc. No. 304 at 27–29 (citing Doc. No. 311-3 §§ 1.1, 1.4, 1.5, 1.6)). The Corporate Defendants next reference Sections 2.2, 6.2, and 10.2, as those sections' definitions make plain "that both Vanderbilt and [Corporate Defendants] understood" the Materials and Literacy Program as not including the various other services offered to Read 180

23

customers (See Doc. No. 304 at 29–30).

Vanderbilt counters that the License's plain terms show its entitlement to royalties on the entire product and its other services. (Doc. No. 337 at 21). Vanderbilt relies upon Section 1.7 of the License, which, it argues, confirms royalties are on entire products because it states, "[p]roducts subject to royalty payments shall be deemed sold when paid for." (Doc. No. 337 at 22). Vanderbilt also argues that Section 9.1 provides that royalties will be paid "based on the sale or licensing or all *products* using or based on the Materials . . . ." (Id. at 21) (emphasis supplied). Moreover, Vanderbilt contends that Section 6.2 supports its claim, specifically the provision that "Vanderbilt shall receive royalties pursuant to Section 9 . . . on all software products based on or derived from the Materials . . . ." (Doc. No. 337 at 21–22).

Having reviewed the contract's plain terms, the Court agrees with Vanderbilt. "In ascertaining the purpose or intent of the parties, 'lest form swallow substance, [the] goal must be to accord the words of the contract their fair and reasonable meaning.'" Two Locks, Inc., 68 F. Supp. 3d at 328 (citing Sutton v. East River Sav. Bank, 435 N.E.2d 1075 (N.Y. 1982)). The Court finds that several sections support a finding that Vanderbilt is entitled to royalties on the entire product. Section 6.2 is particularly telling, as it clearly notes: "[i]t is the express intent of the parties that regardless of the form of future improvements or derivative works, Vanderbilt shall receive royalties pursuant to Section 9 below on all software products based on or derived from the Materials, pro rata, pursuant to the future mutual agreement of the parties as to the amount of the Materials incorporated into such products." (Doc. No. 311-3 § 6.2). And the Court finds particularly clear that Section 1's definitions clarify that Materials include software, LTC Literacy Units, which includes "software products derived from the Materials or the Software," and "a written description of the key academic concepts and techniques that form the pedagogical basis

24

for the Literacy Units." (Doc. No. 311-3 §§ 1.3–1.7). Pursuant to Section 9, the Court finds that the plain terms are clear as to Scholastic's obligation to "pay . . . royalties based upon the sale or licensing of all products using or based on the Materials." (Doc. No. 311-3 § 9.1). Moreover, Section 9's subparts regarding Net Sales do not limit "all" sales, as the Corporate Defendants contend. (Id.). For all of these reasons, the Court concludes that the License Agreement unambiguously provides for royalties based on the entire product.[8]

Accordingly, the Court concludes that the Corporate Defendants are not entitled to summary judgment as a matter of law on Vanderbilt's contract claims.[9]

C. Trademark Infringement

Vanderbilt also brings trademark infringement claims under the Lanham Act. (See Doc. No. 85 ¶ 41). Specifically, Vanderbilt argues that the Corporate Defendants "sought to benefit from the strength of the Vanderbilt trademarks from the very beginning" of the parties' relationship post-licensure, such as by using its name and logo in product marketing. (See Doc. No. 337 at 44–45). The Corporate Defendants argue that such claims are untimely, and alternatively, fail as a matter of law. The Court will discuss each argument in turn.

1. Timeliness

Because "[t]he Lanham Act does not contain a statute of limitations," courts analyze whether such claims are time-barred through the doctrine of laches. Kehoe Component Sales Inc.

---

[8]     Because the Court finds that the License's plain terms are unambiguous, it need not reach the parties argument pertaining to extrinsic evidence. However, the Court notes that such evidence appears to support the parties' intent that Vanderbilt was entitled to royalties on the entire product. (See Doc. Nos. 344 at 10–11, 362-1 at ¶¶ 10–11).

[9]     The Corporate Defendants also argue that Vanderbilt has not shown sufficient evidence of damages concerning the Other Scholastic Products. (See Doc. No. 304 at 36). Their argument attempts to incorporate a pending Daubert motion. (Doc. No. 288). The Court will reserve these issues, along with pending motions in limine, for trial.

25

v. Best Lighting Prods., 796 F.3d 576, 584 (6th Cir. 2015) (citing Tandy Corp. v. Malone & Hyde, Inc., 769 F.2d 362, 365 (6th Cir. 1985)). "Laches is the negligent and unintentional failure to protect one's rights." Kehoe, 796 F.3d at 584 (citing Nartron Corp. v. STMicroelectronics, Inc., 305 F.3d 397, 408 (6th Cir. 2002)). "For claims under the Lanham Act, the laches period begins to run when the plaintiff has 'actual or constructive knowledge of the alleged infringing activity.'" (Id.). To assert laches, a party typically must establish: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." (Id.). Under the first element, courts have found that for infringement claims, the relevant inquiry is whether the party's delay in challenging the infringement was "inexcusable or unreasonable." Audi AG v. D'Amato, 469 F.3d 534, 545–46 (6th Cir. 2006); see also Kehoe, 796 F.3d at 585–86 (finding "a delay beyond the analogous limitations period" as "presumptively prejudicial and unreasonable") (internal quotation and citation omitted). The analogous statute of limitations in this case is the three-year statute of limitations under Tennessee law for tortious injury to property. See Tenn. Code Ann. § 28-3-105.

Here, the Corporate Defendants argue that Vanderbilt lacked diligence and unreasonably delayed pursuing its Lanham Act claims. (Doc. No. 304 at 22). The Corporate Defendants argue they had "actual or constructive knowledge" of the infringement in several ways. First, they claim, that Vanderbilt and the CTTC investigated, and saw, that Hasselbring's Scholastic author page showed he was "an author not only of READ 180, but of System 44 and FASTT Math, which displayed the VANDERBILT UNIVERSITY mark to display his affiliation." (Doc. No. 304 at 23–24 (citing Doc. Nos. 307, 345 ¶¶ 94–95, 113–114)). The Corporate Defendants also argue that Vanderbilt's unreasonable delay prejudiced them because the potential damages claims accrued as long as Vanderbilt failed to bring a timely suit (Doc. No. 304 at 24 (citing Nartron, 305 F.3d at

411) (finding that a showing of "*any* prejudice is sufficient, including an increase in potential damages or a loss of evidence") (emphasis supplied)). Vanderbilt counters that "[w]hen [it] had actual or constructive knowledge of Defendant's infringing use of the Vanderbilt marks is a question of fact," rendering summary judgment inappropriate. (Doc. No. 337 at 19).

The Court agrees with Vanderbilt. As discussed in Section IV.B.1, *supra*, whether or when Vanderbilt had the requisite knowledge of any infringing use is a question of fact best reserved for a jury. See Allied Waste, 93 F. Supp. 3d at 846. The Court further notes that such factual disputes are nearly identical to those at the heart of other claims discussed in both Hasselbring's and the Corporate Defendants' Motions for Summary Judgment. Accordingly, the Court concludes that the Corporate Defendants are not entitled to summary judgment on Vanderbilt's trademark infringement claim for timeliness reasons.

2. Merits

"The Lanham Act covers trademark infringement and imposes liability on "any person who. . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to affiliation, connection, or association" by using a senior trademark owner's "word, term, name, symbol, or device." 15 U.S.C. § 1125(a)(1)(A); see also Sazerac Brands, LLC v. Peristyle, LLC, 892 F.3d 853, 856–57 (6th Cir. 2018); Johnson v. Jones, 149 F.3d 494, 501 (6th Cir. 1998).

To establish a claim for trademark infringement, a plaintiff must show a "likelihood of confusion." Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1123 (6th Cir. 1996). Courts typically consider eight factors in determining a likelihood of confusion: "(1) the strength of plaintiff's mark (i.e., how well-known and distinctive it is); (2) the relatedness of the services or goods offered by plaintiff and defendant; (3) the similarity between the marks; (4) evidence of actual confusion; (5) marketing channels used by plaintiff and defendant . . . ; (6)

27

likely degree of purchaser care and sophistication; (7) intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines using the marks." Johnson, 149 F.3d at 502-03 (citing Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1006 (6th Cir. 1991)).

Courts within the Sixth Circuit have signaled an unwillingness to decide such trademark issues at the summary judgment stage "because the ultimate issue is so factual." GMC v. Keystone Auto. Indus., 453 F.3d 351, 359 (6th Cir. 2006) (internal citation omitted); see also Innovation Ventures, LLC v. N.V.E., Inc., 694 F.3d 723, 733 (6th Cir. 2012); Dist. Brewing Co. v. CBC Rest. LLC, No. 2:15-cv-3114, 2017 WL 5178768, 2017 U.S. Dist. LEXIS 184487, at *10 (S.D. Ohio Nov. 7, 2017); Schneider v. Saddlery Co. v. Best Shot Pet Prods. Int'l, LLC, No. 1:06-cv-02602, 2009 WL 864072, 2009 U.S. Dist. LEXIS 27227, at *10 (N.D. Ohio Mar. 31, 2009).

Here, the Corporate Defendants argue that: (1) there is no evidence of actual confusion; (2) that all but one of the remaining factors for trademark infringement favor them; (3) that the proffered testimony of Vanderbilt's Trademark Survey expert does not create a genuine issue of material fact; and (4) that Vanderbilt has not established evidence of damages for such infringement. (Doc. No. 304 at 43–48). Vanderbilt counters that its trademark infringement claim involves a question of fact and, even then, the factors establish a likelihood of confusion. (Doc. No. 337 at 43–50).

The Court finds that a weighing of the factors suggests a potential likelihood of confusion and that, therefore, summary judgment is inappropriate. Indeed, Defendants' use of trademarks may have caused confusion because the Corporate Defendants used the exact name and logo of Vanderbilt. (See Doc. Nos. 344, 362-1 ¶ 182). Moreover, both Vanderbilt and the Corporate Defendants offer related products in the special education space. Vanderbilt's Peabody College,

where Hasselbring used to teach and is still affiliated as a Professor Emeritus, is a leading educational institution, especially with respect to special education, the same targeted discipline for which the Read 180 and Other Scholastic Products were designed. (See id. ¶¶ 195–96). And because the parties offer related products, it is reasonable to conclude that such products target the same types of customers. (Id. at ¶¶ 193, 196). Finally, the Court finds there is factual evidence of actual confusion; a comprehensive likelihood of confusion survey concluded that nearly one-third of respondents were confused by the Corporate Defendants' use of Vanderbilt's trademarks. (See Doc. No. 335-1; see also Doc. No. 337 at 46). In sum, the Court's weighing of these factors, coupled with the Sixth Circuit's recent unwillingness to decide such issues at the summary judgment stage, compels the conclusion that the Corporate Defendants are not entitled to summary judgment on Vanderbilt's trademark infringement claim as a matter of law.

Accordingly, the Corporate Defendants' claim for summary judgment on Vanderbilt's breach of contract and trademark infringement claims is not warranted. These two claims will therefore proceed to trial. Vanderbilt's declaratory judgment and tortious interference claims will be dismissed.

## V. VANDERBILT'S MOTION FOR SUMMARY JUDGMENT AS TO SCHOLASTIC'S COUNTERCLAIM

The Court turns now to the final summary judgment motion before it. Scholastic brought a counterclaim against Vanderbilt, the remaining claims of which include: (1) breach of the implied duty of good faith and fair dealing; and (2) unjust enrichment because of Scholastic's alleged overpayment of royalties for Read 180 from 2011-2015 (Doc. No. 305 at 1, 6).[10] The Court will examine each claim in turn.

---

[10]     As an initial matter, the Court notes that the parties agree that New York law applies to this particular counterclaim. (See Doc. No. 178 at 4 n. 3; see also Doc. No. 11 ¶ 17).

A.  Breach of the Implied Duty of Good Faith and Fair Dealing

Vanderbilt begins by arguing that Scholastic's claim for a breach of the implied duty of good faith and fair dealing is barred by the voluntary payment doctrine for two reasons: (1) Scholastic was indisputably a sophisticated entity that made the alleged overpayments; and (2) Scholastic failed to exercise diligence in learning about or addressing the payment error. (Doc. No. 305 at 6–7). Scholastic rebuts that the Court has made clear that Scholastic could pursue both a contractual and quasi contractual claim; however, it may not recover on both claims. (See Doc. No. 327 at 2 (citing Doc. No. 178 at 6)).

Under New York law, "[e]very contract contains an implied covenant of good faith and fair dealing." Farina v. Metro Transp. Auth., 409 F. Supp. 3d 173, 215 (S.D.N.Y. 2019). A party breaches this duty when it "acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement." Id. (citing P.T. & L. Contracting Corp. v. Trataros Constr., Inc., 29 A.D.3d 763, 764 (N.Y. App. Div. 1st Dep't 2006)).

But "[t]he voluntary payment doctrine bars recovery of payments voluntarily made with full knowledge of the facts, in the absence of fraud or mistake of material fact or law." DRMAK Realty LLC v. Progressive Credit Union, 133 A.D.3d 401, 403 (N.Y. App. Div. 2015). Where "a sophisticated party has for years remitted voluntary payments pursuant to an understanding of its legal obligations (and there is no indication that such understanding was fraudulently induced), courts have consistently held that such party's 'lack of diligence in determining what its contractual rights were' precludes recoupment of the voluntarily remitted funds." Id. (citing Gimbel Brothers, Inc. v. Brook Shopping Centers, Inc., 118 A.D.2d 532, 536 (N.Y. App. Div. 2d Dep't 1986)); see also Eighty Eight Bleecker Co., LLC v. 88 Bleecker St. Owners, Inc., 34 A.D.3d

30

244 (N.Y. App. Div. 1st Dep't 2006). Moreover, federal courts applying New York law have found the doctrine applies where a party is "solely responsible for calculating," and voluntarily remitting, license fees owed before claiming overpayments at a later date. Turner Network Sales, Inc. v. Dish Network L.L.C., 413 F. Supp. 329, 337–38 (S.D.N.Y. 2019).

Here, Vanderbilt argues that Scholastic is a sophisticated corporate party that was solely responsible for calculating its royalty payments, in the absence of fraud, and voluntarily remitted such payments for years. (Doc. No. 306 at 9). The License Agreement required Scholastic to "send Vanderbilt a statement showing the number of products subject to this Agreement sold or licensed and the calculation of the amount of revenue pertaining to each such product . . . and the amount of royalties." (Doc. No. 311-3 § 9.2; see also Doc. Nos. 306, 327 ¶ 1 at § 9.2). Moreover, Vanderbilt argues that the voluntary payment doctrine also bars recovery where a party is ignorant "of its contractual rights and obligations result[ing] from a lack of diligence." (Doc. No. 306 at 10 (citing United States ex rel. Feldman v. City of New York, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011) (internal citations and quotations omitted))). Vanderbilt argues that Scholastic devoted significant time and resources to calculating the royalty rate and had years "to realize that these alleged overpayments occurred and discontinue the payments." (Doc. No. 306 at 11 (citing Doc. No. 306 ¶¶ 7, 15–16)).

Scholastic counters that the voluntary payment doctrine is not the state of the law; rather, courts have found that the doctrine does not apply where a party makes payments under a mistake of fact or law. See Spagnola v. Chubb Corp., 574 F.3d 64, 72 (2d Cir. 2009). But the Court notes that Scholastic's reliance on this case is misplaced, as the Second Circuit rejected the doctrine specifically at the Motion to Dismiss stage because it was too early for the Court to rule. See id. at 73–74. There, the court specifically reserved judgment on whether the voluntary payment doctrine

might apply at the summary judgment stage. Id.; see also Lavin v. Town of E. Greenbush, 17 Misc. 3d 766, 843 N.Y.S.2d 484, 491–92 (Sup. Ct. 2007) (finding the voluntary payment doctrine applicable at the summary judgment stage).

Despite Scholastic's misplaced reliance on Spagnola, however, the Court finds that there is nonetheless a genuine dispute of material fact as to whether Scholastic made the alleged overpayments under a mistake of fact at all. (Doc. No. 327 at 2). Scholastic points to the deposition testimonies of Beth Polcari and Marcello Kim to argue a fact issue as to whether Scholastic made a mistake of fact by inadvertently including IBSNs in the royalty calculations for Read 180 (Doc. No. 327 at 7 (citing Doc. No. 306 ¶ 10)). Although the Court is not convinced by Scholastic's secondary argument that it is not attempting to change the methodology of its calculation royalties so much as it is arguing a mistake of fact, the Court must take the facts in the light most favorable to Scholastic as the non-moving party.[11] See Matsushita Elec. Indus. Co.,475 U.S. at 587.

Accordingly, the Court finds that Vanderbilt is not entitled to summary judgment on Scholastic's Implied Breach of the Duty of Good Faith and Fair Dealing counterclaim.

## B. Unjust Enrichment

Last, Vanderbilt argues the Court should grant summary judgment in its favor on Scholastic's unjust enrichment claim for two primary reasons: (1) an enforceable contract governs the parties' obligations; and (2) both the voluntary payment doctrine and Vanderbilt's changed position in reliance on Scholastic's royalty statements warrant summary judgment. (Doc. No. 305

---

[11] Nor is the Court persuaded by Vanderbilt's timeliness argument on this claim. Although there is a six-year statute of limitations for the implied duty of good faith and fair dealing, see Deutsche Bank Nat'l Trust Co. v. Flagstar Capital Mkts. Corp., 143 A.D.3d 15, 36 (N.Y. App. Div. 1st Dep't 2016), the Court finds that there is sufficient record evidence that Scholastic's claims for overpayment of royalties occurred within that time frame. (See Doc. No. 306 ¶¶ 26–33).

32

at 7).[12] The Court need not advance past Vanderbilt's first argument.

As the Court noted earlier in the litigation, "[u]njust enrichment is a quasi-contractual theory that imposes a contractual obligation where one does not exist." Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154–55 (Tenn. 1966); (see also Doc. No. 178). An unjust enrichment claim arises when: (1) there is no contract between the parties, or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. Id. at 154–55; see also Cry-Leike, Inc. v. Carver, 415 S.W.3d 808, 824 (Tenn. 2011). "The remedy for unjust enrichment requires that the person who has been unjustly enriched at the expense of another make restitution to that person." Chase Manhattan Bank, N.A. v. CVE, Inc., 206 F. Supp. 2d 900, 909 (M.D. Tenn. 2002).

However, because unjust enrichment requires the absence of a valid contract, "[i]t is true that recovery may not be had under both a breach of contract and an unjust enrichment theory[.]" Town of Smyrna, Tenn. v. Mun. Gas Auth. Of Ga., No. 3:11-0642, 2012 WL 1313340, at *13 (M.D. Tenn. Apr. 17, 2012) (emphasis added). Here, Vanderbilt argues that because Scholastic admits that the License Agreement is a valid, enforceable contract, the Court must grant summary judgment as to an unjust enrichment claim. (Doc. No. 305 at 12–13). Scholastic admits the existence of a valid agreement, (Doc. No. 116 at 14), but nonetheless argues that the Court allowed its alternative theories of relief to proceed earlier in the litigation. (See Doc. No. 327 at 2). Although it is true a party may plead unjust enrichment as an alternate theory of relief at the Motion to Dismiss stage, "at the summary judgment stage, a court forecloses [that opportunity] if . . . it finds that there in fact *was* a valid contract." PSC Indus. v. Johnson, No. 3:19-cv-00362, 2021 WL

---

[12] The Court has already found that Tennessee law governs this particular counterclaim. (See Doc. No. 178 at 6 n. 4).

1663574, 2021 U.S. Dist. LEXIS 81350, at *51 n. 36 (M.D. Tenn. Apr. 28, 2021) (emphasis supplied). Because Scholastic admits the existence of a valid contract, its unjust enrichment counterclaim cannot proceed. (See Doc. No. 116 at 14).

Accordingly, the Court finds that Vanderbilt is entitled to summary judgment on Scholastic's unjust enrichment counterclaim.

## VI. CONCLUSION

For the foregoing reasons, Hasselbring's Motion for Summary Judgment, (Doc. No. 295), will be denied; the Corporate Defendants Motion for Summary Judgment, (Doc. No. 296), will be granted in part and denied in part; and Vanderbilt's Motion for Summary Judgment, (Doc. No. 303), will be granted in part and denied in part. The Court will dismiss Vanderbilt's claim for Declaratory Judgment (Count 2), Vanderbilt's claim for Tortious Interference (Count 7), and Scholastic's Counterclaim for Unjust Enrichment. The remaining claims will proceed to trial. The parties shall return to mediation within thirty (30) days, as set forth in the corresponding order. Given the availability of the COVID-19 vaccine, the Court strongly encourages the parties to attend mediation in person.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE